IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,

                                        Criminal Action
                Plaintiff,              No. 1:21-cr-0213

        vs.                             Washington, DC
                                        July 19, 2023
CHAD BARRETT JONES,

                                        2:14 p.m.
                Defendant.
_____/


              TRANSCRIPT OF BENCH TRIAL - DAY THREE
            BEFORE THE HONORABLE RICHARD J. LEON
                 UNITED STATES DISTRICT JUDGE


**APPEARANCES**:

For the Government:      SONIA WILLIAMS MURPHY
                            DOJ-CIV
                            1100 L Street, NW
                            Washington, DC 20530

                         **ADAM DREHER**
                            USAO-DC
                            601 D Street, NW
                            Washington, DC 20530


For the Defendant:      **WILLIAM BRENNAN**
                        **MICHAEL LAWLOR**
                            Brennan, McKenna & Lawlor
                            6305 Ivy Lane, Suite 700
                            Greenbelt, MD 20770




Court Reporter:          **JEFF HOOK**
                            Official Court Reporter
                            U.S. District & Bankruptcy Courts
                            333 Constitution Avenue, NW
                            Room 4700-C
                            Washington, DC 20001

**I N D E X**

| Witness | Page |
|---|---|

JAVIER GONZALEZ

Continued Cross-Examination by Mr. Brennan ... 336

Redirect Examination by Ms. Murphy ... 353


JOSHUA BLANDFORD

Direct Examination by Mr. Lawlor ... 382

Cross-Examination by Ms. Murphy ... 386

Redirect Examination by Mr. Lawlor ... 392


GARY MUDD

Direct Examination by Mr. Lawlor ... 393

Cross-Examination by Ms. Murphy ... 397

Redirect Examination by Mr. Lawlor ... 401


CHAD JONES

Direct Examination by Mr. Brennan ... 402

Cross-examination by Mr. Dreher ... 463

**E X H I B I T S**

| Exhibit | | Page |
|---|---|---|
| Defense 3 | Admitted into evidence | 412 |
| Defense 4 | Admitted into evidence | 413 |
| Defense 5 | Admitted into evidence | 414 |
| Defense 6 | Admitted into evidence | 416 |
| Defense 7 | Admitted into evidence | 416 |
| Defense 8 | Admitted into evidence | 417 |
| Defense 9 | Admitted into evidence | 417 |
| Defense 10 | Admitted into evidence | 418 |
| Defense 11 | Admitted into evidence | 421 |
| Defense 12 | Admitted into evidence | 422 |
| Defense 13 | Admitted into evidence | 422 |
| Defense 14 | Admitted into evidence | 425 |
| Defense 15 | Admitted into evidence | 425 |
| Defense 16 | Admitted into evidence | 425 |
| Defense 17 | Admitted into evidence | 425 |
| Defense 19 | Admitted into evidence | 429 |
| Defense 20 | Admitted into evidence | 429 |
| Defense 21 | Admitted into evidence | 432 |
| Defense 532A | Admitted into evidence | 358 |
| Defense 804A7 | Admitted into evidence | 352 |
| Defense 804A8 | Admitted into evidence | 352 |
| Defense 804A9 | Admitted into evidence | 352 |
| Defense 804A10 | Admitted into evidence | 352 |

**EXHIBITS CONTINUED**

| Exhibit | | Page |
|---|---|---|
| Defense 804A11 | Admitted into evidence | 352 |
| Defense 804A12 | Admitted into evidence | 352 |
| Defense 804A14 | Admitted into evidence | 352 |
| Defense 804A15 | Admitted into evidence | 352 |
| Defense 804A16 | Admitted into evidence | 352 |
| Defense 804A17 | Admitted into evidence | 352 |

**P R O C E E D I N G S**

**DEPUTY CLERK:** This is criminal case 21-213, United States of America v. Chad Barrett Jones. Starting with the government, please approach the podium and state your appearance for the record.

**MS. MURPHY:** Good afternoon, Your Honor. Sonia Murphy, again, on behalf of the United States. With me again at counsel's table is my co-counsel, Adam Dreher, our paralegal Tamica Meadows, and Special Agent Jordan Jenkins.

**THE COURT:** Welcome back, everyone.

**MR. BRENNAN:** Good afternoon, Your Honor. William Brennan on behalf of the defendant, Chad Jones, who's seated at counsel table. Also, my law partner Michael Lawlor and our intern Mr. Matt Bayline.

**THE COURT:** Welcome back, everyone. The witness can come back to his seat. I'll remind you that you remain under oath, sir.

**THE WITNESS:** Yes, sir.

**THE COURT:** Very good. You may continue, Mr. Brennan, when you're ready.

CONTINUED CROSS-EXAMINATION OF JAVIER GONZALEZ

BY MR. BRENNAN:

**Q.** Good afternoon, again, Special Agent Gonzalez.

**A.** Good afternoon, sir.

**Q.** Now, if madam clerk would switch over, please, to

this.  So I think yesterday you identified the video and audiotape from my client's interview at the FBI office in Louisville, Kentucky on January 16th, I believe, 2021.  Do you remember that?

A.  Yes, sir.

Q.  So I'm going to ask you, do you remember when you -- and you've had occasion to review that, is that correct, as part of your investigation?

A.  Correct.

Q.  And do you recall my client telling -- first being instructed by his own lawyer, Mr. Miller, to make a full and complete statement to the government, do you remember that?

A.  Again, sir, if you want me to talk about the portions of the video, I'd have to -- I don't want to go off memory.  I'm sure what you're saying is correct, but to say that I remember it, I can't say that.

Q.  I'm going to ask to play the sequence beginning at 4 minutes and 53 seconds, please.

THE COURT:  What exhibit number?

MR. BRENNAN:  Your Honor, I think this is the -- we've marked I guess the entire video, two hours.  I asked the Court to receive it, the Court's held that ruling in abeyance.  So what I'm -- subject to whether or not the Court wants to hear the whole thing, I've selected about 13 clips.  Some are just a few seconds long that I intend to

offer for completeness, Your Honor.  So it will take about hopefully not longer than 15 minutes.

**THE COURT:**  Okay.  What number is it?

**MR. BRENNAN:**  So the government number of this exhibit is?

**MS. MURPHY:**  804A, ours are 1 through 5.  My understanding is that 804A6 would be the minute and two seconds or so you showed yesterday.

**MR. BRENNAN:**  Uh-huh.

**MS. MURPHY:**  Your Honor, we would renew our objection to the entire interview.  I'd ask if there's a proffer as to what these 13 clips are responsive to that we showed that is consistent with the rule on completeness under Federal Rule of Evidence 106, then we can take them up in that course.  But overall, offering the entire video on behalf of the defense would be hearsay.

So I just want to understand, if you're using the rule of completeness, we considered fairness when we offered the interview.  We offered questions and answers.  So I just want to make sure that what's being offered, if it's subject to the rule of completeness and fairness, that it's necessary.

**MR. BRENNAN:**  I've selected 13 clips, Your Honor, which I think -- which probably are no more than 13 to 14 minutes out of a two-hour interview that I think gives a

fair depiction of what occurred in Louisville when my client was interviewed by the FBI. Under Rule 11, I think it comes in under completeness, Your Honor.

THE COURT: So that would be 804A7 through 20?

MR. BRENNAN: That's correct, Your Honor.

THE COURT: Well, make sure it's clear when you're using it for record purposes which clip this is. If it totals 14 minutes, 15 minutes, that's fine.

MR. BRENNAN: Okay. So madam clerk, we did 804A6, which was the first clip. This would be the second clip, which would be 7. I should keep track of this.

THE COURT: 804A7. And you say this is how long, sir, roughly?

MR. BRENNAN: This is only a few seconds, this one. And it would be, Mr. Bayline, at approximately 4:53.

THE COURT: All right, go ahead.

(Video played)

BY MR. BRENNAN:

Q. So does that refresh your recollection that my client's lawyer instructed him to make a full statement, don't leave anything out, correct?

A. Correct, yes, sir.

Q. And then my client advised the FBI that he had been to an earlier rally on November 14 in the District of Columbia, do you remember that?

**A.**   I do remember that.

**Q.**   Okay.  And so he told them a number of times that he'd come up for a Trump rally in the District of Columbia on November 14, marched from Freedom Plaza down to the Supreme Court, and that no violence occurred during that rally and that march; is that correct, sir?

**A.**   I only remember that he had attended one additional rally.  I don't remember all those specifics.

**Q.**   Okay.  So I guess we're now at clip number seven, Your Honor, which would be --

**THE COURT:**  No, the one we just did was seven.

**MR. BRENNAN:**  I'm sorry?

**THE COURT:**  The one we had just did --

**MR. BRENNAN:**  Sorry.

**THE COURT:**  -- was seven.  This one will be eight.

**MR. BRENNAN:**  Eight, that's correct.  5:54, Mr. Bayline, please.

(Video played)

**THE COURT:**  Can we turn the volume up on this?

(Video played)

**THE COURT:**  It's awfully hard to hear it.

(Discussion off the record)

**MR. BRENNAN:**  All right.  Let's give this a whirl, see if Your Honor can hear this a little easier.

(Video played)

MR. BRENNAN: I've got the volume on my laptop turned up, I think the Court system is turned up to the highest, Your Honor.

THE COURT: Can the government's computer work better? See what happens. I think that was at 5:54. That's better.

(Video played)

BY MR. BRENNAN:

Q. That's all for that clip. You heard him say he got a hotel room in Gaithersburg back in November for that rally, correct?

A. Correct.

Q. Okay. And 7:38, please -- and this would be now nine, Your Honor.

THE COURT: Right.

MS. MURPHY: Is there a question pending?

BY MR. BRENNAN:

Q. Yeah. So this is, again, verifying that he went to the rally in November. Does that refresh your recollection that he went to the rally in November, sir?

A. Yes, I already said that he did say that.

Q. And he also told you that he is such a creature of habit, that when he went back up on January 6th of 2021, he parked at the exact same parking lot that he had parked at when he was there in November. Do you remember that, sir?

**A.** Again, sir, I don't want to go off my memory when I'm giving testimony, I would rather see it.

**Q.** This would be then I guess --

**THE COURT:** First of all, you have to answer the question. If the answer is that you don't remember, you don't remember. If the answer is you do remember, you need to tell him what the answer is.

**THE WITNESS:** I don't remember all of what he said, sir.

**THE COURT:** Then he doesn't remember.

**MR. BRENNAN:** This would be the next clip, Your Honor, this would be at 11:48.

**THE COURT:** That will be number 10.

(Video played)

**BY MR. BRENNAN:**

**Q.** Thank you. That's all. Does that refresh your recollection that my client told the agents he went to the exact same parking spot that he had used on November 14, he used it again on January 6th?

**A.** Yes, because it was convenient to get in and out of.

**Q.** I'm sorry?

**A.** Because it was convenient to get in and out of.

**Q.** Yes, okay. And do you recall when you reviewed the video, that my client told the FBI on more than one

occasion -- as a matter of fact, on perhaps three or four occasions, that on January 6th, he was there just observing? Do you remember him saying that multiple times to the FBI during that interview?

A.   I'm sure he said it at least once, but I don't --

Q.   My question is:  Do you remember my client told the FBI during the interview in Louisville that when he attended the rally on January 6th, he did so just to be observing; do you remember or not?

A.   No.

MR. BRENNAN:  So then the next clip would be the next number, Your Honor, and it would be at 15:54, thereabouts.

THE COURT:  That will be A11.

(Video played)

MR. BRENNAN:  You can stop.  I think you may have to start maybe at 15:52, if you don't mind.

(Video played)

MR. BRENNAN:  This was played yesterday.

THE COURT:  Stop.  What's the point?

MR. BRENNAN:  This was played yesterday, if you want to hear it again.  But the description of the flag was played yesterday, Your Honor, so I don't want to be redundant.

THE COURT:  But have you got what you need from

this clip?

MR. BRENNAN: Yes, yes, that he was walking around observing, Your Honor.

THE COURT: Okay.

BY MR. BRENNAN:

Q. Do you remember when my client described for the FBI in the interview in Louisville that when he saw himself on the videotapes that was played of the events of January 6th, that he told the FBI that he saw-saw himself, but it was not himself? Do you remember when he said that to the FBI?

A. Those words sound familiar. I don't know that those were the words he used, but he may have said something to that effect. But I'm not -- I don't remember the exact wording.

MR. BRENNAN: The next clip would then be at -- the next number, Your Honor, would be at 30 minutes and 50 seconds, or thereabouts.

THE COURT: It's 804A12, Defendant's Exhibit.

(Video played)

BY MR. BRENNAN:

Q. Does that refresh your recollection that he told the FBI that he could see himself physically there, but that was not him mentally? Does that refresh your recollection that that's what he told the FBI?

**A.** That's what he told the FBI, but I don't know if he's talking about seeing himself in the video, seeing himself in his head. I'm not -- the video is -- doesn't provide the context for what he's saying.

**Q.** Do you remember that when he described the events at the Speaker's Lobby when the window was being broken, do you remember that he told the FBI that his brain just snapped and he started hitting the window?

**A.** Again, sir, I don't know if he used the word "snapped." I remember him describing the incident when he was striking the window with his flag, but I don't know what were the exact words he used.

**Q.** So you remember him describing his hitting the window, but you don't remember him describing his mental state; is that your testimony?

**A.** I don't remember the exact words he used, sir.

**Q.** Would you play 48, maybe 34 or so.

(Video played)

**Q.** Now, does that refresh your recollection? I used the wrong word, "snapped." His brain just tripped and he admitted to hitting the window?

**A.** Yes, sir.

**Q.** Do you remember that he told the FBI, with respect to his activity in the Capitol on January 6th, 2021, that he had no intent to harm anyone? Do you remember when he said

that to the FBI?

**A.** Yes, sir.

**Q.** So you agree that he did, in fact, tell the FBI he had no intent to harm anyone, correct?

**A.** Yes, sir.

**MR. BRENNAN:** Since we don't need to play that clip since the agent remembers that, Your Honor -- or I can play it if you want to hear it?

**THE COURT:** I think you should play it.

**MR. BRENNAN:** Okay, 57:39, please.

**THE COURT:** That will be A14, 84A14.

(Video played)

**MR. BRENNAN:** That's it for that clip, Your Honor. Do you need to hear it again? I don't know if you heard the first part of it or not, Your Honor.

**THE COURT:** I think I heard the first part.

**MR. BRENNAN:** You did or did not?

**THE COURT:** I did.

BY MR. BRENNAN:

**Q.** Thank you. Do you remember that when my client told the FBI in Louisville that when he came out of the Capitol, that his thoughts were that he was sad, he was in disbelief, walked to his truck and went back to the hotel? Do you remember him telling the FBI that, that once he exited the Capitol about -- after being in there for like 24

minutes, he felt sad and in disbelief?

**A.** I don't remember those words.

**Q.** You don't remember that?

**A.** No.

**Q.** One hour, eight minutes and 40 seconds, please.

**THE COURT:** This will be 804A15.

BY MR. BRENNAN:

**Q.** That's correct, Your Honor. Thank you.

(Video played)

**Q.** That's all from that clip. Two more. Do you remember him telling the FBI that he was a loner; that my client, when he was interviewed by the FBI on January 16th, he told them he was a loner?

**A.** I remember the word "loner," but right now, I don't remember if it was him who said it or someone else.

**Q.** This will be the next one at one hour, 29 minutes and 40 seconds.

**THE COURT:** This will be 804A16.

(Video played)

BY MR. BRENNAN:

**Q.** That's it. Does that refresh your recollection he told the FBI he was a loner, by himself?

**A.** Yes, sir.

**THE COURT:** I think we need to hear that in context. What preceded that? Did he just make that comment

out of the blue?

**MR. BRENNAN:** Well, yeah, I mean, that's part of the reason -- well --

**THE COURT:** Why don't you play a few seconds before that.

**MR. BRENNAN:** Sure, that's fine. It begins at 1:29:40, so you can play a few seconds before that, that's fine.

(Video played)

**THE COURT:** He's responding to a question, and I couldn't hear the question the agent's asking him. Let's try it again. The agent's asking him a question apparently.

(Video played)

**MR. BRENNAN:** So the context was, Your Honor, he said describe some people, and he believed the Chinese Communist Party or somebody was handing out fliers. He didn't take them, he just walked by himself. That's when he said -- that's the context when he said, "I'm a loner." He didn't even take the flyers.

**Q.** Okay, the last one. Do you remember when the U.S. Attorney who was present asked my client point blank on January 16 what was the plan? Do you remember that, the federal prosecutor asked my client that?

**A.** I remember her asking him something, I'm not sure if that was the question she asked.

**Q.** And do you remember him responding that there was no plan, that his brain just went, that he had no intent? Do you remember his response to the U.S. Attorney's question?

**A.** No, I don't, sir. I know there was a question by her and an answer.

**MR. BRENNAN:** It's the last clip, Your Honor, and it's at one hour and 56 minutes.

**THE COURT:** That will be 804A17.

(Video played)

**MR. BRENNAN:** That's it, Your Honor. I have no further questions of this witness, Your Honor.

**THE COURT:** Let me ask you a question. The person who asked him that question about --

**MR. BRENNAN:** I misspoke, that was an FBI agent, not the U.S. Attorney, Your Honor. My mistake.

**THE COURT:** There were two FBI agents in the room.

**MR. BRENNAN:** I think it was the black man, Your Honor.

**THE COURT:** Mr. Jared?

**MR. BRENNAN:** I believe so.

**THE WITNESS:** Jared is the white one. Jared is a white agent.

**MR. BRENNAN:** Then it was the other agent?

**THE WITNESS:** Alfred Burney.

THE COURT: Alfred Burney?

MR. BRENNAN: Alfred Burney.

THE COURT: The question was by Alfred Burney?

MR. BRENNAN: That's correct.

THE COURT: One of the FBI agents.

MR. BRENNAN: And the question was what was the plan, and my client responded to that, Your Honor, yes.

MS. MURPHY: Your Honor, as a point of clarification with respect to the clipped video portions, my understanding is they're not being offered as exhibits, but they were being used to refresh the witness' recollection?

THE COURT: I think it was both.

MR. BRENNAN: Yes.

THE COURT: I think he was offering them as part of the evidence, and I think he was also offering it to refresh the recollection of the agent.

MS. MURPHY: But they are out-of-court statements being offered for the truth of the matter asserted with respect to the defendant's statements. The representation was that they were being offered for completeness, and now they're actually being offered to refresh his recollection.

THE COURT: I thought he was offering them for both purposes.

MS. MURPHY: So has Your Honor made a ruling as to whether they will be admitted into evidence?

THE COURT: No, I haven't yet. If you want to object to them, of course.

MS. MURPHY: I do.

THE COURT: Do you have any redirect?

MS. MURPHY: I do, brief redirect, Your Honor.

MR. BRENNAN: I would offer them as -- I would offer them into evidence, Your Honor. The Court's heard them, the Court should receive them and the Court should consider them. So I would offer them and ask that they be received.

THE COURT: As statements of the defendant?

MR. BRENNAN: I'm sorry?

THE COURT: As statements of the defendant?

MR. BRENNAN: No, as statements of the defendant for completeness, to put the two-hour interview into context. I think it was important that the Court hear what his intent was that day. The Court -- the government brought out in their case-in-chief certain actions that he did. They ignored his intent. It was a two-hour interview. We've only selected about -- those selected clips, I think they offer completeness and context for what occurred that day in Louisville, Your Honor. I would offer them for that reason.

THE COURT: Why do you disagree with that?

MS. MURPHY: Your Honor, the defendant is here, so

the defendant will have, if he wishes to, an opportunity to testify as to his intent. They were being offered for the truth of the matter asserted which is hearsay. We were offering them as a party opponent. The rule of completeness is not designed as an end-run around hearsay.

**THE COURT:** But the government already offered these statements in different forms, different segments of the interview.

**MS. MURPHY:** We did, Your Honor. So in considering the rule of completeness, in fairness, we offered the question and answer so it would be clear what she was saying. But as a party opponent, we were able to do that and not have it be hearsay. He's offering it for the truth of the matter asserted, and the defendant is here and can testify.

**THE COURT:** I think your colleague wants you to look at something.

**MS. MURPHY:** I've said what my colleague has suggested. The rule of completeness is not an end-run around the hearsay rule, Your Honor.

**THE COURT:** I understand. I'm going to admit it. I'm going to admit it.

(Defense Exhibits 804A7, 804A8, 804A9, 804A10, 804A11, 804A12, 804A14, 804A15, 804A16 & 804A17 admitted into evidence)

THE COURT: Do you have some redirect?

MS. MURPHY: Briefly, Your Honor.

**REDIRECT EXAMINATION OF JAVIER GONZALEZ**

BY MS. MURPHY:

Q. Good afternoon, Special Agent Gonzalez.

A. Good afternoon.

Q. You were asked yesterday about the search warrants that were issued in this case. Do you remember that?

A. I do.

Q. I think you talked first with Mr. Brennan about the search warrant that was issued to Apple for the contents of the defendant's phone?

A. For the iCloud?

Q. Yes. And I think yesterday when you testified, you were asked about the scope of time or the time period that the search warrant went back as far as the data you can collect?

A. Yes, I don't remember the time period covered, but it was a time period we thought was reasonable, and that obviously, the judge agreed.

Q. Right. Would looking at the warrants refresh your recollection as to the time period?

A. It would.

MS. MURPHY: Permission to approach, Your Honor?

THE COURT: You may.

**BY MS. MURPHY:**

Q. Special Agent Gonzalez, I've just handed you the search warrant for Apple associated with the defendant's iCloud. Would you mind looking at attachment B and informing the Court of the time period that was covered by the data collected from Mr. Jones' iCloud?

A. So attachment B, it's particular things to be seized and procedures to facilitate execution of the warrant. In 1C, and again in 1D and again in 1E, the time period listed is December 17th, 2020 through January 17th, 2021.

Q. Can you speak up a little bit, Special Agent Gonzalez, so the Court is able to hear you?

THE COURT: What's the exhibit number?

THE WITNESS: In section one --

BY MS. MURPHY:

Q. I'm sorry, one second.

A. Sure.

MS. MURPHY: It is not one of our exhibits, I was using it to refresh his recollection. We can add it.

THE COURT: Mark it for identification.

MS. MURPHY: Yep. We'll mark it as 805 -- no, what number is available in the 800 series? We're only going to mark the first page of the attachment B, Your Honor, given that as you know, the search warrant was under

seal.

THE WITNESS: The dates are on page two.

BY MS. MURPHY:

Q. Okay. We'll mark it as 815, Your Honor, for identification purposes only, and we'll just mark attachment B, page two. And I'd ask the witness if the document has refreshed your recollection, to share the time period for which data was collected from the defendant's iCloud?

A. So the time period requested was December 17th, 2020 through January 17th, 2021.

Q. Thank you. And likewise, you were asked for -- you were asked information about a search warrant issued to Facebook. Do you remember that?

A. Yes.

Q. And I think, likewise, you couldn't recall the time period for the Facebook data you received related to the defendant's account?

A. Correct.

Q. Would looking at that search warrant refresh your recollection as to that time period?

A. Yes, it would.

MS. MURPHY: May I approach, Your Honor?

Your Honor, we'll mark this one as 806 for identification purposes only, and only attachment B, once again, page two -- page one, I'm sorry. So attachment B,

page one, this time for the Facebook search warrant.

**Q.** Again, I'd ask the witness: Did that help you refresh your recollection as to the time period for the data you received from the defendant's Facebook account?

**A.** Yes.

**Q.** What was that time period?

**A.** The same, December 17th, 2020 through January 17th, 2021.

**MS. MURPHY:** Thank you. I have no further questions for the witness, Your Honor.

**THE COURT:** Very good. Recross?

**MR. BRENNAN:** Your Honor, yesterday I asked the witness about Defendant's Exhibit 2, which was one page of a call log about a Jason Goddard call. Madam Clerk reminded me that I had it marked it for identification, but had not offered it, Your Honor. At this time I would offer it. It's one page out of a call log that the government I think has already put in as their exhibit. I think it's in the -- the entire call log is in evidence at Exhibit 523. We had one page of that marked, Your Honor, as our Exhibit No. 2, and I would offer that at this time, Your Honor.

**THE COURT:** That's Government's Exhibit 523 has been admitted?

**MR. BRENNAN:** I think it's --

**MS. MURPHY:** I don't think it has.

THE COURT: Hold on, let me check my notes.

MR. BRENNAN: They don't have an objection to No. 2, Your Honor, which is the call log.

THE COURT: Hold on. And you want to mark one page out of an already admitted exhibit?

MR. BRENNAN: We don't think -- I thought it was admitted, it may not have been admitted, the call log. So I just want to then make sure that that one page is admitted as Defense Exhibit 2.

THE COURT: 523 is described in this list as Jones iPhone call list between January 5th, '21 and January 7th, '21. That's the document you're referring to?

MR. BRENNAN: Right, and I've offered page two -- I think it's page --

MS. MURPHY: I don't think it was admitted yesterday, Your Honor.

THE COURT: I don't think so either based on my notes, such as they are. Which witness, if they had been admitted?

MS. MURPHY: If they had been admitted, they would have been admitted through Special Agent Gonzalez, and we did not look at the call logs yesterday.

MR. BRENNAN: He identified it yesterday when I was cross-examining him, so I just want that one page in, Your Honor.

THE COURT: What's the relevance?

MR. BRENNAN: The relevance is it demonstrates a call of, I believe, 24 minutes to a person named Jason Goddard. And counsel's made reference to the -- an earlier text message involving Jason Goddard at a couple of the pretrials and in opening statement. And in order to complete the circle on that, in addition to the text message that was sent to Jason Goddard, my client had made a 24-minute phone call to Jason Goddard after the text message. That's the importance and the context of it, Your Honor.

THE COURT: According to my notes, it's not been admitted. I'll admit it, I'll admit the whole exhibit, and mark the exhibit as -- and mark it as Defendant's Exhibit 523A, which will be page two.

(Defense Exhibit 532A admitted into evidence)

MR. BRENNAN: Thank you, Your Honor.

THE COURT: Otherwise, the whole exhibit will come in. You're excused.

THE WITNESS: Thank you.

THE COURT: Does the government have anymore witnesses?

MR. DREHER: No, Your Honor. At this time, the government rests.

THE COURT: Mr. Brennan?

MR. BRENNAN: I'm sorry, Your Honor?

THE COURT: The government's rested.

MR. BRENNAN: I think Mr. Lawlor will now address the Court, Your Honor.

THE COURT: Mr. Lawlor will, okay.

MR. LAWLOR: Your Honor, at this time, under Federal Rule of Criminal Procedure 29, the defendant moves for a judgment of acquittal as to each count in the indictment of which there are nine. Unless the Court would like otherwise, I just intended to take them in order, Your Honor.

THE COURT: Go right ahead.

MR. LAWLOR: Thank you, Your Honor. The first charge, Your Honor, is that the defendant -- excuse me while I grab the indictment. The first count charges civil disorder, Your Honor. In order to find the defendant guilty of civil disorder under 18 U.S.C. § 231(a)(3), the Court must find the following, Your Honor. Number one, the defendant committed, or attempted to commit, an act with the intended purpose of obstructing, impeding or --

THE COURT: I know the elements.

MR. LAWLOR: Okay, forgive me.

THE COURT: I have the elements here. What's your argument?

MR. LAWLOR: Our argument, Your Honor, is that

Mr. Jones at no time obstructed, impeded law enforcement officers. As the Court saw, he entered the Capitol with a law enforcement officer standing right there who sort of waved him through. He engaged with another officer during his 15 or 20 minutes of travel throughout the Capitol. And I assume the government is going to cite to the conduct at the Speaker's Lobby when he took a flagpole and banged it into a window, Your Honor. Our submission is even at that period of time, there's no evidence here that his conduct, Mr. Jones' conduct, in any way impeded those officers.

Now, there obviously were other goings on, including the shooting of Ms. Babbitt there, that caused the officers to move in certain directions, and perhaps the conduct of other people there.

**THE COURT:** But you know the standard.

**MR. LAWLOR:** I do.

**THE COURT:** Drawing all inferences favorable to the government.

**MR. LAWLOR:** All inferences in the light most favorable to the government, I understand. But we still submit, Your Honor, that the government has offered no evidence to show that he impeded the law enforcement officers.

Two, Your Honor, is destruction of government property. The only argument here, Your Honor, I will

submit, is that he did not destroy any government property. When the Court looks at that video, by the time Mr. Jones assaulted that window with the dowel that he had used to make a flagpole, that window was already broken, Your Honor. So we submit there that even in the light most favorable to the government, that he did not destroy any government property.

The third issue, Your Honor, is obstruction of an official proceeding. Here, Your Honor, I do want to preserve for appellate review the argument that this was not an official proceeding. I believe that issue was ruled on by the D.C. Circuit and is now pending cert. So we do submit, Your Honor, that while I think the D.C. Circuit has ruled that this was an official proceeding, we do want to preserve that issue for appeal.

Here, Your Honor, we submit that in no way did the defendant's conduct, though, obstruct Congress' official proceeding of that day; that he intended to obstruct or impede that proceeding; that he acted knowingly with awareness that the natural and probable effect of his conduct would obstruct or impede that official proceeding. And finally, Your Honor, we dispute that the government has proved that the defendant acted knowingly.

Again, Your Honor, the conduct of the defendant, which was shown through a series of videos, shows him

entering the Capitol on January 6th, walking about, as I said for -- I don't know the exact number, but around 20 minutes, and engaging, again, a window at the Speaker's Lobby. Congress, through the testimony of the government, had already been suspended. Vice President Pence had already left the Capitol that day. So we submit that Mr. Jones' conduct in no manner obstructed or impeded the official proceeding.

And obviously the testimony here, the only testimony, Your Honor, as to the defendant's intent was that he wanted his voice heard. He has no demonstration of planning, Your Honor, that he came here to the Capitol to interfere with Congress' mandate that day; that he brought anything; that he came in a group; that he said anything; that he wore anything. There's nothing to indicate that he had sort of planned to do anything vis-a-vis congressional activity that day.

He enters the building after Congress suspended its session. And as he said, he went in there for one reason, and one reason only, which was to have his voice heard. Which, again, for that same reason, Your Honor, we dispute that the government, even with the evidence being viewed in the light most favorable to them, has shown that the defendant acted knowingly with any awareness that his conduct would obstruct or impede the official proceeding of

Congress that day.

And finally, Your Honor, we dispute that the government has proved that the defendant acted corruptly, meaning that he acted with consciousness of his wrongdoing, and understanding that what the person is doing is wrong. Certainly this isn't just whether or not if the government believes that Mr. Jones trespassed in the Capitol that day, that's not this charge. They believe that his, his conduct that day was designed, and that he was aware and intended to stop the conduct and the mandate of Congress on January 6th. There's no evidence of that in this record, Your Honor. Again, his stated intent was to have his voice heard, and there's nothing about what he planned to do, what he said or said he did or said what his intent was or his conduct that day in any way demonstrates that he acted corruptly.

The fourth count, Your Honor, is that Mr. Jones entered and remained in a restricted building with a dangerous or deadly weapon. I will submit, Your Honor, on the misdemeanor charge. But as to whether or not Mr. Jones acted with a dangerous or deadly weapon, again, we dispute that the government has submitted sufficient evidence to demonstrate that the flagpole that Mr. Jones possessed that day satisfies the definition of a dangerous or deadly weapon.

In its trial brief, Your Honor, the government

cited to the Arrington case in defining what is a dangerous or deadly weapon, which is at page 18 and 19 of their trial brief. That is dangerous and deadly weapon is defined, Your Honor, as something that is not inherently deadly, i.e., a gun. So if it is not inherently deadly, it must -- the object must be capable of causing serious bodily injury or death to another person, and the defendant used it in that manner. Again, Your Honor, that's the government's brief at pages 18 and 19 citing to U.S. vs. Arrington, 309 F.3d 40, 45, D.C. Circuit 2002. Obviously, Your Honor, the defendant -- excuse me, Mr. Jones did not use the flagpole in that manner, Your Honor. He didn't strike at anybody, wave the flag at anybody or the flagpole at anybody. His only conduct that day was that he, again, banged the pole into a window several times.

Also, Your Honor, there's no proof that that flagpole was capable of causing serious bodily injury, which has been defined as involving extreme physical pain or the protracted impairment of a function of a bodily member, organ or mental faculty, or requiring medical intervention such as surgery, hospitalization or physical rehabilitation. I believe the only record evidence here, Your Honor, is Mr. Jones' depiction of the flagpole which he said was like a closet dowel.

So number one, it was not used in any manner that

would cause serious physical injury or death.  And I submit, Your Honor, that even had Mr. Jones struck somebody with a dowel, that that is not capable of causing serious bodily injury as that has been defined by the D.C. Circuit.  I mean, to that end, Your Honor, even banging over and over again at the window, he couldn't even break the window.  So I'm not sure how the government can suggest that he could kill somebody with that device that wasn't even capable of taking out a window in the U.S. Capitol, Your Honor.

The fifth count, Your Honor, is that the defendant was disorderly -- disorderly and disruptive conduct in a restricted building, again, with a deadly or dangerous weapon.  Your Honor, the third element of this is that Mr. Jones' conduct was, in fact, impeding or disrupting. Again, Your Honor, this is not true.  Congress had already been suspended.  Mr. Pence had already left the building. So there is no evidence that the government has satisfied its burden as to the third element.  Again, Your Honor, aside from the misdemeanor count, the same argument we would adopt on count five regarding the dangerous and deadly weapon.

In terms of the sixth count, Your Honor, engaging in physical violence in a restricted building, we'll submit on the misdemeanor and adopt the same argument regarding the dangerous and deadly weapon pertaining to the felony.

**THE COURT:** So you're submitting on all three, four, five and six --

**MR. LAWLOR:** On the misdemeanor.

**THE COURT:** -- on the misdemeanor?

**MR. LAWLOR:** I'll submit, Your Honor, on those, yes, at this stage.

**THE COURT:** Say again?

**MR. LAWLOR:** At this stage.

**THE COURT:** At this stage.

**MR. LAWLOR:** Count seven, Your Honor, is disorderly conduct in a Capitol building. Similar to -- actually, Your Honor, that's not true, I did not submit on five. Because an element there requires Mr. Jones' conduct to have impeded or disrupted Congress, which is true also of the second element of the seventh count. And for the same reason, it says an intent to impede, disrupt or disturb the orderly conduct of a session of Congress. And we submit, Your Honor, that Mr. Jones possessed no intent to impede, disrupt or disturb the orderly conduct of a session of Congress. There's certainly no proof of intent there. Again, Your Honor, the only evidence here is that Mr. Jones wanted to have his voice heard.

Count eight, Your Honor, I will submit.

On count nine, Your Honor, I --

**THE COURT:** Wait a minute, what about seven?

MR. LAWLOR: I was just on seven, Your Honor.

THE COURT: Are you submitting on seven?

MR. LAWLOR: No, seven was what I just argued, Your Honor.

THE COURT: I thought that was five you were arguing?

MR. LAWLOR: Sorry, no, I jumped back to five. So four, Your Honor -- excuse me, five, Your Honor, I did not submit on the misdemeanor, because the third element requires that Mr. Jones impeded or disrupted a session of Congress. As we've argued -- I've argued that this was not true, the government has not carried its burden as to that. I submitted on the misdemeanor as to count six, but I'm arguing that the government has not proved that this flagpole is a dangerous or deadly weapon. As to count seven, Your Honor, we dispute that the government has presented sufficient evidence as to the second element, which is the intent to impede, disrupt or disturb the orderly conduct of a session of Congress.

On count eight, I submit.

Count nine, Your Honor, I would like to preserve the argument that this statute is void for vagueness, because it does not provide sufficient notice of what conduct would constitute the actus reus of this statute, and is so broad it encompasses activity protected by the First

Amendment. For example, Your Honor, picketing. So if I were to go into the Capitol and hold up a sign that said "Vote no," that could be construed as picketing. And therefore, Your Honor, we submit that that statute is broad -- overly broad and void for vagueness.

And those are our arguments, Your Honor.

THE COURT: All right, thank you. Mr. Dreher.

MR. DREHER: Yes, Your Honor. As the Court mentioned, the standard is at this point in the light most favorable to the prosecution. And I believe that the evidence that we have presented to this Court would allow the Court to continue and consider the case on the merits. First of all, although Brother Counsel does go count by count, I think it might be more efficient for me to go through the shared elements amongst some of the counts; one of the key, I think, arguments that Brother Counsel raised related to the defendant's intent.

And at this trial, what the government was able to provide for this Court was information that the defendant specifically knew of the proceeding that was occurring on January 6th through his Facebook material, his plan for going to Washington, D.C., which was also seen on not only the Facebook material, but also the cell phone material. And then, of course, the communications that the defendant had while he was inside the Capitol.

But also more importantly, we saw video of the defendant's actions at the Capitol itself. We saw him run toward the Capitol, run into the Capitol, run through the different grounds to get to the House chamber. At that point, we see the defendant join in on chants of, "Break it down," referencing the doors to the House chamber themselves, before he then runs again to the Speaker's Lobby.

And, of course, there was quite a bit of time spent at this trial of the defendant's actions at that door. And again, once that crowd joined the chants of, "Break it down," the defendant moved to the front of the crowd with what he described as a 4-foot wooden pole and began to strike the window repeatedly. It was not until the defendant saw a gun that he stopped. The police line did not deter him. The alarms did not deter him. Chemical gas did not deter him. And even after seeing that gun where he finally stopped his progression to the House chamber, he then stayed in the Capitol as long as possible.

As I'm sure this Court will remember, in the surveillance camera of that push getting everybody out of the Capitol after Ashli Babbitt was shot, the defendant turned around. After seeing the door to exit the building, he turned around and tried to stay in. And it's really, I think, at that moment that this Court will see the

defendant's intent.  His intent was to be in the Capitol. And the specific intent of being in the Capitol was to disrupt the official proceeding that was occurring in there. We see that not only through the text messages that he received --

THE COURT:  It wasn't occurring at that time.

MR. DREHER:  It was, Your Honor.  Although I do understand Brother Counsel's argument that the sessions -- that the houses themselves had recessed, the recess was to the subject of the chair.  In other words, they could not return until it was safe to do so.  So the proceeding itself could not continue on until it was safe to do so.  And it was not safe because of the actions of the defendant.

THE COURT:  At the time Ms. Babbitt, for example, was shot, the members weren't on the House floor engaged in a debate.  Your position is that that's irrelevant?

MR. DREHER:  Correct, Your Honor.

THE COURT:  The law doesn't require that?

MR. DREHER:  Correct.  I think perhaps the best analogy that I could think of would be that if the attorneys were unable to enter the courtroom here at the start of court time, although the Court wouldn't be sitting, the court proceeding could not occur until everybody could get in.  So in other words, if there was a crowd of angry protesters outside this courtroom that nobody could get

through, not only would it be unsafe for anybody to try to, but the proceedings that would occur in this room would not be able to continue.

THE COURT: Exactly.

MR. DREHER: And that's really what the government has shown. But more importantly, that the defendant knew what was happening in the Capitol that day, and still was trying to stay there for as long as possible to do what his friend outlined as disrupt it. But then we also had the defendant's statements himself. When asked specifically what he meant by have his voice heard, what he described was that hopefully the members of Congress would think about it, there's another side to this. In other words, he wanted Congress to stop what they were doing and listen to his side of things.

And I think that provides sufficient evidence for this Court to decide the case on the merits on counts three -- I'm sorry, where the intent requires an intent to impede Congress, it's counts two -- no, I'm sorry, count three, count four, count five and count nine. But one of the key challenges that Brother Counsel raised as it relates to the obstruction of the official proceeding is whether or not this session of Congress constituted an official proceeding. I understand --

THE COURT: That issue's been resolved in this

circuit.

MR. DREHER: Well, moving on then --

THE COURT: Let's go back to count two.

MR. DREHER: Count two, yes, Your Honor.

THE COURT: Isn't it an element of count two that the damage or attempted damage to the property exceeded the sum of a thousand dollars?

MR. DREHER: For the felony, yes, Your Honor.

THE COURT: What about for not the felony, the misdemeanor?

MR. DREHER: The felony does not -- excuse me, the misdemeanor does not have a value as an element to the offense.

THE COURT: Where's the evidence as to the value of the cost of the door? Is it your position you don't have to show any?

MR. DREHER: I believe the inference that the property belonged to the United States and that it is damaged as the defendant strikes it is present. I believe a fact finder could make that determination as its damage becomes greater as the defendant strikes it.

THE COURT: There's no assessment -- you're not submitting any assessment of what the value of the cost of fixing it, the door, is?

MR. DREHER: I don't believe that's an element of

the misdemeanor, no, Your Honor. It's any depreciation of the property.

THE COURT: Any depreciation of the property, okay. I'll check that out.

MR. DREHER: But then with count three, the corruptly aspect, I think what was shown at trial was the defendant striking a window that was connected to a door, already barricaded, with members of the House of Representatives behind it. And although the inference could be made that the defendant understood the unlawfulness of that act, just breaking a window inside of a government building that's already been barricaded, surrounded by the mob, knowing the unlawfulness is readily apparent.

THE COURT: Remind me of the evidence that there were members behind the barricade.

MR. DREHER: The testimony of Officer Yetter at the time was that he believed there was people behind that door.

THE COURT: Staff?

MR. DREHER: Correct.

THE COURT: Security? I don't remember him saying that there were members.

MR. DREHER: I understand, yes, Your Honor. I understand the distinction.

THE COURT: I mean, the location of that Speaker's

Lobby door is not far from the House floor, it's very close. I couldn't tell you the exact number of feet. But looking at the -- not that one, it would have to be the second floor.

**MR. DREHER:** Yes, Your Honor.

**THE COURT:** The second floor, you can see where that is, where the lobby -- Speaker's Lobby door was that was broken down, where Ashli Babbitt was shot and killed.

**MR. DREHER:** Yes, Your Honor.

**THE COURT:** That's not far from the House floor.

**MR. DREHER:** No, I can say in Exhibit 605, that the early portion of when the video does come to this area, there are individuals that can be seen at the opposite end of the stairwell moving past. But I think -- I believe the Court is correct, the testimony was not specifically that those are members of the House, but it certainly was the staff. And while I certainly --

**THE COURT:** I don't know if that's required.

**MR. DREHER:** In terms -- I believe it's important to note that while the members of the House are very important for the House business, it certainly cannot happen without its staff as well. So the House, as a body being able to operate, would also need those individuals as well. But ultimately, what it comes down to is whether the defendant had some idea that this was unlawful. And aside

from some law school exam questions that I could come up with for the Court -- which I certainly won't do.

THE COURT: I hope not.

MR. DREHER: The idea of striking a window inside the United States Capitol is unlawful, and the defendant knew that. So certainly I would argue there's been sufficient evidence for this Court to continue and decide the case on the merits as to count three.

THE COURT: How about counts four, five and six with the dangerous weapon?

MR. DREHER: So the deadly and dangerous weapon --

THE COURT: We can all agree it's not deadly.

MR. DREHER: Correct.

THE COURT: That's off the table. The only issue is whether it constitutes the dangerous weapon requirement for the felony of those three offenses.

MR. DREHER: Correct. And those three offenses require either the use or the carrying of the weapon while committing the offense. Here, I think it's clear at all times that the defendant carried this flagpole throughout his jaunt through the Capitol. And when he's then being disorderly becomes important for the disorderly either using that weapon -- which he does, in a manner that could cause serious bodily injury -- which he does, grabbing a wooden pole by two hands and using it as a battering ram multiple

times, could cause serious injury. And as Brother Counsel outlined, I did provide the Arrington case in the trial brief for this Court to consider. But I would also ask the Court consider Judge Cooper's assessment of a deadly or dangerous weapon.

THE COURT: Well, I looked at his jury instructions. It says an object is a dangerous or deadly weapon if the object is capable of causing serious bodily injury or death to another person, and the defendant intends that it be used in that manner. So where's the evidence here that he used the flagpole in a manner at any time that was intended to cause serious bodily injury or death to another person?

MR. DREHER: So the --

THE COURT: I can't think of a single instance.

MR. DREHER: When he's striking the window, Your Honor.

THE COURT: When he's striking the window?

MR. DREHER: He is using it in a manner that could cause serious bodily injury if used in that manner on an individual.

THE COURT: Well, that's a stretch, that's a real stretch. That's a real stretch.

MR. DREHER: I would argue that's what's required. Certainly, the government is not arguing that it's

inherently dangerous.

THE COURT: No, I understand that, but --

MR. DREHER: But the question then becomes whether or not it's capable of causing serious bodily injury and used in that manner. So the manner is not --

THE COURT: He's using it in a manner of hitting a glass partition on a door, not using it in a manner to threaten some person or attack some person. He had many instances where he carried it in a manner that was not in any way intended to scare somebody or in any way intended to brandish it in a way that would put a person on notice that he was about to do it. So I think there's a real serious problem there for you with regard to that element.

MR. DREHER: Well, I will just boil down my argument, then, in what I think is perhaps the clearest way that I could, in that when it's the manner in which it's used, it's focused on the defendant's action. Criminal law always focuses on the defendant's action in the manner with which it's used. It's not often when criminal law focuses on the target by which it is used.

THE COURT: The manner in which it was used in this case was striking the glass in the door window.

MR. DREHER: So my argument would be the manner in which it's used is him grabbing a 4-foot pole with two hands and striking something as a battering ram.

THE COURT: You've got a case somewhere that says that?

MR. DREHER: I believe the Arrington case says that, Your Honor.

THE COURT: It does not. Where does it say it in the Arrington case?

MR. DREHER: As quoted at least in the trial brief, it reads --

THE COURT: Well, wait a minute. A trial brief is not -- that's not a ruling by the Court.

MR. DREHER: No, no. I --

THE COURT: I'm asking if you have a ruling by a court that says that?

MR. DREHER: I wouldn't be able to provide a direct quotation except for what I've written from the case in the trial brief, is what I meant, Your Honor.

THE COURT: Well, we've looked and can't find any such ruling.

MR. DREHER: Okay, I understand, Your Honor.

THE COURT: So I think as to those three counts, that particular element is defective, it's missing. The Court will grant the Rule 29 as to that.

MR. DREHER: Yes, Your Honor. I appreciate the Court's indulgence to allow me to clarify on the record the position. But as it relates, then -- and I believe Brother

Counsel submitted on the misdemeanors. Except for the parading count, which I would argue --

THE COURT: He's not going to win on that count.

MR. DREHER: In that case, I will stand down. I would just ask the Court deny the motion on the remaining counts, and understand the Court's position.

THE COURT: You said you had an issue on count nine, though. Let's go back to that.

MR. DREHER: The parading count, Your Honor?

THE COURT: You said you had an issue as to the count nine argument. That's the parading, demonstrating and picketing.

MR. DREHER: Yes, Your Honor. Brother Counsel argued it was void for vagueness.

THE COURT: Yeah.

MR. DREHER: But I was just going to comment that I don't believe any other judge on this district has found that it's void, and it's very clear what's criminalized.

THE COURT: I don't think so, I think that's a denial.

MR. DREHER: So with that, Your Honor, I'd ask the Court deny the Rule 29 motion and proceed to decide the case on the merits. Thank you.

THE COURT: The Court has indicated how it's going to rule. It's going to grant the Rule 29 as to the

dangerous weapon element of the three counts, counts three, four and -- no, four, five and six, the felony counts, and deny it as to the misdemeanor count, which you submitted on two of the three anyway. And it's denying all the other counts, the Rule 29 on all the other counts.

Now, do you have any witnesses?

MR. LAWLOR: We do, Your Honor. I'm wondering if we could take -- given the hour now, take our mid afternoon recess, and we can line them up.

THE COURT: Are they here in the building?

MR. LAWLOR: Yeah.

THE COURT: Well, I usually take a break in about an hour and a half.

MR. LAWLOR: Yeah, it's about an hour and a half. Didn't we start at 2:00?

THE COURT: We started at about 2:10, so it's close. All right. Why don't we take a 15-minute break, 20-minute break, and we'll reconvene. We're going to get both witnesses done today.

MR. LAWLOR: Yes, all three.

THE COURT: Correct?

MR. LAWLOR: All three of them.

THE COURT: What do you mean all three of them?

MR. LAWLOR: Our three character witnesses.

THE COURT: You said you had two witnesses.

**MR. LAWLOR:** I think we said three. You suggested two, and we counted three.

**THE COURT:** No, you've got two. Pick your best two. You've been having two since the beginning. Mr. Brennan's represented that to the Court, I might add.

**MR. LAWLOR:** Your Honor, I object to the Court's --

**THE COURT:** Mr. Brennan represented to the Court he had two witnesses yesterday.

**MR. LAWLOR:** He said three. You counted two, we counted three.

**THE COURT:** He said three if the defendant takes the stand. Are you telling me the defendant's taking the stand?

**MR. BRENNAN:** Yes, Your Honor.

**THE COURT:** So those are your three witnesses?

**MR. BRENNAN:** Yes, Your Honor.

**THE COURT:** Fine. What order do you want to do them in?

**MR. BRENNAN:** I can put the two character witnesses on and then put our client on.

**THE COURT:** Fine. That three is fine, as long as it's that three. Two character and the defendant, that's fine. You shouldn't be so obtuse, Mr. Lawlor. Maybe you can work on your obtuseness for the next 15 minutes.

(Recess taken at 3:31 p.m.)

(Back on the record at 3:58 p.m.)

**DEPUTY CLERK:** Please raise your right hand. Do you solemnly swear or affirm that the testimony you're about to give in this proceeding will be the truth, the whole truth, and nothing but the truth?

**THE WITNESS:** I do.

**DEPUTY CLERK:** Thank you. You may be seated.

**MR. LAWLOR:** May I, Your Honor?

**THE COURT:** You may.

**DIRECT EXAMINATION OF JOSHUA BLANDFORD**

BY MR. LAWLOR:

Q. Thank you. Good afternoon, sir. How are you?

A. I'm doing good. How are you?

Q. Good, thank you. Can you tell everyone your name, please.

A. My name is Joshua Blandford.

Q. How old are you, sir?

A. I just turned 39.

**THE COURT:** Can you spell your last name, please?

**THE WITNESS:** Yes, B-L-A-N-D-F-O-R-D.

**THE COURT:** Thank you.

BY MR. LAWLOR:

Q. Where do you live, Mr. Blandford?

A. Taylorsville, Kentucky.

**Q.** Did you fly in, drive into court for the purposes of testifying here today?

**A.** Flew in yesterday afternoon.

**Q.** Well, thank you for being here.

**A.** Yes, sir.

**Q.** Do you know a person by the name of Chad Jones?

**A.** I do.

**Q.** And how do you know Mr. Jones?

**A.** When we met each other, I was a salesman, we sold security alarm equipment to his company. Since then, we've become very, very good friends. I worked for Chad for a while before I went back to the company that I met him through. And ever since then, we've just become extremely close friends.

**Q.** How long ago was that that you first met?

**A.** Seventeen or 18 years ago.

**Q.** And what do you do for a living now?

**A.** Now, I design video surveillance and access control equipment. I design the systems for companies to do installations on that.

**Q.** All right. And are you married?

**A.** Yeah.

**Q.** And have kids?

**A.** I have two, two girls, four and six.

**Q.** And what about Mr. Jones, do you know his wife?

**A.** Yes, very well.

**Q.** And do you and your family spend time together with Chad and his wife?

**A.** As much as possible, yeah. We've vacationed together. We built a house a couple years ago, Chad was always willing to help me on that. I've helped him on projects. They're very involved in my kids and their lives, they're very important to them. He's Uncle Chad and she's Aunt Amanda.

**Q.** Okay. And what about just you and Mr. Jones, do you two spend time together individually?

**A.** Yeah, definitely, as much as we can. We both have fairly busy lifestyles, but we see each other as much as possible.

**Q.** For what -- doing what kind of things?

**A.** We'll have barbecues. They'll come over for -- on the weekends and hang out with the kids and play with them. We vacation together. We go to the gorge a few months ago and went hiking. We used to ride four-wheelers together when we had a little more spare time. Yeah, we're around them quite often.

**Q.** Now, during this time, have you come to have an opinion about Mr. Jones' honesty or veracity?

**A.** Oh, he's one of the most honest people I know.

**Q.** Well, let me break this down if I could. First of

all, just do you have an opinion?

**A.** Sure, yes.

**Q.** And do you have an opinion about whether Mr. Jones is a peaceful and law abiding person?

**A.** Yes, very much so he is.

**Q.** So tell the Court what you base both of those opinions on.

**A.** Well, I've been around him for close to half of my life, and I've never seen him do anything that would change my mind on that.

**Q.** Okay. Are there things that he's done for you over the years that would attest to his good character?

**A.** Oh, yeah. Like I said, I was building my house, and at the time working full-time. I'd come there after work and find out that Chad had been there doing -- helping me out on projects there. I know Chad, you know, he has a house in Mount Washington, somewhat of a smaller town. When the hurricane hit Houston, I believe it was Harvey, he had a trailer out in front of his house. He worked on getting things that they needed, water, cleaning supplies, and he drove those down on his dollar.

There was a tornado in Henryville, Indiana. A lot of people were really hurt. Chad took his time and went to Indiana to help them. A year or two ago, we had lots of flooding in eastern Kentucky, and people lost everything

that they had. And at the time Chad, I believe, was under surveillance, but he got permission from the Court so that he could go help them. But he didn't -- the person Chad is, Chad -- I've known him forever. Chad's just the guy that gets things done. If it snows and an elderly person's driveway needs to be cleared, he's going to shovel it. That's the kind of guy he is. And, like, when eastern Kentucky happened --

**MS. MURPHY:** Objection, Your Honor. I move to strike the specific instances, and ask that the witness be instructed to focus on the broad question.

**THE COURT:** Overruled.

BY MR. LAWLOR:

Q. You can finish, sir.

A. So -- well, just like the eastern Kentucky thing, him and another friend of ours were spending their dollars and taking their time away from their work and their families to help people that needed it.

**MR. LAWLOR:** Thank you for your time today, sir.

**THE WITNESS:** Sure.

CROSS-EXAMINATION OF JOSHUA BLANDFORD

BY MS. MURPHY:

Q. Good afternoon, Mr. Blandford.

A. Good afternoon.

Q. My name is Sonia Murphy, I'm one of the

prosecutors on this case. You testified that you and the defendant, Chad Jones, are very good friends?

**A.** We are.

**Q.** Yes, and that you're extremely close?

**A.** I'm sorry?

**Q.** That you are extremely close, you said?

**A.** We are.

**Q.** And I believe you said you've been friends for 17 or 18 years?

**A.** Correct.

**Q.** And that you worked for him for some time?

**A.** Yeah.

**Q.** That you vacation together?

**A.** Yeah.

**Q.** So you wouldn't want anything bad to happen to him, correct?

**A.** No, of course not.

**Q.** I think you testified to his peaceful nature; is that right?

**A.** Uh-huh.

**Q.** Are you familiar with the definition of peaceful, sir?

**A.** I mean, not maybe according to a dictionary, but yes, I am.

**Q.** You are. And what would be your definition of

peaceful?

**A.** Somebody that doesn't want to cause any problems, and somebody that is looking for -- peace is a pretty generic term, so...

**Q.** The Oxford dictionary defines peace as free from disturbance. Does that sound consistent with your understanding of peace?

**A.** Yes, it does.

**Q.** Or tranquil consistent with your understanding of peace?

**A.** Uh-huh.

**Q.** Is not violent consistent with your understanding of peacefulness?

**A.** Correct.

**Q.** Did you have an opportunity -- were you present at the United States Capitol on January 6th?

**A.** I was not.

**Q.** Have you had an opportunity or occasion to see any of the coverage from January 6th?

**A.** Yeah, I've seen some.

**Q.** And would you describe the coverage you've seen as peaceful?

**A.** Some of it, not all of it.

**MR. LAWLOR:** Your Honor, I'm going to object.

**THE COURT:** You can approach.

(Sidebar discussion)

**THE COURT:** What was your objection?

**MR. LAWLOR:** Well, if he's being asked -- the witness is being asked about whether or not Mr. Jones was peaceful on that day and what he observed about Mr. Jones' peacefulness, then I don't have an objection. But I don't think the conduct of other people on January 6th goes to his opinion about Mr. Jones' character.

**MS. MURPHY:** My very next question will go to Mr. Jones. He's already answered the questions as to his observations of other people's conduct.

**THE COURT:** She gets a little leeway on this cross-examination. You can redirect once she's done, so you can clean up any unfairness, if there is any.

**MS. MURPHY:** Thank you, Your Honor.

(Open court)

**THE COURT:** You may proceed, consistent with the discussion at the bench.

**BY MS. MURPHY:**

**Q.** I think you had just testified you did have an opportunity to observe some of the events from January 6th in news outlets, et cetera?

**A.** Yes, I've seen some, yes.

**Q.** And I was asking would you describe your observations as peaceful?

**A.** I've seen some various clips. Some I thought were, some were not.

**Q.** Have you had an opportunity to observe the defendant, Chad Jones', conduct, whether it be through news outlets, et cetera, on January 6th?

**A.** Yes.

**Q.** And would you describe that conduct as peaceful?

**A.** Not all of it, no.

**Q.** Would you pull up Government's Exhibit 605, please.

**MR. LAWLOR:** Your Honor, I object.

**THE COURT:** Did you say 605?

**MS. MURPHY:** 605.

(Sidebar discussion)

**MR. LAWLOR:** Your Honor, a line of questioning that asks whether or not the defendant's conduct in this particular case would alter the witness' opinion, these so called guilt assuming questions are not proper. I can cite the Court to United States vs. Oshatz, which is a Second Circuit opinion. Questions that ask whether or not the particular conduct of a defendant are not proper cross-examination for a character witness.

**MS. MURPHY:** So my question doesn't go to the -- whether or not he's guilty of the charges, it goes to whether -- he's described peacefulness, he's testified that

he knows what peaceful means.  He's here to provide testimony on the defendant's character as peaceful.  So my question is just whether that conduct represented is peaceful according to his opinion.  It's just a challenge to his opinion on his definition of peacefulness.

**THE COURT:**  He just said that he's seen some clips of his conduct that were peaceful and some that were not.

**MS. MURPHY:**  That's why I want to show an exhibit and ask him if that conduct itself was peaceful.

**THE COURT:**  I'll let you do that, but you have to move on after that.

**MS. MURPHY:**  Okay.  Thank you, Your Honor.

(Open court)

**THE COURT:**  You may proceed, consistent with the discussion at the bench.

**BY MS. MURPHY:**

Q.  If we could pull up Government's Exhibit 605, please.  You can play the clip, just the first 10 seconds or so.

(Video played)

Q.  Mr. Blandford, do you recognize the defendant in this video clip?

A.  I do.

Q.  Is this conduct you would describe as peaceful?

A.  No, ma'am.

**MS. MURPHY:** Thank you. I have no further questions.

**THE COURT:** Redirect, if you have any.

**REDIRECT EXAMINATION OF JOSHUA BLANDFORD**

**BY MR. LAWLOR:**

**Q.** So sir, is that conduct anything you've seen from Mr. Jones prior to or since?

**A.** No, never. I've spent a lot of time with Chad since then, a whole lot of time since then, and not at all.

**Q.** Okay. Let me ask you this: Did you have occasion to talk to Mr. Jones prior to January 6th about his intentions to come to Washington?

**A.** I did, yes.

**Q.** Did you speak -- did you ask him why he was coming?

**MS. MURPHY:** Objection, Your Honor. The question calls for hearsay.

**THE COURT:** No, no, that's not -- overruled.

**THE WITNESS:** No, I did not ask him why.

**BY MR. LAWLOR:**

**Q.** Did somebody in your presence ask him why he was coming to Washington?

**A.** Oh, well, so, yes, he did. I guess the overall question was, you know, well, why would we go if we were to go with him. The answer was: "Well, just to be a body

there to support him," you know, President Trump.  That was the answer.

    **Q.**    That's what he --

    **A.**    That was what Mr. Jones replied to us with, yes.

        **MR. LAWLOR:**  Thank you, sir.

        **THE WITNESS:**  You're welcome.

        **THE COURT:**  You're excused.

        **DEPUTY CLERK:**  Raise your right hand.  Do you solemnly swear or affirm that the testimony you're about to give in this proceeding will be the truth, the whole truth, and nothing but the truth?

        **THE WITNESS:**  I do.

        **DEPUTY CLERK:**  Thank you.  You may be seated.

    **DIRECT EXAMINATION OF GARY MUDD**

**BY MR. LAWLOR:**

    **Q.**    How are you today, sir?

    **A.**    I'm good, thanks for asking.  A little bit nervous.

    **Q.**    That's okay.  Could you state your name, and spell your last name.

    **A.**    My name is Gary Mudd, last name M-U-D-D.

    **Q.**    And how old are you, sir?

    **A.**    I'm 48 years old.

    **Q.**    Where do you live, sir?

    **A.**    I live in Louisville, Kentucky -- I'm sorry, let

me correct that.  I live in New Albany, Indiana.

Q. Which is near Louisville, I assume?

A. Right across the river.

Q. And did you come to Washington today for the purpose of testifying for Mr. Jones?

A. Yes, sir.

Q. So you know Mr. Jones?

A. I do, I've known Chad for over 20 years.

Q. And how did you come to know him?

A. I met Chad, I'd been friends with Amanda, his wife's family, for pretty much the entirety of my childhood. Chad started dating Amanda, he started his own security company.  I was working midnight shift at my job, and I was looking for some moonlight time.  So I started -- asked Chad if he would hire me.  He graciously accepted, even though I didn't know anything about low voltage or any kind of what he was doing.  So I worked as an employee for him for two years.

During that time, I was not just an employee, but we grew as friends.  We continued that friendship all the way to the present.  We've been on vacations together, dinners, weddings.  I've just -- like I said, we've been friends for that long.

Q. Okay.  And do you guys spend a lot of time together currently?

**A.** Not so much probably in the last couple of years because of personal situations, but things happen, you know, as far as -- I mean, we talk probably at least once or twice a week probably. Maybe not that much, but I'm always trying to catch up and make sure, check in and seeing how he's doing. He does the same.

**Q.** What do you do for a living, sir?

**A.** I work for Ford Motor Company in the Louisville assembly plant.

**Q.** You mentioned Chad works in security. What kind of work does he do now?

**A.** What type of work does Chad do?

**Q.** Uh-huh.

**A.** He owns an Airbnb or VRBO rental cabin business. He's got, I believe, three cabins in Red River Gorge.

**Q.** Now, during the time that you've known Mr. Jones, have you come to form an opinion about his character trait for honesty?

**A.** Absolutely, absolutely.

**Q.** And let me -- sorry, let me interrupt you there. Have you also come to form an opinion about whether or not Mr. Jones is a peaceful and law abiding person?

**A.** I have, yes.

**Q.** And what do you base those opinions on?

**A.** It's a 20-year body of work. I've witnessed Chad

speak with -- if you want to talk about honesty, I've seen him -- he built a business in a highly competitive market, ADT, et cetera, as a small business. But Chad differentiated his business with himself. He was always honest, he always backed his work up. He led his business with integrity. He was honest, he was charitable to the community. He even sponsored softball teams, et cetera. So I've witnessed interactions with him throughout his career as a business owner and personally with his charity he's done through disaster relief.

And just friendship. I mean, Chad's -- I mean, he's the kind of guy that if you're driving down the road -- and this is pretty uncommon I'd say, he does not pass a stranded motorist. If someone's broken down in the road, he's going to stop. So, yeah, 20 years of that is enough to base I feel -- like I said, his character is irreproachable as it comes to honesty, integrity. Like I said, he's a very high moral person.

**Q.** You mentioned some charity work he had been involved in?

**A.** Uh-huh.

**Q.** What kind of work was that?

**A.** I didn't know Chad -- I mean, our friendship was still pretty new. I guess it was 2005 or whatever. I was still in close contact with him. That was -- I guess it was

Hurricane Katrina, I believe, if I've got my years right. He just packed up a truck, went down there, was gone for two weeks to help people during that time. But it wasn't until, like I said, many years later we were on vacation together, and he asked if we could stop by New Orleans to see some friends. And the smiles on their faces, the happiness that they showed as far as -- it's hard to witness what someone does, right, behind the scenes. But they were extremely grateful for him going down there.

And then helping with not just that, but again Harvey. And then, you know, more recently he went down to help the folks in eastern Kentucky when it flooded. I'm not sure what exact town, but he went down there. As a matter of fact, I called him and asked him, said: "What are you doing?" He said: "I'm in eastern Kentucky." He said, "I'm cooking on a food truck right now." So like I said, very charitable, very caring. He's even more so as far as friendships and his family and people that are close to him.

**MR. LAWLOR:** Okay. Thank you, sir. Those are all the questions I have, Your Honor.

**THE COURT:** Thank you. Cross-exam.

**CROSS-EXAMINATION OF GARY MUDD**

BY MS. MURPHY:

Q. Good afternoon, Mr. Mudd.

A. Good afternoon.

**Q.** My name is Sonia Murphy, I'm one of the prosecutors on this case. You testified that you've known the defendant, Chad Jones, for over 20 years?

**A.** Correct.

**Q.** You consider yourself to be friends?

**A.** I do.

**Q.** You say you're a former employee of his as well?

**A.** Correct.

**Q.** You've been on vacations together?

**A.** Correct.

**Q.** So you wouldn't want anything bad to happen to him, correct?

**A.** Absolutely not, no.

**Q.** And you testified that his character is irreproachable?

**A.** Correct.

**Q.** And that you know him to be peaceful?

**A.** Correct.

**Q.** Are you familiar with Oxford's definition of peaceful?

**A.** What -- whose definition?

**Q.** Oxford Dictionary's definition?

**A.** Oh, no, I'm not, ma'am.

**Q.** That definition includes free from disturbance. Does that sound like what you would consider to be peaceful

as a definition?

     **A.**   Sure.

     **Q.**   And tranquil --

     **A.**   Sure.

     **Q.**   -- is that consistent with your thoughts of peacefulness?

     **A.**   Sure.

     **Q.**   Nonviolent, is that consistent with your thoughts of peacefulness?

     **A.**   Sure.

     **Q.**   Have you had an opportunity to observe the coverage from the events that took place at the Capitol on January 6th?

     **A.**   I don't have social media, I rarely watch the news.  So if you're asking me if I have an expert opinion or an overall view of that coverage, I do not.

     **Q.**   Can we pull up Government's Exhibit 605, please.

          **MR. LAWLOR:**  Your Honor, objection.

          **THE COURT:**  Same ruling.

**BY MS. MURPHY:**

     **Q.**   I'm going to play some video footage for you, just about the first eight to 10 seconds or so.

     (Video played)

     **Q.**   Mr. Mudd, do you recognize the defendant, Chad Jones, in that coverage?

**A.** I do not. I see a lot of people in there, but I do not see Chad Jones' face.

**Q.** I'll go back to the beginning and play it for you again. But if I represented to you that is Chad Jones in the red jacket and gray hat, would you have any reason to believe otherwise?

**MR. LAWLOR:** Your Honor, we'll stipulate that that is, in fact, Mr. Jones.

BY MS. MURPHY:

**Q.** So you've now been told that that's Mr. Jones in the red jacket and gray hat. I'm going to ask her to play the video for you again.

**THE COURT:** No, we're not going to play it again, no need to.

BY MS. MURPHY:

**Q.** Okay. So now that you've seen Mr. Jones, is that behavior that you would call peaceful in your opinion, in your definition of peacefulness?

**A.** My opinion is for -- to appear today as far as I know to talk about Chad's character. I don't have any expertise in legalities, police administration, justice. I'm not even sure the exact location of where this was, so I can't really offer an opinion.

**Q.** So your testimony is that you don't have an opinion as to whether the behavior you just saw was peaceful

or not?

**A.** Again, I'm not an expert on any kind of laws or where this was taken. I mean, I can describe what's happening, but I can't offer an opinion on it, not an expert opinion.

**MS. MURPHY:** That's fine, Mr. Mudd. Thank you. I have no further questions, Your Honor.

**THE COURT:** Redirect.

**REDIRECT EXAMINATION OF GARY MUDD**

**BY MR. LAWLOR:**

**Q.** Sir, I'm going to read to you the Oxford Dictionary definition of perfect, which is: "Having all the required or desirable elements, qualities or characteristics; as good as it is possible to be."

Do you think Mr. Jones is perfect?

**A.** I don't think anyone's perfect.

**MR. LAWLOR:** Thank you, sir.

**THE COURT:** You're excused.

**MR. BRENNAN:** The defense will call Chad Jones.

**DEPUTY CLERK:** Please raise your right hand. Do you solemnly swear or affirm that the testimony you're about to give in this proceeding will be the truth, the whole truth, and nothing but the truth?

**THE WITNESS:** I do.

**DEPUTY CLERK:** Thank you.

**DIRECT EXAMINATION OF CHAD JONES**

**BY MR. BRENNAN:**

Q.   Mr. Jones, can you state your name, spell your name and speak in a loud, clear voice so we can all hear.

A.   Chad Barrett Jones, C-H-A-D, B-A-R-R-E-T-T, J-O-N-E-S.

Q.   And where do you live, sir?

A.   Mount Washington, Kentucky.

Q.   Okay.  So right at the beginning here, we've heard a lot in this trial about the person in the red jacket and the gray cap.  Who was the person in the red jacket and gray cap that we've seen in these videos?

A.   That was me.

Q.   That was you?

A.   That was me.

Q.   Have you ever denied being that person, sir?

A.   Never.

Q.   Were you in the United States Capitol on January 6th, 2021, sir?

A.   Yes, I was.

Q.   Did you strike the window outside the Speaker's Lobby with a flagpole on January 6th, 2021?

A.   Yes, I did.

Q.   Since that day, you've had over two and a half years to think about it.  What do you want to say about your

conduct that day, sir?

**A.** It was wrong, I should not have hit the window. And even after two and a half years, I cannot give you a reason why I hit it. I have no reason. I can't make up a reason, I don't know. I blacked out possibly, I just got caught up in the crowd and I hit the window.

**Q.** Okay. And you entered the Capitol?

**A.** I did enter the Capitol.

**Q.** Are you proud of your conduct or are you sorry for your conduct that day now that you've had a chance to reflect on it?

**A.** I'm very sorry for my conduct.

**Q.** Let's talk a little bit about your background. You said you're from Mount Washington, Kentucky. Where did you grow up, sir?

**A.** I grew up in Mount Washington.

**Q.** Go to high school there?

**A.** I did.

**Q.** After high school, what did you do?

**A.** I went to college, three years, got a Bachelor degree in electronic engineering.

**Q.** And what year was that approximately?

**A.** That was probably around 2000, I guess, finished in 2000.

**Q.** And then did you work, establish your own company?

What did you do?

**A.** I went to work for a security company for about three years, and then quit and started my own company.

**Q.** Okay. And were you successful in your own company?

**A.** In my opinion I was.

**Q.** Did you sell it?

**A.** I did.

**Q.** Are you married?

**A.** I am married.

**Q.** Do you have any children?

**A.** No children.

**Q.** What's your wife's name?

**A.** Amanda.

**Q.** Is she here today?

**A.** She is, she's the pretty one in the green.

**Q.** She's been here during the whole trial?

**A.** She has.

**Q.** And who are the -- I guess, who are the other people sitting with Amanda?

**A.** That would be my friends Kenny, Troy, Josh and Gary.

**Q.** And where are they all from?

**A.** Mount Washington.

**Q.** Now, you said you sold your company. Once you

sold your security company, what do you and Amanda do now for a living?

**A.** I guess we're entrepreneurs. Amanda takes care of a VRBO business that we have. We did have it through Airbnb, but after January 6th, Airbnb canceled my account after five years, so I had to be taken off of our business.

**Q.** They canceled your account?

**A.** They canceled my account.

**Q.** Because of your conduct on January 6th?

**A.** That's somewhat to what they said, yes.

**Q.** Now, would your -- so you grew up in Mount Washington. You lived with your mom and dad growing up?

**A.** I did.

**Q.** What did your mom do?

**A.** My mom was a kindergarten teacher for about 31 years.

**Q.** How about your dad?

**A.** My dad worked at different companies that contracted with auto manufacturers. He was project manager or quality control manager. He oversaw fairly large projects.

**Q.** Are you close with your parents?

**A.** Yeah, pretty close.

**Q.** Is there anything that causes them not to be here for this trial?

**A.** Well, they were going to be here when we were going to have it on the 20th of June, but they're actually on a cruise for their 50th anniversary right now. They don't have a lot of money. My dad had been saving for about a year, and I told them not to cancel the cruise.

**Q.** So other than the fact they're on the cruise, they'd be here to support you?

**A.** Absolutely.

**Q.** Now, you heard a little bit about when your witness talked about Hurricane Katrina in terms of -- you know, what is your reaction, sir, when something like Hurricane Katrina occurred? What was your reaction to that, sir?

**A.** Well, I watched for a couple days on the news of people pretty much stranded, people hanging out on the roofs. New Orleans was completely flooded, so that was the first time I felt like I might try to help. So a friend and I gathered up equipment. I bought a small boat, we went to New Orleans and spent about a week and a half wading through the water and riding on hot-wired boats and rescuing people.

**Q.** How long did you stay in New Orleans rescuing people from Katrina, sir?

**A.** It was about a week and a half. And it was only civilians that were out rescuing people, there was no government, there was no other organized departments.

**Q.** Did you get paid for that or did you do it on your own time?

**A.** No, I didn't get paid.

**Q.** When the hurricane hit Houston, what did you do -- and I forget the name of the hurricane, do you remember that?

**A.** It was Harvey in 2017.

**Q.** Hurricane Harvey.

**A.** I saw kind of the same thing. This time we started -- my wife and I started a donation drive, and I filled a very large cargo trailer full of donations. We organized it, and then I took it to Houston to a donation center.

**Q.** And that was in 2017?

**A.** It was.

**Q.** I know on the news, the state of Kentucky itself was hit rather hard with floods last year. How did you react to that, sir?

**A.** Well, the next day, I met up with some friends that had a food trailer, and we set up in Jackson, Kentucky and made meals for people. The first day we served, I think, 1,500 hot dogs and 300 hamburgers to however many people that feeds that were in need, and we did that for about a little bit over a week.

**Q.** Okay. Now, you talked to us about your

response to -- I guess to human tragedy during hurricanes and floods. What about politics, sir, had you been active in politics or followed politics much in your youth, either in high school or college or your early business days?

**A.** No, not really. Growing up, our I guess family vacations we spent at historic places, forts or D.C. But not really political.

**Q.** So do you have any recollection of when was the first time you voted in a presidential election?

**A.** I remember my parents told me it was important to register to vote when I was 18, so maybe sometime -- I know I did that. I don't remember voting. The first time I remember voting was I believe was 2012.

**Q.** Was that the Obama --

**A.** Romney, yes.

**Q.** -- Romney election?

**A.** Uh-huh.

**Q.** And you voted, but still, were you politically active? Did you belong to any political clubs, make any contributions?

**A.** No.

**Q.** Now, did there come a time when you became aware of Donald Trump?

**A.** Uh-huh.

**Q.** I'll get into all the details. Did you ever

attend a Trump rally or anything like that, sir?

**A.** In 2018, we were traveling out west and just happened to be in the area of El Cajon, Nevada, and went to a President Trump rally -- or a USA rally, I guess.

**Q.** That's 2018?

**A.** Yes.

**Q.** Other than that rally, had you ever been to any other political rally other than that one?

**A.** No.

**Q.** So let's fast forward then to November of 2020.

**A.** Okay.

**Q.** Did you follow the election?

**A.** Yes.

**Q.** Did there come a point in time where you knew the election was called, if you will, for President Joe Biden, do you remember that?

**A.** Yes.

**Q.** And there's also, I guess, a march or a rally in Washington after that election, and when was that, sir?

**A.** That was November 14th, 2020.

**Q.** November 14th, 2020. So how did you hear about that rally in November 2020?

**A.** Probably online, probably something popped up on Facebook.

**Q.** So you heard about the rally on, I guess, it was

Saturday, November 14th, 2020. So do you ignore it, decide to go to it? Tell the Judge in your own words what your reaction was to that rally, sir. Make plans to go?

**A.** Yeah, I mean, short plans, I guess, yeah. I live about 10 hours away, so I found a hotel. I think my wife paid for it with credit card points. And then I drove to D.C. the day before, stayed the night in the hotel in Gaithersburg, and then drove into D.C. the next day.

**Q.** Did you come with anybody or did you come by yourself?

**A.** I came by myself.

**Q.** Came by yourself?

**A.** Yes.

**Q.** With any group, with any organization or anything like that?

**A.** No.

**Q.** You said you stayed in Gaithersburg on the night before, Friday the 13th; is that right?

**A.** Yes.

**Q.** So when you got up in the morning of the 14th, tell the Court what you did.

**A.** Well, after I got ready obviously, drove into D.C. and circled around D.C. because I couldn't find a place to park. I have an F150, it won't fit in the parking garages. So I found a small, I assume, private lot that was 20 bucks

to park.  It was close to the Mall, and I parked there.

Q.  Had you been to downtown D.C. -- and this is -- excuse me, this was on November 14, 2020.  Had you been to downtown D.C. before that, sir?

A.  Not since I was a kid.

Q.  Not since you were a kid?

A.  No.

Q.  First time as an adult?

A.  Yes.

Q.  Take any pictures?

A.  Quite a few.

Q.  Madam Clerk, could we have the screen, please. I'm going to start with Exhibit 3.  What's on the screen, Mr. Jones, is a photograph.  It's dated November 14, 2020 at 8:52 a.m.

Who took that photograph, sir?

A.  I took it.

Q.  What's it depict?

A.  That's the Washington Monument.

Q.  And why did you take that?

A.  I take lots of pictures.

Q.  Was that a short walk from the lot that you'd parked your car at?

A.  Yeah, it was very short, maybe four or five blocks to the middle of the Mall, and then to the left was the

Washington Monument.

Q.   So when you parked your car -- and this was about almost 9:00 o'clock.  Next item, please.

MR. DREHER:  Your Honor, just for clarity of the record, I don't know if that was ever identified before we move on to the next one.

MR. BRENNAN:  Oh, I'm sorry, I would -- my mistake.  Thank you, counsel.  Madam Clerk, I think I e-mailed you a list of exhibits.  I would ask that this photograph be marked as Defense Exhibit 3.  I think I sent one to counsel as well.

MR. DREHER:  There's no objection to its admission.

THE COURT:  Do you want to admit it?

MR. BRENNAN:  Yes, I'm going to offer it, Your Honor, Exhibit 3.

THE COURT:  Okay, it will be admitted.

(Defense Exhibit 3 admitted into evidence)

BY MR. BRENNAN:

Q.   Thank you, Your Honor.  The next photograph, sir, I'm going to offer as -- mark as Defense Exhibit 4.  Tell us what that is, sir.

A.   That is the same day.  It's going to be close to Freedom Plaza I believe in D.C.

Q.   And what does it depict, sir?

**A.** That was the rally. Those are people that were at the rally.

**Q.** And that was taken almost 11:30, 11:24 a.m.?

**A.** Yeah, it sure was.

**MR. BRENNAN:** I'd offer that, Your Honor, as the next exhibit number.

**MR. DREHER:** No objection.

**THE COURT:** Admitted.

(Defense Exhibit 4 admitted into evidence)

**BY MR. BRENNAN:**

**Q.** Next photograph, sir?

**THE COURT:** Defense Exhibit 4.

**BY MR. BRENNAN:**

**Q.** Thank you, Your Honor. I show you what's marked as Exhibit 5, a photograph at 10:38 on November 14 at -- well, I guess this was taken at 12:36 p.m. What does that depict, sir?

**A.** That is me, and the picture is looking back down Constitution Avenue right beside the Capitol.

**Q.** So when you say "me," is that your hat?

**A.** Yes.

**Q.** A selfie, I guess, taken backwards?

**A.** Yes.

**Q.** Okay. So you're marching down Constitution Avenue towards where? Where are you headed, sir?

**A.** We were walking to the Supreme Court.

**MR. BRENNAN:** I would offer this, Your Honor.

**MR. DREHER:** No objection.

**THE COURT:** Admitted.

(Defense Exhibit 5 admitted into evidence)

**BY MR. BRENNAN:**

**Q.** So next one, please. When you got down to the Supreme Court -- do you know what route you took, I guess, from -- you said you started at Freedom Plaza in Washington. Do you know the approximate address of Freedom Plaza, sir?

**A.** I don't know the address. I'm not sure of the address.

**Q.** But you know you walked down Pennsylvania Avenue?

**A.** I believe so, and then made a left in front of the Capitol.

**Q.** Up Constitution Avenue?

**A.** Yes, that's where that previous picture was taken.

**Q.** And then where did you wind up at that point, sir?

**A.** I remember we walked up Constitution, which is -- it seems like a slight hill. To the right was the Capitol, and then once we passed the Capitol, we made a sharp right and in just a few hundred feet was the Supreme Court.

**Q.** And what happened when you and the other marchers got to the Supreme Court on November 14, 2020?

**A.** They had a stage set up, and there were several

speakers that gave speeches, probably for about three and a half hours or so, maybe four.

**Q.** Did you stay and listen to the speeches?

**A.** Yeah, I did. There was quite a few people there.

**Q.** Did you observe any violence or the crowd engaging in civil disturbance at all, sir?

**A.** No, quite the opposite.

**Q.** You said quite the opposite?

**A.** Quite the opposite.

**Q.** And the next one, please. What does this depict, sir? This is at 1:03 p.m. on November 14. Is this a picture you took?

**A.** I took that picture.

**Q.** What does it show, sir? Tell the Court what it shows.

**A.** Those are the steps of the Supreme Court.

**Q.** You might be able to touch the screen and show us yourself.

**A.** Yeah, sure. These are the steps of the Supreme Court. I'm standing right here. There's a bike rack right here that you cannot see, obviously, because the camera is above it. And then these are all just attendees along the steps.

**Q.** When you were at the rally at the Supreme Court on November 14, 2020, did you see any of the participants in

that rally breach those bike racks, sir?

**A.** No, no one tried.

**Q.** And do you see the police officer standing there? Did you see anyone assault those police officers when you were at that rally on November 14?

**A.** No.

**Q.** And did you take any videos of what occurred at that -- very brief videos of what occurred?

**A.** Yeah, I took a few.

**MR. BRENNAN:** I don't know what number I'm at, but I'd offer --

**THE COURT:** No. 7.

**MR. BRENNAN:** I'd offer that exhibit and the one before it, I guess, Your Honor, No. 6, as well.

**MR. DREHER:** No objection to either 6 or 7.

**THE COURT:** They'll be admitted.

(Defense Exhibits 6 and 7 admitted into evidence)

**BY MR. BRENNAN:**

**Q.** Next one, please.

(Video played)

**Q.** What does that show, sir?

**A.** That shows the crowd at the Supreme Court. I'm not sure what street we're on, but that street is full of attendees.

**Q.** People with flags and supporting Donald Trump; is

that correct?

     A.   And American flags, absolutely.

          MR. BRENNAN:  I'd offer that video, Your Honor.

          MR. DREHER:  No objection.

          THE COURT:  It will be admitted.

     (Defense Exhibit 8 admitted into evidence)

BY MR. BRENNAN:

     Q.   Next one, please.

     (Video played)

     Q.   What does that show, sir?

     A.   People singing and being patriotic.

     Q.   Did you take that?

     A.   I took that.

          MR. BRENNAN:  I would offer that, Your Honor.

          MR. DREHER:  No objection.

          THE COURT:  That's Exhibit 8 -- 9.

     (Defense Exhibit 9 admitted into evidence)

BY MR. BRENNAN:

     Q.   Thank you, Your Honor.  Next one, what does that
show, sir?

     A.   That is a picture of the stage and one of the
speakers.  I believe that's Vernon Johnson -- or Vernon
Jones, I'm sorry, from Georgia.

     Q.   And that was taken at -- did you take that photo?

     A.   I took that photo.

**MR. BRENNAN:** I'd offer that, Your Honor.

**MR. DREHER:** I believe that's 10, Your Honor, and no objection.

**THE COURT:** Okay. That's Exhibit 10.

(Defense Exhibit 10 admitted into evidence)

**THE COURT:** Counsel approach.

(Sidebar discussion)

**THE COURT:** Mr. Brennan, where are we going? What are you doing?

**MR. BRENNAN:** Last one. What I'm doing is I'm now transitioning to January 6th, and the testimony will be that my client had every expectation that when he appeared at January 6th, it would be a similar rally to what occurred on November 14th; that there would be no violence; that it was a permitted rally; and he expected -- that's what he expected and his intent when he came up alone on November 14. And he came up again alone on January 6th, fully expecting it to be the same thing with no intent to commit any crime or invade the Capitol.

I just wanted to set the foundation, it's the last photo I have. But that's where I'm headed with it, Your Honor. What was in his mind, what's his experience on November 14th.

**THE COURT:** It's a quarter of 5:00. We're going until 5:30 today, and we have cross-examination.

MR. BRENNAN: Yeah.

THE COURT: Possibly redirect. You want to complete the witnesses today, you told me yesterday.

MR. BRENNAN: We started an hour late, Your Honor, I'm sorry. We started at 2:00 o'clock rather than 1:00 o'clock.

THE COURT: What do you want to do tomorrow?

MR. BRENNAN: Finish my client if we can, if we don't get to it today, Your Honor.

THE COURT: How much longer do you have today?

MR. BRENNAN: Take him through what he did at the Capitol. I'll do my best to see if I can't finish him by 5:30, Your Honor. But it started late, I'm sorry, Your Honor. There was nothing I could do about it.

MR. DREHER: I believe we'll still be able to close tomorrow, Your Honor, if the Court's willing. I don't know if it would affect --

THE COURT: We have to do our closings tomorrow.

MR. DREHER: Right.

MR. BRENNAN: We're prepared to close tomorrow, Your Honor.

THE COURT: All right.

(Open court)

BY MR. BRENNAN:

Q. Thank you, Your Honor. Mr. Jones, after your

experience on the rally for Donald Trump on November 14 had ended, did there come a point when you left Washington that day?

**A.** Yeah, I left when the rally was over.

**Q.** When the rally was over?

**A.** Yes.

**Q.** And the next photo, please. What does that show?

**A.** That's when I was driving out. It's a picture of the Washington Monument.

**Q.** A quarter to 6:00 on the 14th?

**A.** Yes.

**Q.** Where did you go? You left downtown Washington about a quarter to 6:00 on the 14th. Where did you go?

**A.** I went back to the hotel.

**Q.** In Gaithersburg?

**A.** Yes.

**Q.** And when did you leave to go back to Kentucky?

**A.** The next morning.

**Q.** Did you make any stops on the way back?

**A.** Maybe a rest area and for fuel.

**Q.** And I guess did you ever look at -- okay.

So I'd offer this exhibit, it's the last one in that series, Your Honor, if the Court please.

**THE COURT:** What exhibit do you want to -- do you want to introduce this picture of the Washington Monument?

MR. BRENNAN: I'm sorry, yes, Your Honor, as he's leaving town on the 14th.

THE COURT: That's Exhibit 11.

MR. DREHER: No objection.

THE COURT: It will be admitted.

(Defense Exhibit 11 admitted into evidence)

BY MR. BRENNAN:

Q. Now, if we can have the next one, please. Without getting into a lot of detail because we're kind of short on time, what does this show, sir?

A. This is a picture of a tractor that I was interested in buying.

Q. So fast forward. So go to the rally on November 14th. You're now -- the date of this photograph is January 5. Where were you headed on January 5 or January 6th of 2021, sir?

A. January 5th, I was headed back to Washington, D.C.

Q. Why were you headed back to Washington, D.C.?

A. I was going to attend the rally on January 6th.

Q. Come by yourself or with anyone?

A. Came by myself.

Q. Were you a member of any group that you were planning on meeting up with on January 6th?

A. No.

Q. Did -- when you got to Washington on January 6th,

did you -- even though you weren't planning on meeting any group, did you connect up with anyone or any group on January 6th?

**A.** No, I did not.

**Q.** Tell the Court -- and I guess -- so why is a tractor picture here? Tell us about this tractor picture.

**A.** Well, I was in the market for a tractor for our property, and I had exhausted, I guess, all outlets around close to my house. I was getting ready to drive nine and a half hours away, so I looked on Facebook Marketplace and found this one was at the border of West Virginia and Kentucky right off 64. So on the way there, I stopped and looked at it.

**Q.** What's the next picture show, sir -- again, very quickly, what's the next one show?

**A.** I was just measuring to see -- make sure it would fit on a trailer that I have.

**Q.** And those are taken the day before you got to Washington on the way up?

**A.** Correct.

**MR. BRENNAN:** I'd offer those, Your Honor.

**MR. DREHER:** I believe that's 12 and 13, and there's no objection.

**THE COURT:** It is 12 and 13. They'll be admitted.

(Defense Exhibits 12 and 13 admitted into evidence)

**BY MR. BRENNAN:**

Q. So when you got to Washington on November 5, where did you stay?

A. I went to the same hotel in Gaithersburg.

Q. The same hotel in Gaithersburg?

A. Yes.

Q. When you got up the next morning, January 6th, what did you do, where did you go?

A. I had pinpointed the parking lot and saved it in my phone, and I went to the same parking lot, paid 20 bucks to park.

Q. Same parking lot you used on November 14th?

A. Correct.

Q. Once you got your truck parked and started walking around, where were you going? Where were you headed? What were you intending to do? Tell the Court what was going on.

A. So I didn't know exactly where the rally would be, just like November 14th I didn't know where the rally would be. When I got to D.C., I knew that I would just see lots of people headed in a direction. So that's what happened this day, I walked to the Mall. This picture obviously is of the Washington Monument. Then I saw people moving and congregating, and I followed them to the Washington Monument.

Q. Did you -- were you a participant or an observer

or documenting?  What were you doing then, sir?

A.  I was just being a body, just showing up.

Q.  And we're going to roll through some of these next pictures fairly quickly.  I'd like you to, I guess, identify them and then we'll offer them.  Can we go to the next photograph, please.

What is this, sir?

A.  Same thing, Washington Monument, 8:48, just showing the crowd that was there at that time.

Q.  And the next one, sir?

A.  That's some buses that were unloading that was close to where I parked my truck.

Q.  Were a lot of people going to that rally on January 6th?

A.  Yeah, there were way more buses than this.

Q.  Next photograph, sir.

A.  That is in front of the Washington Monument.  It would be probably to the right or to the back of me, I guess, in that picture.

Q.  The next one, please.  This is a video I think.

(Video played)

Q.  Now, did you take this video?

A.  I did.

Q.  Up to this point, did you have any -- did you see any violence occurring?

**A.** No, none.

**Q.** Did you know where, if any place, you would be going after this rally or during this rally?

**A.** Well, not yet. I think it wasn't until maybe a little bit after this that I heard people say that we're walking to the Capitol. And then after the speech, I knew that we were walking to the Capitol.

**MR. BRENNAN:** Those earlier exhibits, Your Honor, that have been identified, I would offer those just to complete the record. I tried to move through them quickly.

**MR. DREHER:** There's no objection as to their admissions. I believe just numbering --

**THE COURT:** It's 14 through 17.

**MR. DREHER:** No objection.

(Defense Exhibits 14 through 17 admitted into evidence)

BY MR. BRENNAN:

**Q.** Thank you, Your Honor. Next one, please.

(Video played)

**A.** I took the video.

**Q.** Any indication there's going to be violence or any civil disobedience at the time that these people are congregated there at the Washington Monument?

**A.** No, not at all.

**Q.** The next one, please.

**A.** Looked like the previous rally.

**Q.** Next one, please.

(Video played)

**Q.** Did you take that one as well?

**A.** I did.

**Q.** The next one. Now, this shows -- at 11:06 a.m., where are you at that point, sir?

**A.** Still in the middle of the crowd at the Washington Monument.

**MR. BRENNAN:** I'd offer the two videos and this photograph, Your Honor.

**MR. DREHER:** Your Honor, I just wanted to note for the record that the first video is the same as what's found in Government's 532.

**THE COURT:** That's what I thought.

**MR. DREHER:** As for the second one, I would ask the Court to consider using its discretion to exclude under 403 at this point. Certainly identification hasn't been in dispute at this trial. I do know in the several pretrial conferences that we had there was discussions about limiting a lot of the videos based on the Court's time. I would argue that the videos that were excluded --

**THE COURT:** This is duplicative and doesn't have anything --

**MR. BRENNAN:** That's fine. I'm just trying to set the stage, Your Honor.

THE COURT: This is wasting time.

MR. BRENNAN: We'll move on, Your Honor, no problem.

THE COURT: Sustained.

BY MR. BRENNAN:

Q. Let's go through the next one. I want to establish when you were still at the Washington Monument, Mr. Jones. Next one, please.

What time is this one taken, sir?

A. That's at 1:13.

Q. Where are you in that one?

A. Still in the same spot at the Washington Monument.

Q. So at 1:13 p.m. on January 6th, you were still at the Washington Monument?

A. Correct.

Q. Next one, please. What time is that one, sir?

A. That is 1:20.

Q. Where is that one taken?

A. That is at the corner of 15th and Constitution, I believe. The corner of the Washington Monument grass.

Q. And what is depicted in that photograph, sir?

A. That is the crowd that was at the Washington Monument starting to walk -- or the back probably two-thirds of the crowd starting to walk down towards the Capitol.

Q. Leaving the Washington -- so you and the group are

leaving the Washington Monument at approximately 1:20 p.m. headed towards the Capitol?

A. Correct.

Q. What was your expectation, sir, when you were walking with this large group of people towards the Capitol? A, did you have a plan, what were you intending to do, number one?

A. No, I didn't have a plan. I didn't know we were even going to the Capitol until probably two hours before that I guess.

Q. What was your expectation, sir, when you got down to the Capitol? What, if anything, were you expecting to occur?

A. I assumed there were going to be speakers like at the last rally, and we were going to walk down there and just make a presence and be there.

Q. Approximately how long did it take you, Mr. Jones, to get from the area of the Washington Monument down to the Capitol?

A. It's about a mile and a half, so probably in a crowd like that, it probably took us about 40 minutes or so.

Q. So what's your best estimate, sir, of when you arrived at the Capitol of the United States on January 6th, 2020?

A. I think it was around 2:00 o'clock, somewhere

around there, give or take five or 10 minutes, I guess.

MR. BRENNAN: I would offer those just to establish the timeframe, Your Honor, in terms of where he was at certain times.

THE COURT: Exhibits 19 and 20?

MR. BRENNAN: That's correct, Your Honor.

MR. DREHER: No objection.

THE COURT: They'll be admitted.

(Defense Exhibits 19 and 20 admitted into evidence)

MR. BRENNAN: This, Your Honor, is going to be identified as --

THE COURT: What does Jayden X mean?

MR. BRENNAN: So it's a video -- I'm only going to offer the first 13 seconds of this video.

THE COURT: Who made the video?

MR. BRENNAN: Let me -- it's slightly out of order. Let me stop -- let me go to --

THE COURT: Who made the video?

MR. BRENNAN: It's --

THE COURT: Did the defendant make the video?

MR. BRENNAN: No, he did not.

THE COURT: Where did you get it from?

MR. BRENNAN: The Jayden X video is in -- by the government, Your Honor. The government put this in as one of their exhibits.

THE COURT: Was it admitted?

MR. BRENNAN: The end of this exhibit was put in by the government. So the person who shot this, the end of it -- there's some video by Jayden X that shows a Speaker's Lobby. There's some video by Jayden X that shows Mr. Jones leaving the Capitol. The same videographer, if you will, took that photo. So that's where this came from, that particular person. And the government has admitted the Jayden X video outside the Speaker's Lobby, as well as Mr. Jones being escorted out of the building.

THE COURT: I remember that.

MR. BRENNAN: Yeah, same person.

THE COURT: But is this the one you want to admit?

MR. BRENNAN: I only want the first 13 seconds of this.

THE COURT: Part of the first same video -- is it part of the same video?

MR. BRENNAN: Yes.

MR. DREHER: So I might be able to clarify a little bit, Your Honor.

THE COURT: Hopefully.

MR. DREHER: So this portion, the entire video -- well, I should say the entire beginning portion, that I believe this covers, was marked as 805 in preparation for trial. The government did not seek its admission as

substantive evidence as 805. The last portion, the clip that was prepared for trial and the government sought admission of, was labeled 609. However, the Court excluded that at our pretrial conference as duplicative as it depicts the aftermath of the shooting.

So the -- so to clarify, this individual Jayden X is an internet title. He filmed himself going throughout the Capitol, and does depict certain events that occurred at the Capitol. We would have no objection to its authenticity in that it is provided to all the defense attorneys in global discovery as a depiction of the events at the Capitol. But I just wanted to make sure the Court was aware that the portion that we did seek admission of was excluded. However, we would have no objection to portions of it being admitted.

THE COURT: What is its relevance? What does it show?

MR. BRENNAN: Your Honor, it's just going to describe -- so we've reached the point now, Your Honor, where my -- I can make a proffer at the bench or do you want me to do it in front of my client?

THE COURT: Go ahead.

MR. BRENNAN: I'm sorry?

THE COURT: Go ahead.

MR. BRENNAN: Okay. We've reached the point now

where my client now, Your Honor, is down at the -- he's reached the Capitol. I want to take him through where he's at the bike racks that we've seen in evidence. And then he goes over to the bleachers, he climbs up the bleachers. I'm going to walk through, Your Honor, what was going on in his mind, what his intent was and why he was doing it. That's where we're at right now, Your Honor.

**THE COURT:** Okay. You need this Jayden X thing to do that?

**MR. BRENNAN:** Only the first 13 seconds of it, that's all.

**THE COURT:** What do you want to mark it as?

**MR. BRENNAN:** Yes, Your Honor.

**THE COURT:** That was a question. What do you want to mark it as?

**MR. BRENNAN:** Whatever the next number was, Your Honor.

**THE COURT:** I think it's 21, Defense Exhibit 21.

**MR. BRENNAN:** Twenty-one, that would be fine, Your Honor.

**THE COURT:** The government has no objection, correct?

**MR. DREHER:** Yes, Your Honor, no objection.

(Defense Exhibit 21 admitted into evidence)

**BY MR. BRENNAN:**

**Q.** Now --

**THE COURT:** Thirteen seconds of it.

**MR. BRENNAN:** Okay.

**THE COURT:** Do you want to play it?

**MR. BRENNAN:** No, not now, I want to play something else before then.

**THE COURT:** Wait a minute, whoa, whoa. What do you want to play before it?

**MR. BRENNAN:** I want my client, Your Honor, to walk the Court through the body-worn camera that's in evidence, Government's Exhibit 700. It's Metropolitan Police Officer Jason Rathburn at the bike racks. My client was depicted on that. He's going to tell you what was going on in his mind and what he did. I'm going to play portions of -- it's already in evidence.

**THE COURT:** Do we need to play the video to do that? He can testify to that.

**MR. BRENNAN:** I'm sorry?

**THE COURT:** He can testify to that.

**MR. BRENNAN:** Okay, I'll take him through it.

**THE COURT:** He can testify what's in his mind.

BY MR. BRENNAN:

**Q.** So let me ask you this way, Mr. Jones. In preparation for your testimony, have you had occasion to look at what's known as the Rathburn body-worn camera video?

**A.** I have, yes.

**Q.** Are you depicted in that, sir?

**A.** I am.

**Q.** And you're the person in the red puffy coat; is that right?

**A.** Yes.

**Q.** Now, during that video, sir, tell the Court, refresh the Court's recollection -- or perhaps mine, where are you when you're -- that video is taken?

**A.** So I am on the west terrace on the east -- I'm sorry, west side of the bike racks, the opposite side of the police, standing in the crowd. I'm three or four people back. Everyone around me is just standing around singing. I saw people in circles praying. In that video, the police shot flash grenades. One landed right beside my -- right beside me on the ground. I saw someone get injured, so I got away from that. It was very confusing, because there was no warning. There was no audible warning. We were just standing around, and all of a sudden explosions started happening in the crowd.

**Q.** As depicted in that video, had you or any members of the crowd that you were standing in attempted to breach the bike racks at that point?

**A.** No.

**Q.** Had you, by the time you arrived at the bike

racks, seen any signs prohibiting you from being there, sir?

A. No, I did not.

Q. You've heard some testimony about this green snow fencing?

A. Right.

Q. Had you seen any green snow fencing?

A. No.

Q. When you were there at the bike racks, three or four people back, are you shouting anything or participating in anything, sir?

A. No, I'm not.

Q. So what are you doing, you're standing there at the bike racks?

A. I was just standing there observing. I had my phone out. I tried to do a Facebook Live video, but it didn't work because I assume the towers were overcrowded with all the cell phones in the area. I was just observing, just like I was on November 14th.

Q. Now, there's been some discussion about whether or not there was any sort of announcement made that you were not supposed to be there. Did you, sir -- when you were at the bike racks, did you hear any announcement saying you were not supposed to be there?

A. No, I never heard any announcements.

Q. At that point, Mr. Jones, when you're at the bike

racks, had you seen any signs or heard any announcements you were not supposed to be there?

A. No, I had not.

Q. When those munitions or those nonlethal munitions are fired into the crowd, what did you do?

A. I was shocked, I was stunned, confused as to why they were shooting explosives into the crowd. So I saw people going under the scaffolding where the bleachers were, and I went that way to get away because the police were not firing on the bleachers.

Q. Did you want to be part of what was going on at the bike racks?

A. No.

Q. And you left the bike racks, where did you go?

A. I went under the bleachers, which are built on top of the steps. I went up the steps, around the corner and onto the bleachers.

MR. BRENNAN: Your Honor, I would ask to play the first 13 seconds of that video. Mr. Jones can describe what he saw and where he went. That would be the Jayden X video, which would be 805.

(Video played)

Q. Now, what is depicted down here, Mr. Jones, down there?

A. That is some doors.

**Q.** Is that how you entered that area?

**A.** It is.

**Q.** When you entered those doors, did you see any signs saying that you're not supposed to be there?

**A.** No.

**Q.** Did you see any police officers prohibiting you from going there?

**A.** No.

**Q.** Did you see some people climbing on the scaffolding over here? Did you ever attempt to climb on the scaffolding at all, sir?

**A.** No, not like that, I did not.

**Q.** Not like that, okay. This sort of I guess white covering that's around, what is that, sir?

**A.** That's what they call scrim. It's a white fabric for I guess decoration to kind of hide the scaffolding.

**Q.** Just play it to 13 seconds, please, sir.

(Video played)

**Q.** What is this over here, sir?

**A.** Those are bags of the fabric, the scrim.

**Q.** And approximately how much do they weigh, sir?

**A.** Probably about four or five pounds, if that.

**Q.** Now, these bleachers that are shown here -- well, I guess it's the structure under the bleachers and the bleachers themselves. Once you came through the door down

here, where did you go, sir?

**A.** So if I was coming up the steps through the doors, I would have then made a right -- which, looking at this picture, would be to the left.

**Q.** Over that way?

**A.** Yes.

**Q.** Okay. And when you got over there, what did you do, sir?

**A.** I got up on the bleachers -- which you can't see it, but right out of the bottom corner kind of over here, it goes up onto the bleachers.

**Q.** Now what's been admitted into evidence already as Government's Exhibit 600, which shows an open source video of people on the bleachers. Have you had occasion to review that, sir?

**A.** Yes.

**Q.** Tell Judge Leon in your own words what it depicts and what you were doing when you were on the bleachers, sir.

**A.** I believe that one is where they showed me tossing some of these green bags right here over the rail. It was filling up with people, and people were tripping over the bags, and so I saw one person toss one over. I saw a guy trip over one. And then I picked it up, tossed the first one over. And then the second one, I actually stopped to look to make sure there wasn't anyone below, and slid it

through the rails.

Q. Were you trying to hit anyone when you tossed those bags over?

A. No. Actually, the second time when I stopped and looked, I made sure there wasn't anyone there.

Q. Now, with respect to that video, were you on the bleachers with anybody in particular?

A. No.

Q. Did you have any discussions with anybody of what was going on?

A. No.

Q. What were you doing on the bleachers?

A. Just walked around the bleachers, took pictures, took a video, observed the massive crowd, and waved a flag.

Q. Did there come a time when you left the bleachers, sir?

A. Yes.

Q. Tell Judge Leon why you left the bleachers.

A. They started filling up with lots of people and it started to sway. So I got off of the bleachers because they were starting to sway.

Q. Did that make you nervous?

A. Yeah, it did. I mean, I've been on scaffolding before in construction-type work, and I know how they're built and put together. There were people climbing up the

sides and back and filling up the top, and so I didn't know what they were rated for. It started to sway, so I got off of them.

Q. Now, when you got off the bleachers, where did you go?

A. Around the corner -- which was kind of on that picture, were more stable temporary bleachers that were built on the steps I assume. I went around the corner of that, went up those and sat down up on the -- towards the top.

MR. BRENNAN: There's just a couple exhibits, Your Honor, that are already in evidence. I just want to play a few seconds of them, if I may. Mr. Jones can show where he was, what he was doing and why he was doing it.

THE COURT: Uh-huh.

MR. BRENNAN: It's Government Exhibit 401 at the 52 second mark.

(Video played)

Q. So you're on the bleachers, Mr. Jones. You left the bleachers because they were shaking. Did there come a point, sir, where you entered the United States Capitol?

A. Yes, I did.

Q. Why did you do that?

A. Well, when I was sitting on the second set of bleachers I was just describing, it gave a pretty much

straight view towards the area that you see in this -- the outside of this door. And there was a group congregating and people waving, so I went that way. And then we walked right into the Capitol.

**Q.** Now, you say "we." Were you with a group?

**A.** In general, not like partnering up with anybody. But just the big, large group of people that was there walked through the door.

**Q.** Did you see any signs that say you were not supposed to go in that door?

**A.** No.

**Q.** Was the door locked or damaged in any fashion, sir?

**A.** No, it was wide open like that.

**Q.** And did you walk in the United States Capitol?

**A.** I did.

**Q.** Tell Judge Leon what your intent was when you walked in the building.

**A.** I didn't really have an intent, I guess, or a thought other than we must be allowed to go in and have our voices heard. So I went into the Capitol.

**Q.** And it shows you coming in I think in just a few seconds at approximately -- well, can you just play it, Mr. Bayline, please.

(Video played)

**Q.** Is that you right there going in?

**A.** That is, in the red coat.

**Q.** Now, your attire that day, you had on your red coat, gray hat?

**A.** Yes.

**Q.** Now, in your business, do you have such things as goggles and face masks and helmets, things like that?

**A.** I have all those.

**Q.** Have steel-tipped shoes?

**A.** Yes.

**Q.** Did you wear them that day?

**A.** No.

**Q.** Do you have goggles to protect your eyes when you spray paint?

**A.** I have goggles, respirator, helmet.

**Q.** Did you bring any of that material with you to Washington that day?

**A.** No, I did not. I wore my favorite red coat.

**Q.** You wore your favorite red coat. No goggles, no face masks, no respirators, no helmet?

**A.** No, tennis shoes.

**Q.** Tennis shoes, okay. Now, when you got in the Capitol, sir, who did you see and what did you do?

**A.** Right inside this door at the end of the hallway, like we've seen, there were two officers at the next door.

I went straight to them, I shook their hand, thanked them for their service. I asked them where the restroom was. They pointed me -- one of them pointed me down the hall to the right of the steps that go up to the Rotunda. I ended up down the hall and ended up in the Crypt.

Q. So if you can go to 402 and just 55 seconds, please. This is in evidence through the government. Go to 55 seconds, please. Before you hit play, just stop.

Now, did you hear anything -- was there any noise going on?

A. There was lots of noise. I heard all kinds of things, people yelling, people with bullhorns.

Q. So is that you right there, sir?

A. That's me.

Q. Can you hit play, Mr. Bayline, please.

(Video played)

Q. Were you having a conversation with that police officer?

A. I was.

Q. Tell the Judge what you're talking to that police officer about.

A. I shook his hand, thanked him for his service, and asked him where the restroom was.

Q. During that conversation, did he ask you to leave the building?

A.    No.

Q.    Hit play, please.

(Video played)

Q.    You go off the right down that hall.  Where are you headed at that point, sir?

A.    That's the direction they pointed me towards the restroom.

Q.    And you see you're heading down to the restroom.  Is that you there in the corner heading down to the restroom?

A.    That's me right there.

Q.    The time you entered the building, headed to the restroom, did you have any intent to interfere with the Congress of the United States, sir?

A.    No, I did not.  Honestly, I assumed that it was over since the police let us in.

Q.    You thought it was over because the police let you in?

A.    Yeah, the police let us in.

Q.    Okay.  Now, did you then walk around the Capitol, sir?

A.    I did walk around the Capitol.

Q.    Did you encounter any other police officers as you were going through the Capitol, sir?

A.    Yeah, there were several inside the Capitol.

**Q.** Well, before we get to that, can you, Mr. Bayline, go to Government's Exhibit 601, about the 50 second mark, please.

(Video played)

**Q.** Is that you right there, sir, walking in?

**A.** Yes, it was.

**Q.** Go ahead, Mr. Bayline.

(Video played)

**Q.** You heard the conversation, "No metal." Did you hear that on the video?

**A.** I heard it on the video.

**Q.** Can you -- do you have any recollection today hearing that or what that was about?

**A.** I can't honestly say I heard it -- or remember it then, but I hear it on the video.

**Q.** You hear it on the video. And making sure that no one -- and you had no metal on you, sir; is that right?

**A.** No, I had no metal, I had a wooden flagpole.

**Q.** Now, when you said you were walking around the Capitol, did you encounter other police officers inside the Capitol?

**A.** Yes, I did.

**Q.** And I think that would be 404, I believe -- yes, 404, please. Now, you've had an opportunity to observe this video, sir?

**A.** Yeah, I've seen this one many times.

**Q.** Tell the Court what you see and where you are on this, and what occurs.

(Video playing)

**A.** So this is what -- this is I think Memorial Hall. And at that moment, we were just -- people were just milling around, as you can see in the video.

**Q.** Is that you right there, sir?

**A.** Bottom right, yes, by the police officers.

**Q.** Can you stop it. That's you in the gray hat, the red puffy coat and the police officers, right?

**A.** Right there, yes.

**Q.** So what's going on there, sir?

**A.** People are just chatting with the police officers.

**Q.** Did they tell you to leave?

**A.** No.

**Q.** Tell you weren't supposed to be there?

**A.** No.

**Q.** What did you say to them, anything?

**A.** Well, there's another one you'll see in a minute.

**Q.** Sure, okay, yeah.

**A.** Stood with him and shook his hand at one point.

**Q.** Chatting with those officers, okay.

**A.** These guys are fist bumping, these police officers here. The police officers in the Capitol were friendly and

nice. The one in the middle of the screen walking around I think is the one that I talked to.

Q. We'll see you in a moment here, I think.

A. Nobody's tearing anything up, we're just milling around.

Q. Is that you right there walking, talking to that officer?

A. It is.

Q. Go ahead. Is that a police officer you're talking to?

A. That's just one of the other people in there. But the police officer right now is walking back up, and he comes back.

Q. Can you stop. So talking to a police officer here at Memorial Hall door, right?

A. Multiple times.

Q. Multiple times?

A. Yes.

Q. Anyone ever -- did he tell you you weren't supposed to be there, ask you to leave?

A. No.

Q. Hit play.

(Video playing)

Q. He seems to pat you on the back?

A. Several times. He stood with his arm -- his arm

was around me.

Q.   And you touched the police officer?

A.   To pat him on the shoulder.  These people on the bottom right are fist bumping the cops.  Where I was, that was the overall, I guess, atmosphere of inside the Capitol.

Q.   So did there come a point in time where you went to a location when an officer may have said you weren't supposed to be there?

A.   Yes.

Q.   And where was that, sir?

A.   I can't tell you exactly where it was, because I'm not -- I don't know.  But just the crowd was walking around the Capitol, and we came to a door where there were some police officers.  And they said -- one of them said:  "I support what you're doing, but you need to leave."  And so the group left that area, and we walked around some more.

Q.   And then there came a point in time, sir, where you found yourself at the Speaker's Lobby door?

A.   I did.

Q.   There's a number of videos of that, you and I have looked at them many, many times.  Tell Judge Leon in your own words how it was that you wound up at the Speaker's Lobby door.

A.   I just went with the group of people in the Capitol.  It was like a school of fish kind of, I guess.

**Q.** A school of fish?

**A.** Yeah.

**Q.** What do you mean by that?

**A.** Just kind of weaving around through different hallways and following people, other people following different people and just ending up in different places.

**Q.** When you got to the Speaker's Lobby door, did you know what that meant? Did you know where you were, the Speaker's Lobby door?

**A.** No, I didn't know I was at the Speaker's Lobby door until I saw it on the news when I got back to the hotel. I had no idea where I was.

**Q.** So you get up there. Who was there and what happened when you first got there?

**A.** When I turned into the short hallway, there were a handful of police officers I guess, maybe 10 other people. And I finally found the restroom, it was on the left.

**Q.** You went to go to the restroom again?

**A.** Yes, it was on the left right before the Speaker's Lobby, maybe 15 feet before the wooden doors. So I went in there, used the restroom. The guy with the fur hat was in the restroom pretty much like destroying the restroom.

**Q.** What do you mean the guy with the fur hat, the guy we saw later on in the video, the guy with the fur hat talking?

**A.** Yes, yes.

**Q.** What was he doing in the restroom?

**A.** Well, he broke the mirror in the bathroom, he broke the faucet, he took a piss in the sink, just being overall loud and tearing stuff up.

**Q.** Did you do any damage at all in there, sir?

**A.** No.

**Q.** So you came out. What happened when you came out, what did you see?

**A.** When I came out of the restroom, it put me close to the front of what is now a big crowd just a few feet back from the doors where now there were three police officers across the door.

**Q.** Now, we've seen multiple versions of that, sir. You're hitting the door. Tell Judge Leon, if you can, what was going on in your mind at that time. What did you do and why did you do it, sir?

**A.** So before I hit the door, I was just standing there with the crowd just, again, observing. And then the crowd started yelling: "Break it down, break it down," and the police just moved. They just moved out of the way, they just left, and something tripped. I saw somebody else hit the window, and I hit the window it looks like nine times. And then I kind of, I guess, came to when I heard somebody yell, "gun," and I saw a gun out of the corner of my eye.

When that happened, I turned and said, "Stop," put my hand up and told people to stop.

Q. You've had two and a half years to think about it, why you hit that window. Are you able to give us a good explanation today?

A. I have no idea why I hit the window. I don't know, I don't have a particular reason. The only thing that I can come up with that compares it -- my father, I guess, made this analogy, is a person at a football game that has never done anything wrong, and their favorite team wins the playoff -- or the championship game, and they wind up on the field with the goalpost in their hand. They don't understand why, how it happened, it just happened. And that's all I can come up with. No reason.

Q. Did you hit that window with the intent of interfering with the certification of the presidency?

A. No, not at all.

Q. Did there come a time where you saw the individual named Ashli Babbitt get shot, sir?

A. Unfortunately, I witnessed that firsthand.

Q. What was your reaction to that?

A. At the moment, I cried. I went back in the bathroom and cried. It's -- for many months, and even now, every time it plays, it's tough. I've tried to see many counselors for PTSD. I've seen someone be shot and die.

Yeah, it's very tough.

**Q.** So after Ms. Babbitt was shot, what did you do then, sir?

**A.** I went in the restroom and cried. I texted my friend Dan, told him what had happened. And then I came back out, and the crowd was just angry. People on this side of the door where I was were yelling at the police officers, accusing them of killing her, killing Ashli Babbitt. And only like two to three other people besides myself knew that the shot came from the other side of the door. Even the police officers didn't know where it came from. They thought -- the crowd thought the police officers did it that were on our side of the door.

I took some video because -- I just did. And then I stayed around because they were trying to tell everybody to leave, but they weren't taking any statements or asking if anyone saw anything. They just -- it just -- it didn't seem right at the moment.

**Q.** Now, there's some other videos that have been admitted into evidence that have been shown to the Court already. One is at I think 606 and 601 and 404, showing you exiting the Capitol. So the Court has seen them, I won't replay them.

What is depicted in those? What are you doing when you're exiting the Capitol, sir?

**A.** Are you talking about the body cam?

**Q.** Yeah.

**A.** Towards the end?

**Q.** Uh-huh.

**A.** That's only one body cam of like 26 body cam videos that show us leaving. I walked out, but at -- while I was leaving, I thought if I leave, nobody's going to know what happened. There was only, like I said, four of us on our side of the door that knew who shot Ashli.

**Q.** I'm sorry, you said you thought there was only like four people who really saw what happened?

**A.** Yeah, me and like three other people that were right there at the glass, at the door.

**Q.** Okay.

**A.** So whenever -- I walked down the hallway and made a right and saw the exit doors, and that's where they were having us leave. I turned around to go back to the officer -- which is in the body cam. You can see me, I'm not trying to get past her, I'm leaning in to tell her that I just witnessed the shooting before I leave the building.

**Q.** Did you want to give her your name and address?

**A.** I did.

**Q.** And there's also a camera angle that shows you like getting on the elevator?

**A.** I did.

**Q.** So what was all that about?

**A.** That was after -- when I leaned in to talk to I believe it -- is it Ms. Green, the body cam?

**Q.** Yeah.

**A.** I was, I guess you call it, blindsided by an officer with a baton and started being pushed out. I saw the elevator, and thought I can get onto that and stay in the building. And I did, and actually was kind of fortunate, because if you watch the video, an enormous brawl broke out and they started fighting with the police and the police started hitting the people that were there. I came off of the elevator, and I have my hands over my head. I never fought with any police. I never pushed back.

I actually got stuck between two police officers, ones that were pushing out and ones that were at the door. I got sandwiched between them. And if you watch some of the other 26 body cams, you can see the police officers talking about helping me to get me out of the building. And then I left the building.

**Q.** Sir, during the time that -- at any time at all, sir, when you were on the Capitol grounds in the Capitol, did you ever strike a police officer, sir?

**A.** No.

**Q.** Never?

**A.** No.

**Q.** When you tried to remain in the building after the shooting of Ms. Ashli Babbitt, why were you trying to remain in the building?

**A.** To tell someone that I saw what happened.

**Q.** When you got out of the -- when you exited the Capitol, do you know what door you exited from that day, sir?

**A.** I'm not a hundred percent which door, but it was on the opposite side of the Capitol than where I came in.

**Q.** That would be the east side?

**A.** East side.

**Q.** What did you do when you got out the door?

**A.** I walked around and sat on a chair and cried.

**Q.** You cried?

**A.** I did.

**Q.** Why did you cry, sir?

**A.** Because of what just took place, I just saw someone be shot and die inside the Capitol.

**Q.** And then what did you do?

**A.** I walked back around to the other side of the Capitol and back towards my truck. Halfway down the Mall, I sat on another bench and sat and cried again.

**Q.** Did you eventually get to your truck?

**A.** I did, yeah.

**Q.** What time did you leave Washington, D.C. that day?

**A.** Probably 3:45 to 4:00 o'clock, because I was back at the hotel I think 4:30 or 5:00.

**Q.** You're back in Gaithersburg at 4:30, 5:00 o'clock?

**A.** Yes.

**Q.** You got to Gaithersburg. What did you do when you got to Gaithersburg, sir?

**A.** Went to the hotel and turned on the news, and then that's when I saw what had taken place at the Capitol.

**Q.** What do you mean by what had taken place?

**A.** Honestly, that was the first time that I saw that people broke into the Capitol to get in the Capitol. I assumed that we were -- the only people that came in were let in through the doors, because I never saw people breaking in windows or breaking in doors.

**Q.** When you were there?

**A.** When I was there. I saw it on the news afterwards.

**Q.** Did you have any conversation or text messages with any friends or family there at that point, sir?

**A.** In the hotel?

**Q.** Yeah.

**A.** Yeah, a couple. I spoke with my wife and a couple friends, Mr. Goddard I guess.

**Q.** Mr. Goddard?

**A.** Uh-huh.

Q. Tell people you were in the Capitol?

A. I did.

Q. Who did you tell?

A. I told Amanda and Mr. Goddard.

Q. Now, there's a text message that's there where Mr. Goddard, I think, says, "Please tell me you weren't in the Capitol," and your response is, "I wasn't in the Capitol."

Do you remember that text message we've heard about?

A. I do.

Q. After you got that text message, what did you do?

A. So he asked if I was in the Capitol -- or he said: "Please tell me you weren't in the Capitol." And I said: "No, I wasn't in the Capitol, but a lot of people were." Then he sent a picture of me and said: "It looks a lot like you, no comment?" And then I picked up the phone and called him and talked to him for 24 minutes.

Q. What's in evidence as Defense Exhibit 2 is a call log from your phone on the evening of January 6th, 2021 with a 24-minute phone call to Mr. Goddard?

A. Correct.

Q. Is that the phone call, sir?

A. It is.

Q. What did you tell him?

**A.** I talked to him a bit about why we were there as far as how we believed there were irregularities with the election and that's what the rally was for. I told him that was me in the Capitol at the window. He knew it was me obviously.

**Q.** What's his background? Did he make any recommendations to you about getting a lawyer? What's his background? Tell the Court his background.

**A.** Yeah, Jason's like been a police officer for like 20 years. He's a detective. He told me he took an oath so he was going to turn me into the FBI; that I should get an attorney, they're going to want -- the FBI's probably going to want to talk to me because I witnessed a bad shooting by a police officer.

**Q.** What phrase did he use with respect to a text message to you?

**A.** About the shooting?

**Q.** Yeah.

**A.** I think it was a shooting of color maybe.

**Q.** Yeah, what does that mean? Do you know what that meant?

**A.** A bad shooting.

**Q.** A bad shooting?

**A.** A questionable shooting.

**Q.** So that was on the evening of the 6th; is that

right?

**A.** It was.

**Q.** What did you do the next day, the 7th?

**A.** The 7th, I drove home.

**Q.** Did you stop for your tractor or just go home?

**A.** No, I went home.

**Q.** Did you have any contact with a lawyer on the way home?

**A.** Yes.

**Q.** Who was that?

**A.** I called Nate, Nathan Miller, in Louisville.

**Q.** In Louisville?

**A.** Yes.

**Q.** That was on the 7th?

**A.** 7th, yes.

**Q.** And then did you authorize him to reach out to the FBI and contact the FBI on your behalf, sir?

**A.** So at that point I had not. Amanda and I met with him on the 8th, the next day, at his office. And then he reached out either that evening or the morning of the 9th to the FBI field office I believe in Owensboro -- or maybe Bowling Green, actually, to a Mr. -- or FBI Agent Michael Brown, I believe.

**Q.** Did there come a point in time where you went in to see the FBI?

**A.** I did, yeah.

**Q.** Tell us about that, how that came about, sir.

**A.** So after Nate said he contacted the FBI on either the 8th or 9th, he said: "Just hang out, they're going to call. They'll let us know when they want to meet up and talk with you."

**Q.** Did you get word from Mr. Nathan Miller that the FBI wanted to talk to you?

**A.** Eight days later.

**Q.** Eight days later?

**A.** Yes.

**Q.** What did you do?

**A.** So that was in the morning whenever he told me they were ready. I had seen them riding by my house taking pictures of the house.

**Q.** You had?

**A.** Yeah, saw them out the window. So within two hours I was at their office. It was 40 minutes away, so I showered and shaved and headed that way, went and sat with them for two plus hours.

**Q.** So we saw the introduction of that interview yesterday that was played for the Court. You went in with Mr. Miller, you were read your rights?

**A.** Uh-huh.

**Q.** Did you have any consideration, sir, of not

cooperating with the FBI, sir?

**A.** No, not at all.

**Q.** Did you know that you didn't have to make a statement, you could exercise your Fifth Amendment rights?

**A.** Yeah, I believe they told me that.

**Q.** And you talked to them?

**A.** I talked to them, yes.

**Q.** And have you and I and Mr. Lawlor -- have we all gone through the interview that you did?

**A.** Yeah, we sure have. A few times.

**Q.** Did you tell the truth in that interview?

**A.** Yes, I did.

**Q.** Do you ever deny that you were the man in the red puffy coat and the gray hat in the Capitol that day?

**A.** No, never. I pointed myself out in the video.

**Q.** You pointed yourself out in the video?

**A.** In the video, in the FBI's office.

**Q.** Did you ever deny that you were the person that struck the window at the Speaker's Lobby?

**A.** No. That was actually the video I pointed myself out in.

**Q.** You pointed yourself out?

**A.** Yeah.

**Q.** And what did you tell them why you were there? What did you say?

**A.** Just -- on January 6th, why was I there?

**Q.** Yeah.

**A.** To show up and show support for the president, and just be a body and have our voices heard.

**Q.** There was some talk about a search warrant at your home and the seizure of your iPhone and your red puffy jacket. Did you let them have your iPhone?

**A.** I did, yeah.

**Q.** Tell them what the code was to get into it?

**A.** I gave them the code, signed the paperwork. The phone was at my house with my wife, and the agents, I guess, went to the house.

**Q.** We've seen all these pictures, three or four different pictures, of your red puffy coat. I guess they got the coat, huh?

**A.** They have my coat.

**Q.** Mr. Jones, we now have a situation where you attended a rally on November 14 of 2020; we have an occasion where you attended a second rally on January 6th, 2021?

**A.** Right.

**Q.** Stayed the same place both times?

**A.** I did.

**Q.** Parked at the same lot both times?

**A.** I did.

**Q.** Wore the same clothing both times?

**A.** I did.

**Q.** But different things happened?

**A.** Very different.

**Q.** Was there ever any expectation, sir, when you traveled to Washington on November -- excuse me, on January 6th, 2021, that it would be any different than what had occurred on November 14 of 2020?

**A.** No, I had no thought of anything different happening. It seemed it was just a rally like before.

**Q.** You're on trial in this court, you've seen the evidence, heard the testimony. Are you proud of what happened or are you sorry for what happened?

**A.** I am sorry for what happened. I'm sorry that I hit the window.

**MR. BRENNAN:** The Court's indulgence, Your Honor. Thank you, Your Honor. I have no further questions.

**THE COURT:** Cross-exam.

**CROSS-EXAMINATION OF CHAD JONES**

**BY MR. DREHER:**

**Q.** Yes, Your Honor. Good evening, sir. My name is Adam Dreher, I'm one of the prosecutors in this case.

**A.** I know who you are.

**Q.** I'm sorry?

**A.** I know who you are.

**Q.** Oh, okay. This will be a little bit easier, then.

**A.** Yeah.

**Q.** So ultimately you are the individual in the red puffy coat and the gray hat that we've seen in just about every exhibit that was played during trial?

**A.** Yes, that's me.

**Q.** You entered the Capitol on January 6th, 2021, correct?

**A.** I did.

**Q.** You traveled to the Capitol from the Ellipse on that day, correct?

**A.** I walked, yes.

**Q.** And when you got to the Capitol, you saw a scene that was much different than what you presented from November 14th, correct?

**A.** I saw a scene that was different, is that what --

**Q.** Did you see a different scene from the crowd on January 6th than there was on November 14th?

**A.** Yes, it was different.

**Q.** In fact, you recorded the difference, and we've seen both videos during this trial, haven't we?

**A.** We have, yes.

**Q.** In the scene of November 14th, they're singing and people are lined up behind bike racks, and there's police officers who are not being assaulted, correct?

**A.** Correct.

**Q.** But you saw the exact opposite on January 6th of 2021, didn't you?

**A.** There was some differences, but the majority of the people that I saw were not doing what you're talking about.

**Q.** So the majority of people on January 6th presented a different scene than what was observed in the video you recorded on November 14th, correct?

**A.** Yes.

**Q.** At what point on January 6th did you realize that the scene was different?

**A.** When did I realize the scene was different. I guess whenever we started getting hit with flashbangs and grenades.

**Q.** Now, you mentioned on direct examination that once this occurred, to avoid that you ran closer to the Capitol, right?

**A.** Actually, I went around the side and under the bleachers where they were not shooting, correct.

**Q.** Once under the bleachers, you then climbed the scaffolding to get on top of it, right?

**A.** I didn't climb the scaffolding. There's steps underneath of it, so I went under the steps and then around. And then to get onto the first level of the bleachers was like a ladder, so two climbs onto the bleachers.

**Q.** So you didn't climb the scaffolding, you climbed a ladder to get up there?

**A.** Around the corner to get onto the first part of the bleachers, yes, a ladder-like part of the scaffolding to get up onto the bleachers like a shortcut. Not climbing the scaffolding, like in the video climbing 20 or 30 feet, I walked up the stairs underneath.

**Q.** Sir, my question was did you climb up the scaffolding?

**A.** In a roundabout way, yes.

**Q.** Once you were on top of that scaffolding, you were able to see clearly a line of police officers, correct?

**A.** Yeah, I did.

**Q.** And, in fact, you recorded this line from your own cell phone, right?

**A.** I did.

**Q.** And in that recording you can see the police officers' backs, right?

**A.** I can.

**Q.** Now, on direct examination, you testified that you went to this location because the police weren't shooting there, right?

**A.** Correct.

**Q.** But this was behind them, wasn't it?

**A.** Not really. So they were lined up from the corner

of one scaffolding to the other scaffolding, and then I went on the side and around. So I was kind of on the side of them.

Q. Now, in the video that was played, the Jayden X video as it was described, there were doors?

A. Yes, under the scaffolding.

Q. And you entered those doors?

A. Yes, the steps went up and through the doors.

Q. Now, in the video clip that we showed, there were no police officers in there, correct?

A. Yeah, there were no officers when I was there.

Q. That didn't stand out to you?

A. No. The police officers were in the line on the bike racks down lower.

Q. Now, from your vantage point on top of this scaffolding, you were also able to see the violence that was occurring on January 6th, right?

A. I could see some violence, yes.

Q. You saw smoke being used to disperse the crowd?

A. Yes, and flash grenades being shot into the crowd, yes.

Q. And, in fact, at one point on direct you said the scaffolding started shaking, right?

A. It did, it swayed, I assume from the amount of people on it.

**Q.** And, again, you ran closer to the Capitol, right?

**A.** Well, if I had gone back under the scaffolding, I felt that that wasn't safe if it was to collapse from the swaying and the amount of people. So I went around the corner onto the more, I guess, secure or permanent foundation bleachers.

**Q.** You went to the presidential inaugural stage, right?

**A.** I didn't know that's what it was at that time, but yes, I did go there.

**Q.** Now, from your vantage point on top of the scaffolding, you were able to see the police officers retreat to this position, right?

**A.** They retreated below me, yes.

**Q.** And they went to the presidential inaugural stage, right?

**A.** I don't know where they went.

**Q.** So you didn't see any police officers when you went to these more secure bleachers as you called them?

**A.** Not where I was, no.

**Q.** And you didn't consider that to be out of place?

**A.** No, not really.

**Q.** Did there ever come a time on November 14th of 2020 when you were present at the Supreme Court that you did not see police officers?

**A.** Yeah, when I was walking up to the Supreme Court.

**Q.** And did there ever come a time on November 14th of 2020 where you entered the United States Supreme Court?

**A.** Well, no, I didn't --

**Q.** Did there ever come a time when you --

**MR. BRENNAN:** Objection. He should be able to finish his answer.

**THE COURT:** Hold on. Let him finish his answer.

**MR. DREHER:** Yes, Your Honor.

**THE COURT:** Go ahead.

**THE WITNESS:** I did not enter the Supreme Court, but there also wasn't a crowd of people with a door wide open and police officers shaking our hand as I went in.

**BY MR. DREHER:**

**Q.** Did there ever come a time where you stepped foot on any of the stairs to the United States Supreme Court?

**A.** No, I did not.

**Q.** Did there ever come a time where you passed the police line at the United States Supreme Court?

**A.** I don't believe so.

**Q.** Now, when you attended the rally on November 14th of 2020 in front of the Supreme Court, there was some litigation that you were aware of, right?

**A.** No, I'm not aware -- I don't know what you're talking about.

**Q.** The group that you were with at the Supreme Court, did you know if there was any reason why they chose that location?

**A.** No. I didn't know we were going to the Supreme Court when I went to D.C. on November 14th. I didn't even --

**Q.** So what was your understanding of why you went to D.C. on November 14th?

**A.** I'm sorry?

**Q.** What was your understanding of why you went to D.C. on November 14th?

**A.** There was going to be a rally, just a President Trump rally. I didn't know where it was. I just showed up in D.C. and followed the people, and we ended up at Freedom Plaza.

**Q.** How did you know to go to D.C.?

**A.** I assume I saw it online or on Facebook or some place like that.

**Q.** And that's the same for January 6th?

**A.** Yeah.

**Q.** But you had no idea why the rally was occurring at the Supreme Court?

**A.** No, I had no idea. There were speakers who were going to be there. So at Freedom Plaza, they said we're going to walk down to the Supreme Court. And that's what I

did, I walked with everybody else.

Q. So the speakers were at the Supreme Court?

A. There were speakers at Freedom Plaza, and then there were speakers at the Supreme Court. There was a stage set up at both locations.

Q. Now, on January 6th, you also attended a rally where there were speakers as well?

A. Yes.

Q. And those speakers were at the Ellipse?

A. Yes.

Q. And there were no speakers at the Capitol?

A. Not when I got there, no.

Q. At no time when you were at the United States Capitol on January 6th were there any speakers that you listened to, correct?

A. No.

Q. Was that out of place to you?

A. Well, I hadn't really thought about it. President Trump said we're going to walk down to the Capitol and cheer on the congresspeople, so that's what I did, I walked with the crowd down to the Capitol to cheer. I didn't know if there were going to be speakers there or not.

Q. When you entered into the doorway under the scaffolding, did you think the speakers were going to be under the bleachers?

**A.**　Probably not.

**Q.**　When you climbed --

**A.**　I didn't know if there were going to be speakers there.

**Q.**　When you climbed the scaffolding to the presidential inaugural stage, did you think the speakers were going to be there?

**A.**　I just told you I didn't know if there were going to be speakers there or not.  So no, I would not think there were speakers on top of the scaffolding.

**Q.**　At what point, sir, did you think your presence at the Capitol was out of place?

**A.**　Whenever I hit the window.

**Q.**　So it wasn't until you were inside the Capitol that you thought you shouldn't be in the Capitol?

**A.**　That's exactly right, that's what I'm saying.  I shook hands with two police officers as I walked in the door.  They pointed me to the restroom.  I went into the Crypt, and you saw in the video the police officer with his arm around me.  Two different times I shook hands with officers in there.  No one ever told us to leave.

**Q.**　Now sir, from the presidential inaugural stage, you ran to the open door, correct?

**A.**　Possibly part of the way.

**Q.**　When you saw the door open, you ran towards it,

correct?

A.     Sure.

Q.     Now, once inside there, there was a crowd that was being stopped by those police officers, wasn't there?

A.     They weren't being stopped, we walked right in. They held the door open for us.  I shook hands with both of those police officers.

Q.     I'd ask that we pull up Government's Exhibit 402, and fast forward to the 55 second mark.  Now, sir, this is Government's Exhibit 402.  This is the hallway of the door that you entered, correct?

A.     Yeah, it is.

Q.     And you recall earlier saying that there was not a group being stopped by police officers at this door?

A.     I do.

Q.     But there is a group that's stopped by police officers at that door.

A.     The video's not playing, it's frozen.

MR. DREHER:  I'm sorry, Your Honor, I didn't hear the --

THE COURT:  Do you have an objection?

MR. BRENNAN:  Yes, Your Honor.

THE COURT:  What's your objection?

MR. BRENNAN:  That the video speaks for itself, Your Honor.

**THE COURT:** He's asking a question based on the video. So I'll let the questioner ask the question he believes is appropriate, and then we'll see if it's appropriate.

**MR. DREHER:** Yes, Your Honor.

**THE COURT:** Ask your question.

BY MR. DREHER:

Q. Earlier you testified that there was not a group stopped by police officers at this door.

A. Okay.

Q. Does this video depict that, sir?

A. Well, at the moment the video's not playing.

Q. If we could play for five seconds.

A. Let it play through, yeah.

(Video played)

A. They're talking with the police officers.

Q. That group is stopped by the police officers, correct?

A. I don't know if they're stopped by the police officers or if they're talking to the police officers. But what I'm telling you is when I got there, I shook hands with the police officers and they let us through.

Q. Now, within that five seconds we see you enter the frame, correct?

A. Yes, I'm in the red coat.

**Q.** And you show up at the back of this stopped group, don't you?

**A.** Yeah.

**Q.** But you push your way to the front, right?

**A.** I went straight to the police officers.

**Q.** Through the crowd of people, right?

**A.** There's two people there in front of me.

**Q.** If we can play another five seconds, please.

(Video played)

**A.** The police officer's right there. I went straight to him.

**Q.** Sir, there's no question. Ultimately, you pushed through this crowd, didn't you?

**A.** The crowd is behind me. I did not push through the crowd.

**Q.** You're the individual in the red jacket and the gray hat, right?

**A.** I am.

**Q.** And this individual depicted in this video turns sideways to work his way through this crowd, doesn't he?

**A.** I guess we see it differently.

**Q.** Okay. If we could play this clip to the end.

(Video played)

**Q.** Now sir, the time stamp on this clip reads that at 2:35 p.m. is when you entered the United States Capitol.

Does that sound about right?

A. It does.

Q. Earlier on direct you testified that the police officer at this door directed you to some restroom that was along that path, correct?

A. I asked him where the restroom was, and they pointed me down the hall.

Q. And that's the hall that you then went down towards the Crypt?

A. It is.

Q. Did you find a bathroom in the Crypt?

A. No.

Q. You continued further on, didn't you?

A. I did, because I didn't find the bathroom.

Q. Now, in preparation for trial, you've had an opportunity to look at a lot of video, I'm guessing?

A. Yes.

Q. And throughout the video that you reviewed, do you ever see yourself looking for a bathroom?

A. I actually went in the bathroom right in front of the Speaker's Lobby. That's where I found it.

Q. So that's the only time that you enter a bathroom?

A. It is.

Q. My question, sir, is is there ever a video clip where you see yourself looking for a bathroom?

**A.** I guess not. I can't -- no.

**Q.** Okay. Now, ultimately from the Crypt, you moved to this Memorial Door corridor where you had another interaction with a police officer, correct?

**A.** Yeah, that would be the second time. It was actually inside the Crypt, I talked to another police officer and shook hands with him. Y'all have the video somewhere.

**Q.** Correct. You've had an opportunity to review that video, right?

**A.** Yes, I have.

**Q.** And was this police officer able to direct you to where a bathroom was?

**A.** I don't remember. I remember shaking hands and telling him thank you for your service.

**Q.** So the topic of conversation was not the bathroom at that point?

**A.** Probably not at that point.

**Q.** Now, from this area you then go upstairs into the Rotunda, correct?

**A.** From the Crypt, I ended up in the Memorial Door hallway, I guess.

**Q.** Right, the Memorial Door corridor is where you had the interaction with the police?

**A.** One of them, yes.

**Q.** And it was after that you then went up to the Rotunda?

**A.** It is.

**Q.** And from the Rotunda, we can see you take a video of some sort while you're up there?

**A.** Probably.

**Q.** Now, throughout your time from the Rotunda from when you entered it, you also had your phone out at different times taking video, correct?

**A.** And pictures, yes.

**Q.** And pictures?

**A.** Uh-huh.

**Q.** Right, that was a yes?

**A.** Yes.

**Q.** Now, from the Rotunda, you move towards where the Statuary Hall is. Do you remember that area?

**A.** Is that the one with the ropes, the velvet ropes?

**Q.** Correct. That's where you moved again?

**A.** Yes.

**Q.** And at that point, there was another crowd that was stopped by police, right?

**A.** I don't know if they were stopped by police.

**Q.** Well, you pushed through them again, right?

**A.** You would have to show me. I'm not sure which one you're talking about.

**Q.** If we could pull up Exhibit 411, please -- no, I'm sorry. Let's pull up 407 and start at 30 seconds.

(Video played)

**Q.** Yep, right there at 30 seconds. Now, sir, I'm going to direct your attention to this area of the screen here.

**A.** Okay.

**Q.** That individual in the red coat and gray hat, that's you, right?

**A.** That's me, yeah.

**Q.** If we can play this clip, yes, please.

(Video playing)

**A.** Yeah, I'm right beside that StopTheSteal sign.

**Q.** Now, if we can pause it right here. Now sir, would you agree with me that when we started that clip, you were in this area?

**A.** Yes.

**Q.** But then when we finished that clip, you're in this area?

**A.** True, yes, I agree.

**Q.** So you pushed through that crowd, too, right?

**A.** I did.

**Q.** Now, also during -- while we were watching that clip, we see you point forward and at one point put your hand up on your face as though you were yelling?

**A.** Uh-huh.

**Q.** Do you remember what you were yelling?

**A.** I don't.

**Q.** You were yelling something?

**A.** Maybe like excuse me, possibly. I don't know what I said.

**Q.** Okay. Now, further you continued pushing through the crowd and then running towards the House chamber, right?

**A.** Can you show me?

**Q.** Sir, do you remember running towards this House chamber?

**A.** I don't remember where I went. I didn't know where I was inside the Capitol, I was just following with the crowd. So to say I specifically ran towards a specific area, I don't know. I possibly ran, but I can't tell you, yeah, I was running towards that area.

**Q.** Now, after seeing the police presence outside, did you find it odd that the police presence inside in this area was -- there was no police officers there?

**A.** No, not really.

**Q.** You didn't find that out of place?

**A.** No.

**Q.** That outside the House chamber of the United States Capitol there was no police officers with this crowd?

**A.** I didn't know I was outside the House chambers. I

don't know where I was.

Q. Okay. If we can pull up --

A. I had no idea.

Q. If we could pull up 408 and begin at 58 seconds, please. Just pause it at 58, though.

So sir, to orient you from the clip we were in in the last exhibit of 407, 407 looks north. This now looks west. So if I could direct your attention to that area of the screen right there.

A. Okay.

Q. If we could, please, play for 30 seconds.

(Video playing)

Q. That's you running, isn't it?

A. It is with about 40 other people running. There were people yelling: "Come this way, come this way."

Q. Those people were not police officers?

A. No, they sure weren't.

Q. But you were following them?

A. I was.

Q. Was that out of place to you?

A. Not at the moment, no.

Q. Now, the time stamp on this is 2:41 p.m.; is that correct?

A. Yes, that's correct.

Q. Now, before this occurs, you were with a group

chanting: "Break it down" at that first door that we saw at the beginning of this clip, right?

**A.** The group was, I did not chant that.

**Q.** You were with the group, weren't you?

**A.** I was in the group, but you said I was in a group chanting. I did not chant that.

**Q.** But you were with the group?

**A.** I was in the group, yes.

**Q.** Now, after this, you then go to the Speaker's Lobby door, right?

**A.** I know that now. At the moment, I did not know that it was the Speaker's Lobby.

**Q.** On direct examination, you testified that this is when you finally found the bathroom?

**A.** It is, I did.

**Q.** And after you used the bathroom, you went outside and pushed your way through the crowd to get to the front again?

**A.** No, not necessarily. The bathroom door is close to the Speaker's Lobby door. So when I went in, there wasn't a large crowd. When I came out of the bathroom, I ended up right almost in the front of the crowd. So I didn't push my way to the front of the crowd.

**Q.** So there wasn't a crowd after you got out of the bathroom?

**A.** Yes, there was. The bathroom was on the side. So when I came out of the bathroom, I was already in the front of the hallway in front of the crowd.

**Q.** So you didn't have to push through anybody to get there, did you?

**A.** No.

**Q.** You just came out of the bathroom, you were right there?

**A.** Yeah, the bathroom door is right beside the Speaker's Lobby door.

**Q.** When you came out, did you see the police officers in front of that door as well?

**A.** I did, I sure did.

**THE COURT:** Can you put the tape that has the Speaker's Lobby door there so we can have him point this out.

**BY MR. DREHER:**

**Q.** Yes, Your Honor. If we can pull up 602, and let's start at 410. No, I'm sorry, not Exhibit 410, Exhibit 602, paused at 4 minutes and 10 seconds.

Sir, this is the area that we're discussing?

**A.** It is.

**Q.** And on the screen here, at least, the bathroom is here?

**A.** Yes, that looks like the corner door, yes.

**Q.** And earlier you told us that immediately upon coming out from there, you were right at the front?

**A.** I did.

**Q.** If we can play this for 15 seconds.

(Video played)

**THE COURT:** Stop that. Now, back up a little bit. Yeah, pause that -- well, go back. Right there, can that be made clearer?

**MR. DREHER:** If you'd just hit E on the keyboard, maybe.

**THE COURT:** It's fuzzy, mine's very fuzzy.

**MR. DREHER:** I believe it's the movement, Your Honor.

**THE COURT:** See where that clock is? Do you see the clock?

**THE WITNESS:** The clock above the door?

**THE COURT:** Yeah.

**THE WITNESS:** I do.

**THE COURT:** Can you see what's below the clock?

**THE WITNESS:** I do now, yes.

**THE COURT:** You didn't see it that day?

**THE WITNESS:** No, sir.

**THE COURT:** It says "Speaker's Lobby." It's your testimony you never saw that? You were standing in front of that door for this period of time, and you never saw those

words "Speaker's Lobby"?

**THE WITNESS:** I never looked up, Your Honor. I did not see that until I saw it on the news, until I saw this video on the news.

**THE COURT:** Okay, that's your testimony. Go ahead.

BY MR. DREHER:

Q. Now sir, between the door to this bathroom, there's also a painting on the wall, correct?

A. It looks like there is, yes.

Q. And so this would be additional space to where you're at the front, then?

A. It would be.

Q. So in other words, when you got out of the bathroom, you would have to go through this crowd to get to the front where the door is, right?

A. There were police officers there in front of the door, so they were out from the door a couple feet. So that takes up some of that space that you're talking about. So the crowd wasn't as close as what --

Q. As soon as the police officers moved, you were at the window smashing it, weren't you?

A. I did, yes.

Q. As soon as they moved, you were there with your flagpole to hit this window?

**A.** Yes, I haven't denied that.

**Q.** I think you said it was nine times?

**A.** Yeah.

**Q.** Now, certainly at that point, the windows -- these four windows began to give way, correct?

**A.** Please explain give way.

**Q.** You were causing damage to the window that you were hitting, weren't you?

**A.** I hit a window that was already broken.

**Q.** Sir, my question: You were causing damage to the window you were hitting, weren't you?

**A.** Yes.

**Q.** And this damage then caused the window to fall out?

**A.** I don't know if the window that I hit fell out or not, I don't remember.

**Q.** Sir, at some point Ashli Babbitt got up into a window?

**A.** She did.

**Q.** And attempted to go further than this door?

**A.** She did.

**Q.** And after she was shot, you hung around?

**A.** I did.

**Q.** Not just hung around, but leaned over the railing to film her?

**A.** I did.

**Q.** After she was shot?

**A.** Yes.

**Q.** Through the officers telling everyone to leave, you stuck around?

**A.** I did, because no one knew who shot her.

**Q.** Now sir, earlier you testified you went into the Capitol because no one told you to leave. You continued on through until the Memorial Door corridor because nobody told you to leave.

When the police tell you to leave, you then hung around?

**A.** I just witnessed a shooting, sir, and I was one of only about four people that saw who did it.

**Q.** Did you explain that to the police officers?

**A.** No, because they wouldn't let me, they wouldn't let me do it. If you watch other videos, you can see me telling multiple people in the crowd that it came from the other side of the door.

**Q.** You can. We never see you talk to police, do we?

**A.** I tried.

**Q.** There is never a time --

**MR. BRENNAN:** Objection. The witness should be allowed to finish his answer.

**THE COURT:** Let the witness finish his answer.

**MR. DREHER:** Yes, Your Honor, I apologize.

**THE COURT:** Finish your answer.

**THE WITNESS:** Okay. Actually, there are videos of me talking to the police, you all just didn't play them in court. There is multiple videos of me talking to the police.

**MR. DREHER:** Your Honor, at this time I would renew my motion to admit Exhibit 609 into evidence. This relates to the aftermath of the Ashli Babbitt shooting.

**THE COURT:** 609?

**MR. DREHER:** It was a discussion point at one of the pretrial hearings. The video itself is eight minutes long. However, it will document Mr. Jones' -- I believe it will impeach his testimony at this point.

**THE COURT:** I don't know. I think -- at this point, it's 6:15. We've gone over 45 minutes from what the original plan was to recess at 5:30. I think it probably makes more sense to call it a day for today.

**MR. DREHER:** Yes, Your Honor.

**THE COURT:** My court reporter's been working awfully hard, and I think we need to take a break. Why don't I see counsel at the bench.

(Sidebar discussion)

**THE COURT:** How much more would you guesstimate that you have? I realize it's an approximation.

MR. DREHER: Your Honor, at this point, the defendant still has the search of the proceedings -- or at least the topics I'm going to cover is the red coat was found in the Infinity and not the truck. He drove the truck to D.C.

THE COURT: You've been going for about a half hour.

MR. DREHER: It will probably be another half hour to 45 minutes.

THE COURT: And will there be redirect?

MR. BRENNAN: I don't know, Your Honor. All I know is I'm parked in a parking garage that closes at 7:00.

THE COURT: Well, my reporter needs to take a break. I was hoping if maybe I went this late, we could get it done. But it's obvious we're not going to get it done, so we'll reconvene tomorrow at 1:30.

MR. BRENNAN: At 1:30?

THE COURT: And I'm going to guesstimate that you'll be done at 2:00 or 2:15, and that you might have a little bit of redirect, 15 minutes?

MR. BRENNAN: Right.

THE COURT: So 2:30, take a little break, and then we'll do closing arguments. Roughly 45 minutes each, roughly, so that's an hour and a half. So we should be done by 4:30.

MR. DREHER: Yes, Your honor.

THE COURT: If that schedule kind of works.

MR. DREHER: The only question I would have, I don't know if Mr. Brennan would know if there's going to be a renewed Rule 29 motion. I don't know if that needs to be factored --

THE COURT: We've already dealt with that.

MR. BRENNAN: Usually we submit on the arguments already made.

THE COURT: No, I think as a practical matter, that's been dispensed.

MR. DREHER: I understand, Your Honor.

MR. BRENNAN: I think we'll finish tomorrow, Judge.

THE COURT: We better finish tomorrow.

MR. BRENNAN: I got you. So what's your plan for the verdict? I know Your Honor said he makes factual findings and stuff.

THE COURT: Well, it's regrettable that the Court of Appeals wants me to go through -- basically issue an opinion. It's not an opinion, it's a detailed ruling. So that's going to take a few days.

MR. BRENNAN: The only reason I ask, Your Honor --

THE COURT: And I won't have a transcript.

MR. BRENNAN: Yeah. The only reason I ask, Your

Honor, is that my client has been staying in a hotel here locally, if I should send him back for a few of days? I'm not trying to pressure the Court.

THE COURT: I'm guesstimating Tuesday.

MR. BRENNAN: Tuesday you think.

THE COURT: I'll have something done by Tuesday --

MR. BRENNAN: Okay.

THE COURT: -- Tuesday or Wednesday, one or the other. I can let you know as it's progressing how close I am. In other words, if it's a Monday and I don't think Tuesday will work and it will be more likely Wednesday, I'll tell you Monday that it's probably going to be Wednesday, if that's the situation hypothetically. I can't imagine it would be past Wednesday.

MR. BRENNAN: Okay.

THE COURT: I don't think it will be past Wednesday. But not having a transcript, I've got to do it with my clerk's notes.

MR. DREHER: The rough draft, is that something you ordered, my office ordered? We do have a rough draft.

MR. BRENNAN: We ordered a rough draft from the court reporter --

THE COURT: Oh, I don't know.

MR. BRENNAN: -- to prepare for closing argument, Your Honor. We did do that.

**THE COURT:** Okay.

**MR. BRENNAN:** I don't mind sharing.

**THE COURT:** Well, if they have it --

**MR. BRENNAN:** I guess it's up to the court reporter, Your Honor.

**THE COURT:** That'll help. So I would say Tuesday, Wednesday is probably the farthest out, I would guesstimate, that I'll need. It's nine counts.

**MR. DREHER:** I understand, Your Honor.

**THE COURT:** Do you have anything else?

**MR. BRENNAN:** No.

**THE COURT:** He's a witness on the stand. He can't discuss his testimony so far with anyone, including you.

**MR. BRENNAN:** Including me?

**THE COURT:** I think that's the rule, at least the rule as I've always understood it. Once the witness takes the stand, it's hard to do, but that's the rule in our circuit.

**MR. BRENNAN:** We are aware of the rules, and certainly, we have no intention of violating those rules, Judge. I've been doing this a lot of years, I'm not going to do that now.

**THE COURT:** Okay, thank you.

(Open court)

**THE COURT:** We're going to recess for the evening.

We're not going to be able to get done tonight. We're going to reconvene tomorrow at 1:30.

You're a witness under oath in a proceeding now, and there's rules that we have about that. You're not at liberty to discuss your testimony so far or what it might be when you return. Cross-exam's not done, and your counsel has the opportunity to redirect you.

**THE WITNESS:** Okay.

**THE COURT:** You're not allowed to discuss that with anyone -- the lawyers, your spouse, anyone. You're supposed to stay independent of all others, that's the rules. You have to be able to say under oath -- testify under oath that you have not discussed your testimony so far or what it might be when you return with anybody.

**THE WITNESS:** Okay.

**THE COURT:** Do you understand?

**THE WITNESS:** Absolutely.

**THE COURT:** You're excused, you can step down.

Does government counsel have any issues that need to be resolved overnight from the government's perspective?

**MR. DREHER:** No, Your Honor. Thank you.

**THE COURT:** Does defense counsel have any issue that needs to get -- issue or issues that need to get resolved? Mr. Lawlor seems to have a question that he wants...

MR. LAWLOR: This concerns the timing, Your Honor. Can I assume that we will finish with Mr. Jones, and subject to any rebuttal by the government, go into closing arguments?

THE COURT: There will be closing arguments, they will be completed tomorrow. They will be completed tomorrow. The Court is estimating each side to have 45 minutes or less, it's up to them. But I'm going to try to hold them to 45 minutes. I think that's enough for a trial that goes for three days, it's plenty. Remember, less is more.

MR. LAWLOR: I have to trim mine by 50 percent.

THE COURT: Your Rule 29 set all kinds of records, Mr. Lawlor. I won't be more specific than that. Have a nice evening, counsel.

(Proceedings adjourned at 6:22 p.m.)

# C E R T I F I C A T E

I, **Jeff M. Hook, Official Court Reporter,** certify that the foregoing is a true and correct transcript of the record of proceedings in the above-entitled matter.

February 7, 2024

**DATE**

Jeff M. Hook

**BY MR. BRENNAN: [25]** 336/21 339/17 341/7 341/16 342/14 344/4 344/20 346/18 347/6 347/19 402/1 412/18 413/9 413/12 414/5 416/17 417/6 417/17 419/23 421/6 422/25 425/15 427/4 432/24 433/21

**BY MR. DREHER: [5]** 463/18 469/13 474/6 483/16 485/6

**BY MR. LAWLOR: [7]** 382/11 382/22 386/12 392/4 392/19 393/14 401/9

**BY MS. MURPHY: [11]** 353/3 353/25 354/15 355/2 386/21 389/18 391/15 397/22 399/19 400/8 400/14

**DEPUTY CLERK: [7]** 336/1 382/2 382/7 393/7 393/12 401/19 401/24

**MR. BRENNAN: [125]** 336/10 337/19 338/3 338/8 338/22 339/4 339/8 339/13 340/11 340/13 340/15 340/22 340/25 342/10 343/10 343/15 343/18 343/20 344/1 344/15 346/5 346/9 346/12 346/16 348/1 348/5 348/13 349/6 349/10 349/14 349/17 349/20 349/23 350/1 350/3 350/5 350/12 351/5 351/11

351/13 356/11 356/23 357/1 357/5 357/12 357/22 358/1 358/16 358/25 359/2 381/14 381/16 381/19 401/18 412/6 412/14 413/4 414/1 416/9 416/12 417/2 417/13 417/25 418/9 418/25 419/3 419/7 419/10 419/19 420/25 422/20 425/7 426/8 426/23 427/1 429/1 429/5 429/9 429/12 429/15 429/18 429/20 429/22 430/1 430/11 430/13 430/17 431/17 431/22 431/24 432/9 432/12 432/15 432/18 433/2 433/4 433/8 433/17 433/19 436/17 440/10 440/15 463/14 469/5 473/21 473/23 487/22 489/10 489/16 489/20 490/7 490/12 490/15 490/22 490/24 491/4 491/6 491/14 491/20 491/23 492/1 492/3 492/10 492/13 492/18

**MR. DREHER: [79]** 358/22 368/7 370/6 370/16 370/18 371/4 372/1 372/3 372/7 372/10 372/16 372/24 373/4 373/15 373/19 373/22 374/4 374/8 374/10 374/18 375/3 375/10 375/12 375/16 376/13 376/15 376/18

376/23 377/2 377/13 377/22 378/2 378/6 378/10 378/13 378/18 378/22 379/3 379/8 379/12 379/15 379/20 412/3 412/11 413/6 414/2 416/14 417/3 417/14 418/1 419/14 419/18 421/3 422/21 425/10 425/13 426/10 426/14 429/6 430/18 430/21 432/22 469/8 473/18 474/4 484/8 484/11 487/25 488/6 488/10 488/18 488/25 489/7 489/25 490/2 490/11 491/18 492/8 493/20

**MR. LAWLOR: [35]** 359/5 359/12 359/21 359/24 360/15 360/18 366/2 366/4 366/7 366/9 366/25 367/2 367/6 380/6 380/10 380/13 380/19 380/21 380/23 380/25 381/5 381/9 382/8 386/18 388/23 389/2 390/10 390/14 393/4 397/18 399/17 400/6 401/16 493/25 494/11

**MS. MURPHY: [31]** 336/5 338/5 338/9 341/15 350/7 350/16 350/23 351/2 351/4 351/24 352/8 352/17 353/1 353/23 354/18 354/21 355/21 356/8 356/24 357/14 357/19 386/8 389/8

389/14 390/12 390/22 391/7 391/11 391/25 392/15 401/5

**THE COURT: [260]**

**THE WITNESS: [24]** 336/17 342/7 349/21 349/24 354/14 355/1 358/19 382/6 382/20 386/19 392/18 393/5 393/11 401/23 469/10 484/15 484/17 484/19 484/21 485/1 488/2 493/7 493/14 493/16

---

**'**

**'21 [2]** 357/11 357/12

---

**0**

**0213 [1]** 332/4

---

**1**

**1,500 [1]** 407/22

**10 [11]** 334/10 342/13 391/18 399/22 410/5 418/2 418/4 418/5 429/1 449/16 483/20

**106 [1]** 338/14

**10:38 [1]** 413/15

**11 [4]** 334/11 339/2 421/3 421/6

**1100 [1]** 332/13

**11:06 a.m [1]** 426/5

**11:24 a.m [1]** 413/3

**11:30 [1]** 413/3

**11:48 [1]** 342/12

**12 [4]** 334/12 422/22 422/24 422/25

**12:36 p.m [1]** 413/16

**13 [13]** 334/13

337/24 338/12 338/23 338/24 422/22 422/24 422/25 429/14 430/14 432/10 436/19 437/17

**13th [1]** 410/18

**14 [19]** 334/14 338/24 339/8 339/24 340/4 342/18 411/3 411/14 413/15 414/24 415/11 415/25 416/5 418/17 420/1 425/13 425/15 462/18 463/7

**14th [23]** 409/20 409/21 410/1 410/20 418/14 418/23 420/10 420/13 421/2 421/14 423/12 423/18 435/18 464/14 464/17 464/22 465/8 468/23 469/2 469/21 470/5 470/8 470/11

**15 [7]** 334/15 338/2 339/8 360/5 381/25 484/4 489/20

**15 feet [1]** 449/20

**15-minute [1]** 380/17

**15:52 [1]** 343/17

**15:54 [1]** 343/12

**15th [1]** 427/19

**16 [2]** 334/16 348/22

**16th [2]** 337/3 347/12

**17 [4]** 334/17 387/8 425/13 425/15

**17th [6]** 354/10 354/10 355/9 355/10 356/7 356/8

**18 [6]** 359/17 364/2 364/9

**1**

**18... [3]**
383/16 387/9
408/11
**19 [6]** 332/5
334/18 364/2
364/9 429/5
429/9
**1:00 [1]** 419/5
**1:03 p.m [1]**
415/11
**1:13 [1]**
427/10
**1:13 p.m [1]**
427/13
**1:20 [1]**
427/17
**1:20 p.m [1]**
428/1
**1:21-cr-0213
 [1]** 332/4
**1:29:40 [1]**
348/7
**1:30 [3]**
489/16 489/17
493/2
**1C [1]** 354/9
**1D [1]** 354/9
**1E [1]** 354/9

**2**

**20 [13]** 334/19
339/4 360/5
362/2 394/8
396/15 398/3
410/25 423/10
429/5 429/9
458/10 466/6
**20-minute [1]**
380/18
**20-year [1]**
395/25
**2000 [2]**
403/23 403/24
**20001 [1]**
332/25
**2002 [1]**
364/10
**2005 [1]**
396/24
**2012 [1]**
408/13
**2017 [2]** 407/7
407/14
**2018 [2]** 409/2
409/5
**2020 [18]**
354/10 355/10

356/7 409/10
409/20 409/21
409/22 410/1
411/3 411/14
414/24 415/25
428/24 462/18
463/7 468/24
469/3 469/22
**2021 [14]**
337/3 341/23
345/24 354/11
355/10 356/8
402/19 402/22
421/16 457/20
462/19 463/6
464/6 465/2
**2023 [1]** 332/5
**20530 [2]**
332/14 332/16
**20770 [1]**
332/20
**20th [1]** 406/2
**21 [4]** 334/20
432/18 432/18
432/24
**21-213 [1]**
336/2
**213 [1]** 336/2
**231 [1]** 359/17
**24 [3]** 346/25
358/3 457/18
**24-minute [2]**
358/9 457/21
**26 [2]** 453/5
454/17
**29 [8]** 347/16
359/7 378/22
379/22 379/25
380/5 490/5
494/13
**2:00 [3]**
380/15 419/5
428/25
**2:00 or [1]**
489/19
**2:10 [1]**
380/16
**2:14 [1]** 332/6
**2:15 [1]**
489/19
**2:30 [1]**
489/22
**2:35 p.m [1]**
475/25
**2:41 p.m [1]**
481/22

**3**

**30 [4]** 344/17

479/2 479/4
481/11
**30 feet [1]**
466/6
**300 [1]** 407/22
**309 [1]** 364/9
**31 [1]** 405/15
**333 [1]** 332/24
**336 [1]** 333/4
**34 [1]** 345/17
**352 [10]**
334/22 334/23
334/24 334/25
335/3 335/4
335/5 335/6
335/7 335/8
**353 [1]** 333/5
**358 [1]** 334/21
**382 [1]** 333/8
**386 [1]** 333/9
**39 [1]** 382/19
**392 [1]** 333/10
**393 [1]** 333/13
**397 [1]** 333/14
**3:31 p.m [1]**
382/1
**3:45 to [1]**
456/1
**3:58 p.m [1]**
382/2

**4**

**4-foot [2]**
369/13 377/24
**40 [6]** 347/5
347/17 364/9
428/21 460/18
481/14
**401 [2]** 333/15
440/16
**402 [4]** 333/18
443/6 473/8
473/10
**403 [1]** 426/17
**404 [3]** 445/23
445/24 452/21
**407 [3]** 479/2
481/7 481/7
**408 [1]** 481/4
**410 [2]** 483/19
483/19
**411 [1]** 479/1
**412 [1]** 334/3
**413 [1]** 334/4
**414 [1]** 334/5
**416 [2]** 334/6
334/7
**417 [2]** 334/8
334/9

**418 [1]** 334/10
**421 [1]** 334/11
**422 [2]** 334/12
334/13
**425 [4]** 334/14
334/15 334/16
334/17
**429 [2]** 334/18
334/19
**432 [1]** 334/20
**45 [6]** 364/10
488/16 489/9
489/23 494/7
494/9
**463 [1]** 333/19
**4700-C [1]**
332/24
**48 [2]** 345/17
393/23
**4:00 [1]** 456/1
**4:30 [3]** 456/2
456/3 489/25
**4:53 [1]**
339/15

**5**

**50 [2]** 344/17
445/2
**50 percent [1]**
494/12
**50th [1]** 406/3
**52 [1]** 440/17
**523 [3]** 356/19
356/22 357/10
**523A [1]**
358/15
**53 [1]** 337/18
**532 [1]** 426/13
**532A [2]**
334/21 358/16
**55 [3]** 443/6
443/8 473/9
**56 [1]** 349/8
**57:39 [1]**
346/10
**58 [2]** 481/4
481/5
**5:00 [3]**
418/24 456/2
456/3
**5:30 [3]**
418/25 419/13
488/17
**5:54 [2]**
340/16 341/5
**5th [2]** 357/11
421/17

**6**

**600 [1]** 438/13
**601 [3]** 332/16
445/2 452/21
**602 [2]** 483/18
483/19
**605 [6]** 374/11
390/9 390/12
390/13 391/17
399/17
**606 [1]** 452/21
**609 [3]** 431/3
488/8 488/10
**6305 [1]**
332/19
**64 [1]** 422/12
**6:00 [1]**
420/13
**6:00 on [1]**
420/10
**6:15 [1]**
488/16
**6:22 p.m [1]**
494/16
**6th [46]**
341/23 342/19
343/2 343/8
344/9 345/24
362/1 363/10
368/21 388/16
388/19 389/7
389/21 390/5
392/11 399/13
402/19 402/22
405/5 405/9
418/11 418/13
418/17 421/16
421/19 421/23
421/25 422/3
423/7 424/14
427/13 428/23
457/20 458/25
462/1 462/19
463/6 464/6
464/17 465/1
465/6 465/10
467/17 470/19
471/6 471/14

**7**

**700 [2]** 332/19
433/11
**7:00 [1]**
489/12
**7:38 [1]**
341/13
**7th [5]** 357/11
459/3 459/4

**7**

**7th... [2]**
459/14 459/15

**8**

**800 [1]** 354/23
**804A [1]** 338/6
**804A10 [2]**
334/25 352/23
**804A11 [2]**
335/3 352/23
**804A12 [3]**
335/4 344/19
352/24
**804A14 [2]**
335/5 352/24
**804A15 [3]**
335/6 347/6
352/24
**804A16 [3]**
335/7 347/18
352/24
**804A17 [3]**
335/8 349/9
352/24
**804A6 [2]**
338/7 339/9
**804A7 [4]**
334/22 339/4
339/12 352/23
**804A8 [2]**
334/23 352/23
**804A9 [2]**
334/24 352/23
**805 [4]** 354/22
430/24 431/1
436/21
**806 [1]** 355/23
**815 [1]** 355/4
**84A14 [1]**
346/11
**8:48 [1]** 424/8
**8:52 a.m [1]**
411/15
**8th [2]** 459/19
460/4

**9**

**9:00 [1]** 412/3
**9th [2]** 459/20
460/4

**A**

**a.m [3]** 411/15
413/3 426/5
**A11 [1]** 343/14
**A14 [1]** 346/11
**abeyance [1]**

337/23
**abiding [2]**
385/4 395/22
**able [17]**
352/12 354/13
368/18 371/3
374/23 378/14
415/17 419/15
430/19 451/4
466/12 467/16
468/12 469/6
477/12 493/1
493/12
**above [3]**
415/22 484/16
495/6
**above-entitled
[1]** 495/6
**absolutely [6]**
395/19 395/19
398/13 406/8
417/2 493/17
**accepted [1]**
394/15
**access [1]**
383/18
**according [3]**
358/12 387/23
391/4
**account [5]**
355/17 356/4
405/5 405/7
405/8
**accusing [1]**
452/8
**acquittal [1]**
359/8
**across [2]**
394/3 450/13
**act [2]** 359/19
373/11
**acted [7]**
361/19 361/23
362/24 363/3
363/4 363/15
363/20
**action [3]**
332/3 377/17
377/18
**actions [4]**
351/18 369/2
369/10 370/13
**active [2]**
408/2 408/19
**activity [3]**
345/24 362/17
367/25
**actually [13]**

350/21 366/12
406/2 438/24
439/4 454/8
454/14 459/22
461/20 465/18
476/20 477/6
488/3
**actus [1]**
367/24
**ADAM [3]**
332/15 336/8
463/21
**add [2]** 354/20
381/5
**addition [1]**
358/7
**additional [2]**
340/8 485/11
**address [5]**
359/3 414/10
414/11 414/12
453/21
**adjourned [1]**
494/16
**administration
[1]** 400/21
**admission [4]**
412/13 430/25
431/3 431/13
**admissions [1]**
425/12
**admit [7]**
352/21 352/22
358/13 358/13
412/14 430/13
488/8
**admitted [68]**
334/3 334/4
334/5 334/6
334/7 334/8
334/9 334/10
334/11 334/12
334/13 334/14
334/15 334/16
334/17 334/18
334/19 334/20
334/21 334/22
334/23 334/24
334/25 335/3
335/4 335/5
335/6 335/7
335/8 345/21
350/25 352/24
356/23 357/5
357/7 357/7
357/8 357/15
357/19 357/20
357/21 358/13

358/16 412/17
412/18 413/8
413/9 414/4
414/5 416/16
416/17 417/5
417/6 417/17
418/5 421/5
421/6 422/24
422/25 425/15
429/8 429/9
430/1 430/8
431/15 432/24
438/12 452/20
**adopt [2]**
365/20 365/24
**ADT [1]** 396/3
**adult [1]**
411/8
**advised [1]**
339/23
**affect [1]**
419/17
**affirm [3]**
382/4 393/9
401/21
**aftermath [2]**
431/5 488/9
**afternoon [13]**
336/6 336/11
336/23 336/24
353/5 353/6
380/8 382/13
383/3 386/23
386/24 397/24
397/25
**afterwards [1]**
456/17
**again [44]**
336/7 336/8
336/23 337/13
341/18 342/1
342/19 343/22
345/9 346/14
348/12 354/9
354/9 355/25
356/2 361/24
362/3 362/21
363/12 363/20
364/8 364/14
365/6 365/12
365/15 365/18
366/7 366/21
369/7 369/11
397/10 400/4
400/12 400/13
401/2 418/17
422/14 449/18
450/19 455/22

468/1 478/18
478/23 482/18
**agent [12]**
336/9 336/23
346/7 349/15
349/23 349/24
350/16 353/5
354/2 354/12
357/21 459/22
**agent's [2]**
348/11 348/12
**agents [4]**
342/17 349/17
350/5 462/11
**ago [5]** 383/15
383/16 384/5
384/18 385/24
**agree [4]**
346/3 375/12
479/15 479/20
**agreed [1]**
353/20
**ahead [8]**
339/16 359/12
431/22 431/24
445/7 447/9
469/10 485/6
**Airbnb [3]**
395/14 405/5
405/5
**alarm [1]**
383/10
**alarms [1]**
369/16
**Albany [1]**
394/1
**Alfred [4]**
349/25 350/1
350/2 350/3
**allow [2]**
368/11 378/24
**allowed [3]**
441/20 487/24
493/9
**almost [3]**
412/3 413/3
482/22
**alone [2]**
418/16 418/17
**along [2]**
415/22 476/5
**alter [1]**
390/17
**although [4]**
368/13 370/7
370/22 373/9
**always [6]**
377/18 384/6

**A**

**always... [4]**
395/4 396/4
396/5 492/16
**Amanda [9]**
384/9 394/10
394/12 404/14
404/20 405/1
405/3 457/4
459/18
**Amendment [2]**
368/1 461/4
**AMERICA [2]**
332/3 336/3
**American [1]**
417/2
**amongst [1]**
368/15
**amount [2]**
467/24 468/4
**analogy [2]**
370/20 451/9
**angle [1]**
453/23
**angry [2]**
370/24 452/6
**anniversary [1]**
406/3
**announcement
[2]** 435/20
435/22
**announcements
[2]** 435/24
436/1
**answered [1]**
389/10
**anymore [1]**
358/21
**apologize [1]**
488/1
**apparent [1]**
373/13
**apparently [1]**
348/12
**appeal [1]**
361/15
**Appeals [1]**
490/20
**appear [1]**
400/19
**appearance [1]**
336/5
**APPEARANCES [1]**
332/11
**appeared [1]**
418/12
**appellate [1]**
361/10

**Apple [2]**
353/11 354/3
**appreciate [1]**
378/23
**approach [5]**
336/4 353/24
355/22 388/25
418/6
**appropriate [2]**
474/3 474/4
**approximate [1]**
414/10
**approximately
[6]** 339/15
403/22 428/1
428/17 437/21
441/23
**approximation
[1]** 488/25
**area [18]**
374/12 409/3
420/20 428/18
435/17 437/1
441/1 448/16
477/19 478/16
479/5 479/16
479/19 480/15
480/16 480/18
481/8 483/21
**argue [4]**
375/6 376/24
379/2 426/21
**argued [4]**
367/3 367/11
367/11 379/14
**arguing [3]**
367/6 367/14
376/25
**argument [12]**
359/24 359/25
360/25 361/10
365/19 365/24
367/22 370/8
377/15 377/23
379/11 491/24
**arguments [6]**
368/6 368/16
489/23 490/8
494/4 494/5
**arm [3]** 447/25
447/25 472/20
**around [46]**
344/2 352/5
352/20 362/2
369/23 369/24
384/20 385/8
403/23 410/23
422/8 423/15

428/25 429/1
434/13 434/13
434/19 436/16
437/14 439/13
440/6 440/8
444/20 444/22
445/19 446/7
447/1 447/5
448/1 448/12
448/16 449/4
452/15 453/17
455/13 455/20
465/18 465/23
466/3 467/2
468/4 472/20
486/22 486/24
487/5 487/12
**Arrington [5]**
364/1 364/9
376/2 378/3
378/6
**arrived [2]**
428/23 434/25
**Ashli [8]**
369/22 374/8
451/19 452/8
453/9 455/2
486/17 488/9
**aside [2]**
365/19 374/25
**aspect [1]**
373/6
**assault [1]**
416/4
**assaulted [2]**
361/3 464/24
**assembly [1]**
395/9
**asserted [3]**
350/18 352/3
352/14
**assessment [3]**
372/22 372/23
376/4
**associated [1]**
354/3
**assume [8]**
360/6 394/2
410/25 435/16
440/8 467/24
470/17 494/2
**assumed [3]**
428/14 444/15
456/12
**assuming [1]**
390/18
**atmosphere [1]**
448/5

**attachment [6]**
354/4 354/7
354/24 355/5
355/24 355/25
**attack [1]**
377/8
**attempt [1]**
437/10
**attempted [4]**
359/19 372/6
434/22 486/20
**attend [2]**
409/1 421/19
**attended [6]**
340/7 343/8
462/18 462/19
469/21 471/6
**attendees [2]**
415/22 416/24
**attention [2]**
479/5 481/8
**attest [1]**
385/12
**attire [1]**
442/3
**attorney [3]**
348/21 349/16
458/12
**Attorney's [1]**
349/3
**attorneys [2]**
370/20 431/10
**audible [1]**
434/18
**audiotape [1]**
337/2
**Aunt [1]** 384/9
**authenticity
[1]** 431/9
**authorize [1]**
459/16
**auto [1]**
405/19
**available [1]**
354/23
**Avenue [5]**
332/24 413/19
413/24 414/13
414/16
**avoid [1]**
465/16
**aware [6]**
363/9 408/22
431/12 469/23
469/24 492/19
**awareness [2]**
361/20 362/24
**away [6]**

386/17 410/5
422/10 434/17
436/9 460/18
**awfully [2]**
340/21 488/21

**B**

**B-A-R-R-E-T-T
[1]** 402/5
**B-L-A-N-D-F-O-R
-D [1]** 382/21
**Babbitt [10]**
360/12 369/22
370/14 374/8
451/19 452/2
452/8 455/2
486/17 488/9
**Bachelor [1]**
403/20
**back [42]**
336/10 336/15
336/16 341/10
341/23 346/23
353/16 367/7
372/3 379/8
382/2 383/12
400/3 413/18
420/14 420/17
420/19 421/17
421/18 424/18
427/23 434/13
435/9 440/1
447/12 447/13
447/24 449/11
450/11 451/22
452/6 453/17
454/13 455/20
455/21 456/1
456/3 468/2
475/1 484/6
484/7 491/2
**backed [1]**
396/5
**background [4]**
403/13 458/6
458/8 458/8
**backs [1]**
466/18
**backwards [1]**
413/22
**bad [5]** 387/15
398/11 458/13
458/22 458/23
**bags [4]**
437/20 438/20
438/22 439/3
**banged [2]**
360/7 364/14
**banging [1]**

## B

**banging... [1]**
365/5
**Bankruptcy [1]**
332/23
**barbecues [1]**
384/16
**BARRETT [3]**
332/6 336/3
402/5
**barricade [1]**
373/15
**barricaded [2]**
373/8 373/12
**base [3]** 385/6
395/24 396/16
**based [3]**
357/17 426/20
474/1
**basically [1]**
490/20
**bathroom [22]**
450/3 451/23
476/11 476/14
476/19 476/20
476/22 476/25
477/13 477/16
482/14 482/16
482/19 482/21
482/25 483/1
483/2 483/7
483/9 483/23
485/8 485/15
**baton [1]**
454/6
**battering [2]**
375/25 377/25
**Bayline [7]**
336/14 339/15
340/17 441/24
443/15 445/1
445/7
**became [1]**
408/22
**become [2]**
383/11 383/13
**becomes [3]**
372/21 375/22
377/3
**began [2]**
369/13 486/5
**begin [1]**
481/4
**beginning [6]**
337/17 381/4
400/3 402/9
430/23 482/2
**begins [1]**

348/6
**behalf [4]**
336/7 336/12
338/16 459/17
**behavior [2]**
400/17 400/25
**behind [7]**
373/9 373/15
373/17 397/8
464/23 466/24
475/14
**believes [2]**
363/7 474/3
**belong [1]**
408/19
**belonged [1]**
372/18
**below [3]**
438/25 468/14
484/19
**bench [6]**
332/9 389/18
391/15 431/20
455/22 488/22
**beside [5]**
413/19 434/15
434/16 479/13
483/9
**besides [1]**
452/9
**best [4]**
370/19 381/3
419/12 428/22
**better [3]**
341/5 341/6
490/15
**Biden [1]**
409/15
**big [2]** 441/7
450/11
**bike [15]**
415/20 416/1
432/3 433/12
434/11 434/23
434/25 435/8
435/13 435/22
435/25 436/12
436/14 464/23
467/14
**bit [12]**
354/12 369/9
393/17 403/13
406/9 407/24
425/5 430/20
458/1 463/25
484/6 489/20
**black [1]**
349/18

**blacked [1]**
403/5
**BLANDFORD [8]**
333/7 382/11
382/17 382/24
386/21 386/23
391/21 392/4
**blank [1]**
348/21
**bleachers [33]**
432/4 432/4
436/8 436/10
436/15 436/17
437/23 437/24
437/25 438/9
438/11 438/14
438/18 439/7
439/12 439/13
439/15 439/18
439/20 440/4
440/7 440/19
440/20 440/25
465/19 465/20
465/24 465/25
466/4 466/5
468/6 468/19
471/25
**blindsided [1]**
454/5
**blocks [1]**
411/24
**blue [1]** 348/1
**boat [1]**
406/18
**boats [1]**
406/20
**bodily [9]**
364/6 364/17
364/19 365/3
375/24 376/8
376/12 376/20
377/4
**body [13]**
374/22 392/25
395/25 424/2
433/10 433/25
453/1 453/5
453/5 453/18
454/3 454/17
462/4
**body-worn [2]**
433/10 433/25
**boil [1]**
377/14
**border [1]**
422/11
**both [11]**
350/12 350/23

380/19 384/12
385/6 462/21
462/23 462/25
464/20 471/5
473/6
**bottom [3]**
438/10 446/9
448/4
**bought [1]**
406/18
**Bowling [1]**
459/22
**brain [3]**
345/7 345/20
349/2
**brandish [1]**
377/11
**brawl [1]**
454/9
**breach [2]**
416/1 434/22
**break [13]**
365/6 369/5
369/11 380/12
380/17 380/18
384/25 450/20
450/20 482/1
488/21 489/14
489/22
**breaking [3]**
373/11 456/14
456/14
**BRENNAN [11]**
332/18 332/19
333/4 333/18
336/12 336/20
353/10 358/25
381/8 418/8
490/4
**Brennan's [1]**
381/5
**brief [9]**
351/5 363/25
364/3 364/8
376/3 378/8
378/9 378/16
416/8
**Briefly [1]**
353/2
**bring [1]**
442/16
**broad [4]**
367/25 368/5
368/5 386/11
**broke [4]**
450/3 450/4
454/10 456/11
**broken [5]**

345/6 361/4
374/8 396/14
486/9
**Brother [7]**
368/13 368/16
370/8 371/21
376/1 378/25
379/13
**brought [2]**
351/18 362/13
**Brown [1]**
459/23
**bucks [2]**
410/25 423/10
**building [20]**
362/18 363/17
365/12 365/16
365/23 366/11
369/23 373/12
380/10 385/13
430/10 441/18
443/25 444/12
453/20 454/8
454/18 454/19
455/1 455/3
**built [5]**
384/5 396/2
436/15 439/25
440/8
**bullhorns [1]**
443/12
**bumping [2]**
446/24 448/4
**burden [2]**
365/18 367/12
**Burney [4]**
349/25 350/1
350/2 350/3
**buses [2]**
424/11 424/15
**business [11]**
374/21 395/14
396/2 396/3
396/4 396/5
396/9 405/4
405/6 408/4
442/6
**busy [1]**
384/13
**buying [1]**
421/12

## C

**C-H-A-D [1]**
402/5
**cabin [1]**
395/14
**cabins [1]**
395/15

**C**

**Cajon [1]**
409/3
**call [19]**
356/14 356/14
356/17 356/19
357/3 357/7
357/11 357/22
358/3 358/9
400/17 401/19
437/15 454/5
457/19 457/21
457/23 460/5
488/18
**called [6]**
390/18 397/14
409/15 457/17
459/11 468/19
**calls [1]**
392/17
**cam [5]** 453/1
453/5 453/5
453/18 454/3
**came [28]**
346/21 362/12
362/14 410/11
410/12 418/16
418/17 421/21
430/7 437/25
448/13 448/17
450/8 450/8
450/10 450/24
452/5 452/10
452/11 454/11
455/9 456/12
460/2 482/21
483/2 483/7
483/11 487/18
**camera [5]**
369/21 415/21
433/10 433/25
453/23
**cams [1]**
454/17
**can [75]**
336/16 338/14
340/19 340/24
341/4 343/16
346/7 348/7
352/15 353/16
354/12 354/20
365/7 374/6
374/11 374/13
375/12 380/9
381/20 381/25
382/15 382/20
384/12 386/14
388/25 389/13

389/14 390/18
391/18 399/17
401/3 402/3
402/4 419/8
421/8 424/5
431/20 433/17
433/19 433/21
436/19 440/13
441/23 443/6
443/15 445/1
445/12 446/7
446/10 447/14
450/15 451/8
451/14 453/18
454/7 454/17
466/17 466/19
475/8 478/4
479/11 479/14
480/9 481/2
483/14 483/15
483/18 484/4
484/7 484/19
487/17 487/20
491/9 493/18
494/2
**cancel [1]**
406/5
**canceled [3]**
405/5 405/7
405/8
**cap [2]** 402/11
402/12
**capable [6]**
364/6 364/17
365/3 365/8
376/8 377/4
**Capitol [98]**
345/24 346/22
346/25 360/2
360/5 362/1
362/6 362/12
363/7 365/9
366/11 368/2
368/25 369/2
369/3 369/3
369/19 369/22
370/1 370/2
371/7 375/5
375/21 388/16
399/12 402/18
403/7 403/8
413/19 414/15
414/20 414/21
418/19 419/12
425/6 425/7
427/24 428/2
428/5 428/9
428/12 428/19

428/23 430/6
431/8 431/9
431/12 432/2
440/21 441/4
441/15 441/21
442/23 444/20
444/22 444/24
444/25 445/20
445/21 446/25
448/5 448/13
448/25 452/22
452/25 454/21
454/21 455/6
455/9 455/18
455/21 456/8
456/11 456/11
457/1 457/7
457/8 457/13
457/14 457/15
458/4 461/14
464/6 464/9
464/12 465/16
468/1 471/11
471/14 471/19
471/21 472/12
472/14 472/15
475/25 480/13
480/24 487/8
**car [2]** 411/23
412/2
**card [1]** 410/6
**care [1]** 405/3
**career [1]**
396/8
**cargo [1]**
407/11
**caring [1]**
397/17
**carried [3]**
367/12 375/20
377/9
**carrying [1]**
375/18
**case [19]**
336/2 351/18
353/8 364/1
368/12 371/17
375/8 376/2
377/22 378/1
378/3 378/6
378/15 379/4
379/22 387/1
390/17 398/2
463/21
**case-in-chief**
**[1]** 351/18
**catch [1]**
395/5

**caught [1]**
403/6
**cause [6]**
365/1 375/23
376/1 376/12
376/20 388/2
**caused [2]**
360/12 486/13
**causes [1]**
405/24
**causing [7]**
364/6 364/17
365/3 376/8
377/4 486/7
486/10
**cell [3]**
368/23 435/17
466/15
**center [1]**
407/13
**cert [1]**
361/12
**certain [4]**
351/18 360/13
429/4 431/8
**certainly [11]**
363/6 366/20
374/16 374/17
374/21 375/2
375/6 376/25
426/17 486/4
492/20
**certification**
**[1]** 451/16
**certify [1]**
495/4
**cetera [4]**
389/22 390/5
396/3 396/7
**CHAD [35]**
332/6 333/17
336/3 336/12
383/6 383/11
384/3 384/5
384/8 385/15
385/16 385/23
386/1 386/3
386/4 387/2
390/4 392/8
394/8 394/10
394/12 394/14
395/10 395/12
395/25 396/3
396/23 398/3
399/24 400/2
400/4 401/19
402/1 402/5
463/18

**Chad's [3]**
386/4 396/11
400/20
**chair [2]**
370/10 455/13
**challenge [1]**
391/4
**challenges [1]**
371/21
**chamber [6]**
369/4 369/6
369/18 480/8
480/11 480/23
**chambers [1]**
480/25
**championship**
**[1]** 451/11
**chance [1]**
403/10
**change [1]**
385/9
**chant [2]**
482/3 482/6
**chanting [2]**
482/1 482/6
**chants [2]**
369/5 369/11
**character [11]**
380/24 381/20
381/23 385/12
389/8 390/22
391/2 395/17
396/16 398/14
400/20
**characteristics**
**[1]** 401/14
**charge [3]**
359/14 363/8
363/19
**charges [2]**
359/15 390/24
**charitable [2]**
396/6 397/17
**charity [2]**
396/9 396/19
**chatting [2]**
446/14 446/23
**check [3]**
357/1 373/4
395/5
**cheer [2]**
471/19 471/21
**Chemical [1]**
369/16
**chief [1]**
351/18
**childhood [1]**
394/11

**C**

**children [2]** 404/11 404/12
**Chinese [1]** 348/15
**chose [1]** 470/2
**circle [1]** 358/7
**circled [1]** 410/23
**circles [1]** 434/14
**circuit [7]** 361/12 361/13 364/10 365/4 372/1 390/20 492/18
**cite [2]** 360/6 390/18
**cited [1]** 364/1
**citing [1]** 364/9
**CIV [1]** 332/13
**civil [4]** 359/15 359/17 415/6 425/21
**civilians [1]** 406/24
**clarification [1]** 350/9
**clarify [3]** 378/24 430/19 431/6
**clarity [1]** 412/4
**clean [1]** 389/14
**cleaning [1]** 385/20
**clear [5]** 339/6 352/11 375/19 379/18 402/4
**cleared [1]** 386/6
**clearer [1]** 484/8
**clearest [1]** 377/15
**clearly [1]** 466/12
**clerk [5]** 336/25 339/9 356/14 411/12 412/8
**clerk's [1]**

491/18
**client [21]** 337/10 339/1 339/23 342/17 342/25 343/6 344/6 346/20 347/12 348/21 348/23 350/7 358/8 381/21 418/12 419/8 431/21 432/1 433/9 433/12 491/1
**client's [2]** 337/2 339/20
**climb [4]** 437/10 465/22 466/1 466/8
**climbed [4]** 465/20 466/1 472/2 472/5
**climbing [4]** 437/9 439/25 466/5 466/6
**climbs [2]** 432/4 465/25
**clip [26]** 339/7 339/10 339/10 340/9 341/9 342/11 343/11 344/1 344/16 346/7 346/13 347/10 349/7 391/18 391/22 431/1 467/9 475/22 475/24 476/24 479/11 479/15 479/18 479/24 481/6 482/2
**clipped [1]** 350/9
**clips [6]** 337/25 338/12 338/23 351/20 390/1 391/6
**clock [4]** 484/14 484/15 484/16 484/19
**close [20]** 374/1 380/17 383/14 385/8 387/4 387/6 396/25 397/18 405/22 405/23 411/1 412/23 419/16 419/20 422/9 424/12

450/10 482/19 485/20 491/9
**closer [2]** 465/16 468/1
**closes [1]** 489/12
**closet [1]** 364/24
**closing [4]** 489/23 491/24 494/3 494/5
**closings [1]** 419/18
**clothing [1]** 462/25
**clubs [1]** 408/19
**co [1]** 336/8
**co-counsel [1]** 336/8
**coat [14]** 434/4 442/2 442/4 442/18 442/19 446/11 461/14 462/14 462/15 462/16 464/3 474/25 479/8 489/3
**code [2]** 462/9 462/10
**collapse [1]** 468/3
**colleague [2]** 352/16 352/18
**collect [1]** 353/17
**collected [2]** 354/6 355/8
**college [2]** 403/20 408/4
**color [1]** 458/19
**COLUMBIA [3]** 332/1 339/25 340/3
**coming [5]** 392/15 392/22 438/2 441/22 484/2
**comment [3]** 347/25 379/16 457/17
**commit [2]** 359/19 418/19
**committed [1]** 359/19
**committing [1]** 375/19

**communications [1]** 368/24
**Communist [1]** 348/16
**community [1]** 396/7
**companies [2]** 383/19 405/18
**company [10]** 383/10 383/12 394/13 395/8 403/25 404/2 404/3 404/5 404/25 405/1
**compares [1]** 451/8
**competitive [1]** 396/2
**complete [4]** 337/12 358/7 419/3 425/10
**completed [2]** 494/6 494/6
**completely [1]** 406/16
**completeness [11]** 338/1 338/13 338/18 338/21 339/3 350/20 351/15 351/21 352/4 352/10 352/19
**computer [1]** 341/4
**concerns [1]** 494/1
**conduct [37]** 360/6 360/9 360/10 360/14 361/17 361/21 361/24 362/7 362/25 363/8 363/10 363/14 364/14 365/11 365/14 366/11 366/13 366/17 366/19 367/19 367/24 389/7 389/11 390/4 390/7 390/16 390/21 391/3 391/7 391/9 391/24 392/6 403/1 403/9 403/10 403/12 405/9
**conference [1]** 431/4

**conferences [1]** 426/19
**confused [1]** 436/6
**confusing [1]** 434/17
**congregated [1]** 425/22
**congregating [2]** 423/23 441/2
**Congress [15]** 362/4 362/18 363/1 363/10 365/15 366/14 366/17 366/20 367/11 367/19 371/12 371/14 371/19 371/23 444/14
**Congress' [2]** 361/17 362/13
**congressional [1]** 362/16
**congresspeople [1]** 471/20
**connect [1]** 422/2
**connected [1]** 373/7
**consciousness [1]** 363/4
**consider [8]** 351/9 368/12 376/3 376/4 398/5 398/25 426/16 468/21
**consideration [1]** 460/25
**considered [1]** 338/18
**considering [1]** 352/10
**consistent [8]** 338/13 388/6 388/9 388/12 389/17 391/14 399/5 399/8
**constitute [1]** 367/24
**constituted [1]** 371/23
**constitutes [1]** 375/15
**Constitution [6]** 332/24 413/19 413/24 414/16 414/19

**C**

**Constitution...
[1]** 427/19
**construction
[1]** 439/24
**construction-ty
pe [1]** 439/24
**construed [1]**
368/3
**contact [3]**
396/25 459/7
459/17
**contacted [1]**
460/3
**contents [1]**
353/11
**context [7]**
345/4 347/25
348/14 348/18
351/16 351/21
358/10
**continue [5]**
336/19 368/12
370/12 371/3
375/7
**continued [7]**
333/4 335/1
336/21 394/20
476/13 480/7
487/8
**contracted [1]**
405/19
**contributions
[1]** 408/20
**control [2]**
383/19 405/20
**convenient [2]**
342/20 342/23
**conversation
[5]** 443/17
443/24 445/9
456/18 477/16
**cooking [1]**
397/16
**Cooper's [1]**
376/4
**cooperating [1]**
461/1
**cops [1]** 448/4
**corner [12]**
427/19 427/20
436/16 438/10
440/6 440/8
444/9 450/25
466/3 466/25
468/5 483/25
**corridor [3]**
477/3 477/23

487/9
**corruptly [3]**
363/3 363/15
373/6
**cost [2]**
372/15 372/23
**counsel [16]**
336/8 336/13
368/13 368/16
371/21 376/1
379/1 379/13
412/8 412/11
418/6 488/22
493/6 493/19
493/22 494/15
**counsel's [3]**
336/8 358/4
370/8
**counselors [1]**
451/25
**count [32]**
359/8 359/15
363/16 365/10
365/19 365/20
365/22 366/10
366/15 366/23
366/24 367/13
367/15 367/20
367/21 368/13
368/14 371/19
371/20 371/20
371/20 372/3
372/4 372/5
373/5 375/8
379/2 379/3
379/7 379/9
379/11 380/3
**counted [3]**
381/2 381/10
381/11
**counts [12]**
368/15 371/17
371/19 375/9
378/20 379/6
380/1 380/1
380/2 380/5
380/5 492/8
**couple [8]**
358/5 384/5
395/1 406/14
440/11 456/22
456/22 485/18
**course [5]**
338/15 351/2
368/24 369/9
387/17
**court [95]**
332/1 332/22

332/23 337/22
337/24 340/5
341/2 350/17
351/8 351/8
351/16 351/17
354/5 354/13
359/4 359/9
359/17 360/2
361/2 368/8
368/11 368/12
368/19 369/20
369/25 370/22
370/22 370/23
371/17 374/15
375/2 375/7
376/3 376/4
378/10 378/13
378/22 379/5
379/22 379/24
381/5 381/8
383/1 385/6
386/2 389/16
390/19 391/13
410/21 414/1
414/8 414/22
414/24 415/14
415/16 415/20
415/24 416/22
419/23 420/23
422/5 423/16
426/16 431/3
431/12 433/10
434/7 446/2
452/20 452/22
458/8 460/22
463/10 468/24
469/1 469/3
469/11 469/16
469/19 469/22
470/1 470/5
470/22 470/25
471/2 471/4
488/5 488/20
490/19 491/3
491/22 492/4
492/24 494/7
495/3
**Court's [9]**
337/22 351/7
378/24 379/6
381/7 419/16
426/20 434/8
463/15
**courtroom [2]**
370/21 370/25
**Courts [1]**
332/23
**cover [1]**

489/3
**coverage [5]**
388/19 388/21
399/12 399/16
399/25
**covered [2]**
353/18 354/5
**covering [1]**
437/14
**covers [1]**
430/24
**cr [1]** 332/4
**creature [1]**
341/22
**credit [1]**
410/6
**cried [6]**
451/22 451/23
452/4 455/13
455/14 455/22
**crime [1]**
418/19
**criminal [5]**
332/3 336/2
359/7 377/17
377/19
**criminalized
[1]** 379/18
**cross [15]**
333/4 333/9
333/14 333/19
336/21 357/24
386/21 389/13
390/22 397/21
397/22 418/25
463/17 463/18
493/6
**Cross-exam [2]**
397/21 463/17
**Cross-exam's
[1]** 493/6
**cross-examinati
on [11]** 333/4
333/9 333/14
333/19 336/21
386/21 389/13
390/22 397/22
418/25 463/18
**cross-examining
[1]** 357/24
**crowd [48]**
369/11 369/12
370/24 403/6
415/5 416/22
424/9 426/7
427/22 427/24
428/21 434/12
434/20 434/22

436/5 436/7
439/14 448/12
450/11 450/19
450/20 452/6
452/12 464/16
467/19 467/20
469/12 471/21
473/3 475/6
475/13 475/14
475/15 475/20
478/20 479/21
480/8 480/14
480/24 482/17
482/21 482/22
482/23 482/24
483/3 485/15
485/20 487/18
**cruise [3]**
406/3 406/5
406/6
**cry [1]** 455/16
**Crypt [7]**
443/5 472/19
476/9 476/11
477/2 477/6
477/21
**currently [1]**
394/25

**D**

**D.C [23]**
361/12 361/13
364/10 365/4
368/22 408/6
410/7 410/8
410/22 410/23
411/2 411/4
412/24 421/17
421/18 423/19
455/25 470/5
470/8 470/11
470/14 470/16
489/5
**dad [4]** 405/12
405/17 405/18
406/4
**damage [7]**
372/6 372/6
372/20 450/6
486/7 486/10
486/13
**damaged [2]**
372/19 441/12
**Dan [1]** 452/5
**dangerous [16]**
363/18 363/20
363/23 364/1
364/3 365/12
365/20 365/25

**D**

**dangerous...
[8]** 367/15
375/10 375/11
375/15 376/5
376/7 377/1
380/1
**data [5]**
353/16 354/6
355/8 355/16
356/3
**date [2]**
421/14 495/11
**dated [1]**
411/14
**dates [1]**
355/2
**dating [1]**
394/12
**day [37]** 332/9
351/17 351/22
361/18 362/6
362/13 362/17
363/1 363/7
363/9 363/15
363/23 364/14
371/7 389/5
402/24 403/1
403/10 407/19
407/21 410/7
410/8 412/23
420/3 422/18
423/21 442/3
442/11 442/17
455/6 455/25
459/3 459/19
461/14 464/10
484/21 488/18
**days [7]**
406/14 408/4
460/9 460/10
490/22 491/2
494/10
**DC [5]** 332/5
332/14 332/15
332/16 332/25
**deadly [15]**
363/18 363/20
363/23 364/2
364/3 364/4
364/5 365/12
365/20 365/25
367/15 375/11
375/12 376/4
376/7
**dealt [1]**
490/7
**death [4]**

364/7 365/1
376/9 376/12
**debate [1]**
370/16
**December [3]**
354/10 355/9
356/7
**December 17th
[3]** 354/10
355/9 356/7
**decide [4]**
371/17 375/7
379/22 410/1
**decoration [1]**
437/16
**defective [1]**
378/21
**defendant [46]**
332/7 332/18
336/12 351/11
351/13 351/14
351/25 352/1
352/14 359/7
359/14 359/16
359/19 361/23
361/24 362/24
363/3 364/7
364/11 365/10
368/19 368/24
369/5 369/12
369/15 369/22
370/13 371/6
372/19 372/21
373/7 373/10
374/25 375/5
375/20 376/9
381/12 381/23
387/2 390/4
390/21 391/21
398/3 399/24
429/20 489/2
**defendant's
[21]** 344/19
350/19 353/12
354/3 355/8
355/17 356/4
356/13 358/14
361/17 362/10
368/17 369/2
369/10 370/1
371/10 377/17
377/18 381/13
390/16 391/2
**defense [53]**
334/3 334/4
334/5 334/6
334/7 334/8
334/9 334/10

334/11 334/12
334/13 334/14
334/15 334/16
334/17 334/18
334/19 334/20
334/21 334/22
334/23 334/24
334/25 335/3
335/4 335/5
335/6 335/7
335/8 338/16
352/23 357/9
358/16 401/19
412/10 412/18
412/21 413/9
413/12 414/5
416/17 417/6
417/17 418/5
421/6 422/25
425/15 429/9
431/10 432/18
432/24 457/19
493/22
**defined [3]**
364/3 364/18
365/4
**defines [1]**
388/5
**defining [1]**
364/1
**definitely [1]**
384/12
**definition [11]**
363/23 387/21
387/25 391/5
398/19 398/21
398/22 398/24
399/1 400/18
401/12
**degree [1]**
403/21
**demonstrate [1]**
363/22
**demonstrates
[2]** 358/2
363/15
**demonstrating
[1]** 379/11
**demonstration
[1]** 362/11
**denial [1]**
379/20
**denied [2]**
402/16 486/1
**deny [5]** 379/5
379/22 380/3
461/13 461/18
**denying [1]**

380/4
**departments [1]**
406/25
**depict [6]**
411/18 412/25
413/17 415/10
431/8 474/11
**depicted [7]**
427/21 433/13
434/2 434/21
436/23 452/24
475/19
**depiction [3]**
339/1 364/23
431/11
**depicts [2]**
431/4 438/17
**depreciation
[2]** 373/1
373/3
**describe [8]**
348/15 388/21
389/24 390/7
391/24 401/3
431/19 436/19
**described [7]**
344/6 345/5
357/10 369/13
371/11 390/25
467/5
**describing [4]**
345/10 345/13
345/14 440/25
**description [1]**
343/22
**design [2]**
383/18 383/19
**designed [2]**
352/5 363/9
**desirable [1]**
401/13
**destroy [2]**
361/1 361/6
**destroying [1]**
449/22
**destruction [1]**
360/24
**detail [1]**
421/9
**detailed [1]**
490/21
**details [1]**
408/25
**detective [1]**
458/10
**deter [3]**
369/16 369/16
369/17

**determination
[1]** 372/20
**device [1]**
365/8
**dictionary [3]**
387/23 388/5
401/12
**Dictionary's
[1]** 398/22
**die [2]** 451/25
455/18
**difference [1]**
464/19
**differences [1]**
465/3
**different [21]**
352/7 352/7
369/4 405/18
449/4 449/6
449/6 462/14
463/2 463/3
463/6 463/8
464/13 464/15
464/16 464/18
465/7 465/11
465/12 472/20
478/9
**differentiated
[1]** 396/4
**differently [1]**
475/21
**dinners [1]**
394/22
**direct [15]**
333/8 333/13
333/18 378/15
382/11 393/14
402/1 465/15
466/20 467/22
476/3 477/12
479/5 481/8
482/13
**directed [1]**
476/4
**direction [2]**
423/20 444/6
**directions [1]**
360/13
**disagree [1]**
351/24
**disaster [1]**
396/10
**disbelief [2]**
346/23 347/1
**discovery [1]**
431/11
**discretion [1]**
426/16

**D**

**discuss [3]**
492/13 493/5
493/9
**discussed [1]**
493/13
**discussing [1]**
483/21
**discussion [9]**
340/22 389/1
389/18 390/14
391/15 418/7
435/19 488/11
488/23
**discussions [2]**
426/19 439/9
**disobedience
[1]** 425/21
**disorder [2]**
359/16 359/17
**disorderly [5]**
365/11 365/11
366/11 375/22
375/22
**dispensed [1]**
490/11
**disperse [1]**
467/19
**dispute [6]**
361/22 362/22
363/2 363/20
367/16 426/18
**disrupt [5]**
366/16 366/19
367/18 370/3
371/9
**disrupted [2]**
366/14 367/10
**disrupting [1]**
365/14
**disruptive [1]**
365/11
**distinction [1]**
373/24
**district [7]**
332/1 332/1
332/10 332/23
339/24 340/3
379/17
**disturb [3]**
366/16 366/19
367/18
**disturbance [3]**
388/6 398/24
415/6
**document [3]**
355/6 357/12
488/13

**documenting [1]**
424/1
**dogs [1]**
407/22
**DOJ [1]** 332/13
**DOJ-CIV [1]**
332/13
**dollar [1]**
385/21
**dollars [2]**
372/7 386/16
**Donald [3]**
408/23 416/25
420/1
**donation [2]**
407/10 407/12
**donations [1]**
407/11
**done [13]**
380/19 385/11
386/5 389/13
396/10 451/10
489/15 489/15
489/19 489/24
491/6 493/1
493/6
**door [67]**
369/10 369/23
372/15 372/24
373/7 373/18
374/1 374/7
377/7 377/22
437/25 441/2
441/8 441/10
441/12 442/24
442/25 447/15
448/13 448/18
448/23 449/7
449/9 449/11
450/13 450/15
450/18 452/7
452/10 452/13
453/9 453/13
454/15 455/6
455/8 455/12
469/12 472/18
472/23 472/25
473/6 473/10
473/14 473/17
474/9 476/4
477/3 477/21
477/23 482/1
482/10 482/19
482/20 483/9
483/10 483/12
483/15 483/25
484/16 484/25
485/8 485/16

485/18 485/18
486/20 487/9
487/19
**doors [12]**
369/6 436/25
437/3 438/2
449/20 450/12
453/16 456/13
456/14 467/5
467/7 467/8
**doorway [1]**
471/23
**dowel [3]**
361/3 364/24
365/3
**down [45]**
340/4 369/6
369/12 374/8
374/24 377/14
379/4 384/25
385/21 396/12
396/14 397/2
397/9 397/11
397/13 413/18
413/24 414/7
414/13 427/24
428/11 428/15
428/18 432/1
436/23 436/23
437/25 440/9
443/3 443/5
444/4 444/8
444/9 450/20
450/20 453/15
455/21 467/14
470/25 471/19
471/21 476/7
476/8 482/1
493/18
**downtown [3]**
411/2 411/4
420/12
**draft [3]**
491/19 491/20
491/21
**Drawing [1]**
360/17
**DREHER [5]**
332/15 333/19
336/8 368/7
463/21
**drive [3]**
383/1 407/10
422/9
**driveway [1]**
386/6
**driving [2]**
396/12 420/8

**drove [6]**
385/21 410/6
410/8 410/22
459/4 489/4
**duplicative [2]**
426/22 431/4
**during [17]**
340/5 343/4
343/7 360/4
384/22 394/19
395/16 397/3
404/17 408/1
425/3 434/7
443/24 454/20
464/4 464/20
479/23

**E**

**e-mailed [1]**
412/9
**earlier [8]**
339/24 358/4
425/8 473/13
474/8 476/3
484/1 487/7
**early [2]**
374/12 408/4
**easier [2]**
340/24 463/25
**east [3]**
434/10 455/10
455/11
**eastern [5]**
385/25 386/7
386/15 397/12
397/15
**effect [2]**
344/14 361/20
**efficient [1]**
368/14
**eight [9]**
340/15 340/16
347/5 366/23
367/20 399/22
460/9 460/10
488/12
**either [7]**
357/17 375/18
375/22 408/3
416/15 459/20
460/3
**El [1]** 409/3
**elderly [1]**
386/5
**election [6]**
408/9 408/16
409/12 409/15
409/19 458/3
**electronic [1]**

403/21
**element [12]**
365/13 365/18
366/13 366/15
367/9 367/17
372/5 372/12
372/25 377/13
378/21 380/1
**elements [4]**
359/21 359/23
368/15 401/13
**elevator [3]**
453/24 454/7
454/12
**Ellipse [2]**
464/9 471/9
**else [5]**
347/15 433/6
450/22 471/1
492/10
**employee [3]**
394/17 394/19
398/7
**encompasses [1]**
367/25
**encounter [2]**
444/23 445/20
**end [9]** 352/5
352/19 365/5
374/13 430/2
430/3 442/24
453/3 475/22
**end-run [2]**
352/5 352/19
**ended [6]**
420/2 443/4
443/5 470/14
477/21 482/22
**ending [1]**
449/6
**enforcement [3]**
360/1 360/3
360/22
**engaged [2]**
360/4 370/15
**engaging [3]**
362/3 365/22
415/5
**engineering [1]**
403/21
**enormous [1]**
454/9
**enough [2]**
396/15 494/9
**enter [5]**
370/21 403/8
469/11 474/23
476/22

**E**

**entered [14]** 360/2 363/17 403/7 437/1 437/3 440/21 444/12 464/6 467/7 469/3 471/23 473/11 475/25 478/8

**entering [1]** 362/1

**enters [1]** 362/18

**entire [6]** 337/21 338/11 338/15 356/19 430/22 430/23

**entirety [1]** 394/11

**entitled [1]** 495/6

**entrepreneurs [1]** 405/3

**equipment [3]** 383/10 383/19 406/18

**escorted [1]** 430/10

**establish [3]** 403/25 427/7 429/3

**estimate [1]** 428/22

**estimating [1]** 494/7

**et [4]** 389/22 390/5 396/3 396/7

**even [19]** 348/19 360/8 361/5 362/22 365/2 365/5 365/6 365/8 369/17 394/15 396/7 397/17 400/22 403/3 422/1 428/9 451/23 452/10 470/6

**evening [6]** 457/20 458/25 459/20 463/20 492/25 494/15

**events [6]** 344/8 345/5 389/21 399/12 431/8 431/11

**eventually [1]** 455/23

**ever come [1]** 469/5

**everybody [4]** 369/21 370/23 452/15 471/1

**everyone [5]** 336/10 336/15 382/15 434/13 487/4

**evidence [74]** 334/3 334/4 334/5 334/6 334/7 334/8 334/9 334/10 334/11 334/12 334/13 334/14 334/15 334/16 334/17 334/18 334/19 334/20 334/21 334/22 334/23 334/24 334/25 335/3 335/4 335/5 335/6 335/7 335/8 338/14 350/15 350/25 351/7 352/25 356/19 358/16 360/9 360/22 362/22 363/11 363/21 364/22 365/17 366/21 367/17 368/11 371/16 372/14 373/14 375/7 376/10 412/18 413/9 414/5 416/17 417/6 417/17 418/5 421/6 422/25 425/15 429/9 431/1 432/3 432/24 433/11 433/15 438/12 440/12 443/7 452/20 457/19 463/11 488/8

**exact [10]** 341/24 342/18 344/14 345/12 345/16 362/2 374/2 397/13 400/22 465/1

**exactly [4]** 371/4 423/17 448/11 472/16

**exam [3]** 375/1 397/21 463/17

**exam's [1]** 493/6

**examination [26]** 333/4 333/5 333/8 333/9 333/10 333/13 333/14 333/15 333/18 333/19 336/21 353/3 382/11 386/21 389/13 390/22 392/4 393/14 397/22 401/9 402/1 418/25 463/18 465/15 466/20 482/13

**examining [1]** 357/24

**example [2]** 368/1 370/14

**exceeded [1]** 372/6

**except [2]** 378/15 379/1

**exclude [1]** 426/16

**excluded [3]** 426/21 431/3 431/13

**excuse [7]** 359/14 364/11 367/8 372/11 411/3 463/5 480/5

**excused [4]** 358/19 393/7 401/18 493/18

**execution [1]** 354/8

**exercise [1]** 461/4

**exhausted [1]** 422/8

**exhibit [59]** 334/2 335/2 337/19 338/5 344/19 354/14 356/13 356/18 356/19 356/20 356/22 357/5 357/9 358/13 358/14 358/15 358/16 358/18 374/11 390/9 391/8 391/17 399/17 411/13 412/10 412/16 412/18 412/21 413/6 413/9 413/12 413/15 414/5 416/13 417/6 417/16 417/17 418/4 418/5 420/22 420/24 421/3 421/6 430/2 432/18 432/24 433/11 438/13 440/16 445/2 457/19 464/4 473/8 473/10 479/1 481/7 483/19 483/19 488/8

**Exhibit 10 [1]** 418/5

**Exhibit 11 [1]** 421/3

**Exhibit 2 [3]** 356/13 357/9 457/19

**Exhibit 21 [1]** 432/18

**Exhibit 3 [3]** 411/13 412/10 412/16

**Exhibit 4 [2]** 412/21 413/12

**Exhibit 401 [1]** 440/16

**Exhibit 402 [2]** 473/8 473/10

**Exhibit 410 [1]** 483/19

**Exhibit 411 [1]** 479/1

**Exhibit 5 [1]** 413/15

**Exhibit 523 [2]** 356/19 356/22

**Exhibit 523A [1]** 358/15

**Exhibit 600 [1]** 438/13

**Exhibit 601 [1]** 445/2

**Exhibit 602 [1]** 483/19

**Exhibit 605 [4]** 374/11 390/9 391/17 399/17

**Exhibit 609 [1]** 488/8

**Exhibit 700 [1]** 433/11

**Exhibit 8 [1]** 417/16

**exhibit do [1]** 420/24

**exhibits [13]** 335/1 350/10 352/23 354/19 412/9 416/17 422/25 425/8 425/15 429/5 429/9 429/25 440/11

**Exhibits 19 [1]** 429/5

**exit [2]** 369/23 453/16

**exited [3]** 346/25 455/5 455/6

**exiting [2]** 452/22 452/25

**expectation [4]** 418/12 428/4 428/11 463/4

**expected [2]** 418/15 418/16

**expecting [2]** 418/18 428/12

**experience [2]** 418/22 420/1

**expert [3]** 399/15 401/2 401/4

**expertise [1]** 400/21

**explain [2]** 486/6 487/15

**explanation [1]** 451/5

**explosions [1]** 434/19

**explosives [1]** 436/7

**extreme [1]** 364/18

**extremely [4]** 383/13 387/4 387/6 397/8

**eye [1]** 450/25

**eyes [1]** 442/13

**F**

**F.3d [1]** 364/9

**F150 [1]** 410/24

**fabric [2]** 437/15 437/20

**face [4]** 400/2

**F**

**face... [3]**
442/7 442/20
479/25

**Facebook [10]**
355/13 355/16
356/1 356/4
368/21 368/23
409/24 422/10
435/15 470/17

**faces [1]**
397/6

**facilitate [1]**
354/8

**fact [10]**
343/1 346/3
365/14 372/20
397/14 400/8
406/6 464/19
466/14 467/22

**factored [1]**
490/6

**factual [1]**
490/17

**faculty [1]**
364/20

**fair [1]** 339/1

**fairly [3]**
384/13 405/20
424/4

**fairness [3]**
338/18 338/21
352/10

**fall [1]**
486/13

**familiar [3]**
344/12 387/21
398/19

**families [1]**
386/18

**family [5]**
384/2 394/11
397/18 408/5
456/19

**far [11]**
353/16 374/1
374/10 395/3
397/7 397/17
400/19 458/2
492/13 493/5
493/13

**farthest [1]**
492/7

**fashion [1]**
441/12

**fast [3]**
409/10 421/13
473/9

**father [1]**
451/8

**faucet [1]**
450/4

**favorable [5]**
360/17 360/20
361/5 362/23
368/10

**favorite [3]**
442/18 442/19
451/10

**FBI [33]** 337/2
339/2 339/23
342/25 343/3
343/7 344/7
344/9 344/11
344/23 344/25
345/1 345/7
345/23 346/1
346/3 346/21
346/24 347/11
347/12 347/22
349/15 349/17
350/5 458/11
459/17 459/17
459/21 459/22
459/25 460/3
460/8 461/1

**FBI's [2]**
458/12 461/17

**federal [3]**
338/14 348/23
359/7

**feeds [1]**
407/23

**feel [1]**
396/16

**feet [6]** 374/2
414/22 449/20
450/11 466/6
485/18

**fell [1]**
486/15

**felony [6]**
365/25 372/8
372/9 372/11
375/16 380/2

**felt [3]** 347/1
406/17 468/3

**fencing [2]**
435/4 435/6

**few [15]**
337/25 339/14
348/4 348/7
384/18 411/11
414/22 415/4
416/9 440/13
441/22 450/11

461/10 490/22
491/2

**field [2]**
451/12 459/21

**fifth [2]**
365/10 461/4

**fighting [1]**
454/10

**filled [1]**
407/11

**filling [3]**
438/21 439/19
440/1

**film [1]**
486/25

**filmed [1]**
431/7

**finally [5]**
361/22 363/2
369/18 449/17
482/14

**find [9]**
359/16 359/18
378/17 385/15
410/23 476/11
476/14 480/18
480/21

**finder [1]**
372/20

**findings [1]**
490/18

**fine [10]**
339/8 348/6
348/8 381/18
381/22 381/22
381/24 401/6
426/24 432/19

**finish [11]**
386/14 419/8
419/12 469/7
469/8 487/24
487/25 488/2
490/13 490/15
494/2

**finished [2]**
403/23 479/18

**fired [1]**
436/5

**firing [1]**
436/10

**first [32]**
337/10 339/10
342/4 346/15
346/16 353/10
354/24 359/13
359/15 367/25
368/13 383/15
384/25 391/18

399/22 406/17
407/21 408/9
408/12 411/8
426/12 429/14
430/14 430/16
432/10 436/19
438/23 449/14
456/10 465/24
466/3 482/1

**firsthand [1]**
451/20

**fish [2]**
448/25 449/1

**fist [2]**
446/24 448/4

**fit [2]** 410/24
422/17

**five [16]**
365/20 366/2
366/13 367/5
367/7 367/8
371/20 375/9
380/2 405/6
411/24 429/1
437/22 474/13
474/23 475/8

**five pounds [1]**
437/22

**fixing [1]**
372/24

**flag [4]**
343/22 345/11
364/13 439/14

**flagpole [13]**
360/7 361/4
363/22 364/11
364/13 364/17
364/23 367/15
375/20 376/11
402/22 445/18
485/25

**flags [2]**
416/25 417/2

**flash [2]**
434/15 467/20

**flashbangs [1]**
465/13

**Flew [1]** 383/3

**fliers [1]**
348/16

**flooded [2]**
397/12 406/16

**flooding [1]**
385/25

**floods [2]**
407/17 408/2

**floor [5]**
370/15 374/1

374/4 374/6
374/10

**fly [1]** 383/1

**flyers [1]**
348/19

**focus [1]**
386/11

**focused [1]**
377/17

**focuses [2]**
377/18 377/19

**folks [1]**
397/12

**follow [1]**
409/12

**followed [3]**
408/3 423/23
470/14

**following [5]**
359/18 449/5
449/5 480/13
481/18

**food [2]**
397/16 407/20

**foot [3]**
369/13 377/24
469/15

**footage [1]**
399/21

**football [1]**
451/9

**For the
Defendant [1]**
332/18

**Ford [1]** 395/8

**foregoing [1]**
495/4

**forever [1]**
386/4

**forget [1]**
407/5

**forgive [1]**
359/22

**form [2]**
395/17 395/21

**former [1]**
398/7

**forms [1]**
352/7

**forts [1]**
408/6

**fortunate [1]**
454/9

**forward [4]**
409/10 421/13
473/9 479/24

**fought [1]**
454/13

## F

**found [10]** 379/17 410/5 410/25 422/11 426/12 448/18 449/17 476/21 482/14 489/4

**foundation [2]** 418/20 468/6

**four [19]** 343/1 366/2 367/8 371/20 375/9 380/2 380/2 383/24 384/19 411/24 415/2 434/12 435/9 437/22 453/8 453/11 462/13 486/5 487/14

**four-wheelers [1]** 384/19

**fourth [1]** 363/16

**frame [1]** 474/24

**free [2]** 388/5 398/24

**Freedom [7]** 340/4 412/24 414/9 414/10 470/14 470/24 471/3

**Friday [1]** 410/18

**friend [4]** 371/9 386/16 406/17 452/5

**friendly [1]** 446/25

**friends [13]** 383/11 383/14 387/2 387/8 394/10 394/20 394/23 397/6 398/5 404/21 407/19 456/19 456/23

**friendship [3]** 394/20 396/11 396/23

**friendships [1]** 397/18

**front [21]** 369/12 385/19 414/14 424/17 431/21 450/11 469/22 475/4

475/7 476/20 482/17 482/22 482/23 483/2 483/3 483/12 484/2 484/24 485/12 485/16 485/17

**frozen [1]** 473/18

**fuel [1]** 420/20

**full [5]** 337/11 339/20 385/14 407/11 416/23

**full-time [1]** 385/14

**fully [1]** 418/18

**function [1]** 364/19

**fur [3]** 449/21 449/23 449/24

**further [8]** 349/12 356/9 392/1 401/7 463/16 476/13 480/7 486/20

**fuzzy [2]** 484/11 484/11

## G

**Gaithersburg [9]** 341/10 410/8 410/17 420/15 423/4 423/5 456/3 456/5 456/6

**game [2]** 451/9 451/11

**garage [1]** 489/12

**garages [1]** 410/24

**GARY [6]** 333/12 393/14 393/21 397/22 401/9 404/22

**gas [1]** 369/16

**gathered [1]** 406/18

**gave [3]** 415/1 440/25 462/10

**general [1]** 441/6

**generic [1]** 388/4

**Georgia [1]** 417/23

**gets [2]** 386/5 389/12

**girls [1]** 383/24

**given [2]** 354/25 380/8

**gives [1]** 338/25

**giving [1]** 342/2

**glass [3]** 377/7 377/22 453/13

**global [1]** 431/11

**goalpost [1]** 451/12

**Goddard [10]** 356/14 358/4 358/5 358/8 358/9 456/23 456/24 457/4 457/6 457/21

**goes [5]** 389/7 390/24 432/4 438/11 494/10

**goggles [4]** 442/7 442/13 442/15 442/19

**goings [1]** 360/11

**GONZALEZ [8]** 333/3 336/21 336/23 353/3 353/5 354/2 354/13 357/21

**good [22]** 336/6 336/11 336/19 336/23 336/24 353/5 353/6 356/11 382/13 382/14 382/15 383/11 385/12 386/23 386/24 387/2 393/17 397/24 397/25 401/14 451/4 463/20

**gorge [2]** 384/18 395/15

**government [45]** 332/12 336/4 337/12 338/4 351/17 352/6 356/17 358/21 358/24 360/6 360/18 360/20 360/21 360/24

361/1 361/6 361/6 361/22 362/4 362/22 363/3 363/6 363/21 363/25 365/7 365/17 367/12 367/14 367/16 368/18 371/5 373/11 376/25 406/25 429/24 429/24 430/3 430/8 430/25 431/2 432/21 440/16 443/7 493/19 494/3

**government's [14]** 341/4 356/22 359/2 364/8 390/9 391/17 399/17 426/13 433/11 438/13 445/2 473/8 473/10 493/20

**grab [1]** 359/15

**grabbing [2]** 375/24 377/24

**graciously [1]** 394/15

**grant [2]** 378/22 379/25

**grass [1]** 427/20

**grateful [1]** 397/9

**gray [10]** 400/5 400/11 402/11 402/11 442/4 446/10 461/14 464/3 475/17 479/8

**greater [1]** 372/21

**green [6]** 404/16 435/3 435/6 438/20 454/3 459/22

**Greenbelt [1]** 332/20

**grenades [3]** 434/15 465/14 467/20

**grew [3]** 394/20 403/16 405/11

**ground [1]**

434/16

**grounds [2]** 369/4 454/21

**group [25]** 362/14 410/14 421/22 422/2 422/2 427/25 428/5 441/2 441/5 441/7 448/16 448/24 470/1 473/14 473/16 474/8 474/17 475/1 481/25 482/3 482/4 482/5 482/5 482/7 482/8

**grow [1]** 403/15

**growing [2]** 405/12 408/5

**guess [45]** 337/21 340/9 342/3 392/23 396/24 396/25 403/23 404/19 405/3 408/1 408/5 409/4 409/18 409/25 410/4 413/16 413/22 414/8 416/14 420/21 422/5 422/8 424/4 424/19 428/10 429/1 437/13 437/16 437/24 441/19 448/5 448/25 449/16 450/24 451/8 454/5 456/23 462/11 462/14 465/13 468/5 475/21 477/1 477/22 492/4

**guessing [1]** 476/16

**guesstimate [3]** 488/24 489/18 492/7

**guesstimating [1]** 491/4

**guilt [1]** 390/18

**guilty [2]** 359/16 390/24

**gun [5]** 364/5 369/15 369/17

**G**

**gun... [2]**
450/25 450/25
**guy [8]** 386/4
386/7 396/12
438/22 449/21
449/23 449/23
449/24
**guys [2]**
394/24 446/24

**H**

**habit [1]**
341/23
**half [14]**
380/13 380/14
385/8 402/24
403/3 406/19
406/23 415/2
422/10 428/20
451/3 489/6
489/8 489/24
**Halfway [1]**
455/21
**hall [8]** 443/3
443/5 444/4
446/5 447/15
476/7 476/8
478/16
**hallway [6]**
442/24 449/15
453/15 473/10
477/22 483/3
**hallways [1]**
449/5
**hamburgers [1]**
407/22
**hand [10]**
382/3 393/8
401/20 443/1
443/22 446/22
451/1 451/12
469/13 479/25
**handed [1]**
354/2
**handful [1]**
449/16
**handing [1]**
348/16
**hands [9]**
375/25 377/24
454/12 472/17
472/20 473/6
474/21 477/7
477/14
**hang [2]**
384/17 460/4
**hanging [1]**

406/15
**happen [4]**
374/21 387/15
395/2 398/11
**happened [17]**
386/8 409/3
414/23 423/20
449/14 450/8
451/1 451/13
451/13 452/5
453/8 453/11
455/4 463/2
463/12 463/12
463/13
**happening [4]**
371/7 401/4
434/20 463/9
**happens [1]**
341/5
**happiness [1]**
397/6
**hard [5]**
340/21 397/7
407/17 488/21
492/17
**harm [2]**
345/25 346/4
**Harvey [4]**
385/18 397/11
407/7 407/8
**hat [12]** 400/5
400/11 413/20
442/4 446/10
449/21 449/23
449/24 461/14
464/3 475/17
479/8
**he received [1]**
370/5
**head [2]** 345/3
454/12
**headed [11]**
413/25 418/21
421/15 421/17
421/18 423/15
423/20 428/2
444/5 444/12
460/19
**heading [2]**
444/8 444/9
**hear [18]**
337/24 340/21
340/24 343/22
346/8 346/14
347/24 348/11
351/16 354/13
402/4 409/21
435/22 443/9

445/10 445/15
445/16 473/19
**heard [25]**
341/9 346/14
346/16 351/7
362/11 362/21
363/12 366/22
371/11 402/9
406/9 409/25
425/5 435/3
435/24 436/1
441/21 443/11
445/9 445/11
445/14 450/24
457/9 462/4
463/11
**hearing [1]**
445/13
**hearings [1]**
488/12
**hearsay [6]**
338/16 352/3
352/5 352/13
352/20 392/17
**held [2]**
337/22 473/6
**helmet [2]**
442/15 442/20
**helmets [1]**
442/7
**help [9]** 356/2
384/6 385/24
386/3 386/18
397/3 397/12
406/17 492/6
**helped [1]**
384/6
**helping [3]**
385/15 397/10
454/18
**Henryville [1]**
385/22
**hide [1]**
437/16
**high [4]**
396/18 403/17
403/19 408/4
**highest [1]**
341/3
**highly [1]**
396/2
**hiking [1]**
384/19
**hill [1]**
414/20
**himself [11]**
344/7 344/9
344/10 344/23

345/2 345/3
347/22 348/17
371/10 396/4
431/7
**hire [1]**
394/15
**his arm [1]**
447/25
**historic [1]**
408/6
**hit [24]**
385/18 403/2
403/4 403/6
407/4 407/17
439/2 443/8
443/15 444/2
447/22 450/18
450/22 450/23
451/4 451/6
451/15 463/14
465/13 472/13
484/9 485/25
486/9 486/15
**hitting [8]**
345/8 345/13
345/21 377/6
450/15 454/11
486/8 486/11
**hold [5]** 357/1
357/4 368/2
469/8 494/9
**home [5]** 459/4
459/5 459/6
459/8 462/6
**honest [3]**
384/24 396/5
396/6
**honestly [3]**
444/15 445/14
456/10
**honesty [4]**
384/23 395/18
396/1 396/17
**honor [216]**
**HONORABLE [1]**
332/9
**HOOK [3]**
332/22 495/3
495/11
**hope [1]** 375/3
**hopefully [3]**
338/2 371/12
430/21
**hoping [1]**
489/14
**hospitalization**
**[1]** 364/21
**hot [2]** 406/20

407/22
**hot-wired [1]**
406/20
**hotel [12]**
341/10 346/23
410/5 410/7
420/14 423/4
423/5 449/12
456/2 456/7
456/20 491/1
**hour [13]**
338/25 347/5
347/16 349/8
351/15 351/19
380/8 380/13
380/14 419/4
489/7 489/8
489/24
**hours [7]**
337/21 410/5
415/2 422/10
428/9 460/18
460/20
**house [24]**
369/4 369/6
369/18 370/15
373/8 374/1
374/10 374/16
374/20 374/21
374/22 384/5
385/13 385/17
385/19 422/9
460/14 460/15
462/11 462/12
480/8 480/10
480/23 480/25
**houses [1]**
370/9
**Houston [3]**
385/18 407/4
407/12
**huh [14]** 338/9
387/20 388/11
395/13 396/21
408/17 408/24
440/15 453/4
456/25 460/24
462/15 478/12
480/1
**human [1]**
408/1
**hundred [2]**
414/22 455/8
**hung [3]**
486/22 486/24
487/11
**hurricane [7]**
385/18 397/1

**H**

**hurricane...**
**[5]** 406/10
406/12 407/4
407/5 407/8
**hurricanes [1]**
408/1
**hurt [1]**
385/23
**hypothetically**
**[1]** 491/13

**I**

**i.e [1]** 364/4
**iCloud [4]**
353/13 354/4
354/6 355/8
**idea [7]**
374/25 375/4
449/12 451/6
470/21 470/23
481/3
**identification**
**[5]** 354/21
355/5 355/24
356/15 426/17
**identified [5]**
337/1 357/23
412/5 425/9
429/11
**identified as**
**[1]** 429/11
**identify [1]**
424/4
**ignore [1]**
410/1
**ignored [1]**
351/19
**imagine [1]**
491/13
**immediately [1]**
484/1
**impairment [1]**
364/19
**impeach [1]**
488/14
**impede [7]**
361/19 361/21
362/25 366/16
366/18 367/18
371/19
**impeded [6]**
360/1 360/10
360/22 362/7
366/14 367/10
**impeding [2]**
359/20 365/14
**importance [1]**

358/10
**important [6]**
351/16 374/19
374/21 375/22
384/8 408/10
**importantly [2]**
369/1 371/6
**inaugural [4]**
468/7 468/15
472/6 472/22
**incident [1]**
345/10
**includes [1]**
398/24
**including [3]**
360/12 492/13
492/14
**independent [1]**
493/11
**Indiana [3]**
385/22 385/24
394/1
**indicate [1]**
362/15
**indicated [1]**
379/24
**indication [1]**
425/20
**indictment [2]**
359/9 359/15
**individual [7]**
376/21 431/6
451/18 464/2
475/16 475/19
479/8
**individually**
**[1]** 384/11
**individuals [2]**
374/13 374/23
**indulgence [2]**
378/24 463/15
**inference [2]**
372/17 373/9
**inferences [2]**
360/17 360/19
**Infinity [1]**
489/4
**information [2]**
355/12 368/19
**informing [1]**
354/5
**inherently [3]**
364/4 364/5
377/1
**injured [1]**
434/16
**injury [10]**
364/6 364/17

365/1 365/4
375/24 376/1
376/9 376/12
376/20 377/4
**inside [13]**
368/25 373/11
375/4 442/24
444/25 445/20
448/5 455/18
472/14 473/3
477/6 480/13
480/18
**installations**
**[1]** 383/20
**instance [1]**
376/15
**instances [2]**
377/9 386/10
**instructed [3]**
337/11 339/20
386/11
**instructions**
**[1]** 376/7
**integrity [2]**
396/6 396/17
**intend [1]**
337/25
**intended [7]**
359/10 359/20
361/18 363/9
376/12 377/10
377/10
**intending [2]**
423/16 428/6
**intends [1]**
376/9
**intent [26]**
345/25 346/4
349/2 351/17
351/19 352/2
362/10 363/12
363/14 366/16
366/18 366/20
367/18 368/17
370/1 370/1
370/2 371/18
371/18 418/16
418/18 432/6
441/17 441/19
444/13 451/15
**intention [1]**
492/20
**intentions [1]**
392/12
**interaction [2]**
477/4 477/24
**interactions**
**[1]** 396/8

**interested [1]**
421/12
**interfere [2]**
362/13 444/13
**interfering [1]**
451/16
**intern [1]**
336/14
**internet [1]**
431/7
**interrupt [1]**
395/20
**intervention**
**[1]** 364/20
**interview [13]**
337/2 338/11
338/19 338/25
343/4 343/7
344/7 351/15
351/19 352/8
460/21 461/9
461/11
**interviewed [2]**
339/2 347/12
**into [73]**
334/3 334/4
334/5 334/6
334/7 334/8
334/9 334/10
334/11 334/12
334/13 334/14
334/15 334/16
334/17 334/18
334/19 334/20
334/21 334/22
334/23 334/24
334/25 335/3
335/4 335/5
335/6 335/7
335/8 350/25
351/7 351/15
352/24 358/16
360/8 364/15
368/2 369/3
383/1 408/25
410/8 410/22
412/18 413/9
414/5 416/17
417/6 417/17
418/5 421/6
421/9 422/25
425/15 429/9
432/24 436/5
436/7 438/12
441/4 441/21
449/15 452/20
456/11 458/11
462/9 467/20

471/23 472/18
477/19 486/17
487/7 488/8
494/3
**introduce [1]**
420/25
**introduction**
**[1]** 460/21
**invade [1]**
418/19
**investigation**
**[1]** 337/8
**involved [2]**
384/7 396/20
**involving [2]**
358/5 364/18
**iPhone [3]**
357/11 462/6
462/7
**irregularities**
**[1]** 458/2
**irrelevant [1]**
370/16
**irreproachable**
**[2]** 396/16
398/15
**issue [9]**
361/8 361/11
361/15 375/14
379/7 379/10
490/20 493/22
493/23
**issue's [1]**
371/25
**issued [3]**
353/8 353/11
355/12
**issues [2]**
493/19 493/23
**item [1]** 412/3
**Ivy [1]** 332/19

**J**

**J-O-N-E-S [1]**
402/6
**jacket [6]**
400/5 400/11
402/10 402/11
462/7 475/16
**Jackson [1]**
407/20
**January [56]**
337/3 341/23
342/19 343/2
343/8 344/8
345/24 347/12
348/22 354/10
355/10 356/8
357/11 357/11

**J**

**January... [42]**
362/1 363/10
368/21 388/16
388/19 389/7
389/21 390/5
392/11 399/13
402/18 402/22
405/5 405/9
418/11 418/13
418/17 421/15
421/15 421/15
421/17 421/19
421/23 421/25
422/3 423/7
424/14 427/13
428/23 457/20
462/1 462/19
463/5 464/6
464/17 465/1
465/6 465/10
467/17 470/19
471/6 471/14
**January 16 [1]**
348/22
**January 16th
[2]** 337/3
347/12
**January 17th
[3]** 354/10
355/10 356/8
**January 5 [2]**
421/15 421/15
**January 5th [2]**
357/11 421/17
**January 7th [1]**
357/11
**Jared [3]**
349/20 349/22
349/22
**Jason [6]**
356/14 358/3
358/5 358/8
358/9 433/12
**Jason's [1]**
458/9
**jaunt [1]**
375/21
**JAVIER [3]**
333/3 336/21
353/3
**Jayden [9]**
429/12 429/23
430/4 430/5
430/9 431/6
432/8 436/20
467/4
**JEFF [3]**

332/22 495/3
495/11
**Jenkins [1]**
336/9
**job [1]** 394/13
**Joe [1]** 409/15
**Johnson [1]**
417/22
**join [1]** 369/5
**joined [1]**
369/11
**JONES [58]**
332/6 333/17
336/3 336/12
357/10 360/1
361/2 363/7
363/16 363/19
363/22 364/11
365/2 366/18
366/21 367/10
383/6 383/8
383/25 384/10
385/3 387/2
389/4 389/10
392/7 392/11
393/4 394/5
394/7 395/16
395/22 398/3
399/25 400/4
400/8 400/10
400/16 401/15
401/19 402/1
402/3 402/5
411/14 417/23
419/25 427/8
428/17 430/5
430/10 433/23
435/25 436/19
436/23 440/13
440/19 462/17
463/18 494/2
**Jones' [12]**
354/6 360/10
362/7 364/23
365/14 366/13
384/23 389/5
389/8 390/4
400/2 488/13
**Jordan [1]**
336/9
**Josh [1]**
404/21
**JOSHUA [5]**
333/7 382/11
382/17 386/21
392/4
**judge [13]**
332/10 353/20

376/4 379/17
410/2 438/17
439/18 441/17
443/20 448/21
450/15 490/14
492/21
**judgment [1]**
359/8
**July [1]** 332/5
**jumped [1]**
367/7
**June [1]** 406/2
**jury [1]** 376/6
**justice [1]**
400/21

**K**

**Katrina [4]**
397/1 406/10
406/12 406/22
**keep [1]**
339/11
**Kenny [1]**
404/21
**Kentucky [14]**
337/3 382/25
385/25 386/8
386/15 393/25
397/12 397/15
402/8 403/14
407/16 407/20
420/17 422/12
**key [2]** 368/16
371/21
**keyboard [1]**
484/9
**kid [2]** 411/5
411/6
**kids [3]**
383/23 384/7
384/17
**kill [1]** 365/8
**killed [1]**
374/8
**killing [2]**
452/8 452/8
**kind [18]**
384/15 386/7
394/16 395/10
396/12 396/22
401/2 407/9
421/9 437/16
438/10 440/6
448/25 449/4
450/24 454/8
467/2 490/2
**kindergarten
[1]** 405/15
**kinds [2]**

443/11 494/13
**knew [10]**
368/20 371/6
375/6 409/14
423/19 425/6
452/9 453/9
458/4 487/6
**knowing [1]**
373/13
**knowingly [3]**
361/19 361/23
362/24
**known [5]**
386/4 394/8
395/16 398/2
433/25
**knows [1]**
391/1

**L**

**labeled [1]**
431/3
**ladder [3]**
465/25 466/2
466/4
**ladder-like [1]**
466/4
**landed [1]**
434/15
**Lane [1]**
332/19
**laptop [1]**
341/1
**large [5]**
405/20 407/11
428/5 441/7
482/21
**last [13]**
348/20 349/7
382/20 393/20
393/21 395/1
407/17 418/10
418/20 420/22
428/15 431/1
481/7
**late [3]** 419/4
419/13 489/14
**later [4]**
397/4 449/24
460/9 460/10
**law [10]**
336/13 360/1
360/3 360/22
370/18 375/1
377/17 377/19
385/4 395/22
**LAWLOR [13]**
332/18 332/19
333/8 333/10

333/13 333/15
336/13 359/3
359/5 381/24
461/8 493/24
494/14
**laws [1]** 401/2
**lawyer [4]**
337/11 339/20
458/7 459/7
**lawyers [1]**
493/10
**leaned [2]**
454/2 486/24
**leaning [1]**
453/19
**least [6]**
343/5 378/7
395/3 483/23
489/3 492/15
**leave [16]**
339/21 420/17
443/24 446/15
447/20 448/15
452/16 453/7
453/17 453/20
455/25 472/21
487/4 487/8
487/10 487/11
**leaving [6]**
421/2 427/25
428/1 430/6
453/6 453/7
**led [1]** 396/5
**leeway [1]**
389/12
**left [17]**
362/6 365/16
411/25 414/14
420/2 420/4
420/12 436/14
438/4 439/15
439/18 440/19
448/16 449/17
449/19 450/22
454/19
**legalities [1]**
400/21
**LEON [6]** 332/9
438/17 439/18
441/17 448/21
450/15
**less [2]** 494/8
494/10
**less is [1]**
494/10
**level [1]**
465/24
**liberty [1]**

**L**

**liberty... [1]**
493/5
**life [1]** 385/9
**lifestyles [1]**
384/13
**light [4]**
360/19 361/5
362/23 368/9
**likely [1]**
491/11
**likewise [2]**
355/11 355/15
**limiting [1]**
426/19
**line [7]**
369/15 380/9
390/15 466/12
466/14 467/13
469/19
**lined [2]**
464/23 466/25
**list [3]**
357/10 357/11
412/9
**listed [1]**
354/10
**listen [2]**
371/14 415/3
**listened [1]**
471/15
**litigation [1]**
469/23
**little [14]**
340/24 354/12
384/20 389/12
393/17 403/13
406/9 407/24
425/5 430/20
463/25 484/6
489/20 489/22
**live [7]**
382/24 393/24
393/25 394/1
402/7 410/4
435/15
**lived [1]**
405/12
**lives [1]**
384/7
**living [3]**
383/17 395/7
405/2
**lobby [25]**
345/6 360/7
362/4 369/8
374/1 374/7
374/7 402/22

430/5 430/9
448/18 448/23
449/7 449/9
449/10 449/20
461/19 476/21
482/10 482/12
482/20 483/10
483/15 484/23
485/1
**locally [1]**
491/2
**location [5]**
373/25 400/22
448/7 466/21
470/3
**locations [1]**
471/5
**locked [1]**
441/12
**log [6]** 356/14
356/17 356/19
357/3 357/7
457/20
**logs [1]**
357/22
**loner [5]**
347/11 347/13
347/14 347/22
348/18
**long [10]**
337/25 339/12
369/19 371/8
381/22 383/15
394/23 406/21
428/17 488/13
**longer [2]**
338/2 419/10
**look [6]**
352/17 357/22
420/21 433/25
438/25 476/16
**looked [8]**
376/6 378/17
422/10 422/13
425/25 439/5
448/21 485/2
**looking [10]**
353/21 354/4
355/19 374/2
388/3 394/14
413/18 438/3
476/19 476/25
**looks [7]**
361/2 450/23
457/16 481/7
481/7 483/25
485/10
**lost [1]**

385/25
**lot [21]**
341/24 385/22
392/8 392/9
394/24 400/1
402/10 406/4
410/25 411/22
421/9 423/9
423/10 423/12
424/13 426/20
457/15 457/16
462/23 476/16
492/21
**lots [5]**
385/24 411/21
423/19 439/19
443/11
**loud [2]** 402/4
450/5
**Louisville [11]**
337/3 339/1
343/7 344/7
346/21 351/22
393/25 394/2
395/8 459/11
459/12
**low [1]** 394/16
**lower [1]**
467/14

**M**

**M-U-D-D [1]**
393/21
**ma'am [2]**
391/25 398/23
**madam [5]**
336/25 339/9
356/14 411/12
412/8
**mailed [1]**
412/9
**majority [2]**
465/3 465/6
**makes [2]**
488/18 490/17
**making [1]**
445/16
**Mall [4]** 411/1
411/25 423/21
455/21
**man [2]** 349/18
461/13
**manager [2]**
405/19 405/20
**mandate [2]**
362/13 363/10
**manner [18]**
362/7 364/8
364/12 364/25

375/23 376/10
376/11 376/19
376/20 377/5
377/5 377/6
377/7 377/9
377/16 377/18
377/21 377/23
**manufacturers
[1]** 405/19
**many [8]** 377/8
397/4 407/22
446/1 448/21
448/21 451/23
451/24
**march [2]**
340/6 409/18
**marched [1]**
340/4
**marchers [1]**
414/23
**marching [1]**
413/24
**mark [15]**
354/21 354/22
354/24 355/4
355/5 355/23
357/4 358/14
358/14 412/21
432/12 432/15
440/17 445/2
473/9
**marked [6]**
337/21 356/15
356/20 412/10
413/14 430/24
**market [2]**
396/2 422/7
**Marketplace [1]**
422/10
**married [3]**
383/21 404/9
404/10
**masks [2]**
442/7 442/20
**massive [1]**
439/14
**material [4]**
368/21 368/23
368/23 442/16
**Matt [1]**
336/14
**matter [7]**
343/1 350/18
352/3 352/14
397/13 490/10
495/6
**may [14]**
336/19 343/16

344/13 353/25
355/22 357/7
382/8 382/9
382/10 389/17
391/14 393/13
440/13 448/7
**maybe [17]**
343/17 345/17
381/24 387/23
395/4 408/11
411/24 415/2
420/20 425/4
449/16 449/20
458/19 459/21
480/5 484/10
489/14
**McKenna [1]**
332/19
**MD [1]** 332/20
**Meadows [1]**
336/9
**meals [1]**
407/21
**mean [17]**
348/2 365/5
373/25 380/23
387/23 395/3
396/11 396/11
396/23 401/3
410/4 429/12
439/23 449/3
449/23 456/9
458/20
**meaning [1]**
363/4
**means [1]**
391/1
**meant [4]**
371/11 378/16
449/8 458/21
**measuring [1]**
422/16
**media [1]**
399/14
**medical [1]**
364/20
**meet [1]** 460/5
**meeting [2]**
421/23 422/1
**member [2]**
364/19 421/22
**members [8]**
370/15 371/12
373/8 373/15
373/22 374/16
374/20 434/21
**Memorial [6]**
446/5 447/15

**M**

**Memorial... [4]**
477/3 477/21 477/23 487/9

**memory [2]**
337/15 342/1

**mental [2]**
345/14 364/20

**mentally [1]**
344/24

**mentioned [4]**
368/9 395/10 396/19 465/15

**merits [4]**
368/12 371/17 375/8 379/23

**message [7]**
358/5 358/7 358/10 457/5 457/9 457/12 458/16

**messages [2]**
370/4 456/18

**met [6]** 383/9 383/12 383/15 394/10 407/19 459/18

**metal [3]**
445/9 445/17 445/18

**Metropolitan [1]** 433/11

**MICHAEL [3]**
332/18 336/13 459/22

**mid [1]** 380/8

**middle [3]**
411/25 426/7 447/1

**midnight [1]**
394/13

**might [8]**
368/14 381/5 406/17 415/17 430/19 489/19 493/5 493/14

**mile [1]**
428/20

**Miller [4]**
337/11 459/11 460/7 460/23

**milling [2]**
446/6 447/4

**mind [9]**
343/17 354/4 385/10 418/22 432/6 433/14 433/21 450/16

492/2

**mine [2]** 434/8 494/12

**mine's [1]**
484/11

**minute [9]**
338/7 358/9 366/25 378/9 380/17 380/18 433/7 446/20 457/21

**minutes [26]**
337/18 338/2 338/25 339/8 339/8 344/17 347/1 347/5 347/16 349/8 358/3 360/5 362/3 381/25 428/21 429/1 457/18 460/18 483/20 488/12 488/16 489/9 489/20 489/23 494/8 494/9

**mirror [1]**
450/3

**misdemeanor [11]** 363/19 365/19 365/24 366/3 366/4 367/9 367/13 372/10 372/12 373/1 380/3

**misdemeanors [1]** 379/1

**missing [1]**
378/21

**misspoke [1]**
349/15

**mistake [2]**
349/16 412/8

**mob [1]** 373/13

**mom [3]** 405/12 405/14 405/15

**moment [8]**
369/25 446/6 447/3 451/22 452/18 474/12 481/21 482/11

**Monday [2]**
491/10 491/12

**money [1]**
406/4

**months [2]**
384/18 451/23

**Monument [17]**
411/19 412/1

420/9 420/25 423/22 423/24 424/8 424/17 425/22 426/8 427/7 427/12 427/14 427/20 427/23 428/1 428/18

**moonlight [1]**
394/14

**moral [1]**
396/18

**more [19]**
338/24 342/25 347/10 368/14 369/1 371/6 384/20 397/11 397/17 424/15 440/7 448/16 468/5 468/19 488/18 488/24 491/11 494/11 494/14

**morning [5]**
410/20 420/18 423/7 459/20 460/13

**most [5]**
360/19 361/5 362/23 368/9 384/24

**motion [4]**
379/5 379/22 488/8 490/5

**Motor [1]**
395/8

**motorist [1]**
396/14

**Mount [6]**
385/17 402/8 403/14 403/16 404/24 405/11

**move [7]**
360/13 386/9 391/11 412/6 425/10 427/2 478/15

**moved [7]**
369/12 450/21 450/21 477/2 478/18 485/21 485/24

**movement [1]**
484/12

**moves [1]**
359/7

**moving [3]**
372/2 374/14

423/22
**Mr. [90]**
336/14 336/20 337/11 339/15 340/17 349/20 353/10 354/6 358/25 359/3 359/5 360/1 360/10 361/2 362/7 363/7 363/16 363/19 363/22 364/11 364/23 365/2 365/14 365/16 366/13 366/18 366/21 367/10 368/7 381/5 381/8 381/24 382/24 383/8 383/25 384/10 384/23 385/3 386/23 389/4 389/5 389/8 389/10 391/21 392/7 392/11 393/4 394/5 394/7 395/16 395/22 397/24 399/24 400/8 400/10 400/16 401/6 401/15 402/3 411/14 418/8 419/25 427/8 428/17 430/5 430/10 433/23 435/25 436/19 436/23 440/13 440/19 441/24 443/15 445/1 445/7 456/23 456/24 457/4 457/6 457/21 460/7 460/23 461/8 462/17 488/13 490/4 493/24 494/2 494/14

**Mr. Bayline [6]**
339/15 340/17 441/24 443/15 445/1 445/7

**Mr. Blandford [3]** 382/24 386/23 391/21

**Mr. Brennan [6]**
336/20 353/10 358/25 381/8 418/8 490/4

**Mr. Brennan's [1]** 381/5

**Mr. Dreher [1]**
368/7

**Mr. Goddard [5]**
456/23 456/24 457/4 457/6 457/21

**Mr. Jared [1]**
349/20

**Mr. Jones [43]**
360/1 361/2 363/7 363/16 363/19 363/22 364/11 365/2 366/18 366/21 367/10 383/8 383/25 384/10 385/3 389/4 389/10 392/7 392/11 393/4 394/5 394/7 395/16 395/22 400/8 400/10 400/16 401/15 402/3 411/14 419/25 427/8 428/17 430/5 430/10 433/23 435/25 436/19 436/23 440/13 440/19 462/17 494/2

**Mr. Jones' [10]**
354/6 360/10 362/7 364/23 365/14 366/13 384/23 389/5 389/8 488/13

**Mr. Lawlor [6]**
359/3 359/5 381/24 461/8 493/24 494/14

**Mr. Matt [1]**
336/14

**Mr. Miller [2]**
337/11 460/23

**Mr. Mudd [3]**
397/24 399/24 401/6

**Mr. Nathan [1]**
460/7

**Mr. Pence [1]**
365/16

**Ms. [5]** 360/12 370/14 452/2 454/3 455/2

**Ms. Ashli [1]**

## M

**Ms. Ashli...
[1]** 455/2
**Ms. Babbitt [3]**
360/12 370/14
452/2
**Ms. Green [1]**
454/3
**much [15]**
384/4 384/12
384/13 385/5
394/11 395/1
395/4 406/15
408/3 419/10
437/21 440/25
449/22 464/13
488/24
**MUDD [8]**
333/12 393/14
393/21 397/22
397/24 399/24
401/6 401/9
**multiple [7]**
343/3 375/25
447/16 447/17
450/14 487/18
488/5
**munitions [2]**
436/4 436/4
**MURPHY [7]**
332/12 333/5
333/9 333/14
336/7 386/25
398/1
**must [4]**
359/18 364/5
364/6 441/20
**myself [5]**
410/11 421/21
452/9 461/15
461/20

## N

**name [16]**
382/15 382/17
382/20 383/6
386/25 393/19
393/20 393/21
393/21 398/1
402/3 402/4
404/13 407/5
453/21 463/20
**named [2]**
358/3 451/19
**Nate [2]**
459/11 460/3
**Nathan [2]**
459/11 460/7

**natural [1]**
361/20
**nature [1]**
387/18
**near [1]** 394/2
**necessarily [1]**
482/19
**necessary [1]**
338/22
**need [15]**
342/6 343/25
346/6 346/14
347/24 374/23
400/14 407/23
432/8 433/16
448/15 488/21
492/8 493/19
493/23
**needed [2]**
385/20 386/18
**needs [4]**
386/6 489/13
490/5 493/23
**needs to [1]**
493/23
**nervous [2]**
393/18 439/22
**Nevada [1]**
409/3
**new [6]** 394/1
396/24 397/5
406/16 406/19
406/21
**news [10]**
389/22 390/4
399/15 406/14
407/16 449/11
456/7 456/16
485/3 485/4
**next [42]**
342/11 343/11
343/12 344/16
344/17 347/16
381/25 389/9
407/19 410/8
412/3 412/6
412/20 413/6
413/11 414/7
415/10 416/19
417/8 417/19
420/7 420/18
421/8 422/14
422/15 423/7
424/3 424/5
424/10 424/16
424/20 425/17
425/24 426/1
426/5 427/6

427/8 427/16
432/16 442/25
459/3 459/19
**nice [2]** 447/1
494/15
**night [2]**
410/7 410/17
**nine [11]**
341/14 359/9
366/24 367/21
371/20 379/8
379/11 422/9
450/23 486/2
492/8
**No. [2]** 356/20
357/3
**No. 2 [2]**
356/20 357/3
**nobody [2]**
370/25 487/9
**nobody's [2]**
447/4 453/7
**noise [2]**
443/9 443/11
**none [1]** 425/1
**nonlethal [1]**
436/4
**Nonviolent [1]**
399/8
**north [1]**
481/7
**note [2]**
374/20 426/11
**notes [4]**
357/1 357/18
358/12 491/18
**notice [2]**
367/23 377/11
**November [41]**
339/24 340/4
341/10 341/19
341/20 341/25
342/18 409/10
409/20 409/21
409/22 410/1
411/3 411/14
413/15 414/24
415/11 415/25
416/5 418/14
418/17 418/23
420/1 421/14
423/2 423/12
423/18 435/18
462/18 463/5
463/7 464/14
464/17 464/22
465/8 468/23
469/2 469/21

470/5 470/8
470/11
**November 14
[14]** 339/24
340/4 342/18
411/3 411/14
413/15 414/24
415/11 415/25
416/5 418/17
420/1 462/18
463/7
**November 14th
[19]** 409/20
409/21 410/1
418/14 418/23
421/14 423/12
423/18 435/18
464/14 464/17
464/22 465/8
468/23 469/2
469/21 470/5
470/8 470/11
**November 2020
[1]** 409/22
**November 5 [1]**
423/2
**number [19]**
337/19 338/3
338/4 340/2
340/9 342/13
343/12 344/17
354/14 354/23
359/18 362/2
364/25 374/2
413/6 416/10
428/7 432/16
448/20
**numbering [1]**
425/12
**NW [3]** 332/13
332/16 332/24

## O

**o'clock [6]**
412/3 419/5
419/6 428/25
456/1 456/3
**oath [5]**
336/17 458/10
493/3 493/12
493/13
**Obama [1]**
408/14
**object [7]**
351/2 364/6
376/7 376/8
381/6 388/24
390/11
**objection [27]**

338/11 357/2
386/9 389/2
389/6 392/16
399/18 412/12
413/7 414/3
416/15 417/4
417/15 418/3
421/4 422/23
425/11 425/14
429/7 431/9
431/14 432/21
432/23 469/6
473/21 473/23
487/23
**observations
[2]** 389/11
389/25
**observe [5]**
389/21 390/3
399/11 415/5
445/24
**observed [3]**
389/5 439/14
465/7
**observer [1]**
423/25
**observing [6]**
343/2 343/9
344/3 435/14
435/17 450/19
**obstruct [4]**
361/17 361/18
361/21 362/25
**obstructed [2]**
360/1 362/7
**obstructing [1]**
359/20
**obstruction [2]**
361/8 371/22
**obtuse [1]**
381/24
**obtuseness [1]**
381/25
**obvious [1]**
489/15
**obviously [8]**
353/20 360/11
362/9 364/10
410/22 415/21
423/21 458/5
**occasion [7]**
337/7 343/1
388/18 392/10
433/24 438/14
462/18
**occasions [1]**
343/2
**occur [3]**

**O**

**occur... [3]**
370/23 371/2 428/13

**occurred [10]**
339/1 340/5 351/21 406/12 416/7 416/8 418/13 431/8 463/7 465/16

**occurring [6]**
368/20 370/3 370/6 424/25 467/17 470/21

**occurs [2]**
446/3 481/25

**odd [1]** 480/18

**off [11]**
337/14 340/22 342/1 375/14 405/6 422/12 439/20 440/2 440/4 444/4 454/12

**offense [2]**
372/13 375/19

**offenses [2]**
375/16 375/17

**offer [26]**
338/1 351/6 351/7 351/9 351/21 351/22 356/16 356/21 400/23 401/4 412/15 412/21 413/5 414/2 416/11 416/13 417/3 417/14 418/1 420/22 422/21 424/5 425/9 426/9 429/2 429/14

**offered [13]**
338/18 338/19 338/20 350/10 350/18 350/20 350/21 352/2 352/6 352/11 356/16 357/13 360/21

**offering [6]**
338/15 350/14 350/15 350/22 352/4 352/13

**office [6]**
337/2 459/19 459/21 460/18 461/17 491/20

**officer [23]**
360/3 360/4 373/16 416/3 433/12 443/18 443/21 447/7 447/9 447/12 447/14 448/2 448/7 453/18 454/6 454/22 458/9 458/14 472/19 476/4 477/4 477/7 477/12

**officer's [1]**
475/10

**officers [53]**
360/2 360/10 360/13 360/23 416/4 437/6 442/25 444/23 445/20 446/9 446/11 446/14 446/23 446/24 446/25 448/14 449/16 450/12 452/7 452/11 452/12 454/14 454/17 464/24 466/12 467/10 467/11 467/13 468/12 468/18 468/25 469/13 472/17 472/21 473/4 473/7 473/14 473/17 474/9 474/16 474/17 474/20 474/20 474/22 475/5 480/19 480/24 481/16 483/11 485/17 485/21 487/4 487/15

**officers' [1]**
466/18

**official [12]**
332/23 361/9 361/11 361/14 361/17 361/21 362/8 362/25 370/3 371/22 371/23 495/3

**often [2]**
377/19 384/21

**old [3]** 382/18 393/22 393/23

**once [15]**
343/5 346/24

355/24 369/11 389/13 395/3 404/25 414/21 423/14 437/25 465/15 465/20 466/11 473/3 492/16

**one [102]**
339/15 340/7 340/11 340/13 340/15 342/25 347/5 347/16 347/16 348/20 349/8 349/22 350/5 354/15 354/17 354/19 355/23 355/25 356/1 356/13 356/17 356/20 357/4 357/8 357/24 359/18 362/19 362/20 364/25 368/15 371/20 374/3 384/24 386/25 398/1 404/16 409/8 412/6 412/11 414/7 415/10 416/2 416/13 416/19 417/8 417/19 417/21 418/10 420/22 421/8 422/11 422/15 424/10 424/20 425/17 425/24 426/1 426/3 426/5 426/15 427/6 427/8 427/9 427/11 427/16 427/16 427/18 428/7 429/24 430/13 432/19 434/15 438/19 438/22 438/22 438/23 438/24 438/24 443/3 445/17 446/1 446/20 446/22 447/1 447/2 447/11 448/14 452/21 453/5 463/21 467/1 467/22 472/21 477/25 478/17 478/24 479/24 487/6 487/8 487/13

488/11 491/8

**ones [2]**
454/15 454/15

**online [2]**
409/23 470/17

**only [32]**
339/14 340/7 351/20 354/23 355/5 355/24 355/24 360/25 362/9 362/20 364/14 364/22 366/21 368/22 370/4 371/1 375/14 406/23 429/13 430/14 432/10 451/7 452/9 453/5 453/8 453/10 456/12 476/22 487/14 490/3 490/23 490/25

**onto [8]**
436/17 438/11 454/7 465/24 465/25 466/3 466/5 468/5

**open [10]**
389/16 391/13 419/23 438/13 441/14 469/13 472/23 472/25 473/6 492/24

**opening [1]**
358/6

**operate [1]**
374/23

**opinion [20]**
384/23 385/1 385/3 389/8 390/17 390/20 391/4 391/5 395/17 395/21 399/15 400/17 400/19 400/23 400/25 401/4 401/5 404/6 490/21 490/21

**opinions [2]**
385/7 395/24

**opponent [2]**
352/4 352/12

**opportunity [10]** 352/1 388/15 388/18 389/21 390/3 399/11 445/24 476/16 477/9

493/7

**opposite [7]**
374/13 415/7 415/8 415/9 434/11 455/9 465/1

**order [5]**
358/6 359/10 359/16 381/18 429/17

**ordered [3]**
491/20 491/20 491/21

**orderly [3]**
366/17 366/19 367/19

**organ [1]**
364/20

**organization [1]** 410/14

**organized [2]**
406/25 407/12

**orient [1]**
481/6

**original [1]**
488/17

**Orleans [4]**
397/5 406/16 406/19 406/21

**Oshatz [1]**
390/19

**others [1]**
493/11

**otherwise [3]**
358/18 359/10 400/6

**ours [2]** 338/6 386/16

**out [67]**
338/25 339/21 342/20 342/23 346/21 348/1 348/16 350/17 351/18 356/17 357/5 365/9 369/21 373/4 384/17 385/15 385/16 385/19 403/5 406/15 406/24 409/2 420/8 429/16 430/10 435/15 438/10 450/8 450/8 450/10 450/21 450/25 452/6 453/6 454/6 454/10 454/15 454/18

## O

**out... [29]**
455/5 455/12
459/16 459/20
460/4 460/17
461/15 461/16
461/21 461/22
467/12 468/21
471/17 472/12
478/8 480/21
481/20 482/21
482/24 483/2
483/7 483/11
483/16 484/2
485/14 485/18
486/14 486/15
492/7

**out-of-court
[1]** 350/17

**outlets [3]**
389/22 390/5
422/8

**outlined [2]**
371/9 376/2

**outside [8]**
370/25 402/21
430/9 441/2
480/17 480/23
480/25 482/16

**over [28]**
336/25 365/5
365/5 384/16
385/12 394/8
398/3 402/24
407/24 420/4
420/5 432/4
437/10 437/19
438/5 438/7
438/10 438/20
438/21 438/22
438/23 438/24
439/3 444/16
444/17 454/12
486/24 488/16

**overall [5]**
338/15 392/23
399/16 448/5
450/5

**overcrowded [1]**
435/16

**overly [1]**
368/5

**overnight [1]**
493/20

**overruled [2]**
386/12 392/18

**oversaw [1]**
405/20

**Owensboro [1]**
459/21

**own [10]**
337/11 394/12
403/25 404/3
404/4 407/2
410/2 438/17
448/22 466/14

**owner [1]**
396/9

**owns [1]**
395/14

**Oxford [3]**
388/5 398/22
401/11

**Oxford's [1]**
398/19

## P

**p.m [10]** 332/6
382/1 382/2
413/16 415/11
427/13 428/1
475/25 481/22
494/16

**packed [1]**
397/2

**page [19]**
333/2 334/2
335/2 354/24
355/2 355/6
355/25 355/25
356/1 356/13
356/17 356/20
357/5 357/8
357/13 357/14
357/24 358/15
364/2

**pages [1]**
364/9

**paid [4]** 407/1
407/3 410/6
423/10

**pain [1]**
364/18

**paint [1]**
442/14

**painting [1]**
485/9

**paperwork [1]**
462/10

**parading [3]**
379/2 379/9
379/11

**paralegal [1]**
336/9

**parents [2]**
405/22 408/10

**park [3]**

410/24 411/1
423/11

**parked [9]**
341/24 341/24
411/1 411/23
412/2 423/14
424/12 462/23
489/12

**parking [7]**
341/24 342/18
410/24 423/9
423/10 423/12
489/12

**part [11]**
337/8 346/15
346/16 348/2
350/14 430/16
430/17 436/11
466/3 466/4
472/24

**participant [1]**
423/25

**participants
[1]** 415/25

**participating
[1]** 435/9

**particular [7]**
354/7 378/21
390/17 390/21
430/8 439/7
451/7

**partition [1]**
377/7

**partner [1]**
336/13

**partnering [1]**
441/6

**party [3]**
348/16 352/4
352/12

**pass [1]**
396/13

**passed [2]**
414/21 469/18

**past [4]**
374/14 453/19
491/14 491/16

**pat [2]** 447/24
448/3

**path [1]** 476/5

**patriotic [1]**
417/11

**pause [3]**
479/14 481/5
484/7

**paused [1]**
483/20

**peace [4]**

388/3 388/5
388/7 388/10

**peaceful [20]**
385/4 387/18
387/21 388/1
388/22 389/5
389/25 390/7
391/1 391/2
391/4 391/7
391/9 391/24
395/22 398/17
398/20 398/25
400/17 400/25

**peacefulness
[7]** 388/13
389/6 390/25
391/5 399/6
399/9 400/18

**Pence [2]**
362/5 365/16

**pending [2]**
341/16 361/12

**Pennsylvania
[1]** 414/13

**people [77]**
348/15 360/14
373/17 384/24
385/23 385/25
386/18 389/7
397/3 397/18
400/1 404/20
406/15 406/15
406/20 406/22
406/24 407/21
407/23 413/1
415/4 416/25
417/11 423/20
423/22 424/13
425/5 425/21
428/5 434/12
434/14 435/9
436/8 437/9
438/14 438/21
438/21 439/19
439/25 441/3
441/7 443/12
443/12 446/6
446/14 447/11
448/3 448/24
449/5 449/5
449/6 449/16
451/2 452/6
452/9 453/11
453/12 454/11
456/11 456/12
456/13 457/1
457/15 464/23
465/4 465/6

467/25 468/4
469/12 470/14
475/6 475/7
481/14 481/15
481/16 487/14
487/18

**people's [1]**
389/11

**percent [2]**
455/8 494/12

**perfect [3]**
401/12 401/15
401/16

**perhaps [5]**
343/1 360/13
370/19 377/15
434/8

**period [14]**
353/15 353/18
353/19 353/22
354/5 354/10
355/7 355/9
355/16 355/20
356/3 356/6
360/9 484/25

**permanent [1]**
468/5

**permission [2]**
353/24 386/2

**permitted [1]**
418/15

**person [24]**
349/13 358/3
363/5 364/7
376/9 376/13
377/8 377/8
377/11 383/6
385/4 386/3
395/22 396/18
402/10 402/11
402/16 430/3
430/8 430/12
434/4 438/22
451/9 461/18

**person's [1]**
386/5

**personal [1]**
395/2

**personally [1]**
396/9

**perspective [1]**
493/20

**pertaining [1]**
365/25

**phone [12]**
353/12 358/9
368/23 423/10
435/15 457/17

**P**

**phone... [6]**
457/20 457/21
457/23 462/11
466/15 478/8

**phones [1]**
435/17

**photo [5]**
417/24 417/25
418/21 420/7
430/7

**photograph [11]**
411/14 411/16
412/10 412/20
413/11 413/15
421/14 424/6
424/16 426/10
427/21

**phrase [1]**
458/15

**physical [4]**
364/18 364/21
365/1 365/23

**physically [1]**
344/23

**Pick [1]**   381/3

**picked [2]**
438/23 457/17

**picketing [3]**
368/1 368/3
379/12

**picture [16]**
413/18 414/17
415/12 415/13
417/21 420/8
420/25 421/11
422/6 422/6
422/14 423/21
424/19 438/4
440/7 457/16

**pictures [9]**
411/10 411/21
424/4 439/13
460/15 462/13
462/14 478/10
478/11

**pinpointed [1]**
423/9

**piss [1]**   450/4

**place [13]**
399/12 410/23
425/2 455/17
456/8 456/9
462/21 468/21
470/18 471/17
472/12 480/21
481/20

**places [2]**

408/6 449/6

**Plaintiff [1]**
332/4

**plan [8]**
348/22 349/2
350/7 368/21
428/6 428/8
488/17 490/16

**planned [2]**
362/16 363/13

**planning [3]**
362/12 421/23
422/1

**plans [2]**
410/3 410/4

**plant [1]**
395/9

**play [34]**
337/17 345/17
346/6 346/8
346/9 348/4
348/7 384/17
391/18 399/21
400/3 400/11
400/13 433/4
433/5 433/8
433/14 433/16
436/18 437/17
440/12 441/23
443/8 443/15
444/2 447/22
474/13 474/14
475/8 475/22
479/11 481/11
484/4 488/4

**played [43]**
339/17 340/18
340/20 340/25
341/7 342/14
343/15 343/18
343/19 343/21
343/23 344/8
344/20 345/18
346/12 347/9
347/19 348/9
348/13 349/10
391/20 399/23
416/20 417/9
424/21 425/18
426/2 436/22
437/18 440/18
441/25 443/16
444/3 445/4
445/8 460/22
464/4 467/4
474/15 475/9
475/23 479/3
484/5

**playing [6]**
446/4 447/23
473/18 474/12
479/12 481/12

**playoff [1]**
451/11

**plays [1]**
451/24

**Plaza [7]**
340/4 412/24
414/9 414/10
470/15 470/24
471/3

**please [46]**
336/4 336/25
337/18 340/17
341/13 346/10
347/5 382/3
382/16 382/20
390/10 391/18
399/17 401/20
411/12 412/3
414/7 415/10
416/19 417/8
420/7 420/23
421/8 424/6
424/20 425/17
425/24 426/1
427/8 427/16
437/17 441/24
443/7 443/8
443/15 444/2
445/3 445/24
457/6 457/14
475/8 479/1
479/11 481/5
481/11 486/6

**plenty [1]**
494/10

**plus [1]**
460/20

**podium [1]**
336/4

**point [40]**
343/20 348/21
350/8 368/9
369/5 409/14
414/18 420/2
424/24 426/6
426/17 431/19
431/25 434/23
435/25 440/21
444/5 446/22
448/6 448/17
456/19 459/18
459/24 465/10
467/15 467/22
468/11 472/11

477/17 477/18
478/20 479/24
479/24 483/15
486/4 486/17
488/11 488/14
488/16 489/1

**pointed [9]**
443/3 443/3
444/6 461/15
461/16 461/20
461/22 472/18
476/7

**points [1]**
410/6

**pole [4]**
364/14 369/13
375/25 377/24

**police [85]**
369/15 400/21
416/3 416/4
433/12 434/12
434/14 436/9
437/6 443/17
443/20 444/16
444/17 444/19
444/23 445/20
446/9 446/11
446/14 446/24
446/25 447/9
447/12 447/14
448/2 448/14
449/16 450/12
450/21 452/7
452/11 452/12
454/10 454/11
454/13 454/14
454/17 454/22
458/9 458/14
464/23 466/12
466/17 466/21
467/10 467/13
468/12 468/18
468/25 469/13
469/19 472/17
472/19 473/4
473/7 473/14
473/16 474/9
474/16 474/17
474/19 474/20
474/22 475/5
475/10 476/3
477/4 477/6
477/12 477/24
478/21 478/22
480/17 480/18
480/19 480/24
481/16 483/11
485/17 485/21

487/11 487/15
487/20 488/4
488/6

**political [3]**
408/7 408/19
409/8

**politically [1]**
408/18

**politics [3]**
408/2 408/3
408/3

**popped [1]**
409/23

**portion [5]**
374/12 430/22
430/23 431/1
431/13

**portions [4]**
337/14 350/9
431/14 433/14

**position [5]**
370/16 372/15
378/25 379/6
468/13

**possessed [2]**
363/22 366/18

**possible [5]**
369/19 371/8
384/4 384/14
401/14

**possibly [5]**
403/5 419/2
472/24 480/5
480/15

**pounds [1]**
437/22

**practical [1]**
490/10

**praying [1]**
434/14

**preceded [1]**
347/25

**preparation [3]**
430/24 433/24
476/15

**prepare [1]**
491/24

**prepared [2]**
419/20 431/2

**presence [5]**
392/21 428/16
472/11 480/17
480/18

**present [5]**
348/21 372/19
388/15 394/21
468/24

**presented [4]**

**P**

**presented...
[4]** 367/17
368/11 464/13
465/6
**preserve [3]**
361/10 361/15
367/21
**presidency [1]**
451/16
**president [7]**
362/5 393/1
409/4 409/15
462/3 470/12
471/18
**presidential
[5]** 408/9
468/7 468/15
472/6 472/22
**pressure [1]**
491/3
**pretrial [3]**
426/18 431/4
488/12
**pretrials [1]**
358/6
**pretty [9]**
388/3 394/11
396/13 396/24
404/16 405/23
406/15 440/25
449/22
**previous [2]**
414/17 425/25
**prior [2]**
392/7 392/11
**private [1]**
410/25
**probable [1]**
361/20
**probably [23]**
338/24 395/1
395/3 395/4
403/23 409/23
409/23 415/1
424/18 427/23
428/9 428/20
428/21 437/22
456/1 458/12
472/1 477/18
478/6 488/17
489/8 491/12
492/7
**problem [2]**
377/13 427/3
**problems [1]**
388/2
**Procedure [1]**

359/7
**procedures [1]**
354/8
**proceed [3]**
379/22 389/17
391/14
**proceeding [18]**
361/9 361/11
361/14 361/18
361/19 361/21
362/8 362/25
368/20 370/3
370/11 370/23
371/22 371/24
382/5 393/10
401/22 493/3
**proceedings [4]**
371/2 489/2
494/16 495/5
**proffer [2]**
338/12 431/20
**progressing [1]**
491/9
**progression [1]**
369/18
**prohibiting [2]**
435/1 437/6
**project [1]**
405/19
**projects [3]**
384/7 385/16
405/21
**proof [2]**
364/16 366/20
**proper [2]**
390/18 390/21
**property [8]**
360/25 361/1
361/7 372/6
372/18 373/2
373/3 422/8
**prosecution [1]**
368/10
**prosecutor [1]**
348/23
**prosecutors [3]**
387/1 398/2
463/21
**protect [1]**
442/13
**protected [1]**
367/25
**protesters [1]**
370/25
**protracted [1]**
364/19
**proud [2]**
403/9 463/11

**proved [3]**
361/23 363/3
367/14
**provide [6]**
345/4 367/23
368/19 376/2
378/14 391/1
**provided [1]**
431/10
**provides [1]**
371/16
**PTSD [1]**
451/25
**puffy [6]**
434/4 446/11
461/14 462/6
462/14 464/3
**pull [9]** 390/9
391/17 399/17
473/8 479/1
479/2 481/2
481/4 483/18
**purpose [2]**
359/20 394/5
**purposes [5]**
339/7 350/23
355/5 355/24
383/1
**push [5]**
369/21 475/4
475/14 482/23
483/4
**pushed [6]**
454/6 454/13
475/12 478/23
479/21 482/17
**pushing [2]**
454/15 480/7
**put [12]**
351/15 356/18
377/11 381/20
381/21 429/24
430/2 439/25
450/10 451/1
479/24 483/14

**Q**

**qualities [1]**
401/13
**quality [1]**
405/20
**quarter [3]**
418/24 420/10
420/13
**questionable
[1]** 458/24
**questioner [1]**
474/2
**quickly [3]**

422/15 424/4
425/10
**quit [1]** 404/3
**quite [7]**
369/9 384/21
411/11 415/4
415/7 415/8
415/9
**quotation [1]**
378/15
**quoted [1]**
378/7

**R**

**rack [1]**
415/20
**racks [14]**
416/1 432/3
433/12 434/11
434/23 435/1
435/8 435/13
435/22 436/1
436/12 436/14
464/23 467/14
**rail [1]**
438/20
**railing [1]**
486/24
**rails [1]**
439/1
**raise [3]**
382/3 393/8
401/20
**raised [2]**
368/16 371/21
**rally [45]**
339/24 340/3
340/6 340/8
341/11 341/19
341/20 343/8
409/1 409/4
409/4 409/7
409/8 409/18
409/22 409/25
410/3 413/1
413/2 415/24
416/1 416/5
418/13 418/15
420/1 420/4
420/5 421/13
421/19 423/17
423/18 424/13
425/3 425/3
425/25 428/15
458/3 462/18
462/19 463/9
469/21 470/12
470/13 470/21
471/6

**ram [2]** 375/25
377/25
**ran [6]** 465/16
468/1 472/23
472/25 480/14
480/15
**rarely [1]**
399/14
**rated [1]**
440/2
**Rathburn [2]**
433/12 433/25
**rather [3]**
342/2 407/17
419/5
**reach [1]**
459/16
**reached [4]**
431/19 431/25
432/2 459/20
**react [1]**
407/18
**reaction [4]**
406/11 406/12
410/3 451/21
**read [2]**
401/11 460/23
**readily [1]**
373/13
**reads [2]**
378/8 475/24
**ready [4]**
336/20 410/22
422/9 460/14
**real [3]**
376/22 376/23
377/12
**realize [3]**
465/10 465/12
488/25
**really [12]**
369/24 371/5
385/23 400/23
408/5 408/7
441/19 453/11
466/25 468/22
471/18 480/20
**reason [15]**
348/3 351/23
362/20 362/20
362/21 366/16
400/5 403/4
403/4 403/5
451/7 451/14
470/2 490/23
490/25
**reasonable [1]**
353/19

**R**

**rebuttal [1]**
494/3
**recall [4]**
337/10 342/24
355/15 473/13
**receive [2]**
337/22 351/8
**received [4]**
351/10 355/16
356/4 370/5
**recently [1]**
397/11
**recess [5]**
370/9 380/9
382/1 488/17
492/25
**recessed [1]**
370/9
**recognize [2]**
391/21 399/24
**recollection
[18]** 339/19
341/20 342/17
344/22 344/24
345/19 347/21
350/11 350/16
350/21 353/22
354/20 355/7
355/20 356/3
408/8 434/8
445/12
**recommendations
[1]** 458/7
**reconvene [3]**
380/18 489/16
493/2
**record [11]**
336/5 339/7
340/22 363/11
364/22 378/24
382/2 412/5
425/10 426/12
495/5
**recorded [3]**
464/19 465/8
466/14
**recording [1]**
466/17
**records [1]**
494/13
**Recross [1]**
356/11
**red [19]**
395/15 400/5
400/11 402/10
402/11 434/4
442/2 442/3

442/18 442/19
446/11 461/13
462/6 462/14
464/2 474/25
475/16 479/8
489/3
**redirect [16]**
333/5 333/10
333/15 351/4
351/5 353/1
353/3 389/13
392/3 392/4
401/8 401/9
419/2 489/10
489/20 493/7
**redundant [1]**
343/24
**reference [1]**
358/4
**referencing [1]**
369/6
**referring [1]**
357/12
**reflect [1]**
403/11
**refresh [15]**
339/19 341/19
342/16 344/22
344/24 345/19
347/21 350/11
350/16 350/21
353/21 354/20
355/19 356/3
434/8
**refreshed [1]**
355/7
**regard [1]**
377/13
**regarding [2]**
365/20 365/24
**register [1]**
408/11
**regrettable [1]**
490/19
**rehabilitation
[1]** 364/21
**related [2]**
355/16 368/17
**relates [3]**
371/21 378/25
488/9
**relevance [3]**
358/1 358/2
431/16
**relief [1]**
396/10
**remain [3]**
336/16 455/1

455/2
**remained [1]**
363/17
**remaining [1]**
379/5
**remember [62]**
337/4 337/6
337/12 337/16
339/25 340/1
340/7 340/8
341/25 342/5
342/6 342/6
342/8 342/10
343/3 343/6
343/9 344/6
344/10 344/14
345/5 345/7
345/10 345/13
345/14 345/16
345/23 345/25
346/20 346/24
347/2 347/3
347/11 347/14
347/15 348/20
348/22 348/24
349/1 349/3
353/8 353/18
355/13 369/20
373/21 407/5
408/10 408/12
408/13 409/16
414/19 430/11
445/14 457/9
477/14 477/14
478/16 480/2
480/10 480/12
486/16 494/10
**remembers [1]**
346/7
**remind [2]**
336/16 373/14
**reminded [1]**
356/14
**renew [2]**
338/10 488/8
**renewed [1]**
490/5
**rental [1]**
395/14
**repeatedly [1]**
369/14
**replay [1]**
452/23
**replied [1]**
393/4
**reporter [6]**
332/22 332/23
489/13 491/22

492/5 495/3
**reporter's [1]**
488/20
**representation
[1]** 350/19
**Representatives
[1]** 373/9
**represented [4]**
381/5 381/8
391/3 400/4
**requested [1]**
355/9
**require [2]**
370/18 375/18
**required [3]**
374/18 376/24
401/13
**requirement [1]**
375/15
**requires [3]**
366/13 367/10
371/18
**requiring [1]**
364/20
**rescuing [3]**
406/20 406/21
406/24
**resolved [3]**
371/25 493/20
493/24
**respect [5]**
345/23 350/9
350/19 439/6
458/15
**respirator [1]**
442/15
**respirators [1]**
442/20
**responded [1]**
350/7
**responding [2]**
348/10 349/1
**response [3]**
349/3 408/1
457/7
**response to [1]**
408/1
**responsive [1]**
338/12
**rest [1]**
420/20
**rested [1]**
359/2
**restricted [3]**
363/17 365/12
365/23
**restroom [17]**
443/2 443/23

444/7 444/8
444/10 444/13
449/17 449/18
449/21 449/22
449/22 450/2
450/10 452/4
472/18 476/4
476/6
**rests [1]**
358/24
**retreat [1]**
468/13
**retreated [1]**
468/14
**return [3]**
370/11 493/6
493/14
**reus [1]**
367/24
**review [4]**
337/7 361/10
438/14 477/9
**reviewed [2]**
342/24 476/18
**RICHARD [1]**
332/9
**ride [1]**
384/19
**riding [2]**
406/20 460/14
**right [103]**
339/16 340/23
341/15 347/14
353/21 357/13
359/12 360/3
368/7 380/17
382/3 383/21
387/19 393/8
394/3 397/1
397/8 397/16
401/20 402/9
406/3 410/18
413/19 414/20
414/21 415/20
415/20 419/19
419/22 422/12
424/18 432/7
434/5 434/15
434/15 435/5
438/3 438/10
438/20 441/4
442/1 442/24
443/4 443/13
444/4 444/11
445/5 445/17
446/8 446/9
446/11 446/12
447/6 447/12

## R

**right... [49]**
447/15 448/4
449/19 452/18
453/13 453/16
459/1 462/20
465/17 465/21
466/15 466/18
466/22 467/17
467/23 468/1
468/8 468/13
468/16 469/23
472/16 473/5
475/4 475/6
475/10 475/17
476/1 476/20
477/10 477/23
478/13 478/21
478/23 479/4
479/9 479/13
479/14 479/21
480/8 481/9
482/2 482/10
482/22 483/7
483/9 484/2
484/7 485/16
489/21
**rights [2]**
460/23 461/4
**river [2]**
394/3 395/15
**road [2]**
396/12 396/14
**roll [1]**    424/3
**Romney [2]**
408/15 408/16
**roofs [1]**
406/16
**room [4]**
332/24 341/10
349/17 371/2
**ropes [2]**
478/17 478/17
**Rotunda [6]**
443/4 477/20
478/2 478/4
478/7 478/15
**rough [3]**
491/19 491/20
491/21
**roughly [3]**
339/13 489/23
489/24
**roundabout [1]**
466/10
**route [1]**
414/8
**rule [20]**

338/13 338/14
338/18 338/21
339/2 352/4
352/10 352/19
352/20 359/7
378/22 379/22
379/25 379/25
380/5 490/5
492/15 492/16
492/17 494/13
**ruled [2]**
361/11 361/14
**rules [4]**
492/19 492/20
493/4 493/12
**ruling [7]**
337/22 350/24
378/10 378/12
378/18 399/19
490/21
**run [5]**    352/5
352/19 369/2
369/3 369/3
**running [5]**
480/8 480/10
480/16 481/13
481/14
**runs [1]**    369/7

## S

**sad [2]**    346/22
347/1
**safe [4]**
370/11 370/12
370/13 468/3
**salesman [1]**
383/9
**same [27]**
341/24 342/18
356/7 362/21
365/19 365/24
366/15 395/6
399/19 407/9
412/23 418/18
423/4 423/5
423/10 423/12
424/8 426/12
427/12 430/6
430/12 430/16
430/17 462/21
462/23 462/25
470/19
**sandwiched [1]**
454/16
**sat [5]**    440/9
455/13 455/22
455/22 460/19
**satisfied [1]**
365/17

**satisfies [1]**
363/23
**Saturday [1]**
410/1
**saved [1]**
423/9
**saving [1]**
406/4
**saw [47]**    344/7
344/9 344/9
360/2 369/1
369/2 369/15
400/25 407/9
423/22 434/14
434/16 436/7
436/20 438/22
438/22 449/11
449/24 450/22
450/25 451/18
452/17 453/11
453/16 454/6
455/4 455/17
456/8 456/10
456/13 456/16
460/17 460/21
464/12 464/15
465/1 465/4
467/19 470/17
472/19 472/25
482/1 484/24
484/25 485/3
485/3 487/14
**saw-saw [1]**
344/9
**saying [9]**
337/15 343/3
345/4 352/12
373/21 435/22
437/4 472/16
473/13
**scaffolding
[22]**    436/8
437/10 437/11
437/16 439/23
465/21 465/22
466/1 466/4
466/6 466/9
466/11 467/1
467/1 467/6
467/16 467/23
468/2 468/12
471/24 472/5
472/10
**scare [1]**
377/10
**scene [7]**
464/12 464/15
464/16 464/22

465/7 465/11
465/12
**scenes [1]**
397/8
**schedule [1]**
490/2
**school [6]**
375/1 403/17
403/19 408/4
448/25 449/1
**scope [1]**
353/15
**screen [7]**
411/12 411/13
415/17 447/1
479/5 481/9
483/23
**scrim [2]**
437/15 437/20
**seal [1]**    355/1
**search [10]**
353/7 353/11
353/16 354/3
354/25 355/12
355/19 356/1
462/5 489/2
**seat [1]**
336/16
**seated [3]**
336/12 382/8
393/13
**second [16]**
339/10 354/17
366/15 367/17
374/3 374/6
390/19 426/15
438/24 439/4
440/17 440/24
445/2 462/19
473/9 477/5
**seconds [30]**
337/18 337/25
338/8 339/14
344/18 347/5
347/17 348/4
348/7 391/18
399/22 429/14
430/14 432/10
433/2 436/19
437/17 440/13
441/23 443/6
443/8 474/13
474/23 475/8
479/2 479/4
481/4 481/11
483/20 484/4
**section [1]**
354/15

**secure [2]**
468/5 468/19
**security [6]**
373/21 383/10
394/12 395/10
404/2 405/1
**seeing [6]**
345/2 345/2
369/17 369/23
395/5 480/17
**seek [2]**
430/25 431/13
**seem [1]**
452/18
**seemed [1]**
463/9
**seems [3]**
414/20 447/24
493/24
**segments [1]**
352/7
**seized [1]**
354/8
**seizure [1]**
462/6
**selected [4]**
337/24 338/23
351/20 351/20
**selfie [1]**
413/22
**sell [1]**    404/7
**send [1]**    491/2
**sense [1]**
488/18
**sent [3]**    358/8
412/10 457/16
**sequence [1]**
337/17
**series [3]**
354/23 361/25
420/23
**serious [11]**
364/6 364/17
365/1 365/3
375/24 376/1
376/8 376/12
376/20 377/4
377/12
**served [1]**
407/21
**service [3]**
443/2 443/22
477/15
**session [6]**
362/19 366/17
366/19 367/10
367/19 371/23
**sessions [1]**

**S**

**sessions... [1]**
370/8

**set [7]**   407/20
414/25 418/20
426/24 440/24
471/5 494/13

**seven [9]**
340/9 340/11
340/15 366/10
366/25 367/1
367/2 367/3
367/16

**Seventeen [1]**
383/16

**seventh [1]**
366/15

**several [5]**
364/15 414/25
426/18 444/25
447/25

**shaking [4]**
440/20 467/23
469/13 477/14

**share [1]**
355/7

**shared [1]**
368/15

**sharing [1]**
492/2

**sharp [1]**
414/21

**shaved [1]**
460/19

**shift [1]**
394/13

**shocked [1]**
436/6

**shoes [3]**
442/9 442/21
442/22

**shook [8]**
443/1 443/22
446/22 472/17
472/20 473/6
474/21 477/7

**shooting [15]**
360/12 431/5
436/7 453/20
455/2 458/13
458/17 458/19
458/22 458/23
458/24 465/19
466/21 487/13
488/9

**short [5]**
410/4 411/22
411/24 421/9

449/15

**shortcut [1]**
466/5

**shot [15]**
369/22 370/15
374/8 430/3
434/15 451/19
451/25 452/2
452/10 453/9
455/18 467/20
486/22 487/2
487/6

**shoulder [1]**
448/3

**shouting [1]**
435/9

**shovel [1]**
386/6

**show [21]**
360/22 372/16
391/8 413/14
415/14 415/17
416/21 417/10
417/20 420/7
421/10 422/14
422/15 431/17
440/13 453/6
462/3 462/3
475/1 478/24
480/9

**showed [6]**
338/8 338/13
397/7 438/19
467/9 470/13

**showered [1]**
460/19

**showing [3]**
424/2 424/9
452/21

**shown [6]**
361/25 362/23
371/6 373/6
437/23 452/20

**shows [9]**
361/25 415/15
416/22 426/5
430/4 430/5
438/13 441/22
453/23

**side [18]**
371/13 371/14
434/11 434/11
452/6 452/10
452/13 453/9
455/9 455/10
455/11 455/20
465/18 467/2
467/2 483/1

487/19 494/7

**Sidebar [4]**
389/1 390/14
418/7 488/23

**sides [1]**
440/1

**sideways [1]**
475/20

**sign [2]**   368/2
479/13

**signed [1]**
462/10

**signs [4]**
435/1 436/1
437/4 441/9

**similar [2]**
366/11 418/13

**singing [3]**
417/11 434/13
464/22

**single [1]**
376/15

**sink [1]**   450/4

**sitting [3]**
370/22 404/20
440/24

**situation [2]**
462/17 491/13

**situations [1]**
395/2

**six [5]**   366/2
367/13 375/9
380/2 383/24

**sixth [1]**
365/22

**slid [1]**
438/25

**slight [1]**
414/20

**slightly [1]**
429/16

**small [3]**
396/3 406/18
410/25

**smaller [1]**
385/17

**smashing [1]**
485/22

**smiles [1]**
397/6

**smoke [1]**
467/19

**snapped [3]**
345/8 345/10
345/20

**snow [2]**   435/3
435/6

**snows [1]**

386/5

**social [1]**
399/14

**softball [1]**
396/7

**sold [3]**   383/9
404/25 405/1

**solemnly [3]**
382/4 393/9
401/21

**somebody [9]**
348/16 365/2
365/8 377/10
388/2 388/3
392/21 450/22
450/24

**someone [6]**
347/15 397/7
434/16 451/25
455/4 455/18

**someone's [1]**
396/14

**sometime [1]**
408/11

**somewhat [2]**
385/17 405/10

**somewhere [3]**
378/1 428/25
477/8

**SONIA [4]**
332/12 336/6
386/25 398/1

**soon [2]**
485/21 485/24

**sorry [32]**
340/12 340/14
342/22 351/12
354/17 355/25
359/1 367/7
371/18 371/19
387/5 393/25
395/20 403/9
403/12 412/7
417/23 419/5
419/13 421/1
431/23 433/18
434/11 453/10
463/12 463/13
463/13 463/23
470/9 473/19
479/2 483/19

**sort [5]**   360/3
362/16 435/20
437/13 478/5

**sought [1]**
431/2

**sound [4]**
344/12 388/6

398/25 476/1

**source [1]**
438/13

**space [2]**
485/11 485/19

**spare [1]**
384/20

**speak [4]**
354/12 392/14
396/1 402/4

**Speaker's [24]**
345/6 360/7
362/3 369/7
373/25 374/7
402/21 430/4
430/9 448/18
448/22 449/7
449/9 449/10
449/19 461/19
476/21 482/9
482/12 482/20
483/10 483/15
484/23 485/1

**speakers [17]**
415/1 417/22
428/14 470/23
471/2 471/3
471/4 471/7
471/9 471/11
471/14 471/22
471/24 472/3
472/6 472/9
472/10

**speaks [1]**
473/24

**Special [6]**
336/9 336/23
353/5 354/2
354/12 357/21

**specific [4]**
370/2 386/10
480/14 494/14

**specifically
[4]**   368/20
371/10 374/15
480/14

**specifics [1]**
340/8

**speech [1]**
425/6

**speeches [2]**
415/1 415/3

**spell [3]**
382/20 393/19
402/3

**spend [3]**
384/2 384/11
394/24

## S

**spending [1]**
386/16

**spent [4]**
369/10 392/8 406/19 408/6

**spoke [1]**
456/22

**sponsored [1]**
396/7

**spot [2]**
342/18 427/12

**spouse [1]**
493/10

**spray [1]**
442/14

**stable [1]**
440/7

**staff [3]**
373/19 374/17 374/22

**stage [11]**
366/6 366/8 366/9 414/25 417/21 426/25 468/7 468/15 471/4 472/6 472/22

**stairs [2]**
466/7 469/16

**stairwell [1]**
374/14

**stamp [2]**
475/24 481/22

**stand [6]**
379/4 381/13 381/14 467/12 492/12 492/17

**standard [2]**
360/15 368/9

**standing [11]**
360/3 415/20 416/3 434/12 434/13 434/19 434/22 435/12 435/14 450/18 484/24

**start [6]**
343/17 370/21 380/15 411/13 479/2 483/19

**started [24]**
345/8 380/16 394/12 394/12 394/14 404/3 407/10 407/10 414/9 419/4 419/5 419/13 423/14 434/19 439/19 439/20 440/2 450/20 454/6 454/10 454/11 465/13 467/23 479/15

**starting [4]**
336/3 427/23 427/24 439/21

**state [5]**
336/4 345/15 393/19 402/3 407/16

**stated [1]**
363/12

**statement [4]**
337/12 339/20 358/6 461/4

**statements [8]**
350/17 350/19 351/11 351/13 351/14 352/7 371/10 452/16

**STATES [20]**
332/1 332/3 332/10 336/3 336/7 372/18 375/5 388/16 390/19 402/18 428/23 440/21 441/15 444/14 469/3 469/16 469/19 471/13 475/25 480/24

**Statuary [1]**
478/16

**statute [3]**
367/22 367/24 368/4

**stay [7]**
369/24 371/8 406/21 415/3 423/3 454/7 493/11

**stayed [5]**
369/19 410/7 410/17 452/15 462/21

**staying [1]**
491/1

**steel [1]**
442/9

**steel-tipped [1]** 442/9

**step [1]**
493/18

**stepped [1]**
469/15

**steps [11]**
415/16 415/19 415/23 436/16 436/16 438/2 440/8 443/4 465/22 465/23 467/8

**still [11]**
360/20 371/7 396/24 396/25 408/18 419/15 426/7 427/7 427/12 427/13 489/2

**stipulate [1]**
400/7

**stood [2]**
446/22 447/25

**stop [14]**
343/16 343/20 363/10 371/14 396/15 397/5 429/17 443/8 446/10 447/14 451/1 451/2 459/5 484/6

**stopped [15]**
369/15 369/18 422/12 438/24 439/4 473/4 473/5 473/14 473/16 474/9 474/17 474/19 475/1 478/21 478/22

**stops [1]**
420/19

**StopTheSteal [1]** 479/13

**straight [4]**
441/1 443/1 475/5 475/10

**stranded [2]**
396/14 406/15

**street [4]**
332/13 332/16 416/23 416/23

**stretch [3]**
376/22 376/23 376/23

**strike [5]**
364/12 369/14 386/10 402/21 454/22

**strikes [2]**
372/19 372/21

**striking [7]**
345/11 373/7

**375/4 376/16 376/18 377/22 377/25**

**struck [2]**
365/2 461/19

**structure [1]**
437/24

**stuck [2]**
454/14 487/5

**stuff [2]**
450/5 490/18

**stunned [1]**
436/6

**subject [4]**
337/23 338/20 370/10 494/2

**submission [1]**
360/8

**submit [17]**
360/21 361/1 361/5 361/13 361/16 362/6 363/18 365/1 365/23 366/5 366/12 366/17 366/23 367/9 367/20 368/4 490/8

**submitted [4]**
363/21 367/13 379/1 380/3

**submitting [3]**
366/1 367/2 372/23

**substantive [1]**
431/1

**successful [1]**
404/4

**sudden [1]**
434/19

**sufficient [5]**
363/21 367/17 367/23 371/16 375/7

**suggest [1]**
365/7

**suggested [2]**
352/19 381/1

**Suite [1]**
332/19

**sum [1]** 372/7

**supplies [1]**
385/20

**support [4]**
393/1 406/7 448/15 462/3

**supporting [1]**
416/25

**supposed [9]**
435/21 435/23 436/2 437/4 441/10 446/17 447/20 448/8 493/11

**Supreme [22]**
340/5 414/1 414/8 414/22 414/24 415/16 415/19 415/24 416/22 468/24 469/1 469/3 469/11 469/16 469/19 469/22 470/1 470/4 470/22 470/25 471/2 471/4

**sure [34]**
337/15 338/20 339/6 343/5 348/6 348/24 354/18 357/8 365/7 369/20 385/2 386/20 395/5 397/13 399/2 399/4 399/7 399/10 400/22 413/4 414/11 415/19 416/23 422/16 431/12 438/25 439/5 445/16 446/21 461/10 473/2 478/24 481/17 483/13

**surgery [1]**
364/21

**surrounded [1]**
373/12

**surveillance [3]** 369/21
383/18 386/2

**suspended [3]**
362/5 362/18 365/16

**Sustained [1]**
427/4

**sway [3]**
439/20 439/21 440/2

**swayed [1]**
467/24

**swaying [1]**
468/4

**swear [3]**
382/4 393/9 401/21

**S**

**switch [1]**
336/25
**system [1]**
341/2
**systems [1]**
383/19

**T**

**table [3]**
336/8 336/13
375/14
**talk [12]**
337/13 392/11
395/3 396/1
400/20 403/13
454/2 458/13
460/6 460/8
462/5 487/20
**talked [9]**
353/10 406/10
407/25 447/2
457/18 458/1
461/6 461/7
477/6
**talking [16]**
345/2 443/20
447/6 447/9
447/14 449/25
453/1 454/17
465/4 469/25
474/16 474/20
478/25 485/19
488/4 488/5
**Tamica [1]**
336/9
**tape [1]**
483/14
**target [1]**
377/20
**Taylorsville
[1]** 382/25
**teacher [1]**
405/15
**team [1]**
451/10
**teams [1]**
396/7
**tearing [2]**
447/4 450/5
**telling [8]**
337/10 346/24
347/11 381/13
474/21 477/15
487/4 487/18
**temporary [1]**
440/7
**tennis [2]**

442/21 442/22
**term [1]** 388/4
**terms [4]**
365/22 374/19
406/10 429/3
**terrace [1]**
434/10
**testified [12]**
353/14 387/1
387/18 389/20
390/25 398/2
398/14 466/20
474/8 476/3
482/13 487/7
**testify [6]**
352/2 352/15
433/17 433/19
433/21 493/12
**testifying [2]**
383/2 394/5
**testimony [22]**
342/2 345/15
362/4 362/9
362/10 373/16
374/15 382/4
391/2 393/9
400/24 401/21
418/11 433/24
435/3 463/11
484/24 485/5
488/14 492/13
493/5 493/13
**texted [1]**
452/4
**thanked [2]**
443/1 443/22
**thanks [1]**
393/17
**That'll [1]**
492/6
**thereabouts [2]**
343/13 344/18
**therefore [1]**
368/4
**third [4]**
361/8 365/13
365/18 367/9
**thirds [1]**
427/23
**Thirteen [1]**
433/2
**though [6]**
361/17 379/8
394/15 422/1
479/25 481/5
**thought [16]**
350/22 353/19
357/6 367/5

390/1 426/14
441/20 444/17
452/12 452/12
453/7 453/10
454/7 463/8
471/18 472/15
**thoughts [3]**
346/22 399/5
399/8
**thousand [1]**
372/7
**threaten [1]**
377/8
**three [36]**
332/9 343/1
366/1 371/18
371/20 373/5
375/8 375/16
375/17 378/20
380/1 380/1
380/4 380/20
380/22 380/23
380/24 381/1
381/2 381/10
381/11 381/12
381/16 381/22
381/23 395/15
403/20 404/3
415/1 434/12
435/8 450/12
452/9 453/12
462/13 494/10
**throughout [6]**
360/5 375/20
396/8 431/7
476/18 478/7
**time that [1]**
454/20
**timeframe [1]**
429/3
**times [19]**
340/2 343/3
364/15 375/20
376/1 429/4
446/1 447/16
447/17 447/25
448/21 450/23
461/10 462/21
462/23 462/25
472/20 478/9
486/2
**timing [1]**
494/1
**tipped [1]**
442/9
**title [1]**
431/7
**today [14]**

380/19 383/2
386/19 393/16
394/4 400/19
404/15 418/25
419/3 419/9
419/10 445/12
451/5 488/18
**together [11]**
384/2 384/5
384/11 384/18
384/19 387/13
394/21 394/25
397/4 398/9
439/25
**told [30]**
340/2 341/22
342/17 342/25
343/6 344/9
344/22 344/25
345/1 345/7
345/23 346/21
347/13 347/22
400/10 406/5
408/10 419/3
451/2 452/5
457/4 458/3
458/10 460/13
461/5 472/8
472/21 484/1
487/8 487/9
**tomorrow [10]**
419/7 419/16
419/18 419/20
489/16 490/13
490/15 493/2
494/6 494/7
**tonight [1]**
493/1
**took [21]**
360/7 385/23
399/12 407/12
411/16 411/17
414/8 415/12
415/13 416/9
417/13 417/25
425/19 428/21
430/7 439/13
439/14 450/4
452/14 455/17
458/10
**top [8]** 436/15
440/1 440/10
465/21 466/11
467/15 468/11
472/10
**topic [1]**
477/16
**topics [1]**

489/3
**tornado [1]**
385/22
**toss [1]**
438/22
**tossed [2]**
438/23 439/2
**tossing [1]**
438/19
**totals [1]**
339/8
**touch [1]**
415/17
**touched [1]**
448/2
**tough [2]**
451/24 452/1
**toward [1]**
369/3
**towards [16]**
413/25 427/24
428/2 428/5
440/9 441/1
444/6 453/3
455/21 472/25
476/9 478/15
480/8 480/10
480/14 480/16
**towers [1]**
435/16
**town [3]**
385/17 397/13
421/2
**track [1]**
339/11
**tractor [5]**
421/11 422/6
422/6 422/7
459/5
**tragedy [1]**
408/1
**trailer [4]**
385/19 407/11
407/20 422/17
**trait [1]**
395/17
**tranquil [2]**
388/9 399/3
**transcript [4]**
332/9 490/24
491/17 495/5
**transitioning
[1]** 418/11
**travel [1]**
360/5
**traveled [2]**
463/5 464/9
**traveling [1]**

**T**

**traveling...
[1]** 409/2
**trespassed [1]**
345/20
**trial [21]**
332/9 363/25
364/2 368/18
369/10 373/6
376/2 378/7
378/9 378/16
402/10 404/17
405/25 426/18
430/25 431/2
463/10 464/4
464/20 476/15
494/9
**tried [7]**
369/24 416/2
425/10 435/15
451/24 455/1
487/21
**trim [1]**
494/12
**trip [1]**
438/23
**tripped [2]**
345/20 450/22
**tripping [1]**
438/21
**Troy [1]**
404/21
**truck [9]**
346/23 397/2
397/16 423/14
424/12 455/21
455/23 489/4
489/4
**true [6]**
365/15 366/12
366/14 367/12
479/20 495/4
**Trump [9]**
340/3 393/1
408/23 409/1
409/4 416/25
420/1 470/13
471/19
**truth [13]**
350/18 352/3
352/14 382/5
382/6 382/6
393/10 393/10
393/11 401/22
401/23 401/23
461/11
**try [4]** 348/12
371/1 406/17

494/8
**trying [8]**
371/8 395/4
426/24 439/2
452/15 453/19
455/2 491/3
**Tuesday [6]**
491/4 491/5
491/6 491/8
491/11 492/6
**turn [2]**
340/19 458/11
**turned [9]**
341/2 341/2
369/23 369/24
382/19 449/15
451/1 453/17
456/7
**turns [1]**
475/19
**Twenty [1]**
432/19
**Twenty-one [1]**
432/19
**twice [1]**
395/3
**two [50]**
337/21 338/7
338/25 347/10
349/17 351/15
351/19 355/2
355/6 355/25
357/13 358/15
360/24 371/19
372/3 372/4
372/5 375/25
377/24 380/4
380/25 381/2
381/3 381/4
381/4 381/9
381/10 381/20
381/23 383/24
383/24 384/11
385/24 394/17
397/2 402/24
403/3 426/9
427/23 428/9
442/25 451/3
452/9 454/14
460/17 460/20
465/25 472/17
472/20 475/7
**two-hour [3]**
338/25 351/15
351/19
**two-thirds [1]**
427/23
**type [2]**

395/12 439/24

**U**

**U.S [6]** 332/23
348/20 349/3
349/16 364/9
365/9
**U.S.C [1]**
359/17
**Uh [13]** 338/9
387/20 388/11
395/13 396/21
408/17 408/24
440/15 453/4
456/25 460/24
478/12 480/1
**ultimately [4]**
374/24 464/2
475/12 477/2
**unable [1]**
370/21
**Uncle [1]**
384/8
**uncommon [1]**
396/13
**under [22]**
336/17 338/14
339/2 339/3
354/25 359/6
359/17 386/1
426/16 436/8
436/15 437/24
465/18 465/20
465/23 467/6
468/2 471/23
471/25 493/3
493/12 493/13
**underneath [2]**
465/23 466/7
**understood [2]**
373/10 492/16
**unfairness [1]**
389/14
**Unfortunately
[1]** 451/20
**UNITED [20]**
332/1 332/3
332/10 336/3
336/7 372/18
375/5 388/16
390/19 402/18
428/23 440/21
441/15 444/14
469/3 469/16
469/19 471/13
475/25 480/23
**unlawful [2]**
374/25 375/5
**unlawfulness
[2]** 373/10

373/13
**Unless [1]**
359/9
**unloading [1]**
424/11
**unsafe [1]**
371/1
**up [99]** 338/14
340/3 340/19
341/2 341/2
341/23 354/12
368/2 375/1
380/9 389/14
390/9 391/17
395/5 396/5
397/2 399/17
403/4 403/6
403/15 403/16
405/11 405/12
406/18 407/19
407/20 408/5
409/23 410/20
414/16 414/18
414/19 414/25
418/16 418/17
421/23 422/2
422/19 423/7
424/2 424/24
432/4 436/16
438/2 438/9
438/11 438/21
438/23 439/19
439/25 440/1
440/9 440/9
441/6 443/4
443/5 443/5
447/4 447/12
448/22 449/6
449/13 450/5
451/2 451/8
451/11 451/14
457/17 460/5
462/3 464/23
466/2 466/5
466/7 466/8
466/25 467/8
469/1 470/13
470/14 471/5
473/8 475/1
477/21 478/1
478/5 479/1
479/2 479/25
481/2 481/4
482/22 483/18
484/6 485/2
485/19 486/17
492/4 494/8
**upon [1]** 484/1

**upstairs [1]**
477/19
**USA [1]** 409/4
**USAO [1]**
332/15
**USAO-DC [1]**
332/15
**use [3]** 364/11
375/18 458/15
**used [25]**
342/18 342/19
344/13 345/9
345/12 345/16
345/19 350/11
361/3 364/7
364/25 376/10
376/11 376/20
377/5 377/17
377/19 377/20
377/21 377/24
384/19 423/12
449/21 467/19
482/16
**using [9]**
338/17 339/7
354/20 375/22
375/25 376/19
377/6 377/7
426/16
**usually [2]**
380/12 490/8

**V**

**vacation [3]**
384/18 387/13
397/4
**vacationed [1]**
384/4
**vacations [3]**
394/21 398/9
408/6
**vagueness [3]**
367/22 368/5
379/14
**value [3]**
372/12 372/14
372/23
**vantage [2]**
467/15 468/11
**various [1]**
390/1
**velvet [1]**
478/17
**veracity [1]**
384/23
**verdict [1]**
490/17
**verifying [1]**
341/18

**V**

**Vernon [2]**
417/22 417/22
**versions [1]**
450/14
**Vice [1]** 362/5
**video [116]**
337/1 337/14
337/21 338/15
339/17 340/18
340/20 340/25
341/7 342/14
342/25 343/15
343/18 344/20
345/2 345/3
345/18 346/12
347/9 347/19
348/9 348/13
349/10 350/9
361/2 369/1
374/12 383/18
391/20 391/22
399/21 399/23
400/12 416/20
417/3 417/9
424/20 424/21
424/22 425/18
425/19 426/2
426/12 429/13
429/14 429/15
429/18 429/20
429/23 430/4
430/5 430/9
430/16 430/17
430/22 433/16
433/25 434/7
434/9 434/14
434/21 435/15
436/19 436/20
436/22 437/18
438/13 439/6
439/14 440/18
441/25 443/16
444/3 445/4
445/8 445/10
445/11 445/15
445/16 445/25
446/4 446/7
447/23 449/24
452/14 454/9
461/15 461/16
461/17 461/20
465/7 466/6
467/4 467/5
467/9 472/19
473/24 474/2
474/11 474/15
475/9 475/19

475/23 476/16
476/18 476/24
477/7 477/10
478/4 478/9
479/3 479/12
481/12 484/5
485/4 488/12
**video's [2]**
473/18 474/12
**videographer
[1]** 430/6
**videos [14]**
361/25 402/12
416/7 416/8
426/9 426/20
426/21 448/20
452/19 453/6
464/20 487/17
488/3 488/5
**videotapes [1]**
344/8
**view [2]**
399/16 441/1
**viewed [1]**
362/23
**violating [1]**
492/20
**violence [8]**
340/5 365/23
415/5 418/14
424/25 425/20
467/16 467/18
**violent [1]**
388/12
**Virginia [1]**
422/11
**vis [2]** 362/16
362/16
**vis-a-vis [1]**
362/16
**voice [6]**
362/11 362/20
363/12 366/22
371/11 402/4
**voices [2]**
441/21 462/4
**void [4]**
367/22 368/5
379/14 379/18
**voltage [1]**
394/16
**volume [2]**
340/19 341/1
**vote [2]** 368/3
408/11
**voted [2]**
408/9 408/18
**voting [2]**

408/12 408/13
**VRBO [2]**
395/14 405/4

**W**

**wading [1]**
406/19
**wait [3]**
366/25 378/9
433/7
**walk [11]**
411/22 427/23
427/24 428/15
432/5 433/10
441/15 444/20
444/22 470/25
471/19
**walked [20]**
346/23 348/17
414/13 414/19
423/21 439/13
441/3 441/8
441/18 448/16
453/6 453/15
455/13 455/20
464/11 466/7
471/1 471/20
472/17 473/5
**walking [14]**
344/2 362/1
414/1 423/14
425/6 425/7
428/5 445/5
445/19 447/1
447/6 447/12
448/12 469/1
**wall [1]** 485/9
**wants [4]**
337/24 352/16
490/20 493/25
**warning [2]**
434/18 434/18
**warrant [9]**
353/11 353/16
354/3 354/9
354/25 355/12
355/19 356/1
462/5
**warrants [2]**
353/7 353/21
**Washington [44]**
332/5 332/14
332/16 332/25
368/22 385/17
392/12 392/22
394/4 402/8
403/14 403/16
404/24 405/12
409/19 411/19

412/1 414/9
420/2 420/9
420/12 420/25
421/17 421/18
421/25 422/19
423/2 423/22
423/23 424/8
424/17 425/22
426/7 427/7
427/12 427/14
427/20 427/22
427/25 428/1
428/18 442/17
455/25 463/5
**wasting [1]**
427/1
**watch [4]**
399/14 454/9
454/16 487/17
**watched [1]**
406/14
**watching [1]**
479/23
**water [2]**
385/20 406/20
**wave [1]**
364/13
**waved [2]**
360/4 439/14
**waving [1]**
441/3
**way [29]**
360/10 361/16
363/15 377/10
377/10 377/11
377/15 394/21
420/19 422/12
422/19 424/15
433/23 436/9
438/5 441/3
450/21 459/7
460/19 466/10
472/24 475/4
475/20 481/15
481/15 482/17
482/23 486/5
486/6
**we can [1]**
481/2
**weapon [17]**
363/18 363/20
363/24 364/2
364/3 365/13
365/21 365/25
367/15 375/10
375/11 375/15
375/18 375/23
376/5 376/8

380/1
**wear [1]**
442/11
**weaving [1]**
449/4
**weddings [1]**
394/22
**Wednesday [6]**
491/8 491/11
491/12 491/14
491/17 492/7
**week [4]** 395/4
406/19 406/23
407/24
**weekends [1]**
384/17
**weeks [1]**
397/3
**weigh [1]**
437/21
**welcome [3]**
336/10 336/15
393/6
**weren't [15]**
370/15 422/1
446/17 447/19
448/7 452/16
457/6 457/14
466/21 473/5
481/17 482/4
485/22 486/8
486/11
**west [5]** 409/2
422/11 434/10
434/11 481/8
**what's [27]**
338/20 343/20
354/14 358/1
359/23 376/24
379/18 401/3
404/13 411/13
411/18 413/14
418/22 422/14
422/15 426/12
428/22 433/21
433/25 438/12
446/13 457/19
458/6 458/7
473/23 484/19
490/16
**wheelers [1]**
384/19
**whenever [4]**
453/15 460/13
465/13 472/13
**where's [2]**
372/14 376/10
**whirl [1]**

**W**

**whirl... [1]**
340/23
**white [4]**
349/22 349/23
437/13 437/15
**who's [1]**
336/12
**whoa [2]** 433/7
433/7
**whole [8]**
337/24 358/13
358/18 382/5
392/9 393/10
401/22 404/17
**whose [1]**
398/21
**wide [2]**
441/14 469/12
**wife [6]**
383/25 384/3
407/10 410/5
456/22 462/11
**wife's [2]**
394/11 404/13
**WILLIAM [2]**
332/18 336/11
**WILLIAMS [1]**
332/12
**willing [2]**
384/6 419/16
**win [1]** 379/3
**wind [2]**
414/18 451/11
**window [41]**
345/6 345/8
345/11 345/14
345/21 360/8
361/3 361/4
362/3 364/15
365/6 365/6
365/9 369/14
373/7 373/11
375/4 376/16
376/18 377/22
402/21 403/2
403/6 450/23
450/23 451/4
451/6 451/15
458/4 460/17
461/19 463/14
472/13 485/22
485/25 486/7
486/9 486/11
486/13 486/15
486/18
**windows [3]**
456/14 486/4

486/5
**wins [1]**
451/10
**wired [1]**
406/20
**wishes [1]**
352/1
**within [2]**
460/17 474/23
**without [2]**
374/22 421/8
**witness [18]**
333/2 336/15
349/12 355/6
356/2 356/10
356/13 357/18
386/10 389/4
390/22 397/7
406/10 487/23
487/25 492/12
492/16 493/3
**witness' [2]**
350/11 390/17
**witnessed [6]**
395/25 396/8
451/20 453/20
458/13 487/13
**witnesses [9]**
358/22 380/6
380/19 380/24
380/25 381/9
381/16 381/21
419/3
**wondering [1]**
380/7
**wooden [4]**
369/13 375/24
445/18 449/20
**word [4]** 345/9
345/20 347/14
460/7
**wording [1]**
344/15
**words [14]**
344/12 344/13
345/12 345/16
347/2 370/10
370/24 371/13
410/2 438/17
448/22 485/1
485/14 491/10
**wore [4]**
362/15 442/18
442/19 462/25
**work [17]**
341/4 381/25
385/15 386/17
395/8 395/11

395/12 395/25
396/5 396/19
396/22 403/25
404/2 435/16
439/24 475/20
491/11
**worked [5]**
383/11 385/19
387/11 394/17
405/18
**working [3]**
385/14 394/13
488/20
**works [2]**
395/10 490/2
**worn [2]**
433/10 433/25
**wound [1]**
448/22
**written [1]**
378/15
**wrong [4]**
345/20 363/5
403/2 451/10
**wrongdoing [1]**
363/4

**Y**

**Y'all [1]**
477/7
**year [5]**
385/24 395/25
403/22 406/5
407/17
**years [21]**
383/16 384/5
385/12 387/9
393/23 394/8
394/18 395/1
396/15 397/1
397/4 398/3
402/25 403/3
403/20 404/3
405/6 405/16
451/3 458/10
492/21
**yell [1]**
450/25
**yelling [7]**
443/12 450/20
452/7 479/25
480/2 480/4
481/15
**Yep [2]** 354/22
479/4
**yesterday [15]**
337/1 338/8
343/19 343/21
343/23 353/7

353/14 356/12
357/16 357/22
357/23 381/9
383/3 419/3
460/22
**Yetter [1]**
373/16
**youth [1]**
408/3