IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

　　　　　　　　　　　　　　　　　　Criminal Action
　　　　　　Plaintiff,　　　　　　　No. 1:21-cr-0213

　　　vs.　　　　　　　　　　　　　Washington, DC
　　　　　　　　　　　　　　　　　　July 20, 2023
CHAD BARRETT JONES,

　　　　　　　　　　　　　　　　　　1:38 p.m.
　　　　　　Defendant.
_____/

TRANSCRIPT OF BENCH TRIAL - DAY FOUR
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

For the Government:　　　SONIA WILLIAMS MURPHY
　　　　　　　　　　　　　　DOJ-CIV
　　　　　　　　　　　　　　1100 L Street, NW
　　　　　　　　　　　　　　Washington, DC 20530

　　　　　　　　　　　　　ADAM DREHER
　　　　　　　　　　　　　　USAO-DC
　　　　　　　　　　　　　　601 D Street, NW
　　　　　　　　　　　　　　Washington, DC 20530

For the Defendant:　　　WILLIAM BRENNAN
　　　　　　　　　　　　　MICHAEL LAWLOR
　　　　　　　　　　　　　　Brennan, McKenna & Lawlor
　　　　　　　　　　　　　　6305 Ivy Lane, Suite 700
　　　　　　　　　　　　　　Greenbelt, MD 20770

Court Reporter:　　　　　JEFF HOOK
　　　　　　　　　　　　　　Official Court Reporter
　　　　　　　　　　　　　　U.S. District & Bankruptcy Courts
　　　　　　　　　　　　　　333 Constitution Avenue, NW
　　　　　　　　　　　　　　Room 4700-C
　　　　　　　　　　　　　　Washington, DC 20001

**I N D E X**

| Witness | Page |
|---|---|

CHAD JONES

| Continued Cross-Examination by Mr. Dreher | 529 |
|---|---|
| Redirect Examination by Mr. Brennan | 544 |
| Further Cross-Examination by Mr. Dreher | 565 |

| Closing Argument | Page |
|---|---|
| For the United States:  Mr. Dreher | 568 |
| For the Defendant:  Mr. Lawlor | 594 |
| Rebuttal for the United States:  Mr. Dreher | 610 |

**E X H I B I T S**

| Exhibit | Page |
|---|---|
| Government 609    Admitted into evidence | 532 |

**P R O C E E D I N G S**

**DEPUTY CLERK:**  This is criminal case 21-213, United States of America v. Chad Barrett Jones.  Starting with the government, please approach the podium and state your appearance for the record.

**MR. DREHER:**  Good afternoon, Your Honor.  Adam Dreher, alongside Ms. Sonia Murphy as well as Ms. Tamica Meadows and Jordan Jenkins, the FBI agent for the United States.

**THE COURT:**  Welcome everyone.

**MR. BRENNAN:**  Good afternoon, Your Honor.  William Brennan on behalf of the defendant, Chad Jones, who's seated at counsel table along with my law partner, Mr. Michael Lawlor, and our intern, Matt Bayline.

**THE COURT:**  Welcome, everyone.  I think we have Mr. Jones on the stand.  You can come back up on the stand.  You remain under oath, okay?

**THE WITNESS:**  Okay.

**THE COURT:**  You may proceed when you're ready.

**CONTINUED CROSS-EXAMINATION OF CHAD JONES**

BY MR. DREHER:

   **Q.**  Yes, Your Honor.  If we could please pull up Exhibit 609.  Now, sir, yesterday you had testified that after the shooting you were told to leave the Capitol, correct?

**A.** Yes, at one point we were.

**Q.** And you did not leave the Capitol immediately, right?

**A.** Correct.

**Q.** Now, you've had an opportunity to review what's been marked as Exhibit 609 prior to trial, right?

**A.** Yes.

**Q.** And this footage shows the aftermath of the shooting, doesn't it?

**A.** It's very blurry right now. Can you show me, please?

**Q.** Well, if we could please play the first 4 minutes and 30 seconds of this video.

**MR. BRENNAN:** Your Honor, can I make an inquiry of madam clerk whether or not this is actually in evidence? It's not, okay.

**MR. DREHER:** I apologize. Then prior to playing it, Your Honor, I would move for the admission of Exhibit 609.

**THE COURT:** Okay. Do you object to the admission?

**MR. BRENNAN:** It's cross-examination, we do object. He didn't put it in in his case-in-chief, it's in our case.

**THE COURT:** Well, he needs to use it for cross-examination, right?

**MR. DREHER:** Yes, Your Honor. I guess, for the record, at a pretrial conference it was excluded. However, I think it has become relevant now given the defendant's testimony.

**THE COURT:** Yeah, remind me, if you will, what 609 covers.

**MR. DREHER:** So this period covers following the shooting. However, it will be the defendant's actions afterwards. The video will outline that the defendant remained right up against the police line, and at one point even getting around them to take photographs of the scene. But it will not show the defendant in the bathroom crying, it will not show the defendant giving his information or attempting to provide them with the name and address.

**THE COURT:** Were excerpts of this shown in the government's direct case?

**MR. DREHER:** None of this --

**THE COURT:** Not this one?

**MR. DREHER:** Correct, it was excluded at a pretrial hearing, Your Honor.

**THE COURT:** And what's your objection? He's using it for cross.

**MR. BRENNAN:** I'm sorry?

**THE COURT:** He's using it for cross.

**MR. BRENNAN:** He's using it for cross, Your Honor,

and he just proffered that it doesn't show my client -- video of my client in the bathroom. I don't think there's a video of the bathroom, Your Honor. I'm not sure what the video's relevant to. I mean, it shows the aftermath of the Ashli Babbitt shooting. My client testified, I think, that he went in the bathroom and cried. Counsel just said: Well, there's no video of him going in the bathroom and crying. Well, I'm assuming there's not a CCTV camera in the men's restroom.

**THE COURT:** I certainly hope not.

**MR. BRENNAN:** Right.

**THE COURT:** Tell me, how long is this video?

**MR. DREHER:** Your Honor, I intend to play 4 minutes and 30 seconds of the video. I was going to do it all in one --

**THE COURT:** How long's the whole thing?

**MR. DREHER:** The entirety of the video is eight minutes.

**THE COURT:** No, I'll admit the first four and a half minutes.

**MR. DREHER:** Yes, Your Honor.

**THE COURT:** You can use that for your cross-exam.

**MR. DREHER:** Yes, Your Honor.

(Government Exhibit 609 admitted into evidence)

**MR. DREHER:** If we may please play the first 4

minutes and 30 seconds.

(Video played)

**Q.** Now sir, in that video clip, the video does not depict you in the bathroom crying, does it?

**A.** Well, no, it sure does not.

**Q.** It also doesn't depict you leaving the Capitol at that point?

**A.** Correct, I stayed there.

**Q.** It also does not show -- excuse me, I should say, it's taken from the vantage point of where the bathroom was, though, isn't it?

**A.** That's in the hallway where we were. The bathroom was to the left behind closed doors.

**Q.** Certainly where the filmer of -- where the person making this film is standing is next to where that bathroom is, correct?

**A.** Yes, very close.

**Q.** And ultimately we're able to see then the distance from the bathroom to the door at that point?

**A.** Yes.

**Q.** So yesterday when you testified that when you came out of the bathroom and were already right to the front, we can see that wouldn't be the case in this clip, can't we?

**A.** No, not necessarily. Because when you come -- when I came out of the bathroom, to the left there were

three or four people and then the door.  To the right was probably 200 people facing the door.  So when I came out of the bathroom, I was in the front of the crowd.

Q.   Now, from this point, you then move to an exit to the Capitol, right?

A.   After this video?

Q.   Yes, after the timing in this video, you then moved towards a door to get out of the Capitol?

A.   Yes.

Q.   But you did not move there by yourself?

A.   Yes, I did.

Q.   You weren't pushed out by police?

A.   No, not until -- no, actually I was not.  There's 26 other body cams that show that I walked out.

Q.   Now, if we can pull up Exhibit 411 that's already been admitted into evidence.  And if we can start at 5 seconds, and play until 13 seconds.

(Video played)

Q.   Now sir, you were in the courtroom when prior testimony established that you were in the red jacket and the gray hat?

A.   Correct.

Q.   And can you tell us that you are, in fact, the person in the red coat and the gray hat depicted in this exhibit?

A. Yes.

Q. And what is it that you're looking at at the time of this frame?

A. I guess the back of some people in front of me.

Q. So you didn't notice the exit immediately in front of you?

A. Yeah, absolutely I did notice that, and that's why I turned around.

Q. Because you didn't want to leave, right?

A. Correct.

Q. So if we can play this exhibit then until 37 seconds.

(Video played)

Q. Now sir, at that point you had turned around and then were escorted out by police, right?

A. Actually, I was blindsided by that officer. I went back to tell the lady officer that I'd just witnessed the shooting and I didn't want to go out the door.

Q. Even though you had at least four minutes and 30 seconds right in front of police officers outside the shooting?

A. Well, in that last video that you showed, I was telling the crowd that the shooting came from the other side of the door. No one knew where the shooting came from except for me and about three other people, including the

police officers, because the guy that shot ran off. And so, yes, I had four minutes and -- however many minutes to tell people, and I was actually telling people.

Q. I guess the question that I have is you weren't telling police, you were telling other people that were there, right?

A. I was, but I was also telling the police officers that were there. They didn't even know where the shooting came from.

Q. And it's your testimony that at that moment is when you wanted to tell the police?

A. The moment in this video?

Q. Correct.

A. Yeah, because I saw the exit door, and I knew as soon as I went out that door no one was going to hear about it. And honestly, not a single person has asked me about it since then except the two FBI agents in my interview. Nobody has asked me about the shooting of Ashli Babbitt, and I was an eyewitness of the shooting right in front of me.

Q. Now, at this moment in Exhibit 411, we see you looking at the elevator.

A. I am.

Q. Did you hit the call button to the elevator?

A. I did.

Q. Because you wanted to escape the police pushing

you out, right?

**A.** Yes, I did not want to leave the building because I had seen a shooting, and nobody knew where the shooting came from at that time except for me and about three other people.

**THE COURT:** Didn't you just say you told the police at the scene?

**THE WITNESS:** I was trying to, yes. I was trying.

**THE COURT:** They didn't listen to you?

**THE WITNESS:** No, no. The crowd thought that it was one of the officers on our side of the door that shot Ashli, but it was a gentleman that came from the other side, shot her, and then ran off instantly.

**THE COURT:** Earlier in this clip that we just saw, 609, earlier in that clip, right after the shooting took place, you're standing next to two or three police officers?

**THE WITNESS:** Yes.

**THE COURT:** Didn't you tell them that you witnessed the shooting?

**THE WITNESS:** Yes.

**THE COURT:** What was their reaction?

**THE WITNESS:** They just stood there. Nobody -- it was like nobody cared.

**THE COURT:** But you had told them?

**THE WITNESS:** Yes, I did.

THE COURT: So you were going back because they didn't react to it?

THE WITNESS: Correct, yes. I mean, in my mind it was a crime scene, a shooting, and then they just made everybody leave without taking any info. And to this day, I still have not been asked about it. I witnessed it firsthand.

BY MR. DREHER:

Q. If we could play this clip until 42 seconds, please.

(Video played)

Q. So earlier you told us that you had hit the elevator call button?

A. I did.

Q. Because you wanted to stay in the building?

A. Yes.

Q. Because you wanted to talk to police?

A. Yes.

Q. Now, in this frame, can you tell us how many police officers are seen in this frame?

A. There are quite a few. There's a lot of them.

Q. So at this moment, where did you think this elevator was going to take you?

A. I didn't know. I had no idea, but it was going to keep me from being pushed out the door.

**Q.** Which is where you didn't want to go, you didn't want to go outside?

**A.** Correct, I did not want to leave. I just witnessed a shooting, and nobody knew who did it at that time.

**Q.** But at some point you did leave the Capitol, correct?

**A.** Yeah, right after this I did.

**Q.** And on direct examination, you testified that you went back to your truck?

**A.** Yes, I did.

**Q.** Now, at the truck that was parked -- well, at least you told the FBI your truck was parked at C Street and 12th in Southeast; is that right?

**A.** That's right.

**Q.** So do you remember the path that you took from the Capitol to your truck?

**A.** Absolutely. So this door that we went out was on the east side of the Capitol. I had come in on the west side. After going out this door, I went down the steps and around to the left. I sat in a fold-out chair amongst other people, cried, thought about what just happened. Sat there for a few minutes, walked around the other side of the Capitol back to the west side, and then back down the Mall. Sat on a bench, cried some more -- I think my mother called

while I was sitting on the bench. And then I continued on to my truck, and I drove back to the hotel in Gaithersburg.

**Q.** But you made a couple stops driving from Gaithersburg home, right?

**A.** The next day.

**Q.** You told the FBI that you stopped at a couple of different rest areas, right?

**A.** I stopped at several, yes.

**Q.** And you explained to them that you did that to throw away the flagpole and the flag?

**A.** I didn't stop just to do that, I stopped at a rest area to use the restroom, and then I threw the flag away.

**Q.** But then you also deleted all your Facebook, right?

**A.** I closed the account, yes.

**Q.** And you deleted your Instagram?

**A.** One of them, yes.

**Q.** The one that you use for your business?

**A.** Maybe, yes. I'm not sure, I had a couple. I'm not sure which one, I don't remember.

**Q.** And you deleted all of your social media at that point?

**A.** Correct, I did.

**Q.** You deleted all the photographs that you took from the scene?

**A.** I deleted most, yes.

**Q.** You deleted -- well, at least in the surveillance that we reviewed at trial, you had your phone out quite a bit?

**A.** I'm sorry?

**Q.** You had your phone out quite a bit in the surveillance that we saw at trial, right?

**A.** Yes, I did.

**Q.** But we didn't see any of that footage on your phone?

**A.** That's correct. A lot of times I was trying to do Facebook Live, and it wouldn't work because it would not connect. I'm assuming that the towers were overloaded. So it wouldn't have actually been recording a video.

**Q.** And in 609, we see you try to take a picture of Ashli Babbitt?

**A.** That's when I was telling the police officers that I just witnessed it, and no one was listening to me.

**Q.** But you deleted that, too?

**A.** I did. I didn't want to see that again.

**Q.** So you were so concerned to provide police information of the shooting that you then deleted it all?

**A.** I did.

**Q.** Now, you testified that the officers outside the scene weren't willing to listen to you, and that the

officers pushing you out of the door weren't willing to listen to you. But then that night, you were contacted by your brother-in-law who's a police officer, correct?

A. Yes, I was.

Q. And he asked you whether or not you were inside the Capitol, and you told him no?

A. Well, actually, he said: "Please tell me you didn't go in the Capitol." And so I responded: "No, I did not, but a lot of people did."

Q. So why wouldn't you tell him about the shooting?

A. Well, actually I did tell him.

Q. But you first told him you weren't in the building, sir.

A. I picked up the phone and called him and talked to him for 24 minutes right after that text and told him that I was there.

Q. Now, that telephone call to him occurred after he confronted you with a photograph of you inside the Capitol, didn't it?

A. Yeah, it sure did.

Q. But your first response was to tell him that you were not in the Capitol?

A. Yeah.

Q. Why is that?

A. Why not? I didn't owe Jason anything, I just told

him that I wasn't.

Q. Well, no, I understand, sir. But you were very concerned with letting someone from law enforcement know what you had witnessed.

A. Right.

Q. And the law enforcement officer that is perhaps closest to you out of all the other ones that you contacted that day, you told him you weren't even in the building.

A. But then I picked up the phone and called him and told him I was, within about a half an hour or so.

Q. How long did it take you to drive back in your truck from Washington, D.C. to where you lived in Mount Washington, Kentucky?

A. It took almost all day. I probably got back at 8:00 or 9:00 at night.

Q. And although you threw the flag away, you still had that red jacket?

A. That was my favorite jacket, yes.

Q. But that jacket was not found in your truck, was it?

A. No. It had been eight days or 10 days since I had been to D.C. in my truck. It was found in my wife's car, which I had been driving my wife's car.

Q. So this jacket, though, was found on the -- excuse me, the driver's side backseat floorboard, right?

**A.** It was.

**MR. DREHER:** If I may just have a moment, Your Honor. Your Honor, I have no further questions.

**THE COURT:** Redirect.

**REDIRECT EXAMINATION OF CHAD JONES**

**BY MR. BRENNAN:**

**Q.** Good afternoon, Mr. Jones.

**A.** Good afternoon.

**Q.** So you had some questions about where you were going in the Capitol. Prior to January 6th of 2021, had you ever been in the United States Capitol?

**A.** Possibly when I was a very young child.

**Q.** How old approximately?

**A.** Maybe nine or 10.

**Q.** Nine or 10. And so how old were you when you -- on January 6th, 2021?

**A.** I was 43.

**Q.** So almost 30 years or so, correct?

**A.** Yes.

**Q.** Twenty-five, 30 years. Prior to going in the building, did you have a map of the interior of the building?

**A.** No.

**Q.** Did you have a guidebook?

**A.** No.

**Q.** Did you know -- were you familiar with any of the rooms in the Capitol?

**A.** Not at all.

**Q.** The door that you entered, did you know where that door took you?

**A.** I had no idea.

**Q.** When you got to -- His Honor asked you yesterday whether you saw the sign Speaker's Lobby?

**A.** Yes.

**Q.** Had you noticed that at the time you were there?

**A.** No, I had never looked up.

**Q.** Did you know at the time what the Speaker's Lobby was?

**A.** No, I had no idea.

**Q.** And to this day, as you sit here, do you know where the Speaker's Lobby led to?

**A.** No, I don't.

**Q.** You don't?

**A.** No.

**Q.** So when you're standing outside the Speaker's Lobby, do you have any idea what was going on behind those doors?

**A.** No, sir, I did not.

**Q.** Now, the red jacket, sir, you told the Judge that's your favorite jacket?

**A.** It was. Actually, when they took it, I went out and bought another one just like it.

**Q.** You bought another one just like it?

**A.** Yes.

**Q.** The vehicle in which it was recovered, whose vehicle is that?

**A.** It was Amanda's.

**Q.** That's your wife?

**A.** Yeah. I mean, it was our car, but she drives it most of the time.

**Q.** She typically drives it most of the time and you drive your truck most of the time?

**A.** Yes.

**Q.** But I take it you do from time to time drive her car?

**A.** Oh, absolutely.

**Q.** And were you trying to hide the jacket in the backseat of her car?

**A.** No. It was probably in the -- on the actual seat and just fell down.

**Q.** And that, of course, was recovered on January 16th, correct?

**A.** Yes.

**Q.** Prior to the seizure of the jacket, had anyone on your behalf reached out to law enforcement and told them

that you, in fact, were in the Capitol on January 6th, 2021?

    **A.**    Yes, my attorney did, either on the evening of the 8th or the morning of the 9th.

    **Q.**    Told the FBI that you had been in the Capitol?

    **A.**    Yes.

    **Q.**    So was there any reason for you to deny -- excuse me, your attorney having told the FBI that you had been in the Capitol on January 6th, was there any reason for you to conceal your red jacket?

    **A.**    No, not that I thought of, no.

    **Q.**    Now, government counsel asked you about a conversation you had with your brother-in-law.  I guess the conversation -- we'll use the word conversation, but the first you heard from your brother-in-law was a text message; is that correct?

    **A.**    Yes, it was.

    **Q.**    And you remember it better than I do.  What was the text, as best you can remember?

    **A.**    It was something like:  "Crazy day in D.C.," first, something like that, and I said:  "Sure is."  And then he sent me a text that said:  "Please tell me you didn't go in the Capitol."

    **Q.**    Okay.  And what did you respond?

    **A.**    I responded:  "No, I didn't, but a lot of people did."

**Q.** Okay. And approximately what time was that text message, sir?

**A.** That was probably around 8:00 or 9:00 Eastern, and then he's an hour behind in Owensboro.

**Q.** In Kentucky?

**A.** Yes.

**Q.** And did there come a point, sir, where you then -- well, how comfortable do you feel communicating with someone via text message as opposed to a telephone call?

**A.** I will do short text messages, I am on my way, when will you be here, stuff like that. But if it's any conversation, I pick up the phone and call the person.

**Q.** With the assistance of madam clerk, we're going to call up Defense Exhibit 2, which is in evidence. Do you see Defense Exhibit 2 on your screen, sir?

**A.** I do.

**Q.** And I direct your attention to item number three. Do you see that, sir?

**A.** Yes.

**Q.** What is that phone call to?

**A.** That's Jason Goddard.

**Q.** Is that your brother-in-law?

**A.** It is.

**Q.** And what time did you call your brother-in-law?

**A.** That's 10:30.

**Q.** On the 6th?

**A.** Yes.

**Q.** After the text message. And how long did you talk to your brother-in-law?

**A.** We talked about 24 minutes.

**Q.** During that telephone call with your brother-in-law, after the text message but still the evening of the 6th, what did you tell him?

**A.** I told him why I went to the -- went to D.C. to the rally. I told him some things about the election, and then told him I was in the Capitol.

**Q.** All right. And did he give you any advice about what you should do?

**A.** He said that he was going to turn me into the FBI, and I should contact an attorney and then notify them because I would be -- they would want to speak with me because I was a witness to a shooting.

**Q.** And did you do that?

**A.** I did do that.

**Q.** And when did you do that? When did you take the advice of your brother-in-law, who's in law enforcement, and contact an attorney?

**A.** The next day driving home, I called a few attorneys and then settled on one. So the next day.

**Q.** Nate Miller?

**A.** Nate Miller, yes.

**Q.** And he was the gentleman that then reached out to the FBI, told them you'd been in the Capitol, and you were willing to come in and be interviewed, correct?

**A.** Correct.

**Q.** So this text message that government counsel has repeatedly asked you about, was that an effort to conceal what you had done that day, sir?

**A.** No, it wasn't really, no.

**Q.** Now, government counsel showed you the first Exhibit 609.

(Video played)

**Q.** So what does this show, Mr. Jones?

**A.** Obviously I'm on the left-hand side, and I'm saying: "They didn't do it, it came from the inside."

**Q.** Why were you saying "They didn't do it"? What was going on in that hallway right at that time after Ms. Ashli Babbitt was shot?

**A.** The crowd was getting very angry at those police officers.

**Q.** The police officers that were there?

**A.** Yes, that were on this side of the door.

**Q.** And what were you doing?

**A.** I was telling the people that these officers did not do the shooting.

**Q.** Did not do the shooting?

**A.** Right.

**Q.** Were you trying to calm the situation down?

**A.** Somewhat, yeah.

**Q.** Okay. And Mr. Bayline, can you go to the -- to approximately the 43 second mark, please.

(Video played)

**Q.** You seem to be in that shot there at 46 seconds, Mr. Jones, face-to-face with a police officer?

**A.** Yes.

**Q.** What were you telling him? Were you talking to him?

**A.** I was talking to him.

**Q.** Tell the Judge what you were talking to that police officer about.

**A.** I was just telling him that I saw the shooting, that I saw what happened.

**Q.** Did he ask you your name, phone number, address?

**A.** No, he didn't.

**Q.** And why did you remain -- and can you -- let's go to 301, Mr. Bayline, please.

(Video played)

**Q.** Were you still trying to tell people what you had seen?

**A.** Yes, I actually was taking a picture or video,

because no one was doing anything. She was just laying there on the floor, and nobody listened.

Q. And at 3:30, please, Mr. Bayline.

(Video played)

Q. So what are you doing? You're saying: "I saw the gun." What are you telling people then, sir?

A. The gentleman in the video said: "I saw the gun," and I was telling him that I did, too, and it came from the other side.

Q. The other side, not the officers present at the scene?

A. Not the officers present.

Q. Now, government counsel asked you about not immediately leaving that area. Could you go forward towards the doors and go down those stairs, was that area clear, sir?

A. No, it was not.

Q. How about the area from which you had come, was that area clear to go back?

A. It was packed full of people, of the same crowd.

Q. If you could just go at about 4:37 or so, Mr. Bayline, please.

MR. DREHER: Your Honor, the Court's ruling was that the first 4 minutes and 30 seconds of this exhibit --

THE COURT: That's true.

MR. BRENNAN: All right.

THE COURT: I only admitted up to 4:30.

MR. BRENNAN: To, what, 4:30?

THE COURT: Up to 4:30, yeah.

MR. BRENNAN: Okay. 4:33, I think, is on the screen. Thank you, Your Honor.

THE COURT: 4:30.

MR. BRENNAN: Could I add three seconds to it, Your Honor?

THE COURT: What's the relevance of this?

MR. BRENNAN: The relevance -- well, actually, I don't need to. At 4:23 -- I'm fine, we can take a look at 4 minutes and 23 seconds.

Q. Which direction is that going on, Mr. Jones?

A. That's the opposite way of the doors, so back towards the hallway.

Q. So you told us going towards the Speaker's Lobby door was packed with people, you couldn't go that way?

A. Correct.

Q. If you turned around and went the other way -- what's depicted at 4 minutes and 23 seconds in that picture, sir?

A. It was the same crowd that was in there.

Q. Could you go that way?

A. Not at that moment.

**Q.** Okay. Now, you said at some point you went into a restroom and cried after the shooting; is that correct?

**A.** I did.

**Q.** The CCTV cameras show that Ms. Babbitt was shot at 2:44 p.m., and the CCTV cameras show that you exited the building at 2:58 p.m., 14 minutes later. The government's only shown you a few minutes of your conduct between the shooting and your exiting the building.

So during the period of time that's not shown on that video, what did you do?

**THE COURT:** Hold on, hold on. Would you please repeat that again?

**MR. BRENNAN:** Sure. The CCTV video of the Ashli Babbitt shooting was at 2:44 p.m.

**THE COURT:** And we've seen video where he was standing a few feet away.

**MR. BRENNAN:** Yes. That shooting occurred at 2:44.

**THE COURT:** 2:44.

**MR. BRENNAN:** And then --

**THE COURT:** What time did you say he entered the Capitol?

**MR. BRENNAN:** Well, he entered at --

**THE COURT:** I think you said 2:48.

**MR. BRENNAN:** No, he entered the building -- my

client entered the Capitol building at 2:34 p.m. At 2:34 he entered the building. The Ashli Babbitt --

THE COURT: We have a video that shows that, too.

MR. BRENNAN: Yes, we do. And the time stamp on it, Your Honor, shows 2:34 p.m., it shows when Mr. Jones entered the building. And we have it on two different cameras, one camera showing the door that he enters, if Your Honor remembers that.

THE COURT: West Terrace doors.

MR. BRENNAN: I'm sorry?

THE COURT: He entered at the West Terrace doors.

MR. BRENNAN: That's correct. And we have a camera shot that's going towards the door, and then we have another camera shot, Your Honor, showing his interaction with the police officers there.

THE COURT: Is that consistent with your understanding, Mr. Dreher?

MR. DREHER: The entry is a time stamped video. I don't believe the video at the Speaker's Lobby door is time stamped, Your Honor. So I'm not sure --

THE COURT: You mean when the shooting occurred?

MR. DREHER: Yes, Your Honor. I don't believe that video is time stamped.

THE COURT: Well, we certainly have the video where it happened and where he was located, the defendant

was located.

MR. BRENNAN: Absolutely.

MR. DREHER: Yes.

MR. BRENNAN: And then we do know that my client -- and that, Your Honor, was approximately 10 minutes after he entered the building.

THE COURT: Well, that's why this is -- you're making representations, and I'm not certain they're backed up by the evidence.

MR. BRENNAN: Well, I may be --

THE COURT: So if you want to demonstrate, if you want to show me a clip where there's a time stamp that shows when the shooting occurred, or some other document that's been admitted into evidence that shows when the shooting occurred, that's fine. But the question, the way you've phrased it, I think there's a reason to believe it's not accurate.

MR. BRENNAN: I'm certainly trying to be accurate.

THE COURT: I'm not saying you're not.

MR. BRENNAN: If I may make an inquiry, I'm going to ask my intern to see if he can find a time stamp of the Ashli Babbitt shooting, Your Honor?

THE COURT: Okay.

(Discussion off the record)

THE COURT: While he's looking, Mr. Dreher, what's

the exhibit, Government's exhibit, where the Ashli Babbitt shooting occurred? That's not 609, was it?

**MR. DREHER:** 602 is the one from the Rotunda to the Speaker's Lobby door.

**THE COURT:** No, where she was shot.

**MR. DREHER:** That does show the shooting as well.

**THE COURT:** When she's going in the window and then she's shot?

**MR. DREHER:** Correct.

**THE COURT:** What number was that?

**MR. DREHER:** 602.

**THE COURT:** 602?

**MR. DREHER:** Now, I would represent for the Court that Exhibit 410 does depict the defendant heading towards that area, and that clip is time stamped at 2:41.

**MR. BRENNAN:** Your Honor, 410 is in evidence. Your Honor, it shows my client, and it ends at 2:41:50, which I would round up to 2:42. That is before my client arrives at the Speaker's Lobby door.

**THE COURT:** You're saying Exhibit 410, is that the one you're talking about?

**MR. BRENNAN:** Government's Exhibit 410, it's time stamped, and the ending -- it ends, it's about -- it ends at 2:41:52. It's on the screen right now, I think, Your Honor. So you can see right there the time stamp above is 2:41:51,

Your Honor, if you can see it right there on the screen. That is before my client arrives at the Speaker's Lobby door. So the shooting of Ms. Ashli Babbitt occurs shortly after this, Your Honor.

THE COURT: And the significance of when it occurs is what?

MR. BRENNAN: Well, the point where I was going with that, Your Honor, is that my client is then seen leaving the Capitol at 2:58. So there was approximately 14 or so minutes between the time that Ms. Ashli Babbitt was shot and the time that my client exited the Capitol. And the government tried to suggest that he did not have any opportunity to go to the restroom during that period of time. And there's approximately 13 to 14 minutes where he's not captured on video during that period of time.

It was a minor point, Your Honor, but I think it's a significant one. That was my point. He leaves the building approximately 14 minutes after Ms. Ashli Babbitt is shot.

THE COURT: I'm not sure if we know when she was shot. You're estimating?

MR. BRENNAN: I'm estimating, yeah. We know -- we can put him, Your Honor, before she was shot at --

THE COURT: What was the time stamp on the video that Mr. Dreher was using where the officer had his baton in

his hands and he was nudging the defendant out of the area? When he was near the elevator, near the elevator, what was the time stamp on that?

MR. DREHER: So the CCTV of that is 411, Your Honor, and we're going to pull it up right now to see what the time stamp is.

THE COURT: So at 4:11 --

MR. BRENNAN: No, Exhibit 411.

THE COURT: Excuse me, in Exhibit 411, there's a time stamp of him being at the elevator. Did he get on the elevator?

MR. BRENNAN: Yes.

THE COURT: Did he actually take the elevator?

MR. DREHER: He goes into the elevator, however, the elevator does not go up or down.

THE COURT: Okay.

MR. BRENNAN: We have it on our screen, Your Honor. So you can see this is a CCTV, and it's at -- my client is right there. You can see my client right there, and the time stamp, Your Honor, is 2:56:10.

THE COURT: If you play it, there's a big officer there with a baton who moves him towards that elevator.

MR. BRENNAN: That's correct.

(Video playing)

THE COURT: When we get to the elevator -- when he

gets to the elevator, what's the time stamp right now?

MR. BRENNAN: 2:56:22, Your Honor.

THE COURT: And he doesn't go anywhere because the elevator isn't working apparently.

MR. BRENNAN: No, the elevator door does open. He gets on the --

THE COURT: It doesn't go.

MR. BRENNAN: He gets on, an officer removes him from the elevator.

THE COURT: Say that again.

MR. BRENNAN: He gets on the elevator, an officer removes him from the elevator, and then he's then removed from the building. And I think the exit from the building --

THE COURT: Where is the exit of the building in relation to that elevator?

MR. BRENNAN: I think it's right the way I've drawn the arrow, Your Honor.

THE COURT: The end of the corridor?

MR. BRENNAN: End of the corridor, yes, Your Honor. And that would be on the east side of the Capitol, not the west side.

THE COURT: Do we have a video showing him exiting that door?

MR. DREHER: It's Exhibit 412, Your Honor.

THE COURT: So that was only a few minutes later probably?

MR. BRENNAN: Right.

THE COURT: Once he left the elevator?

MR. DREHER: That's correct, Your Honor.

MR. BRENNAN: We may not have a copy of 412 on our computer. I think it was added later. And here, Your Honor, this shows the exit of the building. You can play this if you want.

(Video played)

MR. BRENNAN: You can see my client right there, Your Honor, he has his head down, he's got his hands over his head, he's not participating in this brawl at all. He's being pushed out, Your Honor, at that point.

THE COURT: Right. Those are MPD officers?

MR. BRENNAN: Yeah, those are MPD officers, Your Honor.

THE WITNESS: May I say something?

MR. BRENNAN: And that ends at -- well, he's still there.

THE WITNESS: I'm actually stuck between the officers, and then they let me out.

THE COURT: And he just left. So he left at 2:57.

MR. BRENNAN: 57:28, that's correct, Your Honor.

Q. Now, so Mr. Jones, two areas of inquiry. One is

between the time that Ms. Ashli Babbitt was shot and the time that you exited, did you have an opportunity at some pointing to go into the restroom that you told us about and cried?

**A.** I went in probably 30 seconds after she was shot, yes.

**Q.** Now, when you were --

**THE COURT:** That same restroom that was over by the doors?

**THE WITNESS:** Yes.

BY MR. BRENNAN:

**Q.** Now, how many times did you make an effort to tell someone from law enforcement your name and your phone number and what you had seen?

**A.** I'm not sure of exact, but several times back at the door where the shooting occurred. And then the video before this where I turned around and walked straight back to the police officer and leaned down to talk to her, that was the last attempt because I got hit from the side.

**Q.** You leaned down and spoke to a -- was it Capitol police or MPD?

**A.** It was MPD, one of the ones in the yellow jacket.

**Q.** Was that Officer Green's body-worn camera?

**A.** I think it was. It was a female.

(Video played)

**Q.** So what is this we're looking at here, Mr. Jones, if you know?

**A.** That's Ms. Green's body-worn camera.

**Q.** Body-worn camera.

**A.** And that's the hallway where she's coming in, going towards where we were at the Speaker's hallway.

**Q.** And did you make an effort to speak with Officer Green and tell her what you had seen?

**A.** Yes, later on in this video.

**Q.** Tell us, do you remember how far into it was?

**A.** It's going to be towards the end, I believe.

**Q.** Can you go to --

**A.** It's when she's standing facing this hallway and everybody's walking back down. So it's probably a little bit after this, I believe.

**Q.** Okay.

**A.** Right, so she was in this position. I think I'm in the far back right in the hallway.

(Video played)

**Q.** Was that you right there on the right there, sir, coming towards her?

**A.** It was.

**Q.** Keep playing that.

(Video played)

**Q.** Between the time that you're now leaving and the

time you saw approaching her, what occurred, sir?

**A.** So this is where I saw that we were getting ready to be pushed out the exit of the Capitol. And this is just another view of the video that was played earlier where I stopped and turned around and walked back to her. And this one shows where I lean in to talk to her, and I get hit from the side from another police officer.

**Q.** So you made an effort to inform Metropolitan Police Officer Green your name and your phone number, correct?

**A.** I tried, yes.

**Q.** Was there any other reason, Mr. Jones, for you to remain in the Capitol other than giving your information, sir?

**A.** No.

**Q.** Now -- the Court's indulgence, Your Honor.

While you were in the Capitol, when you entered, was there anybody in particular that you were following or were you just walking around by your -- well, not by yourself. Was there any particular individual whose path you were following while you're in the Capitol?

**A.** No, there wasn't.

**Q.** There was not?

**A.** No.

**Q.** Was there any leader or group that you latched

onto while you were in the Capitol, sir?

**A.** No, it was just a crowd of people in general just, I guess, walking through the hallways.

**Q.** You used the phrase earlier "a school of fish." Do you remember that?

**A.** Yeah, I've used that, yeah, a few times.

**Q.** So can you expand on that? What did you mean by "a school of fish" as you're going around?

**A.** There wasn't really any --

**MR. DREHER:** Your Honor, I'm going to object as this is redirect, it's outside the scope of the cross.

**THE COURT:** Yeah, I'd sustain that.

**MR. BRENNAN:** The Court's indulgence, Your Honor. I have nothing further. Thank you, Your Honor.

**THE COURT:** All right. Do you have anything else, limited to redirect?

**MR. DREHER:** Just one question, Your Honor.

**THE COURT:** One question.

**RECROSS-EXAMINATION OF CHAD JONES**

**BY MR. DREHER:**

**Q.** Now sir, from the time that you left the United States Capitol until you reached your truck, did -- in the city of D.C., is it fair to say you did not see a single police officer outside the Capitol that you could stop and tell your story to?

**A.** I would say that's accurate, I did not see an officer outside the Capitol.

**MR. DREHER:** Nothing further, Your Honor.

**THE COURT:** You're excused, you may step down.

Mr. Brennan, do you have any other witnesses?

**MR. BRENNAN:** I don't believe so. Can I have the Court's indulgence for a moment, Your Honor?

**THE COURT:** Uh-huh.

(Discussion off the record)

**MR. BRENNAN:** The defense rests, Your Honor.

**THE COURT:** Very good. We'll take a 15-minute break, and then we'll have summations. I think everyone's well aware of the order we do things in the federal system: The government goes first, defense goes second, the government gets to do a rebuttal. I give each side the same amount of time in total. So if we're using 45 minutes as the goal, defense gets 45 minutes, the government gets 45 minutes for both arguments combined. So if you use 40, you've got five minutes for rebuttal hypothetically. I'm not saying you have to do 40, just telling you what I'm thinking.

**MR. DREHER:** Yes, Your Honor.

**THE COURT:** Do you have any questions?

**MR. DREHER:** No, Your Honor.

**THE COURT:** And if you're going to use these

easels, either side, you can move them a little bit more over this way so it's easier for me to see both you and the easel.

MR. DREHER: Yes, Your Honor.

THE COURT: If you're going to use it. You don't have to use it, you can use the videos, too, of course.

MR. LAWLOR: Your Honor, just before we recess, can I renew new my motion for judgment of acquittal?

THE COURT: Oh, okay, fine. Are there new arguments?

MR. LAWLOR: I'll just submit on the previous argument and ask the Court to consider Mr. Jones' testimony, and submit that the Court should grant the MJOA at this time.

THE COURT: Response.

MR. DREHER: I will follow Brother Counsel and refer back to the previous arguments and ask the Court deny it.

THE COURT: The Court will deny the motion based upon reflection of the testimony I've heard since the initial Rule 29 argument. So the same ruling as I had before. We'll see you in about 20 minutes or so.

(Recess taken at 2:38 p.m.)

(Back on the record at 3:16 p.m.)

THE COURT: All right, counsel, are you ready to

proceed?

MR. DREHER: Yes, Your Honor.

THE COURT: All right, whenever you're ready.

#### CLOSING ARGUMENT ON BEHALF OF THE UNITED STATES

MR. DREHER: Yes, Your Honor. Obviously we've spent a couple days at trial. Certainly, I'm sure the Court remembers that there was some pretrial conferences as well where Brother Counsel and I were able to meet with our respective teams and really come up with a lot of different stipulations to certain elements to these offenses.

THE COURT: I think that was helpful in cutting the trial time down.

MR. DREHER: I think it will certainly be helpful in cutting down the closing argument time as well. But I will dive right into it and begin with count one, and just note quickly that there's three elements. The third element itself the parties reached stipulations to. Those stipulations were admitted as Exhibits 1001 and 1002 related to the commerce, the effect on commerce, as well as --

THE COURT: What are these things that you're putting on the screen here? Have you shown these to the defense?

MR. DREHER: These are the elements of the offense that are outlined in the trial brief.

THE COURT: Yeah, but you can't put anything on

the screen in front of the Court that hasn't been seen by the defendants in advance and they have an opportunity to challenge it.

MR. LAWLOR: Your Honor, we've seen it and we're comfortable with it.

THE COURT: Say again.

MR. LAWLOR: We've seen it and we're comfortable with it.

THE COURT: Thank you. I just wanted to be sure about it, I don't want any surprises.

MR. DREHER: Yes, Your Honor.

THE COURT: Go ahead.

MR. DREHER: Which having the third element, the parties reaching a stipulation to, really comes the second element, ultimately is what we have next if we go in reverse order. But the second element of the 231 charge has two different components. The first component is that the law enforcement officer was engaged in the lawful performance, and the second component was that it was during a civil disorder.

THE COURT: My elements are different than yours. My clerks researched the elements of the offense. I don't know what your three elements are, but I have four. This is for the first count, civil disorder and aiding and abetting?

MR. DREHER: Yes, Your Honor.

**THE COURT:** Do you want to show me what your elements are?

**MR. DREHER:** As outlined in the trial brief -- just one moment, Your Honor. First, that the defendant knowingly committed an act with the intended purpose of obstructing, impeding or interfering with one or more law enforcement officers.

**THE COURT:** That's two elements. Defendant knowingly committed an act is the first element.

**MR. DREHER:** Okay.

**THE COURT:** Committing the act, the defendant intended to obstruct, impede or interfere with one or more law enforcement officers.

**MR. DREHER:** I understand. That's our discrepancy, then.

**THE COURT:** Third, at the time of the defendant's actual act, the law enforcement officer or officers were engaged in the lawful performance of their official duties incident to and during a civil disorder.

**MR. DREHER:** In that case, Your Honor, it would be the third element that has two different components, not only that the law enforcement officer was acting lawfully, but that it was during or in response to a civil disorder. Now, a civil disorder has been defined by statute in 18 U.S.C. 232(1) as any public disturbance involving acts of

violence by groups of three of or more persons which cause an immediate danger, either to injury or -- injury to another individual or damage to another property. And the evidence that was presented at this trial, I think, clearly demonstrates that there was a civil disorder on January 6th, 2021.

This screen grab here is taken from Exhibit 516A, which was the video that the defendant took from his cell phone from his vantage point on the scaffolding of the number of people that were present at the Capitol on January 6th. Clearly there's more than three. But ultimately, it really depends that this assemblage threatened damage, either to property or to individuals.

Now, for that, the government also presented Exhibit 200, which was the montage video of the events that occurred on January 6th. This screen grab taken from that exhibit outlines that the rioters on the west and the rioters in the east converged on the Capitol and began to cause damage, not only to the Capitol building itself, but also injuries to the officers trying to protect it.

Now, we also saw this in Exhibit 400. This is the surveillance footage that depicts the west front of the Capitol where we first see the defendant, Chad Jones, on closed-circuit television. We also see the number of people that are there as well as what was occurring during

Exhibit 400, and that was that these rioters were pushing through the police line. So I would submit to the Court -- and I believe the Court is -- can easily make the determination that the events of January 6th were a civil disorder. And I would just remind that along with that third element, having the second part, that the parties had reached an agreement, a stipulation found in 1003, that the Capitol Police and the Metropolitan Police were engaged in the lawful performance of their duties on January 6th.

Now, just quickly for some more of perhaps what I would assume would be the quick portions of the argument -- actually, I'll skip to the misdemeanor destruction of property. Prior to the start of the trial, the government did outline that we would no longer seek the felony version of the destruction of property, but instead would outline a misdemeanor violation. For this, I believe there's three elements. The first being that the defendant injured, damaged or destroyed property. Second, the defendant did so willfully. And third, the property involved was property of the United States.

Now, at trial, the government submitted -- excuse me, admitted Exhibit 605 which clearly demonstrates that Mr. Jones, in fact, admits himself that he was the individual captured in this exhibit striking the window of the Speaker's Lobby door nine times. And through this

exhibit we see the damage that was caused.

(Video played)

**MR. DREHER:** Now, counts four through six have a shared element, and that is that there's a restricted area around the Capitol on January 6th, 2021. The term restricted building --

**THE COURT:** Are you skipping over count three?

**MR. DREHER:** I'm sorry, Your Honor?

**THE COURT:** Are you skipping over count three?

**MR. DREHER:** For now, yes, Your Honor. I believe count three will take some time, whereas with counts four through six, there's a common element, that restricted building or grounds -- which, again, is defined by statute, it means any posted, cordoned off or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting.

Now, at trial we did hear testimony from Inspector Hawa who was the liaison officer between the U.S. Capitol and the United States Secret Service. She provided a notification of the vice president's visit to the Capitol on January 5th, 2021. It was at this point that the grounds of the Capitol became restricted, because the vice president will be visiting. But Inspector Hawa was also able to provide testimony -- and we saw in Exhibit 300, that the vice president, the then vice president, Michael Pence, was

present at the Capitol on January 6th during these events. This CCTV screen grab from Exhibit 300 shows then Vice President Mike Pence inside the Capitol at 2:26 p.m. being led out with his family, as well as the Secret Service detachment protecting him to a secured location.

Now, really the restricted area becomes restricted once it's posted, cordoned off or in another way demarcated that it is restricted. Now, for that, the government presented this Court with Exhibit 209. It's a photograph of the Capitol that depicts multiple barriers that were stopping and informing people that this area was restricted.

But the key, I guess, argument that we have at trial is to show that the defendant knew he was crossing over to the restricted area. And for that, we submitted to the Court an excerpt from the interview the defendant gave to the FBI in Exhibit 804A1 where the defendant tells the FBI this.

(Video played)

**MR. DREHER:** Now, these barriers that the defendant saw were also depicted in Government's Exhibit 700. But these barriers were not the only indications that were provided to the defendant that this area was restricted. On the west plaza, officers also provided audio as well as nonlethal weaponry into the crowd to outline that this was a restricted area. And as

presented in court, the defendant was present when this was played.

(Video played)

**MR. DREHER:** Within Exhibit 700, the defendant appears then to cover his mouth and nose after the firing of nonlethal munitions. The defendant himself testified he heard these flashbangs, and this would demonstrate his knowledge that the area he was about to enter was restricted.

Returning again to Exhibit 804A1, the defendant also told the FBI this.

(Video played)

**MR. DREHER:** And we were able to see the vantage point that the defendant had in the video that he took from the scaffolding. In that video, we see a very clear posted, cordoned off or otherwise restricted area that the defendant told the Court he filmed and could see the officers' backs. Your Honor, the defendant knew he was within a restricted area.

Now, we heard that the defendant also made his way into the Capitol itself. And certainly when the door was open, we could see the defendant run to it and push his way through. So I would argue that even if the defendant, through the barriers, through the nonlethal munitions, through the audible warnings, through the police being

pushed and the police pushing back, did not know that the grounds of the scaffolding and where he was on the presidential inaugural stage were restricted, that certainly the defendant would have known running into the Capitol that that area was restricted.

(Video playing)

**MR. DREHER:** In Exhibit 401, we see the door open. But importantly, we see the defendant run to it. Now, the Capitol surveillance system does not record sound. However, the government provided this Court with Exhibit 601, clipped here, to outline what the defendant would have heard as he was running through that door. The defendant would have heard this.

(Video played)

**MR. DREHER:** That loud, piercing alarm bouncing off the marble floor and room is immediately identifiable in Government's Exhibit 601. And it's exactly the condition that the defendant entered the Capitol on January 6th of 2021. He knew that he was in a restricted area.

But counts four, five and six have separate elements as well. With count four, it's that he knowingly entered or remained in the restricted area without lawful authority to do so. We heard from the defendant he saw the barriers, he saw the police, he had the nonlethal munitions being used against him. He could hear that audible sound.

He knew he entered or remained in that restricted area.

But the difference with count five is that the defendant must knowingly engage in disorderly or disruptive conduct in, or in proximity to, any restricted building or ground with the intent to impede or disrupt the orderly conduct of government business or an official function. And again, the government provided this Court with Exhibit 804A5 in which the defendant told the FBI the reason he was there. He told them this.

(Video played)

**MR. DREHER:** The defendant told the FBI that he went in there to be loud so that Congress could hear him, and outlined maybe they would stop and think that maybe we should listen to this loud and disruptive conduct.

Now, the element in count six that's different from four and five is that the defendant knowingly engaged in any physical violence against a person or property in, or in proximity to, a restricted building or grounds. Now, as previously argued, certainly the defendant knew he was inside a restricted building or on restricted grounds. And again, in Exhibit 605, the defendant used this flagpole against property.

(Video played)

**MR. DREHER:** Counts seven through nine track similar elements --

THE COURT: I was going to say, why do we even need them?

MR. DREHER: Seven through nine?

THE COURT: Yeah, why do you need those? You already have the conduct that's captured by seven, eight and nine with the other counts --

MR. DREHER: So the conduct is --

THE COURT: -- four, five and six.

MR. DREHER: So the difference between four, five and six and seven through nine are that four through six require the restricted building or grounds. In other words, the key difference between four, five and six and seven, eight and nine is that the vice president was there and the grounds were restricted.

THE COURT: Right. But if a person were to be convicted of -- hypothetically, four, five and six, then isn't it redundant for them to also be convicted of seven, eight and nine? It's kind of subsumed within it.

MR. DREHER: I certainly think charging both complies with Blockburger, considering seven through nine has the additional element that the defendant acted willfully and not just knowingly. However, seven, eight and nine are also charged with the conduct within the building itself. So I understand the Court's concern, but I do believe each have separate elements, and I would ask the

Court to consider all of them.

THE COURT: Well, in count one you have civil disorder in the Capitol building. In seven, it's disorderly conduct in the Capitol building. You've got -- of course, obstruction of an official proceeding is three, and that's in the Capitol building. It just seems like seven, eight and nine is already captured -- the events -- the conduct that they're trying to punish -- you're trying to punish is already captured by the other ones, if you're successful with the other ones.

MR. DREHER: Correct.

THE COURT: If you're not successful, then that's different. But I'm just saying it should be a lesser included offense in some way, shape or form.

MR. DREHER: I would agree with the Court if it weren't for seven, eight and nine having that requirement that not just knowing conduct, but willing conduct as well.

THE COURT: Well, tell me the difference in your mind.

MR. DREHER: So in my mind, knowing conduct is encompassed when somebody commits an act and still knows what's happening. Willfully suggests that not only do you know what's happening, but then you're not being pushed -- or willfully is you're doing it yourself, which I think is a higher mens rea than knowingly.

**THE COURT:** That's a misdemeanor?

**MR. DREHER:** Correct, Your Honor.

**THE COURT:** So the felony is the one that should have been the higher standard.

**MR. DREHER:** Well, I think the code -- so the felonies are under Title 18. These misdemeanors, seven, eight and nine, are under Title 40.

**THE COURT:** Count four is knowingly, the knowingly requirement.

**MR. DREHER:** Correct. All the offenses in Title 18 are knowingly.

**THE COURT:** So those would be the higher standard. It just kind of strikes me as duplicative, what's in seven, eight and nine, if you succeed on the other ones.

**MR. DREHER:** Correct. And certainly I understand the Court's position, and I agree that the acts aren't different in terms of what the defendant did. But I would ask the Court to consider those, should it need to, in making its ruling with the distinction being the knowingly versus willfully and knowingly.

**THE COURT:** Yeah, well, I would say because of the knowingly it's a higher standard. And if it's met, then you don't need the disorderly -- counts seven, eight and nine, I don't see why you need them. If the government were to hypothetically succeed with four, five and six and three and

one -- well, and two, if you want to throw two in there, I don't know why you would need them.  They're three misdemeanors at a lower level where the conduct's already been captured by the felony offenses.

**MR. DREHER:**  Yes, Your Honor.  Well, I do believe it would be appropriate to move to count three.  Count three is the obstruction of the official proceeding.  I have that as having four counts, the first of which being that the defendant attempted to or did obstruct or impede an official proceeding.  And the second count -- second element of this count being that the defendant intended to obstruct or impede the official proceeding.  What the government presented to this Court during this trial was some Facebook evidence where we saw that the defendant knew what was happening on January 6th.  He reposted a statement from Senator Hawley on his objection during the Electoral College certification.

**THE COURT:**  What was that exhibit?

**MR. DREHER:**  This is Exhibit 506, and it was posted on the defendant's Facebook page on January 4th at 12:07 UTC.  What this outlines, then, is really the knowledge of what was occurring at the Capitol on January 6th when the defendant went to the Capitol and saw that restricted area.  But then we also, in asking what the defendant's intent was, looked at all his conduct throughout

the day. Not only what he said, but also what he did, but more importantly how he did it -- which I think is very important in this case as we saw in Exhibit 400. In this exhibit, we see the defendant's conduct on the scaffolding as the police line was being breached by other rioters on the west front.

Now, looking closely at this exhibit, what we see is the defendant grab one of these green bags that were on the scaffolding, as also shown in Exhibit 600, and throw the bag over the side as the police were being pushed back. We then see the defendant grab a second bag. But at this point, the police --

**THE COURT:** Is this the scrim, the green bag?

**MR. DREHER:** Yes, Your Honor. The scrim bag, if that's what it was, yes, Your Honor. But he doesn't throw that one, because at that point the police had already been pushed back. There's no one below him at that point, and the defendant doesn't throw it at that point. But from this, we also see the defendant's running towards the Capitol. Through the smoke, through the noise, through what he just observed below him, the defendant runs towards the Capitol.

**THE COURT:** What do you believe is the inference the Court should draw from that?

**MR. DREHER:** It shows his intent, that ultimately

he was to get into the Capitol. The speed with which he moves, I think, illustrates that that was his goal. In other words, if there's a point I'm trying to get to and I want to get there really fast, I would run as opposed to walk. So it shows the intensity of what he was trying to do. And as we observed, again in Exhibit 401, that his running to the Capitol continued as he pushed his way through the door.

In Exhibit 402, a crowd stops, but he turns sideways and pushes through that crowd to get deeper into the Capitol. In Exhibit 407, the defendant again comes upon a crowd that is built up and, again, he pushes his way through the crowd.

(Video playing)

THE COURT: Remind me where 407 --

MR. DREHER: 407, Your Honor?

THE COURT: Yes, is located in the Capitol.

MR. DREHER: So this surveillance footage comes from outside of the House chamber, but it's the connector hallway from the Senate chamber -- excuse me, from the House chamber to the Rotunda.

THE COURT: Okay.

MR. DREHER: Now, one exhibit that also spoke to the defendant's intent was that while he's inside the Capitol, he receives and reads a message from his friend,

Dan Hatfield. The government produced Exhibit 516 in which it was: "They just came on the radio and said they had to stop debate. Y'all have disrupted it LOL." The defendant reads this while he's inside the Capitol and continues his conduct. We see in Exhibit 411 the defendant tried to stay for as long as he could. The police had to forcibly remove him from the Capitol, so much so that the defendant called the elevator and tried to get away from the police. The defendant told us on the stand he was trying to stay in the Capitol for as long as possible.

**THE COURT:** Well, he had a reason. You don't give any credit to that reason.

**MR. DREHER:** I would argue that this Court shouldn't give any credit to that reason anyway either. Ultimately what we heard from the defendant was that he was attempting to provide information about the shooting.

**THE COURT:** Contact information.

**MR. DREHER:** Correct, Your Honor. But then we saw several minutes of him in front of officers, and the video does not depict him providing personal information or identifying information. We also see the conduct that he has at the -- the body-worn camera of that officer in 701, Officer Lauren Green. He doesn't provide her with contact information. We see him attempting to escape the officers that are there pushing him out through the elevator. And

then we also hear that at no time from when he leaves the Capitol and gets into his car, that there was ever a police officer that he sought out to find.

But I think most telling --

THE COURT: But he did reach out the next day to the FBI in Kentucky through his attorney.

MR. DREHER: And what I --

THE COURT: Which you can't deny that.

MR. DREHER: I can't. But I think it should be discredited, because the closest law enforcement officer to him is his brother-in-law. And when his brother-in-law reaches out to him, he denies even being in the Capitol building. It wasn't even an oh, maybe I can tell my brother-in-law type information, until the brother-in-law confronts him with the fact that, yes, you were in the Capitol, here's a photo of you on the national news of you in the Capitol.

THE COURT: When did he do that?

MR. DREHER: So the text message between Jason Goddard and the defendant occurs on the evening of January 6th.

THE COURT: Yes, but that was the one that he said no to.

MR. DREHER: Correct.

THE COURT: He then spoke to him on the phone

shortly thereafter.

MR. DREHER: After the --

THE COURT: After the text.

MR. DREHER: Correct, after the photograph of him in the Capitol was presented to the defendant, yes.

THE COURT: What's the basis for you to say that?

MR. DREHER: So the text -- just one moment, Your Honor.

THE COURT: The text that he was confronted with by his friend did not include the photograph that you say was on the news of him at the Speaker's Lobby doors, did it?

MR. DREHER: So in Exhibit 514 -- which I can just -- I'll pull up real quick. So in message 12, Jason Goddard texts the defendant on 1/7/2021 at 3:09 a.m. UTC, so the evening of January 6th: "Please tell me you didn't go in the Capitol." The defendant responds in message, I believe it's 15 -- no, I apologize, 16, the defendant responds to Jason Goddard at 3:10 a.m. UTC, which would be the evening of January 6th: "Nah, from what I'm seeing on TV, a bunch of people did, though." And then the defendant receives the text from Jason Goddard at 3:27 a.m. UTC, which, again, is the evening of January 6th, with this attachment, this photo attachment, which was provided as Government's Exhibit 514C.

THE COURT: That was at 3:24 in the morning?

**MR. DREHER:** UTC, yes, Your Honor. So it would have been the evening of January 6th.

**THE COURT:** We have to back five hours out of it?

**MR. DREHER:** Correct.

**THE COURT:** So that one with the attachment is 3:24 a.m., so you have to take five hours off of that. So that's like 10:24 p.m.

**MR. DREHER:** P.m.

**THE COURT:** Right. So at that point, hadn't he already spoken to him on the phone?

**MR. DREHER:** So the --

**THE COURT:** To his brother-in-law?

**MR. DREHER:** Well, I was just going to point out those images also came with the message: "Looks a lot like you," in message 19.

**THE COURT:** And then he says: "No comment."

**MR. DREHER:** Yeah, that's Jason Goddard to the defendant again, yes.

**THE COURT:** Message 20, right. So what time was the telephone call to his brother-in-law? 10:30 Eastern Standard Time was the telephone call.

**MR. DREHER:** So it would have been after this.

**THE COURT:** Huh?

**MR. DREHER:** It was after the confrontation of the image, Your Honor.

**THE COURT:** So no, the one that says: "No comment," is at 3:36. Take five hours off of 3:36, and you're at 10:36. The telephone call was at 10:30 Eastern Standard Time for 24 minutes.

**MR. DREHER:** Yes, Your Honor. Now, the "looks a lot like you" is at 3:26. Now, I will point out, just for the Court's clarification, message 19 occurs at 3:26. Message 20 is 3:36. But message 21 is also 3:20. So these are captured on the phone. Although they're numbered on the phone, they're not numbered chronologically. So the "call me" occurs at 3:20, and the "looks a lot like you" at 3:26, that's when the phone call occurs. And my assumption is because the phone call is so long, that during the phone call is when this "no comment" text comes in.

**THE COURT:** What's the point?

**MR. DREHER:** The point is he's confronted with a photograph on the national news of him in the Capitol, and ultimately I believe it discredits the idea that he was seeking out law enforcement to give his personal information.

**THE COURT:** Well, he said he had a conversation with his brother-in-law about that.

**MR. DREHER:** Correct.

**THE COURT:** Do you have any reason to believe that he didn't?

**MR. DREHER:** I have no evidence to suggest that he didn't.

**THE COURT:** Was Goddard interviewed?

**MR. DREHER:** He was interviewed, yes, Your Honor.

**THE COURT:** Do you have the 302?

**MR. DREHER:** I do have the 302.

**THE COURT:** Did it come up in the 302?

**MR. DREHER:** I would have to go back and read it. But the 302 wasn't -- Jason Goddard was originally on our witness list, but he was ultimately --

**THE COURT:** I mean, if it came up in the 302, it potentially could be Brady. If he told his brother-in-law about his conduct in the Capitol, as he says he did under oath yesterday and today, that could be potentially Brady material.

**MR. DREHER:** I can assure the Court that the defense was provided with the information. I don't know if him not testifying becomes any issue related to Brady. But ultimately the information was presented, yes. I don't know standing here precisely what was outlined in the 302.

**THE COURT:** Well, why don't you go on with whatever other evidence you want to point out.

**MR. DREHER:** Yes, Your Honor.

**THE COURT:** About his intent to obstruct an official proceeding.

MR. DREHER: So I think his intent was shown not only by his conduct, but what he said. He joined that group outside the House chamber screaming: "Break it down, break it down." He already had told the FBI that he intended to be loud, make his voice heard, so that they would think about maybe we should consider this; in other words, have them stop.

THE COURT: Do you have the floorplan there, the second floor?

MR. DREHER: I can bring up the demonstrative if...

THE COURT: Yeah, do you have it on the screen?

MR. DREHER: I can bring it -- yes, Your Honor, I can bring it up on the screen.

THE COURT: Can you point out where the Speaker's Lobby doors are in relationship to the House floor?

MR. DREHER: So this is Government's Exhibit 214.

THE COURT: Yeah, you'll have to blow it up a little bit, I guess.

MR. DREHER: We'll zoom in, and then I'll move it over to --

THE COURT: Yeah.

MR. DREHER: So this is Statuary Hall.

THE COURT: Right.

MR. DREHER: This is the hallway where Exhibit 407

shows.

THE COURT: Right.

MR. DREHER: This is the door that they're outside yelling: "Break it down, break it down."

THE COURT: That's the Speaker's Lobby door?

MR. DREHER: No, Your Honor.

THE COURT: No, I didn't think so. It's on the -- it's around the corner.

MR. DREHER: The CCTV then captures Mr. Jones running down this hallway, making his way past this stairwell.

THE COURT: Keep going.

MR. DREHER: Past this exit.

THE COURT: Now take a right.

MR. DREHER: And then taking a right there.

THE COURT: Those are the doors right there?

MR. DREHER: Yes, Your Honor.

THE COURT: So those are the doors that were barricaded, that's the Speaker's Lobby doors, right?

MR. DREHER: Yes, Your Honor, as depicted in Government's Exhibit 605.

THE COURT: Okay. And then there's the stairwell right next to it?

MR. DREHER: Yes, Your Honor.

THE COURT: Where the --

MR. DREHER: The CERT team.

THE COURT: Where the CERT team was coming up. Those are literally steps off the House -- the Capitol floor, the House floor?

MR. DREHER: Yes, Your Honor.

THE COURT: That must be the restroom to the left.

MR. DREHER: That's what I believe, yes, Your Honor.

THE COURT: That rectangular room.

MR. DREHER: Yes, this room here?

THE COURT: Yeah, that must be the restroom.

MR. DREHER: Now, the third and fourth element of obstructing an official proceeding requires that the defendant acted knowingly with awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceeding. And finally, that the defendant acted corruptly.

Now, the natural and probable effect of the defendant's conduct was explained by the defendant himself. He told the FBI this.

(Video played)

THE COURT: You're coming up on your 45 minutes.

MR. DREHER: Yes, Your Honor. Now, perhaps the biggest question is whether the defendant acted corruptly. And what he described to police officers, what he did was he

was intending to get Congress to listen to him by being loud and disruptive. But also, his conduct is apparent that it was unlawful. He took a 4-foot wooden pole and struck the window right outside the House chamber on a day when he knew that they were meeting to elect the next president. Certainly that would show the defendant's corrupt intent.

But also, he had this immediate response, once confronted, that he did not even go into the Capitol. He knew what he did was wrong. He told his brother-in-law he did not go into the Capitol. He threw away the flagpole. He deleted his Facebook. He deleted his Instagram. He called a lawyer. He knew what he did was wrong. And it's that wrongfulness that speaks to the fact that he acted corruptly when he took that pole and he bashed through the window outside the Speaker's Lobby.

So in conclusion, Your Honor, I believe that this Court has sufficient evidence to find beyond a reasonable doubt the defendant is guilty of count one and guilty of count three, the felonies. And we would ask that the Court also find the defendant guilty on the misdemeanor offenses found in count two and counts four through nine. Thank you.

**THE COURT:** All right. You can have 50 minutes, I'll give the government five minutes for rebuttal.

**MR. LAWLOR:** Thank you, Your Honor. I'll try not to use even the 50.

**THE COURT:** It's up to you.

**CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT**

**MR. LAWLOR:** Your Honor, in consideration of the government's case here, I'm going to ask you obviously to consider it as a whole. But what I want the Court -- what I'm asking the Court to do is consider not only Mr. Jones' conduct that day, but his character and his cooperation and his lack of intent. And so, Your Honor, think of the things that brought Mr. Jones to the Capitol that day, what he did do and what he didn't do, and consider the person that he is.

You know, Your Honor, that Mr. Jones is 45. He's married, he's educated, and that he is -- always has been gainfully employed, currently as an entrepreneur. And as you heard his close friends say, Your Honor, he's a good man, and not just in the everyday sense. I like to think that I'm a good man, but I've never got in my car and driven hours away to help people that I've never met because there was a deluge of rain or a hurricane. And so I don't think that this is the average case.

You know, we say everybody who has a mother can come in and say that their son has good character. But I think this is a lot deeper than that, that Mr. Jones' is profoundly a good person. And so I would ask the Court to bear that in mind as you consider not just his conduct, but

his intent and the government's suggestions here that he has been dishonest with the Court in his testimony.

And so, Your Honor, what you also know about Mr. Jones is that he wasn't particularly politically active until he saw Mr. Trump run for office. And Mr. Jones, like a lot of Americans, saw something in Mr. Trump that brought him into the political fray. And when Mr. Trump ran for election in 2016, that was maybe the first or second time that Mr. Jones had voted. And when Mr. Jones -- excuse me, when Mr. Trump lost the election in 2020 and people began to complain about sort of the legality, for lack of a better term, about that election, Mr. Jones was interested in that. So he came, as you heard, to Washington in November of 2020. He drove here, attended a rally, did nothing illegal or illicit, turned around and went home and resumed his life.

When he heard about another rally on January 6th, Your Honor, he came here again. He took the same route, stayed at the same hotel, drove the same car, wore the same clothes. Now, Your Honor, when you consider the government's argument here that Mr. Jones committed these felonies, that he wanted to stop Congress from certifying the election, consider what Mr. Jones brought with him, which was nothing. He brought with him the clothes on his back. Not as you see from so many other people in the crowd that day dressed in camouflage with all sorts of equipment

or goggles or weapons. Mr. Jones came with his favorite red coat and a gray hat, because presumably it was chilly in Washington on January 6th of 2021. Not even boots, no kind of weaponry, nothing to suggest that he would have thought there might be tear gas that day. He's not wearing goggles, as so many other people were that day.

And consider the timeline, Your Honor. Because the government has suggested to you that Mr. Jones was so desperate to stop Congress from certifying the election that he ran through that Capitol that day to thwart the effort of Congress. The problem with that argument is, Your Honor, that as Mr. Jones testified, he came here that day and he went to the speech. Mr. Trump's speech began at noon. The first breach of a barricade at Peace Circle was at 12:54. Mr. Jones was still at 15th and Constitution at 1:20 when he began to walk towards the Capitol. He arrived at a bike rack at 2:08. The Senate recessed at 2:13. Mr. Jones was on the bleachers --

THE COURT: What are you reading from?

MR. LAWLOR: I'm reading from my own timeline, Your Honor, but these are in the exhibits.

THE COURT: Well, it would be helpful for you to cite what exhibit you're relying on --

MR. LAWLOR: I'll do my --

THE COURT: -- if that's what you're saying the

evidence shows.

MR. LAWLOR: Well, some of this is from Mr. Jones' testimony, and others is from -- others are from the exhibits. But I'm confident this is backed up, Your Honor, because we know from the testimony of the government witnesses, for example, that at 2:26 Mr. Pence left the Capitol. We know from the government evidence that the Senate recessed at 2:13 and the House recessed at 2:29. And we know from the video that -- the first video that shows Mr. Jones entering the Capitol -- I don't know the number, but the Court has seen that open door where many people walked right in. You see Mr. Jones come through that open door, and it was at 2:34 p.m.

And so the point is, Your Honor, that if Mr. Jones was in such a rush to seek out that his voice would be in some way so loud that Congress as a whole would stop the certification process, he certainly made no effort to get to that building in a hurry. To the contrary. And so, Your Honor, you see Mr. Jones for 24 minutes inside the U.S. Capitol. In his conduct that day, Your Honor, other than what he conceded was the poor choice and the poor action of taking the flagpole, the one thing that he did bring with him, a homemade flagpole with a Trump banner on it, and bang it into that window, an act that he still can't describe today because it's not in comport with his character.

And, you know, he tried do the best that he could to describe it, which was, you know, getting caught up in the crowd akin to, you know, when your team wins the big game and everybody rushes onto the field, and all of sudden you're down there pulling on the goalpost. I think we can all understand, maybe not invading the Capitol or being at a football game, that we might act poorly. But we can all recall some of that in our lives where something charged us in such a way that we did something that we later regretted.

And so Mr. Jones took the stand, and he told the Court that he can't fully understand why he did that. But, Your Honor, what did he also say that was important? When asked whether or not he was trying to get Congress to stop the certification process, he testified that he thought the certification was already over when he was in the Capitol. And so when the government plays clips from Mr. Jones' statement to the FBI and says that those statements, that he wanted his voice to be heard, are in some way his acknowledgement that what he was doing was in an effort to make Congress stop the certification process or he knew what he was doing was some way illegal --

THE COURT: When did he say that?

MR. LAWLOR: When did he say that?

THE COURT: Yeah, at the FBI interview?

MR. LAWLOR: In the interview the government

played on more than one occasion, Mr. Jones' statement to the FBI agents and the AUSA when they said -- I don't think the question was played for the Court, but the answer was -- and I assume the question was, you know, what made you go into the Capitol that day. And what he said was: "I wanted my voice to be heard."

THE COURT: I'm talking about when he said -- you say that he said that he believed that the certification was already over. Where did he -- where does he say that?

MR. LAWLOR: On the witness stand in Court.

THE COURT: Oh, so there's no corroborating evidence of that?

MR. LAWLOR: There's no corroborating evidence --

THE COURT: Simultaneously at the time?

MR. LAWLOR: Pardon me?

THE COURT: At the time the events took place?

MR. LAWLOR: Not that I'm aware of, Your Honor. But I will say that Mr. Jones gave a two-hour statement to the FBI eight days or 12 days after -- I think eight days after January 6th.

THE COURT: So it's your position he said that during the interview?

MR. LAWLOR: My position is he gave a two-hour interview, and not one time did the government use that statement to impeach anything he said on the witness stand

during this trial.  Not one time did they say -- showing him his statement and saying isn't this a prior inconsistent statement, not once.  And so, Your Honor, that is another piece of this that I would ask the Court to consider when you assess Mr. Jones' conduct and intent is his cooperation.

Again, the government tries to take everything that Mr. Jones did and said, and manipulate it into some sort of confession of guilt or knowledge of what he was doing was wrong.  And just to sort of give waste to that, Your Honor, there's a suggestion that he hid the red coat in his wife's car when, at the same time, he was willingly being interviewed by the FBI acknowledging on the video that he was the person in the red coat.  So the government makes much ado about his Facebook comments, Your Honor, but the testimony that Mr. Jones gave -- which I believe is credible, and certainly the government has talked to Mr. Ballard, could have called him if Mr. Ballard had something to say to the contrary, was that Mr. Jones called him on the way back to -- or that evening and spoke to him for 24 minutes acknowledging what he did.

His brother-in-law gave him counsel to call a lawyer, which he did.  The lawyer contacted the FBI.  This is on January the 7th or 8th, a day or two later.  As I said, either 10 or 12 days later Mr. Jones is sitting down with the FBI answering questions for two hours, failing to

answer no question, and staying until those questions are exhausted. And that is not the conduct of somebody who has acted knowingly in criminality. This is the action of somebody who made a simple mistake.

So when I back up, Your Honor, into sort of the chronology of Mr. Jones' actions that day, the government says that he knew that this was a restricted building. And so consider Mr. Jones' entry into the Capitol that day. And now, they say look back and he acknowledged that there were barricades, and he knew that the police had used non- -- I forget the lingo, Your Honor, nonfatal munitions. That's a word I hadn't heard until this trial. Mr. Jones testified that he moved forward under the bleachers to get away from those very things, and saw people entering the Capitol through an open door -- not a broken window, but through a door that was open. And he enters the door, perhaps at a faster clip than others.

And when he goes in, within several seconds he's confronted by a police officer who doesn't say get out, leave, this is a restricted building. But rather says: "No metal." And so Mr. Jones continues on his way, walks around and through the Capitol for a little bit of ways. And he's confronted with other police officers who they shake hands, speak kindly to one another. They each have their arms around each other's back. And that officer does not say:

This is a restricted building, your conduct is illegal, you should leave, but rather engages him in conversation and permits Mr. Jones to go on his way, which he does until he comes to the Speaker's Lobby where he indicates that he did act poorly in making the choice to take that flagpole and bang it into a window that was already broken when, to his not just surprise, but I think to his horror, he is feet away from someone who is shot and who he believes -- and I think correctly, takes her last breath several feet away from him on the floor right outside of the Speaker's Lobby. And you can tell from his physical reaction right there, Your Honor, and the look on his face that he's horrified about this.

And he's talking then on the video that's been introduced, he's saying that he can see who did this, and he wants to convey this information to somebody there. The scene is chaotic. He's trying to convey this information to somebody. There is body-worn camera that shows him conveying it. One officer, I think it was Officer Green, has body-worn camera in which Mr. Jones was offering to give his information to her. And he testified that he stayed in the building only to try to give his information to somebody so that they would know that he was a witness -- whether or not this was a crime, however you want to define it, to the simple fact that somebody was shot and lost their life and

Mr. Jones was affected by that thing. And so he stayed in the building.

Now, the government has said that he had some ulterior motive, that's not why he wanted to do this. But as has been already -- as I've already stated, Your Honor, Mr. Jones testified that he believed the certification process was already over. And but for the fact that he had banged on that window with that flagpole, his conduct throughout the Capitol for 24 minutes that day, Your Honor, was him walking about.

And so, Your Honor, that's the entirety of his conduct that day. And so the government wants you to ignore his conduct, but for banging on a window. They want you to ignore his testimony. They want you to ignore the 24-minute phone call. And so they bring in these Facebook messages, two of whom are, I guess, forwards or likes of two Congressmen talking about the fact that they had issues with the certification process.

But, again, this isn't Mr. Jones who's a Three Percenter, a Proud Boy, an Oath Keeper. There's not one Facebook message of him saying that he's going to come here and disrupt the work of Congress. There's not one statement of any ill intent. In fact, the testimony was by one of his friends, and his testimony on the stand, that when he came here, he just wanted to be seen, he wanted to

be a body. And when he went in the building, as opposed to having some illegal intent, what he hoped to do was really be a part of the democratic process. He wanted his voice to be heard. Now, obviously this isn't the way the democratic process works, and so maybe that was naive. But I think it was more naive than it was criminal.

Mr. Jones did not go in that building that day because he thought his voice was going to be heard because he was going to thwart all of the actions of Congress that day, and that they were going to fail to certify the election because of his presence. There's absolutely no evidence, Your Honor, that that was his state of mind. In fact, all of the evidence, Your Honor, is to the contrary of that.

And so looking, Your Honor, then, to some of the elements. So Your Honor, in terms of count one -- and I have four elements as well, Your Honor. I'm not sure if between myself, the Court and the government we all have them lined up perfectly, although I do think we have the same language. But the notion that Mr. Jones acted with the intent to obstruct, impede or interfere with law enforcement officers that day is without any evidence, Your Honor. There's no evidence that he breached or removed any bike racks; that he pushed through officers; that he forced his way into the Capitol building; that he pushed through

officers to get inside the building.  To the contrary, Your Honor.  When Mr. Jones went in, he shook hands with the police officer and --

**THE COURT:**  How about trying to break down the doors when there were barricades on the other side?

**MR. LAWLOR:**  Pardon me?

**THE COURT:**  You didn't hear what I just said?

**MR. LAWLOR:**  I did not, Your Honor, forgive me.

**THE COURT:**  How about breaking down a door where there's barricades on the other side?

**MR. LAWLOR:**  Your Honor, as I've said --

**THE COURT:**  What does that mean?

**MR. LAWLOR:**  It means that Mr. Jones acted poorly, but it's not evidence --

**THE COURT:**  It's not evidence of intent?

**MR. LAWLOR:**  It's not evidence of intent to obstruct or impede law enforcement that day, Your Honor.  I mean, his engagement with law enforcement that day is him shaking hands and saying that he's grateful for what they do.  And so it's a matter of, Your Honor, what was it that he was trying to impede.  The element is obstruct, impede or interfere with law enforcement officers.  I'm not denying -- no one has denied he said from day one that his conduct of banging the flagpole into that window that day was surely not --

THE COURT: Is it your position that wasn't a law enforcement barricade?

MR. LAWLOR: The window?

THE COURT: The doorway. There were three officers in front of the doorway.

MR. LAWLOR: There were, Your Honor.

THE COURT: There was a barricade behind the doors.

MR. LAWLOR: Correct.

THE COURT: Is it your position that that was not a law enforcement barricade? Is that what you say the evidence says?

MR. LAWLOR: My evidence is that it was a doorway, Your Honor, but I don't think it was -- I wouldn't call it a barricade. I mean, it seemed to me that it was just -- like I said --

THE COURT: You're entitled to your position.

MR. LAWLOR: That's our position, Your Honor, yes.

THE COURT: Fine.

MR. LAWLOR: All right. Your Honor, moving on to count three, the 1512 count. Your Honor, I'm going to try not to repeat myself here, because a lot of what I've argued is just sort of -- in generally speaking about Mr. Jones' conduct obviously touches upon these elements. But our argument, Your Honor, is that the government has failed to

prove beyond a reasonable doubt any of the four elements here. Again, the notion that Mr. Jones attempted to or actually obstructed an official proceeding, that was not what Mr. Jones was attempting to do, and that's not what he intended to do. The notion that he knowingly, with awareness that the natural and probable causes of the conduct would be to obstruct or impede the official proceeding, I think the best the government can do is to play Mr. Jones' statement to the FBI when he says that he wanted to have his voice heard. And when he said that he wanted to be loud, Your Honor, again, the notion that he's meaning that his voice was going to be so loud that he was going to drown out Congress, I think, really misperceives what the statement was that he made to the FBI that day. And finally, Your Honor, the notion that he acted corruptly belies not only his conduct that day, but about the character of the person that he is.

Getting into some of the misdemeanor counts, Your Honor, again --

**THE COURT:** What are you focusing on now, four, five, and six?

**MR. LAWLOR:** I'm looking at four, five and six, Your Honor. Count four, the element that this was a -- that he knew that this was a restricted building, as I touched upon earlier, Your Honor, he walked through an open door.

There were no signs there that the entry -- or his entry was prohibited. He shook hands there with a police officer. None of the officers said that he should leave. And the vice president had already left the building by the time Mr. Jones entered the building.

In terms of count five, Your Honor, the intent to impede or disrupt the orderly conduct of Congress, the only conduct here that would remotely come close that was him hitting that window at a time when both houses of Congress had adjourned. And certainly his --

**THE COURT:** Adjourned or in recess? I believe they were in recess.

**MR. LAWLOR:** Recess, sorry.

**THE COURT:** There's a difference.

**MR. LAWLOR:** There is, I understand. Yeah, forgive me, Your Honor, I wasn't trying to use -- I was using the words interchangeably, but I understand the Court's point. But that was not Mr. Jones' effort, desire to impede or disrupt the conduct of Congress that day, or any government business, Your Honor. And so, Your Honor, the government, again, has sort of tried to slice and dice not only Mr. Jones' statements, but Mr. Jones' conduct that day.

And when you look at this case in the totality of what occurred, for 24 minutes, what could be pointed to is

one poor choice that Mr. Jones made, not only in the 24 minutes that he was in the Congress, but in the time when he drove to Washington; the time that he came to Washington in November; the words that he said when he was coming to Washington; and more importantly, the words that were not said; the things that he brought with him and the way he dressed; and again, more importantly, the things that he did not bring with him.

This is not the type of person who desired to do evil to Congress that day. This is somebody, Your Honor, who came here -- as he said, he wanted to be a body, he wanted his voice to be heard. And so when munitions began to fly past him -- and you can see people coughing because of the smoke, and he moves forward and he sees an open door, he entered the open door without any sign of any kind of restriction, Your Honor.

And so, as I've said, when you consider, Your Honor, the type of person that he is and the 24 minutes that he was in there, Your Honor, I submit to you that the government's efforts to prove Mr. Jones guilty of either of these felonies falls short of the standard of proof here. And I'd ask the Court to find him not guilty certainly of both of those felonies, but also of the 1752 counts as well as counts seven through nine, Your Honor. Thank you. I think I went well under my time, Your Honor.

THE COURT: Twenty-seven minutes. You can have five minutes.

MR. DREHER: Yes, Your Honor.

THE COURT: Or if you need more, he left you a lot of extra time.

MR. DREHER: I will not abuse it, Your Honor.

THE COURT: Okay.

**REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE UNITED STATES**

MR. DREHER: I just want to make the Court aware that being more naive than criminal is still being criminal. The government provided sufficient evidence for this Court to find beyond a reasonable doubt each and every element of the offenses charged in the indictment. The defendant knew the certification process was happening. He went to the Capitol with the idea that he needed his voice to be heard. And he acted corruptly when he struck the window outside the House chamber at the Speaker's Lobby door.

He joined his fellow rioters chanting: "Break it down" -- or joined a group of other rioters chanting: "Break it down," outside of another door near the House chamber before then running to get to the front, as this Court pointed out, of that law enforcement-barricaded doorway. It was clear in Exhibit 605, as well as the other exhibits outside the Speaker's Lobby door, that furniture had been placed behind this. It would have been immediately

apparent to anybody standing right in front of the door, right where the defendant was standing, he would see those police officers were struggling.

THE COURT: Were what?

MR. DREHER: Struggling.

THE COURT: Struggling.

MR. DREHER: They were struggling outside, they were struggling when he entered. They were struggling at that moment, too. But the defendant was undeterred. So with that, Your Honor, I would ask that the Court find the defendant guilty of counts one and three, as well as the misdemeanor counts two and then four through nine. Thank you.

THE COURT: All right, counsel. If the Court needs any of the videotapes, you can provide those, right?

MR. DREHER: Your Honor, we do have a thumb drive prepared, we would just need a few minutes to show it to defense before it's submitted. 609 was recently added. We haven't clipped that just yet.

THE COURT: Oh, I see.

MR. DREHER: But once that's clipped, the thumb drive will be complete, we'll show it to the defense before providing it to the Court. But that can be available, yes.

THE COURT: Okay. And there weren't any -- I don't remember any documents that were introduced per se.

MR. DREHER: So all the documents have been also printed out, but then also are on the thumb drive as well. We can provide the printed out copies. None of that was clipped.

THE COURT: Yeah, why don't you have that available as well.

MR. DREHER: Do you want it at the same time or now, Your Honor? I can provide it to your staff.

THE COURT: We'll take those now. Well, make sure -- but take your time to go through it, make sure there's nothing in it that the Court shouldn't get copies of.

MR. DREHER: Yes, Your Honor.

THE COURT: Make sure the defense sees it, too. As I said earlier yesterday, I'll try to issue my ruling by Tuesday. If I need more time than that, I'll let you know probably Monday. You know, so I'll try to do it Tuesday or Wednesday of next week.

MR. DREHER: Yes, Your Honor.

THE COURT: So I'll give you as much advance notice as possible.

Mr. Brennan.

MR. BRENNAN: Your Honor, we also put in some exhibits as well, Your Honor. Mainly photographs of Mr. Jones' trip to Washington on November 14. We're more

than happy to supply chambers with those as well, Your Honor.

THE COURT: Make sure the government sees them.

MR. BRENNAN: I'll show them to the government.

THE COURT: Make sure my deputy clerk gets a chance to make sure everybody's on the same page.

MR. BRENNAN: Right, absolutely we'll do that, Your Honor. So Mr. Jones' wife, Your Honor, as you already know, is a resident of Kentucky. Should we count on Tuesday or plan on Wednesday?

THE COURT: I don't know, I couldn't tell you today.

MR. BRENNAN: Okay. What I'm thinking of doing is if they need to return --

THE COURT: I've been on the Court 21 years. This is the first time in 21 years I've had a bench trial in a criminal case. I've had lots of bench trials in civil cases.

MR. BRENNAN: Right.

THE COURT: But I've never had a criminal case bench trial.

MR. BRENNAN: What I was saying, Your Honor, is with the Court's permission, I think I was going to recommend that Mr. Jones' wife, if they need to, return to Kentucky. And we'll circle back with them on Monday if they

need to return Tuesday or Wednesday.  Would that be acceptable, Your Honor?

THE COURT:  That's fine with me.

MR. BRENNAN:  Okay.

THE COURT:  That's fine with me.  Everybody else is proximate to here?

MR. BRENNAN:  Oh, yeah.

THE COURT:  Except for them.  I don't know how hard it is to get a flight from Kentucky to here, I have no idea.  Is it hard?

MR. BRENNAN:  It can be done, just need a little notice, Your Honor.  That's what I'm saying, a little notice.

THE COURT:  Well, we'll try to give you as much notice as possible.

MR. BRENNAN:  Thank you, Your Honor.

THE COURT:  Are there any other questions or issues the Court needs to address?

MR. DREHER:  Nothing from the government.

THE COURT:  Do you have anything else?

MR. BRENNAN:  No, Your Honor.  Thank you.

THE COURT:  We'll stand in recess.

(Proceedings adjourned at 4:33 p.m.)

# C E R T I F I C A T E

I, **Jeff M. Hook, Official Court Reporter**, certify that the foregoing is a true and correct transcript of the record of proceedings in the above-entitled matter.

February 7, 2024
**DATE**

**Jeff M. Hook**

**BY MR. BRENNAN: [2]** 544/5 562/10

**BY MR. DREHER: [3]** 529/20 538/7 565/19

**DEPUTY CLERK: [1]** 529/1

**MR. BRENNAN: [58]** 529/10 530/13 530/20 531/22 531/24 532/10 552/25 553/2 553/4 553/7 553/10 554/12 554/16 554/19 554/22 554/24 555/3 555/9 555/11 556/1 556/3 556/9 556/17 556/19 557/15 557/21 558/6 558/21 559/7 559/11 559/16 559/22 560/1 560/4 560/7 560/10 560/16 560/19 561/2 561/5 561/10 561/15 561/18 561/23 565/12 566/5 566/9 612/22 613/3 613/6 613/12 613/18 613/21 614/3 614/6 614/10 614/15 614/20

**MR. DREHER: [131]**

**MR. LAWLOR: [30]** 567/6 567/10 569/3 569/6 593/23 594/2 596/19 596/23 597/1 598/22 598/24 599/9 599/12 599/14 599/16 599/22 605/5 605/7 605/10 605/12 605/15 606/2 606/5 606/8 606/12 606/17 606/19 607/21 608/12

608/14

**THE COURT: [212]**

**THE WITNESS: [11]** 529/17 537/7 537/9 537/16 537/19 537/21 537/24 538/2 561/17 561/20 562/9

**0**

**0213 [1]** 527/4

**1**

**1/7/2021 [1]** 586/14
**10 [5]** 543/21 544/14 544/15 556/5 600/24
**1001 [1]** 568/18
**1002 [1]** 568/18
**1003 [1]** 572/7
**10:24 p.m [1]** 587/7
**10:30 [1]** 548/25
**10:30 Eastern [2]** 587/20 588/3
**10:36 [1]** 588/3
**1100 [1]** 527/13
**12 [3]** 586/13 599/19 600/24
**12:07 [1]** 581/21
**12:54 [1]** 596/14
**12th [1]** 539/14
**13 [2]** 534/17 558/14
**14 [5]** 554/6 558/9 558/14 558/18 612/25
**15 [1]** 586/17
**15-minute [1]** 566/11
**1512 [1]** 606/21
**15th [1]** 596/15
**16 [1]** 586/17
**16th [1]** 546/22

**1752 [1]** 609/23
**18 [3]** 570/24 580/6 580/11
**19 [2]** 587/15 588/7
**1:20 when [1]** 596/15
**1:21-cr-0213 [1]** 527/4
**1:38 [1]** 527/6

**2**

**20 [4]** 527/5 567/22 587/19 588/8
**200 [2]** 534/2 571/15
**20001 [1]** 527/25
**2016 [1]** 595/8
**2020 [2]** 595/10 595/13
**2021 [9]** 544/10 544/16 547/1 571/6 573/5 573/21 576/19 586/14 596/3
**2023 [1]** 527/5
**20530 [2]** 527/14 527/16
**20770 [1]** 527/20
**209 [1]** 574/9
**21 [3]** 588/8 613/15 613/16
**21-213 [1]** 529/2
**213 [1]** 529/2
**214 [1]** 590/17
**23 [2]** 553/13 553/21
**231 [1]** 569/16
**232 [1]** 570/25
**24 [9]** 542/15 549/5 588/4 597/19 600/20 603/9 608/25 609/1 609/18
**24-minute [1]** 603/14
**26 [1]** 534/14
**29 [1]** 567/21
**2:08 [1]** 596/17
**2:13 [1]** 596/17
**2:13 and [1]**

597/8
**2:26 [1]** 597/6
**2:26 p.m [1]** 574/3
**2:29 [1]** 597/8
**2:34 [1]** 555/1
**2:34 p.m [3]** 555/1 555/5 597/13
**2:38 p.m [1]** 567/23
**2:41 [1]** 557/15
**2:41:50 [1]** 557/17
**2:41:51 [1]** 557/25
**2:41:52 [1]** 557/24
**2:42 [1]** 557/18
**2:44 [2]** 554/18 554/19
**2:44 p.m [2]** 554/5 554/14
**2:48 [1]** 554/24
**2:56:10 [1]** 559/20
**2:56:22 [1]** 560/2
**2:57 [1]** 561/23
**2:58 [1]** 558/9
**2:58 p.m [1]** 554/6

**3**

**30 [8]** 530/13 532/14 533/1 535/19 544/18 544/20 552/24 562/5
**300 [2]** 573/24 574/2
**301 [1]** 551/21
**302 [6]** 589/5 589/6 589/7 589/9 589/11 589/20
**333 [1]** 527/24
**37 [1]** 535/11
**3:09 a.m [1]** 586/14
**3:10 a.m [1]** 586/18
**3:16 p.m [1]** 567/24
**3:20 [2]** 588/8

588/11
**3:24 a.m [1]** 587/6
**3:24 in [1]** 586/25
**3:26 [3]** 588/6 588/7 588/11
**3:27 a.m [1]** 586/21
**3:30 [1]** 552/3
**3:36 [3]** 588/2 588/2 588/8

**4**

**4-foot [1]** 593/3
**40 [3]** 566/18 566/20 580/7
**400 [3]** 571/21 572/1 582/3
**401 [2]** 576/7 583/6
**402 [1]** 583/9
**407 [4]** 583/11 583/15 583/16 590/25
**410 [4]** 557/14 557/16 557/20 557/22
**411 [6]** 534/15 536/20 559/4 559/8 559/9 584/5
**412 [2]** 560/25 561/6
**42 [1]** 538/9
**43 [2]** 544/17 551/6
**45 [5]** 566/16 566/17 566/17 592/22 594/12
**46 [1]** 551/8
**4700-C [1]** 527/24
**4:11 [1]** 559/7
**4:23 [1]** 553/12
**4:30 [4]** 553/2 553/3 553/4 553/7
**4:33 [1]** 553/5
**4:33 p.m [1]** 614/23
**4:37 or [1]** 552/21
**4th [1]** 581/20

**5**

**50 [2]** 593/22

**5**

**50... [1]**
 593/25
**506 [1]**   581/19
**514 [1]**   586/12
**514C [1]**
 586/24
**516 [1]**   584/1
**516A [1]**  571/7
**529 [1]**   528/4
**532 [1]**   528/16
**544 [1]**   528/5
**565 [1]**   528/6
**568 [1]**   528/10
**57:28 [1]**
 561/24
**594 [1]**   528/11
**5th [1]**   573/21

**6**

**600 [1]**   582/9
**601 [3]**   527/16
 576/10 576/17
**602 [3]**   557/3
 557/11 557/12
**605 [4]**   572/22
 577/21 591/21
 610/23
**609 [11]**
 528/16 529/23
 530/6 530/19
 531/5 532/24
 537/15 541/15
 550/11 557/2
 611/18
**610 [1]**   528/12
**6305 [1]**
 527/19
**6th [24]**
 544/10 544/16
 547/1 547/8
 549/1 549/8
 571/5 571/11
 571/16 572/4
 572/9 573/5
 574/1 576/18
 581/15 581/23
 585/21 586/15
 586/19 586/22
 587/2 595/16
 596/3 599/20

**7**

**700 [3]**   527/19
 574/21 575/4
**701 [1]**   584/22
**7th [1]**   600/23

**8**

**804A1 [2]**
 574/16 575/10
**804A5 [1]**
 577/7
**8:00 or [2]**
 543/15 548/3
**8th [2]**   547/3
 600/23

**9**

**9:00 at [1]**
 543/15
**9:00 Eastern
 [1]**   548/3
**9th [1]**   547/3

**A**

**a.m [4]**   586/14
 586/18 586/21
 587/6
**abetting [1]**
 569/24
**able [4]**
 533/18 568/8
 573/23 575/13
**above [2]**
 557/25 615/6
**above-entitled
 [1]**   615/6
**absolutely [6]**
 535/7 539/18
 546/16 556/2
 604/11 613/7
**abuse [1]**
 610/6
**acceptable [1]**
 614/2
**account [1]**
 540/15
**accurate [3]**
 556/17 556/18
 566/1
**acknowledged
 [1]**   601/9
**acknowledgement
 [1]**   598/19
**acknowledging
 [2]**   600/12
 600/20
**acquittal [1]**
 567/8
**act [8]**   570/5
 570/9 570/11
 570/17 579/21
 597/24 598/7
 602/5
**acted [10]**

578/21 592/14
 592/17 592/24
 593/13 601/3
 604/20 605/13
 607/15 610/16
**acting [1]**
 570/22
**action [3]**
 527/3 597/21
 601/3
**actions [3]**
 531/8 601/6
 604/9
**active [1]**
 595/4
**acts [2]**
 570/25 580/16
**actual [2]**
 546/19 570/17
**actually [14]**
 530/15 534/13
 535/16 536/3
 541/14 542/7
 542/11 546/1
 551/25 553/11
 559/13 561/21
 572/12 607/3
**ADAM [2]**
 527/15 529/6
**add [1]**   553/8
**added [2]**
 561/7 611/18
**additional [1]**
 578/21
**address [3]**
 531/14 551/18
 614/18
**adjourned [3]**
 608/10 608/11
 614/23
**admission [2]**
 530/18 530/20
**admit [1]**
 532/19
**admits [1]**
 572/23
**admitted [7]**
 528/16 532/24
 534/16 553/2
 556/14 568/18
 572/22
**ado [1]**   600/14
**advance [2]**
 569/2 612/20
**advice [2]**
 549/12 549/21
**affected [1]**
 603/1

**aftermath [2]**
 530/8 532/4
**afternoon [4]**
 529/6 529/11
 544/7 544/8
**afterwards [1]**
 531/9
**again [21]**
 541/20 554/12
 560/10 569/6
 573/13 575/10
 577/7 577/21
 583/6 583/11
 583/12 586/22
 587/18 595/17
 600/6 603/19
 607/2 607/11
 607/19 608/21
 609/7
**against [4]**
 531/10 576/25
 577/17 577/22
**agent [1]**
 529/8
**agents [2]**
 536/17 599/2
**agree [2]**
 579/15 580/16
**agreement [1]**
 572/7
**ahead [1]**
 569/12
**aiding [1]**
 569/24
**akin [1]**   598/3
**alarm [1]**
 576/15
**almost [2]**
 543/14 544/18
**along [2]**
 529/13 572/5
**alongside [1]**
 529/7
**although [3]**
 543/16 588/9
 604/19
**always [1]**
 594/13
**Amanda's [1]**
 546/7
**AMERICA [2]**
 527/3 529/3
**Americans [1]**
 595/6
**amongst [1]**
 539/21
**amount [1]**
 566/16

**angry [1]**
 550/19
**apologize [2]**
 530/17 586/17
**apparent [2]**
 593/2 611/1
**apparently [1]**
 560/4
**appearance [1]**
 529/5
**APPEARANCES [1]**
 527/11
**appears [1]**
 575/5
**approach [1]**
 529/4
**approaching [1]**
 564/1
**appropriate [1]**
 581/6
**approximately
 [7]**   544/13
 548/1 551/6
 556/5 558/9
 558/14 558/18
**area [22]**
 540/12 552/14
 552/15 552/18
 552/19 557/15
 559/1 573/4
 573/15 574/6
 574/11 574/14
 574/23 574/25
 575/8 575/16
 575/19 576/5
 576/19 576/22
 577/1 581/24
**areas [2]**
 540/7 561/25
**argue [2]**
 575/23 584/13
**argued [2]**
 577/19 606/22
**argument [12]**
 528/9 567/12
 567/21 568/4
 568/14 572/11
 574/12 594/2
 595/20 596/11
 606/25 610/8
**arguments [3]**
 566/18 567/10
 567/17
**arms [1]**
 601/24
**around [16]**
 531/11 535/8
 535/14 539/21

**A**

**around... [12]**
539/23 548/3
553/20 562/17
564/5 564/19
565/8 573/5
591/8 595/15
601/21 601/25
**arrived [1]**
596/16
**arrives [2]**
557/19 558/2
**arrow [1]**
560/18
**Ashli [13]**
532/5 536/18
537/12 541/16
550/17 554/13
555/2 556/22
557/1 558/3
558/10 558/18
562/1
**assemblage [1]**
571/12
**assess [1]**
600/5
**assistance [1]**
548/13
**assume [2]**
572/11 599/4
**assuming [2]**
532/8 541/13
**assumption [1]**
588/12
**assure [1]**
589/16
**attachment [3]**
586/23 586/23
587/5
**attempt [1]**
562/19
**attempted [2]**
581/9 607/2
**attempting [4]**
531/14 584/16
584/24 607/4
**attended [1]**
595/14
**attention [1]**
548/17
**attorney [5]**
547/2 547/7
549/15 549/22
585/6
**attorneys [1]**
549/24
**audible [2]**
575/25 576/25

**audio [1]**
574/24
**AUSA [1]**    599/2
**authority [1]**
576/23
**available [2]**
611/23 612/6
**Avenue [1]**
527/24
**average [1]**
594/20
**aware [3]**
566/13 599/17
610/9
**awareness [2]**
592/14 607/6
**away [10]**
540/10 540/12
543/16 554/16
584/8 593/10
594/18 601/13
602/8 602/9

**B**

**Babbitt [13]**
532/5 536/18
541/16 550/18
554/4 554/14
555/2 556/22
557/1 558/3
558/10 558/18
562/1
**back [30]**
529/16 535/4
535/17 538/1
539/10 539/24
539/24 540/2
543/11 543/14
552/19 553/15
562/15 562/17
563/14 563/18
564/5 567/17
567/24 576/1
582/10 582/17
587/3 589/8
595/24 600/19
601/5 601/9
601/25 613/25
**backed [2]**
556/8 597/4
**backs [1]**
575/17
**backseat [2]**
543/25 546/18
**bag [4]**    582/10
582/11 582/13
582/14
**bags [1]**    582/8
**Ballard [2]**

600/17 600/17
**bang [2]**
597/23 602/6
**banged [1]**
603/8
**banging [2]**
603/13 605/24
**Bankruptcy [1]**
527/23
**banner [1]**
597/23
**BARRETT [2]**
527/6 529/3
**barricade [5]**
596/14 606/2
606/7 606/11
606/15
**barricaded [2]**
591/19 610/22
**barricades [3]**
601/10 605/5
605/10
**barriers [5]**
574/10 574/19
574/21 575/24
576/24
**based [1]**
567/19
**bashed [1]**
593/14
**basis [1]**
586/6
**bathroom [13]**
531/12 532/2
532/3 532/6
532/7 533/4
533/10 533/12
533/15 533/19
533/22 533/25
534/3
**baton [2]**
558/25 559/22
**Bayline [5]**
529/14 551/5
551/21 552/3
552/22
**bear [1]**
594/25
**became [1]**
573/22
**become [1]**
531/3
**becomes [2]**
574/6 589/18
**been already
[1]**    603/5
**began [5]**
571/18 595/10

596/13 596/16
609/12
**begin [1]**
568/15
**behalf [5]**
529/12 546/25
568/4 594/2
610/8
**behind [5]**
533/13 545/21
548/4 606/7
610/25
**belies [1]**
607/16
**believes [1]**
602/8
**below [2]**
582/17 582/21
**bench [6]**
527/9 539/25
540/1 613/16
613/17 613/21
**best [3]**
547/18 598/1
607/8
**better [2]**
547/17 595/11
**beyond [3]**
593/17 607/1
610/12
**big [2]**    559/21
598/3
**biggest [1]**
592/24
**bike [2]**
596/16 604/23
**bit [6]**    541/4
541/6 563/15
567/1 590/19
601/22
**bleachers [2]**
596/18 601/13
**blindsided [1]**
535/16
**Blockburger [1]**
578/20
**blow [1]**
590/18
**blurry [1]**
530/10
**body [9]**
534/14 562/23
563/3 563/4
584/22 602/18
602/20 604/1
609/11
**body-worn [6]**
562/23 563/3

563/4 584/22
602/18 602/20
**boots [1]**
596/3
**both [5]**
566/18 567/2
578/19 608/9
609/23
**bought [2]**
546/2 546/3
**bouncing [1]**
576/15
**Boy [1]**    603/20
**Brady [3]**
589/12 589/14
589/18
**brawl [1]**
561/13
**breach [1]**
596/14
**breached [2]**
582/5 604/23
**break [8]**
566/12 590/3
590/3 591/4
591/4 605/4
610/18 610/20
**breaking [1]**
605/9
**breath [1]**
602/9
**BRENNAN [6]**
527/18 527/19
528/5 529/12
566/5 612/22
**brief [2]**
568/24 570/3
**bring [6]**
590/10 590/13
590/14 597/22
603/15 609/8
**broken [2]**
601/15 602/6
**brother [20]**
542/3 547/12
547/14 548/22
548/24 549/4
549/7 549/21
567/16 568/8
585/11 585/11
585/14 585/14
587/12 587/20
588/22 589/12
593/9 600/21
**brother-in-law
[18]**    542/3
547/12 547/14
548/22 548/24

**B**

**brother-in-law... [13]**  549/4 549/7 549/21 585/11 585/11 585/14 585/14 587/12 587/20 588/22 589/12 593/9 600/21

**brought [5]** 594/9 595/6 595/22 595/23 609/6

**building [44]** 537/2 538/15 542/13 543/8 544/21 544/22 554/6 554/8 554/25 555/1 555/2 555/6 556/6 558/18 560/13 560/14 560/15 561/8 571/19 573/6 573/13 573/15 577/4 577/18 577/20 578/11 578/23 579/3 579/4 579/6 585/13 597/18 601/7 601/20 602/1 602/22 603/2 604/1 604/7 604/25 605/1 607/24 608/4 608/5

**built [1]** 583/12

**bunch [1]** 586/20

**business [3]** 540/18 577/6 608/20

**button [2]** 536/23 538/13

**C**

**call [19]** 536/23 538/13 542/17 548/9 548/12 548/14 548/20 548/24 549/6 587/20 587/21 588/3 588/10 588/12 588/13 588/14 600/21 603/15 606/14

**called [8]** 539/25 542/14 543/9 549/23 584/7 593/12 600/17 600/18

**calm [1]**  551/3

**came [20]** 533/21 533/25 534/2 535/23 535/24 536/9 537/4 537/12 550/15 552/8 584/2 587/14 589/11 595/13 595/17 596/1 596/12 603/25 609/3 609/11

**camera [10]** 532/8 555/7 555/13 555/14 562/23 563/3 563/4 584/22 602/18 602/20

**cameras [3]** 554/4 554/5 555/7

**camouflage [1]** 595/25

**cams [1]** 534/14

**can [50]** 529/16 530/10 530/14 532/22 533/23 534/15 534/16 534/23 535/11 538/19 547/18 551/5 551/20 553/12 556/21 557/25 558/1 558/23 559/18 559/19 561/8 561/11 563/12 565/7 566/6 567/1 567/6 567/8 572/3 585/13 586/12 589/16 590/10 590/13 590/14 590/15 593/22 594/21 598/5 598/7 602/11 602/15 607/8 609/13 610/1 611/15 611/23 612/3 612/8 614/11

**Capitol [93]**

**captured [7]**

558/15 572/24 578/5 579/7 579/9 581/4 588/9

**captures [1]** 591/9

**car [9]**  543/22 543/23 546/9 546/15 546/18 585/2 594/17 595/18 600/11

**cared [1]** 537/23

**case [12]** 529/2 530/22 530/23 531/16 533/23 570/20 582/3 594/4 594/20 608/24 613/17 613/20

**case-in-chief [1]**  530/22

**cases [1]** 613/18

**caught [1]** 598/2

**cause [2]** 571/1 571/19

**caused [1]** 573/1

**causes [1]** 607/6

**CCTV [8]**  532/8 554/4 554/5 554/13 559/4 559/18 574/2 591/9

**cell [1]**  571/8

**CERT [2]**  592/1 592/2

**certain [2]** 556/8 568/10

**certainly [16]** 532/10 533/14 555/24 556/18 568/6 568/13 575/21 576/3 577/19 578/19 580/15 593/6 597/17 600/16 608/10 609/22

**certification [9]**  581/17 597/17 598/14 598/15 598/20 599/8 603/6 603/18 610/14

**certify [2]**

604/10 615/4

**certifying [2]** 595/21 596/9

**CHAD [8]**  527/6 528/3 529/3 529/12 529/20 544/5 565/19 571/23

**chair [1]** 539/21

**challenge [1]** 569/3

**chamber [7]** 583/19 583/20 583/21 590/3 593/4 610/17 610/21

**chambers [1]** 613/1

**chance [1]** 613/6

**chanting [2]** 610/18 610/19

**chaotic [1]** 602/17

**character [4]** 594/7 594/22 597/25 607/17

**charge [1]** 569/16

**charged [3]** 578/23 598/8 610/13

**charging [1]** 578/19

**chief [1]** 530/22

**child [1]** 544/12

**chilly [1]** 596/2

**choice [3]** 597/21 602/5 609/1

**chronologically [1]**  588/10

**chronology [1]** 601/6

**circle [2]** 596/14 613/25

**circuit [1]** 571/24

**cite [1]** 596/23

**city [1]** 565/23

**CIV [1]**  527/13

**civil [9]**

569/19 569/24 570/19 570/23 570/24 571/5 572/4 579/2 613/17

**clarification [1]**  588/7

**clear [4]** 552/15 552/19 575/15 610/23

**clearly [3]** 571/4 571/11 572/22

**clerk [3]** 530/15 548/13 613/5

**clerks [1]** 569/22

**client [13]** 532/1 532/2 532/5 555/1 556/5 557/17 557/18 558/2 558/8 558/11 559/19 559/19 561/11

**clip [8]**  533/3 533/23 537/14 537/15 538/9 556/12 557/15 601/17

**clipped [4]** 576/10 611/19 611/21 612/4

**clips [1]** 598/16

**close [3]** 533/17 594/15 608/8

**closed [3]** 533/13 540/15 571/24

**closed-circuit [1]**  571/24

**closely [1]** 582/7

**closest [2]** 543/7 585/10

**closing [5]** 528/9 568/4 568/14 594/2 610/8

**clothes [2]** 595/19 595/23

**coat [4]** 534/24 596/2 600/10 600/13

**code [1]**  580/5

**C**

**College [1]**
581/16
**COLUMBIA [1]**
527/1
**combined [1]**
566/18
**comfortable [3]**
548/8 569/5
569/7
**coming [5]**
563/5 563/21
592/2 592/22
609/4
**comment [3]**
587/16 588/2
588/14
**comments [1]**
600/14
**commerce [2]**
568/19 568/19
**commits [1]**
579/21
**committed [3]**
570/5 570/9
595/20
**Committing [1]**
570/11
**common [1]**
573/12
**communicating**
**[1]** 548/8
**complain [1]**
595/11
**complete [1]**
611/22
**complies [1]**
578/20
**component [2]**
569/17 569/19
**components [2]**
569/17 570/21
**comport [1]**
597/25
**computer [1]**
561/7
**conceal [2]**
547/9 550/7
**conceded [1]**
597/21
**concern [1]**
578/24
**concerned [2]**
541/21 543/3
**conclusion [1]**
593/16
**condition [1]**
576/17

**conduct [38]**
554/7 577/4
577/6 577/14
578/5 578/7
578/23 579/4
579/7 579/17
579/17 579/20
581/25 582/4
584/5 584/21
589/13 590/2
592/15 592/19
593/2 594/7
594/25 597/20
600/5 601/2
602/1 603/8
603/12 603/13
605/23 606/24
607/7 607/16
608/7 608/8
608/19 608/22
**conduct's [1]**
581/3
**conference [1]**
531/2
**conferences [1]**
568/7
**confession [1]**
600/8
**confident [1]**
597/4
**confrontation**
**[1]** 587/24
**confronted [6]**
542/18 586/9
588/16 593/8
601/19 601/23
**confronts [1]**
585/15
**Congress [16]**
577/12 593/1
595/21 596/9
596/11 597/16
598/13 598/20
603/22 604/9
607/13 608/7
608/9 608/19
609/2 609/10
**Congressmen [1]**
603/17
**connect [1]**
541/13
**connector [1]**
583/19
**consider [14]**
567/12 579/1
580/18 590/6
594/5 594/6
594/10 594/25

595/19 595/22
596/7 600/4
601/8 609/17
**consideration**
**[1]** 594/3
**considering [1]**
578/20
**consistent [1]**
555/16
**Constitution**
**[2]** 527/24
596/15
**contact [4]**
549/15 549/22
584/17 584/23
**contacted [3]**
542/2 543/7
600/22
**continued [4]**
528/4 529/20
540/1 583/7
**continues [2]**
584/4 601/21
**contrary [4]**
597/18 600/18
604/13 605/1
**converged [1]**
571/18
**conversation**
**[6]** 547/12
547/13 547/13
548/12 588/21
602/2
**convey [2]**
602/16 602/17
**conveying [1]**
602/19
**convicted [2]**
578/16 578/17
**cooperation [2]**
594/7 600/5
**copies [2]**
612/3 612/11
**copy [1]** 561/6
**cordoned [3]**
573/14 574/7
575/16
**corner [1]**
591/8
**correctly [1]**
602/9
**corridor [2]**
560/19 560/20
**corroborating**
**[2]** 599/11
599/13
**corrupt [1]**
593/6

**corruptly [5]**
592/17 592/24
593/14 607/15
610/16
**coughing [1]**
609/13
**counsel [11]**
529/13 532/6
547/11 550/6
550/10 552/13
567/16 567/25
568/8 600/21
611/14
**count [23]**
568/15 569/24
573/7 573/9
573/11 576/21
577/2 577/15
579/2 580/8
581/6 581/6
581/10 581/11
593/18 593/19
593/21 604/16
606/21 606/21
607/23 608/6
613/9
**counts [13]**
573/3 573/11
576/20 577/24
578/6 580/23
581/8 593/21
607/18 609/23
609/24 611/11
611/12
**couple [4]**
540/3 540/6
540/19 568/6
**course [3]**
546/21 567/6
579/4
**court [48]**
527/1 527/22
527/23 557/13
567/12 567/13
567/17 567/19
568/6 569/1
572/2 572/3
574/9 574/15
575/1 575/17
576/10 577/7
579/1 579/15
580/18 581/13
582/24 584/13
589/16 593/17
593/19 594/5
594/6 594/24
595/2 597/11
598/11 599/3

599/10 600/4
604/18 609/22
610/9 610/11
610/22 611/10
611/14 611/23
612/11 613/15
614/18 615/3
**Court's [9]**
552/23 564/16
565/13 566/7
578/24 580/16
588/7 608/18
613/23
**courtroom [1]**
534/19
**Courts [1]**
527/23
**cover [1]**
575/5
**covers [2]**
531/6 531/7
**cr [1]** 527/4
**Crazy [1]**
547/19
**credible [1]**
600/16
**credit [2]**
584/12 584/14
**cried [5]**
532/6 539/22
539/25 554/2
562/4
**crime [2]**
538/4 602/24
**criminal [7]**
527/3 529/2
604/6 610/10
610/10 613/17
613/20
**criminality [1]**
601/3
**cross [10]**
528/4 528/6
529/20 530/21
530/25 531/22
531/24 531/25
532/22 565/11
**cross-exam [1]**
532/22
**cross-examinati**
**on [5]** 528/4
528/6 529/20
530/21 530/25
**crossing [1]**
574/13
**crowd [14]**
534/3 535/23
537/10 550/19

## C

**crowd... [10]**
552/20 553/23 565/2 574/24 583/9 583/10 583/12 583/13 595/24 598/3

**crying [3]**
531/12 532/8 533/4

**currently [1]**
594/14

**cutting [2]**
568/11 568/14

## D

**D.C [5]** 543/12 543/22 547/19 549/9 565/23

**damage [4]**
571/3 571/12 571/19 573/1

**damaged [1]**
572/18

**Dan [1]** 584/1

**danger [1]**
571/2

**DATE [1]**
615/11

**day [39]** 527/9 538/5 540/5 543/8 543/14 545/15 547/19 549/23 549/24 550/8 582/1 585/5 593/4 594/7 594/9 595/25 596/5 596/6 596/10 596/12 597/20 599/5 600/23 601/6 601/8 603/9 603/12 604/7 604/10 604/22 605/17 605/18 605/23 605/24 607/14 607/16 608/19 608/23 609/10

**days [7]**
543/21 543/21 568/6 599/19 599/19 599/19 600/24

**DC [5]** 527/5 527/14 527/15 527/16 527/25

**debate [1]**

584/3

**deeper [2]**
583/10 594/23

**defendant [78]**
527/7 527/18 528/11 529/12 531/9 531/12 531/13 555/25 557/14 559/1 570/4 570/8 570/11 571/8 571/23 572/17 572/18 574/13 574/15 574/16 574/20 574/22 575/1 575/4 575/6 575/10 575/14 575/16 575/18 575/20 575/22 575/23 576/4 576/8 576/11 576/12 576/18 576/23 577/3 577/8 577/11 577/16 577/19 577/21 578/21 580/17 581/9 581/11 581/14 581/23 582/8 582/11 582/18 582/21 583/11 584/3 584/5 584/7 584/9 584/15 585/20 586/5 586/14 586/16 586/17 586/20 587/18 592/14 592/17 592/19 592/24 593/18 593/20 594/2 610/13 611/2 611/9 611/11

**defendant's [10]** 531/3 531/8 570/16 581/20 581/25 582/4 582/19 583/24 592/19 593/6

**defendants [1]**
569/2

**defense [10]**
548/14 548/15 566/10 566/14 566/17 568/22 589/17 611/18 611/22 612/14

**define [1]**
602/24

**defined [2]**
570/24 573/13

**deleted [10]**
540/13 540/16 540/21 540/24 541/1 541/2 541/19 541/22 593/11 593/11

**deluge [1]**
594/19

**demarcated [1]**
574/7

**democratic [2]**
604/3 604/4

**demonstrate [2]**
556/11 575/7

**demonstrates [2]** 571/5 572/22

**demonstrative [1]** 590/10

**denied [1]**
605/23

**denies [1]**
585/12

**deny [4]** 547/6 567/17 567/19 585/8

**denying [1]**
605/22

**depends [1]**
571/12

**depict [4]**
533/4 533/6 557/14 584/20

**depicted [4]**
534/24 553/21 574/20 591/20

**depicts [2]**
571/22 574/10

**deputy [1]**
613/5

**describe [2]**
597/24 598/2

**described [1]**
592/25

**desire [1]**
608/18

**desired [1]**
609/9

**desperate [1]**
596/9

**destroyed [1]**
572/18

**destruction [2]**
572/12 572/15

**detachment [1]**
574/5

**determination [1]** 572/4

**dice [1]**
608/21

**difference [5]**
577/2 578/9 578/12 579/18 608/14

**different [9]**
540/7 555/6 568/9 569/17 569/21 570/21 577/15 579/13 580/17

**direct [3]**
531/16 539/9 548/17

**direction [1]**
553/14

**discredited [1]**
585/10

**discredits [1]**
588/18

**discrepancy [1]**
570/15

**Discussion [2]**
556/24 566/9

**dishonest [1]**
595/2

**disorder [8]**
569/20 569/24 570/19 570/23 570/24 571/5 572/5 579/3

**disorderly [3]**
577/3 579/3 580/23

**disrupt [4]**
577/5 603/22 608/7 608/19

**disrupted [1]**
584/3

**disruptive [3]**
577/3 577/14 593/2

**distance [1]**
533/18

**distinction [1]**
580/19

**DISTRICT [4]**
527/1 527/1 527/10 527/23

**disturbance [1]**
570/25

**dive [1]**
568/15

**document [1]**
556/13

**documents [2]**
611/25 612/1

**DOJ [1]** 527/13

**DOJ-CIV [1]**
527/13

**done [2]** 550/8 614/11

**door [46]**
533/19 534/1 534/2 534/8 535/18 535/24 536/14 536/15 537/11 538/25 539/18 539/20 542/1 545/4 545/5 550/22 553/18 555/7 555/13 555/19 557/4 557/19 558/3 560/5 560/24 562/16 572/25 575/21 576/7 576/12 583/8 591/3 591/5 597/11 597/13 601/15 601/16 601/16 605/9 607/25 609/14 609/15 610/17 610/20 610/24 611/1

**doors [14]**
533/13 545/22 552/15 553/15 555/9 555/11 562/9 586/11 590/16 591/16 591/18 591/19 605/5 606/8

**doorway [4]**
606/4 606/5 606/13 610/23

**doubt [3]**
593/18 607/1 610/12

**down [24]**
539/20 539/24 546/20 551/3 552/15 559/15 561/12 562/18 562/20 563/14 566/4 568/12 568/14 590/3 590/4 591/4 591/4 591/10 598/5 600/24

**D**

**down... [4]**
605/4 605/9
610/19 610/20
**draw [1]**
582/24
**drawn [1]**
560/18
**DREHER [9]**
527/15 528/4
528/6 528/10
528/12 529/7
555/17 556/25
558/25
**dressed [2]**
595/25 609/7
**drive [6]**
543/11 546/12
546/14 611/16
611/22 612/2
**driven [1]**
594/17
**driver's [1]**
543/25
**drives [2]**
546/9 546/11
**driving [3]**
540/3 543/23
549/23
**drove [4]**
540/2 595/14
595/18 609/3
**drown [1]**
607/13
**duplicative [1]**
580/13
**during [14]**
549/6 554/9
558/13 558/15
569/19 570/19
570/23 571/25
574/1 581/13
581/16 588/13
599/22 600/1
**duties [2]**
570/18 572/9

**E**

**earlier [7]**
537/14 537/15
538/12 564/4
565/4 607/25
612/15
**easel [1]**
567/3
**easels [1]**
567/1
**easier [1]**

567/2
**easily [1]**
572/3
**east [3]**
539/19 560/21
571/18
**Eastern [3]**
548/3 587/20
588/3
**educated [1]**
594/13
**effect [3]**
568/19 592/15
592/18
**effort [8]**
550/7 562/12
563/7 564/8
596/10 597/17
598/19 608/18
**efforts [1]**
609/20
**eight [13]**
532/17 543/21
578/5 578/13
578/18 578/22
579/6 579/16
580/7 580/14
580/23 599/19
599/19
**either [7]**
547/2 567/1
571/2 571/13
584/14 600/24
609/20
**elect [1]**
593/5
**election [7]**
549/10 595/8
595/10 595/12
595/22 596/9
604/11
**Electoral [1]**
581/16
**element [16]**
568/16 569/13
569/15 569/16
570/9 570/21
572/6 573/4
573/12 577/15
578/21 581/10
592/12 605/21
607/23 610/12
**elements [16]**
568/10 568/16
568/23 569/21
569/22 569/23
570/2 570/8
572/17 576/21

577/25 578/25
604/16 604/17
606/24 607/1
**elevator [23]**
536/21 536/23
538/13 538/23
559/2 559/2
559/10 559/11
559/13 559/14
559/15 559/22
559/25 560/1
560/4 560/5
560/9 560/11
560/12 560/16
561/4 584/8
584/25
**else [3]**
565/15 614/5
614/20
**employed [1]**
594/14
**encompassed [1]**
579/21
**end [3]** 560/19
560/20 563/11
**ending [1]**
557/23
**ends [4]**
557/17 557/23
557/23 561/19
**enforcement
[19]** 543/3
543/6 546/25
549/21 562/13
569/18 570/7
570/13 570/17
570/22 585/10
588/19 604/21
605/17 605/18
605/22 606/2
606/11 610/22
**enforcement-bar
ricaded [1]**
610/22
**engage [1]**
577/3
**engaged [4]**
569/18 570/18
572/8 577/16
**engagement [1]**
605/18
**engages [1]**
602/2
**enter [1]**
575/8
**entered [16]**
545/4 554/21
554/23 554/25

555/1 555/2
555/6 555/11
556/6 564/17
576/18 576/22
577/1 608/5
609/15 611/8
**entering [2]**
597/10 601/14
**enters [2]**
555/7 601/16
**entirety [2]**
532/17 603/11
**entitled [2]**
606/17 615/6
**entrepreneur
[1]** 594/14
**entry [4]**
555/18 601/8
608/1 608/1
**equipment [1]**
595/25
**escape [2]**
536/25 584/24
**escorted [1]**
535/15
**established [1]**
534/20
**estimating [2]**
558/21 558/22
**even [11]**
531/11 535/19
536/8 543/8
575/23 578/1
585/12 585/13
593/8 593/25
596/3
**evening [8]**
547/2 549/7
585/20 586/15
586/19 586/22
587/2 600/19
**events [5]**
571/15 572/4
574/1 579/7
599/16
**everybody [4]**
538/5 594/21
598/4 614/5
**everybody's [2]**
563/14 613/6
**everyday [1]**
594/16
**everyone [2]**
529/10 529/15
**everyone's [1]**
566/12
**evidence [27]**
528/16 530/15

532/24 534/16
548/14 556/9
556/14 557/16
571/4 581/14
589/1 589/22
593/17 597/1
597/7 599/12
599/13 604/12
604/13 604/22
604/23 605/14
605/15 605/16
606/12 606/13
610/11
**evil [1]**
609/10
**exact [1]**
562/15
**exactly [1]**
576/17
**exam [1]**
532/22
**examination [9]**
528/4 528/5
528/6 529/20
530/21 530/25
539/9 544/5
565/19
**example [1]**
597/6
**except [4]**
535/25 536/17
537/4 614/8
**excerpt [1]**
574/15
**excerpts [1]**
531/15
**excluded [2]**
531/2 531/19
**excuse [7]**
533/9 543/24
547/6 559/9
572/21 583/20
595/9
**excused [1]**
566/4
**exhausted [1]**
601/2
**exhibit [60]**
528/15 529/23
530/6 530/19
532/24 534/15
534/25 535/11
536/20 548/14
548/15 550/11
552/24 557/1
557/1 557/14
557/20 557/22
559/8 559/9

**E**

exhibit... [40]
560/25 571/7
571/15 571/17
571/21 572/1
572/22 572/24
573/1 573/24
574/2 574/9
574/16 574/21
575/4 575/10
576/7 576/10
576/17 577/7
577/21 581/18
581/19 582/3
582/4 582/7
582/9 583/6
583/9 583/11
583/23 584/1
584/5 586/12
586/24 590/17
590/25 591/21
596/23 610/23

Exhibit 2 [2]
548/14 548/15

Exhibit 200 [1]
571/15

Exhibit 209 [1]
574/9

Exhibit 214 [1]
590/17

Exhibit 300 [2]
573/24 574/2

Exhibit 400 [3]
571/21 572/1
582/3

Exhibit 401 [2]
576/7 583/6

Exhibit 402 [1]
583/9

Exhibit 407 [2]
583/11 590/25

Exhibit 410 [3]
557/14 557/20
557/22

Exhibit 411 [5]
534/15 536/20
559/8 559/9
584/5

Exhibit 412 [1]
560/25

Exhibit 514 [1]
586/12

Exhibit 514C
[1]    586/24

Exhibit 516 [1]
584/1

Exhibit 516A
[1]    571/7

Exhibit 600 [1]
582/9

Exhibit 601 [2]
576/10 576/17

Exhibit 605 [4]
572/22 577/21
591/21 610/23

Exhibit 609 [3]
529/23 530/6
530/19

Exhibit 700 [2]
574/21 575/4

Exhibit 804A1
[2]   574/16
575/10

Exhibit 804A5
[1]    577/7

exhibits [5]
568/18 596/21
597/4 610/24
612/24

Exhibits 1001
[1]    568/18

exit [8]    534/4
535/5 536/14
560/13 560/15
561/8 564/3
591/13

exited [3]
554/5 558/11
562/2

exiting [2]
554/8 560/23

expand [1]
565/7

explained [2]
540/9 592/19

extra [1]
610/5

eyewitness [1]
536/19

**F**

face [3]    551/9
551/9 602/12

face-to-face
[1]    551/9

Facebook [8]
540/13 541/12
581/13 581/20
593/11 600/14
603/15 603/21

facing [2]
534/2 563/13

fact [10]
534/23 547/1
572/23 585/15
593/13 602/25
603/7 603/17

603/23 604/13

fail [1]
604/10

failed [1]
606/25

failing [1]
600/25

fair [1]
565/23

falls [1]
609/21

familiar [1]
545/1

family [1]
574/4

far [2]    563/10
563/18

fast [1]    583/4

faster [1]
601/17

favorite [3]
543/18 545/25
596/1

FBI [25]    529/8
536/17 539/13
540/6 547/4
547/7 549/14
550/3 574/16
574/17 575/11
577/8 577/11
585/6 590/4
592/20 598/17
598/24 599/2
599/19 600/12
600/22 600/25
607/9 607/14

federal [1]
566/13

feel [1]    548/8

feet [3]
554/16 602/7
602/9

fell [1]
546/20

fellow [1]
610/18

felonies [5]
580/6 593/19
595/21 609/21
609/23

felony [3]
572/14 580/3
581/4

female [1]
562/24

few [8]    538/21
539/23 549/23
554/7 554/16

561/1 565/6
611/17

field [1]
598/4

film [1]
533/15

filmed [1]
575/17

filmer [1]
533/14

filmer of [1]
533/14

finally [2]
592/16 607/15

find [7]
556/21 585/3
593/17 593/20
609/22 610/12
611/10

fine [6]
553/12 556/15
567/9 606/19
614/3 614/5

firing [1]
575/5

first [21]
530/12 532/19
532/25 542/12
542/21 547/14
547/20 550/10
552/24 566/14
569/17 569/24
570/4 570/9
571/23 572/17
581/8 595/8
596/14 597/9
613/16

firsthand [1]
538/7

fish [2]    565/4
565/8

five [18]
544/20 566/19
576/20 577/2
577/16 578/8
578/9 578/12
578/16 580/25
587/3 587/6
588/2 593/23
607/21 607/22
608/6 610/2

flag [3]
540/10 540/12
543/16

flagpole [8]
540/10 577/21
593/10 597/22
597/23 602/5

603/8 605/24

flashbangs [1]
575/7

flight [1]
614/9

floor [7]
552/2 576/16
590/9 590/16
592/4 592/4
602/10

floorboard [1]
543/25

floorplan [1]
590/8

fly [1]    609/13

focusing [1]
607/20

fold [1]
539/21

fold-out [1]
539/21

follow [1]
567/16

following [3]
531/7 564/18
564/21

foot [1]    593/3

footage [4]
530/8 541/9
571/22 583/18

football [1]
598/7

For the
Defendant [1]
527/18

forced [1]
604/24

forcibly [1]
584/6

foregoing [1]
615/4

forget [1]
601/11

forgive [2]
605/8 608/16

form [1]
579/14

forward [3]
552/14 601/13
609/14

forwards [1]
603/16

found [5]
543/19 543/22
543/24 572/7
593/21

four [26]
527/9 532/19

**F**

**four... [24]**
534/1 535/19
536/2 569/23
573/3 573/11
576/20 576/21
577/16 578/8
578/9 578/10
578/12 578/16
580/8 580/25
581/8 593/21
604/17 607/1
607/20 607/22
607/23 611/12
**fourth [1]**
592/12
**frame [3]**
535/3 538/19
538/20
**fray [1]** 595/7
**friend [2]**
583/25 586/10
**friends [2]**
594/15 603/24
**front [13]**
533/22 534/3
535/4 535/5
535/20 536/19
569/1 571/22
582/6 584/19
606/5 610/21
611/1
**full [1]**
552/20
**fully [1]**
598/11
**function [1]**
577/6
**furniture [1]**
610/24
**further [4]**
528/6 544/3
565/14 566/3

**G**

**gainfully [1]**
594/14
**Gaithersburg
[2]** 540/2
540/4
**game [2]** 598/4
598/7
**gas [1]** 596/5
**gave [5]**
574/15 599/18
599/23 600/15
600/21
**general [1]**

565/2
**generally [1]**
606/23
**gentleman [3]**
537/12 550/2
552/7
**gets [9]** 560/1
560/6 560/8
560/11 566/15
566/17 566/17
585/2 613/5
**given [1]**
531/3
**giving [2]**
531/13 564/13
**goal [2]**
566/17 583/2
**goalpost [1]**
598/5
**Goddard [8]**
548/21 585/20
586/14 586/18
586/21 587/17
589/3 589/9
**goes [4]**
559/14 566/14
566/14 601/18
**goggles [2]**
596/1 596/5
**good [9]** 529/6
529/11 544/7
544/8 566/11
594/15 594/17
594/22 594/24
**government [44]**
527/12 528/16
529/4 532/24
547/11 550/6
550/10 552/13
558/12 566/14
566/15 566/17
571/14 572/13
572/21 574/8
576/10 577/6
577/7 580/24
581/12 584/1
593/23 596/8
597/5 597/7
598/16 598/25
599/24 600/6
600/13 600/16
601/6 603/3
603/12 604/18
606/25 607/8
608/20 608/21
610/11 613/3
613/4 614/19
**government's
[13]** 531/16

554/6 557/1
557/22 574/20
576/17 586/24
590/17 591/21
594/4 595/1
595/20 609/20
**grab [5]** 571/7
571/16 574/2
582/8 582/11
**grant [1]**
567/13
**grateful [1]**
605/19
**gray [3]**
534/21 534/24
596/2
**green [6]**
563/8 564/9
582/8 582/13
584/23 602/19
**Green's [2]**
562/23 563/3
**Greenbelt [1]**
527/20
**ground [1]**
577/5
**grounds [8]**
573/13 573/15
573/21 576/2
577/18 577/20
578/11 578/14
**group [3]**
564/25 590/2
610/19
**groups [1]**
571/1
**guess [8]**
531/1 535/4
536/4 547/12
565/3 574/12
590/19 603/16
**guidebook [1]**
544/24
**guilt [1]**
600/8
**guilty [6]**
593/18 593/18
593/20 609/20
609/22 611/11
**gun [2]** 552/6
552/7
**guy [1]** 536/1

**H**

**half [2]**
532/20 543/10
**Hall [1]**
590/23
**hallway [10]**

533/12 550/17
553/16 563/5
563/6 563/13
563/18 583/20
590/25 591/10
**hallways [1]**
565/3
**hand [1]**
550/14
**hands [6]**
559/1 561/12
601/23 605/2
605/19 608/2
**happened [3]**
539/22 551/17
555/25
**happening [4]**
579/22 579/23
581/15 610/14
**happy [1]**
613/1
**hard [2]** 614/9
614/10
**hat [3]** 534/21
534/24 596/2
**Hatfield [1]**
584/1
**Hawa [2]**
573/18 573/23
**Hawley [1]**
581/16
**head [2]**
561/12 561/13
**heading [1]**
557/14
**hear [6]**
536/15 573/17
576/25 577/12
585/1 605/7
**heard [20]**
547/14 567/20
575/7 575/20
576/11 576/13
576/23 584/15
590/5 594/15
595/13 595/16
598/18 599/6
601/12 604/4
604/8 607/10
609/12 610/15
**hearing [1]**
531/20
**help [1]**
594/18
**helpful [3]**
568/11 568/13
596/22
**here's [1]**

585/16
**hid [1]** 600/10
**hide [1]**
546/17
**higher [4]**
579/25 580/4
580/12 580/22
**himself [3]**
572/23 575/6
592/19
**hit [4]** 536/23
538/12 562/19
564/6
**hitting [1]**
608/9
**hold [2]**
554/11 554/11
**home [3]** 540/4
549/23 595/15
**homemade [1]**
597/23
**honestly [1]**
536/16
**Honor [164]**
**HONORABLE [1]**
527/9
**HOOK [3]**
527/22 615/3
615/11
**hope [1]**
532/10
**hoped [1]**
604/2
**horrified [1]**
602/12
**horror [1]**
602/7
**hotel [2]**
540/2 595/18
**hour [4]**
543/10 548/4
599/18 599/23
**hours [5]**
587/3 587/6
588/2 594/18
600/25
**House [10]**
583/19 583/20
590/3 590/16
592/3 592/4
593/4 597/8
610/17 610/20
**houses [1]**
608/9
**huh [2]** 566/8
587/23
**hurricane [1]**
594/19

**H**

**hurry [1]**
597/18

**hypothetically [3]**  566/19
578/16 580/25

**I**

**idea [7]**
538/24 545/6
545/14 545/21
588/18 610/15
614/10

**identifiable [1]**  576/16

**identifying [1]**
584/21

**ignore [3]**
603/12 603/14
603/14

**ill [1]**  603/23

**illegal [4]**
595/14 598/21
602/1 604/2

**illicit [1]**
595/15

**illustrates [1]**
583/2

**image [1]**
587/25

**images [1]**
587/14

**immediate [2]**
571/2 593/7

**immediately [5]**
530/2 535/5
552/14 576/16
610/25

**impeach [1]**
599/25

**impede [12]**
570/12 577/5
581/9 581/12
592/16 604/21
605/17 605/21
605/21 607/7
608/7 608/19

**impeding [1]**
570/6

**important [2]**
582/3 598/12

**importantly [4]**
576/8 582/2
609/5 609/7

**inaugural [1]**
576/3

**incident [1]**
570/19

**include [1]**
586/10

**included [1]**
579/14

**including [1]**
535/25

**inconsistent [1]**  600/2

**indicates [1]**
602/4

**indications [1]**
574/22

**indictment [1]**
610/13

**individual [3]**
564/20 571/3
572/24

**individuals [1]**
571/13

**indulgence [3]**
564/16 565/13
566/7

**inference [1]**
582/23

**info [1]**  538/5

**inform [1]**
564/8

**information [16]**  531/13
541/22 564/13
584/16 584/17
584/20 584/21
584/24 585/14
588/20 589/17
589/19 602/16
602/17 602/21
602/22

**informing [1]**
574/11

**initial [1]**
567/21

**injured [1]**
572/17

**injuries [1]**
571/20

**injury [2]**
571/2 571/2

**injury or [1]**
571/2

**inquiry [3]**
530/14 556/20
561/25

**inside [9]**
542/5 542/18
550/15 574/3
577/20 583/24
584/4 597/19
605/1

**Inspector [2]**
573/17 573/23

**Instagram [2]**
540/16 593/11

**instantly [1]**
537/13

**instead [1]**
572/15

**intend [1]**
532/13

**intended [5]**
570/5 570/12
581/11 590/4
607/5

**intending [1]**
593/1

**intensity [1]**
583/5

**intent [16]**
577/5 581/25
582/25 583/24
589/24 590/1
593/6 594/8
595/1 600/5
603/23 604/2
604/21 605/15
605/16 608/6

**interaction [1]**
555/14

**interchangeably [1]**  608/17

**interested [1]**
595/12

**interfere [3]**
570/12 604/21
605/22

**interfering [1]**
570/6

**interior [1]**
544/21

**intern [2]**
529/14 556/21

**interview [6]**
536/17 574/15
598/24 598/25
599/22 599/24

**interviewed [4]**
550/4 589/3
589/4 600/12

**into [28]**
528/16 532/24
534/16 549/14
554/1 556/14
559/14 562/3
563/10 568/15
574/24 575/21
576/4 583/1
583/10 585/2

593/8 593/10
595/7 597/24
599/5 600/7
601/5 601/8
602/6 604/25
605/24 607/18

**introduced [2]**
602/15 611/25

**invading [1]**
598/6

**involved [1]**
572/19

**involving [1]**
570/25

**issue [2]**
589/18 612/15

**issues [2]**
603/17 614/18

**item [1]**
548/17

**Ivy [1]**  527/19

**J**

**jacket [11]**
534/20 543/17
543/18 543/19
543/24 545/24
545/25 546/17
546/24 547/9
562/22

**January [26]**
544/10 544/16
546/22 547/1
547/8 571/5
571/10 571/16
572/4 572/9
573/5 573/21
574/1 576/18
581/15 581/20
581/22 585/20
586/15 586/19
586/22 587/2
595/16 596/3
599/20 600/23

**January 16th [1]**  546/22

**January 4th [1]**
581/20

**January 5th [1]**
573/21

**January the [1]**
600/23

**Jason [8]**
542/25 548/21
585/19 586/13
586/18 586/21
587/17 589/9

**JEFF [3]**
527/22 615/3

615/11

**Jenkins [1]**
529/8

**joined [3]**
590/2 610/18
610/19

**JONES [59]**
527/6 528/3
529/3 529/12
529/16 529/20
544/5 544/7
550/13 551/9
553/14 555/5
561/25 563/1
564/12 565/19
571/23 572/23
591/9 594/9
594/12 595/4
595/5 595/9
595/9 595/12
595/20 595/22
596/1 596/8
596/12 596/15
596/17 597/10
597/12 597/14
597/19 598/10
599/18 600/7
600/15 600/18
600/24 601/12
601/21 602/3
602/20 603/1
603/6 603/19
604/7 604/20
605/2 605/13
607/2 607/4
608/5 609/1
609/20

**Jones' [17]**
567/12 594/6
594/23 597/2
598/16 599/1
600/5 601/6
601/8 606/23
607/9 608/18
608/22 608/22
612/25 613/8
613/24

**Jordan [1]**
529/8

**JUDGE [3]**
527/10 545/24
551/14

**judgment [1]**
567/8

**July [1]**  527/5

**K**

**keep [3]**
538/25 563/23

**K**

**keep... [1]**
591/12
**Keeper [1]**
603/20
**Kentucky [6]**
543/13 548/5
585/6 613/9
613/25 614/9
**key [2]** 574/12
578/12
**kind [4]**
578/18 580/13
596/3 609/15
**kindly [1]**
601/24
**knew [18]**
535/24 536/14
537/3 539/4
574/13 575/18
576/19 577/1
577/19 581/14
593/4 593/9
593/12 598/20
601/7 601/10
607/24 610/13
**knowing [2]**
579/17 579/20
**knowingly [16]**
570/5 570/9
576/21 577/3
577/16 578/22
579/25 580/8
580/8 580/11
580/19 580/20
580/22 592/14
601/3 607/5
**knowledge [3]**
575/8 581/22
600/8
**known [1]**
576/4
**knows [1]**
579/21

**L**

**lack [2]** 594/8
595/11
**lady [1]**
535/17
**Lane [1]**
527/19
**language [1]**
604/20
**last [3]**
535/22 562/19
602/9
**latched [1]**

564/25
**later [7]**
554/6 561/1
561/7 563/9
598/9 600/23
600/24
**Lauren [1]**
584/23
**law [38]**
529/13 542/3
543/3 543/6
546/25 547/12
547/14 548/22
548/24 549/4
549/7 549/21
549/21 562/13
569/17 570/6
570/13 570/17
570/22 585/10
585/11 585/11
585/14 585/14
587/12 587/20
588/19 588/22
589/12 593/9
600/21 604/21
605/17 605/18
605/22 606/1
606/11 610/22
**lawful [4]**
569/18 570/18
572/9 576/22
**lawfully [1]**
570/22
**LAWLOR [4]**
527/18 527/19
528/11 529/14
**lawyer [3]**
593/12 600/22
600/22
**laying [1]**
552/1
**leader [1]**
564/25
**lean [1]** 564/6
**leaned [2]**
562/18 562/20
**least [3]**
535/19 539/13
541/2
**leave [10]**
529/24 530/2
535/9 537/2
538/5 539/3
539/6 601/20
602/2 608/3
**leaves [2]**
558/17 585/1
**leaving [4]**

533/6 552/14
558/9 563/25
**led [2]** 545/16
574/4
**left [12]**
533/13 533/25
539/21 550/14
561/4 561/23
561/23 565/21
592/6 597/6
608/4 610/4
**left-hand [1]**
550/14
**legality [1]**
595/11
**LEON [1]** 527/9
**lesser [1]**
579/13
**letting [1]**
543/3
**level [1]**
581/3
**liaison [1]**
573/18
**life [2]**
595/15 602/25
**likes [1]**
603/16
**limited [1]**
565/16
**line [3]**
531/10 572/2
582/5
**lined [1]**
604/19
**lingo [1]**
601/11
**list [1]**
589/10
**listen [5]**
537/9 541/25
542/2 577/14
593/1
**listened [1]**
552/2
**listening [1]**
541/18
**literally [1]**
592/3
**little [6]**
563/14 567/1
590/19 601/22
614/11 614/12
**Live [1]**
541/12
**lived [1]**
543/12
**lives [1]**

598/8
**Lobby [19]**
545/8 545/12
545/16 545/21
553/17 555/19
557/4 557/19
558/2 572/25
586/11 590/16
591/5 591/19
593/15 602/4
602/10 610/17
610/24
**located [3]**
555/25 556/1
583/17
**location [1]**
574/5
**LOL [1]** 584/3
**long [6]**
532/12 543/11
549/3 584/6
584/10 588/13
**long's [1]**
532/16
**longer [1]**
572/14
**look [4]**
553/12 601/9
602/12 608/24
**looked [2]**
545/11 581/25
**looking [7]**
535/2 536/21
556/25 563/1
582/7 604/15
607/22
**looks [3]**
587/14 588/5
588/11
**lost [2]**
595/10 602/25
**lot [12]**
538/21 541/11
542/9 547/24
568/9 587/14
588/6 588/11
594/23 595/6
606/22 610/4
**lots [1]**
613/17
**loud [8]**
576/15 577/12
577/14 590/5
593/1 597/16
607/11 607/12
**lower [1]**
581/3

**M**

**madam [2]**
530/15 548/13
**Mainly [1]**
612/24
**makes [1]**
600/13
**making [5]**
533/15 556/8
580/19 591/10
602/5
**Mall [1]**
539/24
**man [2]** 594/16
594/17
**manipulate [1]**
600/7
**many [6]** 536/2
538/19 562/12
595/24 596/6
597/11
**map [1]** 544/21
**marble [1]**
576/16
**mark [1]** 551/6
**marked [1]**
530/6
**married [1]**
594/13
**material [1]**
589/15
**Matt [1]**
529/14
**matter [2]**
605/20 615/6
**may [8]** 529/19
532/25 544/2
556/10 556/20
561/6 561/18
566/4
**maybe [9]**
540/19 544/14
577/13 577/13
585/13 590/6
595/8 598/6
604/5
**McKenna [1]**
527/19
**MD [1]** 527/20
**Meadows [1]**
529/8
**mean [9]** 532/4
538/3 546/9
555/21 565/7
589/11 605/12
605/18 606/15
**meaning [1]**
607/12

**M**

**means [2]**
 573/14 605/13
**media [1]**
 540/21
**meet [1]**   568/8
**meeting [1]**
 593/5
**men's [1]**
 532/9
**mens [1]**
 579/25
**message [17]**
 547/14 548/2
 548/9 549/3
 549/7 550/6
 583/25 585/19
 586/13 586/16
 587/14 587/15
 587/19 588/7
 588/8 588/8
 603/21
**messages [2]**
 548/10 603/15
**met [2]**   580/22
 594/18
**metal [1]**
 601/21
**Metropolitan
 [2]**   564/8
 572/8
**MICHAEL [3]**
 527/18 529/13
 573/25
**might [2]**
 596/5 598/7
**Mike [1]**   574/3
**Miller [2]**
 549/25 550/1
**mind [5]**   538/3
 579/19 579/20
 594/25 604/12
**minor [1]**
 558/16
**minute [2]**
 566/11 603/14
**minutes [40]**
 530/12 532/14
 532/18 532/20
 533/1 535/19
 536/2 536/2
 539/23 542/15
 549/5 552/24
 553/13 553/21
 554/6 554/7
 556/5 558/10
 558/14 558/18
 561/1 566/16

 566/17 566/18
 566/19 567/22
 584/19 588/4
 592/22 593/22
 593/23 597/19
 600/20 603/9
 608/25 609/2
 609/18 610/1
 610/2 611/17
**misdemeanor [6]**
 572/12 572/16
 580/1 593/20
 607/18 611/12
**misdemeanors
 [2]**   580/6
 581/3
**misperceives
 [1]**   607/13
**mistake [1]**
 601/4
**MJOA [1]**
 567/13
**moment [10]**
 536/10 536/12
 536/20 538/22
 544/2 553/25
 566/7 570/4
 586/7 611/9
**Monday [2]**
 612/17 613/25
**montage [1]**
 571/15
**more [16]**
 539/25 567/1
 570/6 570/12
 571/1 571/11
 572/10 582/2
 599/1 604/6
 609/5 609/7
 610/4 610/10
 612/16 612/25
**morning [2]**
 547/3 586/25
**most [5]**   541/1
 546/10 546/11
 546/12 585/4
**mother [2]**
 539/25 594/21
**motion [2]**
 567/8 567/19
**motive [1]**
 603/4
**Mount [1]**
 543/12
**mouth [1]**
 575/5
**move [6]**
 530/18 534/4

 534/10 567/1
 581/6 590/20
**moved [2]**
 534/8 601/13
**moves [3]**
 559/22 583/2
 609/14
**moving [1]**
 606/20
**MPD [4]**   561/15
 561/16 562/21
 562/22
**Mr. [85]**
 529/13 529/16
 544/7 550/13
 551/5 551/9
 551/21 552/3
 552/22 553/14
 555/5 555/17
 556/25 558/25
 561/25 563/1
 564/12 566/5
 567/12 572/23
 591/9 594/6
 594/9 594/12
 594/23 595/4
 595/5 595/5
 595/6 595/7
 595/9 595/9
 595/10 595/12
 595/20 595/22
 596/1 596/8
 596/12 596/13
 596/15 596/17
 597/2 597/6
 597/10 597/12
 597/14 597/19
 598/10 598/16
 599/1 599/18
 600/5 600/7
 600/15 600/17
 600/17 600/18
 600/24 601/6
 601/8 601/12
 601/21 602/3
 602/20 603/1
 603/6 603/19
 604/7 604/20
 605/2 605/13
 606/23 607/2
 607/4 607/9
 608/5 608/18
 608/22 608/22
 609/1 609/20
 612/25 613/8
 613/24
**Mr. Ballard [2]**
 600/17 600/17

**Mr. Bayline [4]**
 551/5 551/21
 552/3 552/22
**Mr. Brennan [1]**
 566/5
**Mr. Dreher [3]**
 555/17 556/25
 558/25
**Mr. Jones [51]**
 529/16 544/7
 550/13 551/9
 553/14 555/5
 561/25 563/1
 564/12 572/23
 591/9 594/9
 594/12 595/4
 595/5 595/9
 595/9 595/12
 595/20 595/22
 596/1 596/8
 596/12 596/15
 596/17 597/10
 597/12 597/14
 597/19 598/10
 599/18 600/7
 600/15 600/18
 600/24 601/12
 601/21 602/3
 602/20 603/1
 603/6 603/19
 604/7 604/20
 605/2 605/13
 607/2 607/4
 608/5 609/1
 609/20
**Mr. Jones' [17]**
 567/12 594/6
 594/23 597/2
 598/16 599/1
 600/5 601/6
 601/8 606/23
 607/9 608/18
 608/22 608/22
 612/25 613/8
 613/24
**Mr. Michael [1]**
 529/13
**Mr. Pence [1]**
 597/6
**Mr. Trump [4]**
 595/5 595/6
 595/7 595/10
**Mr. Trump's [1]**
 596/13
**Ms. [9]**   529/7
 529/7 550/17
 554/4 558/3
 558/10 558/18

 562/1 563/3
**Ms. Ashli [5]**
 550/17 558/3
 558/10 558/18
 562/1
**Ms. Babbitt [1]**
 554/4
**Ms. Green's [1]**
 563/3
**Ms. Sonia [1]**
 529/7
**Ms. Tamica [1]**
 529/7
**much [4]**   584/7
 600/14 612/20
 614/14
**multiple [1]**
 574/10
**munitions [5]**
 575/6 575/24
 576/24 601/11
 609/12
**MURPHY [2]**
 527/12 529/7
**must [3]**   577/3
 592/6 592/11
**myself [2]**
 604/18 606/22

**N**

**Nah [1]**   586/19
**naive [3]**
 604/5 604/6
 610/10
**name [4]**
 531/14 551/18
 562/13 564/9
**Nate [2]**
 549/25 550/1
**national [2]**
 585/16 588/17
**natural [3]**
 592/14 592/18
 607/6
**near [3]**   559/2
 559/2 610/20
**necessarily [1]**
 533/24
**need [14]**
 553/12 578/2
 578/4 580/18
 580/23 580/24
 581/2 610/4
 611/17 612/16
 613/14 613/24
 614/1 614/11
**needed [1]**
 610/15
**needs [3]**

## N

**needs... [3]**
530/24 611/15 614/18

**new [2]** 567/8 567/9

**news [3]**
585/16 586/11 588/17

**next [10]**
533/15 537/16 540/5 549/23 549/24 569/15 585/5 591/23 593/5 612/18

**night [2]**
542/2 543/15

**nine [19]**
544/14 544/15 572/25 577/24 578/3 578/6 578/10 578/13 578/18 578/20 578/23 579/7 579/16 580/7 580/14 580/23 593/21 609/24 611/12

**nobody [6]**
536/18 537/3 537/22 537/23 539/4 552/2

**noise [1]**
582/20

**non [1]** 601/10

**None [3]**
531/17 608/3 612/3

**nonfatal [1]**
601/11

**nonlethal [4]**
574/24 575/6 575/24 576/24

**noon [1]**
596/13

**nose [1]** 575/5

**note [1]**
568/16

**notice [6]**
535/5 535/7 612/21 614/12 614/13 614/15

**noticed [1]**
545/10

**notification [1]** 573/20

**notify [1]**
549/15

**notion [5]**
604/20 607/2 607/5 607/11 607/15

**November [3]**
595/13 609/4 612/25

**November 14 [1]**
612/25

**nudging [1]**
559/1

**number [8]**
548/17 551/18 557/10 562/13 564/9 571/10 571/24 597/10

**numbered [2]**
588/9 588/10

**NW [3]** 527/13 527/16 527/24

## O

**oath [3]**
529/17 589/14 603/20

**object [3]**
530/20 530/22 565/10

**objection [2]**
531/21 581/16

**observed [2]**
582/21 583/6

**obstruct [9]**
570/12 581/9 581/11 589/24 592/15 604/21 605/17 605/21 607/7

**obstructed [1]**
607/3

**obstructing [2]**
570/6 592/13

**obstruction [2]**
579/5 581/7

**obviously [5]**
550/14 568/5 594/4 604/4 606/24

**occasion [1]**
599/1

**occurred [10]**
542/17 554/17 555/21 556/13 556/15 557/2 562/16 564/1 571/16 608/25

**occurring [2]**
571/25 581/22

**occurs [6]**

558/3 558/5 585/20 588/7 588/11 588/12

**off [11]** 536/1 537/13 556/24 566/9 573/14 574/7 575/16 576/16 587/6 588/2 592/3

**offense [3]**
568/23 569/22 579/14

**offenses [5]**
568/10 580/10 581/4 593/20 610/13

**offering [1]**
602/20

**office [1]**
595/5

**officer [31]**
535/16 535/17 542/3 543/6 551/9 551/15 558/25 559/21 560/8 560/11 562/18 562/23 563/7 564/7 564/9 565/24 566/2 569/18 570/17 570/22 573/18 584/22 584/23 585/3 585/10 601/19 601/25 602/19 602/19 605/3 608/2

**officers [34]**
535/20 536/1 536/7 537/11 537/16 538/20 541/17 541/24 542/1 550/20 550/21 550/24 552/10 552/12 555/15 561/15 561/16 561/22 570/7 570/13 570/17 571/20 574/23 584/19 584/24 592/25 601/23 604/22 604/24 605/1 605/22 606/5 608/3 611/3

**officers' [1]**
575/17

**official [13]**

527/23 570/18 577/6 579/5 581/7 581/9 581/12 589/25 592/13 592/16 607/3 607/7 615/3

**old [2]** 544/13 544/15

**once [5]** 561/4 574/7 593/7 600/3 611/21

**one [54]** 530/1 531/10 531/18 532/15 535/24 536/15 537/11 540/17 540/18 540/20 541/18 546/2 546/3 549/24 552/1 555/7 557/3 557/21 558/17 561/25 562/22 564/6 565/17 565/18 568/15 570/4 570/6 570/12 579/2 580/3 581/1 582/8 582/16 582/17 583/23 585/22 586/7 587/5 588/1 593/18 597/22 599/1 599/24 600/1 601/24 602/19 603/21 603/22 603/24 604/16 605/23 605/23 609/1 611/11

**ones [5]** 543/7 562/22 579/9 579/10 580/14

**only [15]**
553/2 554/7 561/1 570/22 571/19 574/21 579/22 582/1 590/2 594/6 602/22 607/16 608/7 608/22 609/1

**onto [2]** 565/1 598/4

**open [10]**
560/5 575/22 576/7 597/11 597/12 601/15

601/16 607/25 609/14 609/15

**opportunity [4]**
530/5 558/13 562/2 569/2

**opposed [3]**
548/9 583/4 604/1

**opposite [1]**
553/15

**order [2]**
566/13 569/16

**orderly [2]**
577/5 608/7

**originally [1]**
589/9

**other's [1]**
601/25

**others [3]**
597/3 597/3 601/17

**otherwise [2]**
573/14 575/16

**out [42]**
533/22 533/25 534/2 534/8 534/12 534/14 535/15 535/18 536/15 537/1 538/25 539/18 539/20 539/21 541/3 541/6 542/1 543/7 546/1 546/25 550/2 559/1 561/14 561/22 564/3 574/4 584/25 585/3 585/5 585/12 587/3 587/13 588/6 588/19 589/22 590/15 597/15 601/19 607/13 610/22 612/2 612/3

**outline [5]**
531/9 572/14 572/15 574/25 576/11

**outlined [4]**
568/24 570/3 577/13 589/20

**outlines [2]**
571/17 581/21

**outside [17]**
535/20 539/2 541/24 545/20 565/11 565/24

**O**

**outside... [11]**
566/2 583/19
590/3 591/3
593/4 593/15
602/10 610/16
610/20 610/24
611/7

**over [11]**
561/12 562/8
567/2 573/7
573/9 574/14
582/10 590/21
598/15 599/9
603/7

**overloaded [1]**
541/13

**owe [1]** 542/25

**Owensboro [1]**
548/4

**own [1]** 596/20

**P**

**p.m [13]** 527/6
554/5 554/6
554/14 555/1
555/5 567/23
567/24 574/3
587/7 587/8
597/13 614/23

**packed [2]**
552/20 553/18

**page [5]** 528/2
528/9 528/15
581/20 613/6

**Pardon [2]**
599/15 605/6

**parked [2]**
539/12 539/13

**part [2]** 572/6
604/3

**participating
[1]** 561/13

**particular [2]**
564/18 564/20

**particularly
[1]** 595/4

**parties [3]**
568/17 569/14
572/6

**partner [1]**
529/13

**past [3]**
591/10 591/13
609/13

**path [2]**
539/16 564/20

**Peace [1]**
596/14

**Pence [3]**
573/25 574/3
597/6

**people [28]**
534/1 534/2
535/4 535/25
536/3 536/3
536/5 537/5
539/22 542/9
547/24 550/24
551/23 552/6
552/20 553/18
565/2 571/10
571/24 574/11
586/20 594/18
595/10 595/24
596/6 597/11
601/14 609/13

**per [1]** 611/25

**Percenter [1]**
603/20

**perfectly [1]**
604/19

**performance [3]**
569/18 570/18
572/9

**perhaps [4]**
543/6 572/10
592/23 601/16

**period [4]**
531/7 554/9
558/13 558/15

**permission [1]**
613/23

**permits [1]**
602/3

**person [13]**
533/14 534/24
536/16 548/12
573/15 577/17
578/15 594/10
594/24 600/13
607/17 609/9
609/18

**personal [2]**
584/20 588/19

**persons [1]**
571/1

**phone [19]**
541/3 541/6
541/10 542/14
543/9 548/12
548/20 551/18
562/13 564/9
571/9 585/25
587/10 588/9
588/10 588/12

588/13 588/13
603/15

**photo [2]**
585/16 586/23

**photograph [5]**
542/18 574/9
586/4 586/10
588/17

**photographs [3]**
531/11 540/24
612/24

**phrase [1]**
565/4

**phrased [1]**
556/16

**physical [2]**
577/17 602/11

**pick [1]**
548/12

**picked [2]**
542/14 543/9

**picture [3]**
541/15 551/25
553/21

**piece [1]**
600/4

**piercing [1]**
576/15

**place [2]**
537/16 599/16

**placed [1]**
610/25

**Plaintiff [1]**
527/4

**plan [1]**
613/10

**play [9]**
530/12 532/13
532/25 534/17
535/11 538/9
559/21 561/8
607/9

**played [24]**
533/2 534/18
535/13 538/11
550/12 551/7
551/22 552/4
561/10 562/25
563/19 563/24
564/4 573/2
574/18 575/2
575/3 575/12
576/14 577/10
577/23 592/21
599/1 599/3

**playing [5]**
530/17 559/24
563/23 576/6

583/14

**plays [1]**
598/16

**plaza [1]**
574/23

**please [14]**
529/4 529/22
530/11 530/12
532/25 538/10
542/7 547/21
551/6 551/21
552/3 552/22
554/11 586/15

**podium [1]**
529/4

**point [32]**
530/1 531/10
533/7 533/10
533/19 534/4
535/14 539/6
540/22 548/7
554/1 558/7
558/16 558/17
561/14 571/9
573/21 575/14
582/12 582/16
582/17 582/18
583/3 587/9
587/13 588/6
588/15 588/16
589/22 590/15
597/14 608/18

**pointed [2]**
608/25 610/22

**pointing [1]**
562/3

**pole [2]** 593/3
593/14

**police [46]**
531/10 534/12
535/15 535/20
536/1 536/5
536/7 536/11
536/25 537/7
537/16 538/17
538/20 541/17
541/21 542/3
550/19 550/21
551/9 551/15
555/15 562/18
562/21 564/7
564/9 565/24
572/2 572/8
572/8 575/25
576/1 576/24
582/5 582/10
582/12 582/16
584/6 584/8

585/2 592/25
601/10 601/19
601/23 605/3
608/2 611/3

**political [1]**
595/7

**politically [1]**
595/4

**poor [3]**
597/21 597/21
609/1

**poorly [3]**
598/7 602/5
605/13

**portions [1]**
572/11

**position [8]**
563/17 580/16
599/21 599/23
606/1 606/10
606/17 606/18

**possible [3]**
584/10 612/21
614/15

**Possibly [1]**
544/12

**posted [4]**
573/14 574/7
575/15 581/20

**potentially [2]**
589/12 589/14

**precisely [1]**
589/20

**prepared [1]**
611/17

**presence [1]**
604/11

**present [5]**
552/10 552/12
571/10 574/1
575/1

**presented [7]**
571/4 571/14
574/9 575/1
581/13 586/5
589/19

**president [7]**
573/22 573/25
573/25 574/3
578/13 593/5
608/4

**president's [1]**
573/20

**presidential
[1]** 576/3

**presumably [1]**
596/2

**pretrial [3]**

## P

pretrial... [3] 531/2 531/20 568/7

previous [2] 567/11 567/17

previously [1] 577/19

printed [2] 612/2 612/3

prior [8] 530/6 530/17 534/19 544/10 544/20 546/24 572/13 600/2

probable [3] 592/15 592/18 607/6

probably [8] 534/2 543/14 546/19 548/3 561/2 562/5 563/14 612/17

problem [1] 596/11

proceed [2] 529/19 568/1

proceeding [9] 579/5 581/7 581/10 581/12 589/25 592/13 592/16 607/3 607/8

proceedings [2] 614/23 615/5

process [8] 597/17 598/14 598/20 603/7 603/18 604/3 604/5 610/14

produced [1] 584/1

proffered [1] 532/1

profoundly [1] 594/24

prohibited [1] 608/2

proof [1] 609/21

property [9] 571/3 571/13 572/13 572/15 572/18 572/19 572/19 577/17 577/22

protect [1] 571/20

protected [1] 573/15

protecting [1] 574/5

Proud [1] 603/20

prove [2] 607/1 609/20

provide [8] 531/14 541/21 573/24 584/16 584/23 611/15 612/3 612/8

provided [8] 573/19 574/22 574/24 576/10 577/7 586/23 589/17 610/11

providing [2] 584/20 611/23

proximate [1] 614/6

proximity [2] 577/4 577/18

public [1] 570/25

pull [4] 529/22 534/15 559/5 586/13

pulling [1] 598/5

punish [2] 579/8 579/8

purpose [1] 570/5

push [1] 575/22

pushed [11] 534/12 538/25 561/14 564/3 576/1 579/23 582/10 582/17 583/7 604/24 604/25

pushes [2] 583/10 583/12

pushing [5] 536/25 542/1 572/1 576/1 584/25

put [4] 530/22 558/23 568/25 612/23

putting [1] 568/21

## Q

quick [2] 572/11 586/13

quickly [2] 568/16 572/10

quite [3] 538/21 541/3 541/6

## R

rack [1] 596/17

racks [1] 604/24

radio [1] 584/2

rain [1] 594/19

rally [3] 549/10 595/14 595/16

ran [4] 536/1 537/13 595/7 596/10

rather [2] 601/20 602/2

rea [1] 579/25

reach [1] 585/5

reached [5] 546/25 550/2 565/22 568/17 572/7

reaches [1] 585/12

reaching [1] 569/14

react [1] 538/2

reaction [2] 537/21 602/11

read [1] 589/8

reading [2] 596/19 596/20

reads [2] 583/25 584/4

ready [4] 529/19 564/2 567/25 568/3

real [1] 586/13

really [10] 550/9 565/9 568/9 569/14 571/12 574/6 581/21 583/4 604/2 607/13

reason [9] 547/6 547/8 556/16 564/12 577/8 584/11 584/12 584/14

588/24

reasonable [3] 593/17 607/1 610/12

rebuttal [5] 528/12 566/15 566/19 593/23 610/8

recall [1] 598/8

receives [2] 583/25 586/21

recently [1] 611/18

recess [6] 567/7 567/23 608/11 608/12 608/13 614/22

recessed [3] 596/17 597/8 597/8

recommend [1] 613/24

record [7] 529/5 531/2 556/24 566/9 567/24 576/9 615/5

recording [1] 541/14

recovered [2] 546/5 546/21

RECROSS [1] 565/19

RECROSS-EXAMINA TION [1] 565/19

rectangular [1] 592/9

red [8] 534/20 534/24 543/17 545/24 547/9 596/1 600/10 600/13

redirect [5] 528/5 544/4 544/5 565/11 565/16

redundant [1] 578/17

refer [1] 567/17

reflection [1] 567/20

regretted [1] 598/9

related [2] 568/18 589/18

relation [1] 560/16

relationship [1] 590/16

relevance [2] 553/10 553/11

relevant [2] 531/3 532/4

relying [1] 596/23

remain [3] 529/17 551/20 564/13

remained [3] 531/10 576/22 577/1

remember [7] 539/16 540/20 547/17 547/18 563/10 565/5 611/25

remembers [2] 555/8 568/7

remind [3] 531/5 572/5 583/15

remotely [1] 608/8

remove [1] 584/6

removed [2] 560/12 604/23

removes [2] 560/8 560/12

renew [1] 567/8

repeat [2] 554/12 606/22

repeatedly [1] 550/7

Reporter [3] 527/22 527/23 615/3

reposted [1] 581/15

represent [1] 557/13

representations [1] 556/8

require [1] 578/11

requirement [2] 579/16 580/9

requires [1] 592/13

researched [1] 569/22

resident [1]

## R

**resident... [1]**
613/9
**respective [1]**
568/9
**respond [1]**
547/23
**responded [2]**
542/8 547/24
**responds [2]**
586/16 586/18
**response [4]**
542/21 567/15
570/23 593/7
**rest [2]** 540/7
540/11
**restricted [31]**
573/4 573/6
573/12 573/14
573/22 574/6
574/6 574/8
574/11 574/14
574/23 574/25
575/9 575/16
575/18 576/3
576/5 576/19
576/22 577/1
577/4 577/18
577/20 577/20
578/11 578/14
581/24 601/7
601/20 602/1
607/24
**restriction [1]**
609/16
**restroom [8]**
532/9 540/12
554/2 558/13
562/3 562/8
592/6 592/11
**rests [1]**
566/10
**resumed [1]**
595/15
**return [3]**
613/14 613/24
614/1
**Returning [1]**
575/10
**reverse [1]**
569/15
**review [1]**
530/5
**reviewed [1]**
541/3
**RICHARD [1]**
527/9
**right [71]**

530/3 530/6
530/10 530/25
531/10 532/11
533/22 534/1
534/5 535/9
535/15 535/20
536/6 536/19
537/1 537/15
539/8 539/14
539/15 540/4
540/7 540/14
541/7 542/15
543/5 543/25
549/12 550/17
551/2 553/1
557/24 557/25
558/1 559/5
559/19 559/19
560/1 560/17
561/3 561/11
561/15 563/17
563/18 563/20
563/20 565/15
567/25 568/3
568/15 578/15
587/9 587/19
590/24 591/2
591/14 591/15
591/16 591/19
591/23 593/4
593/22 597/12
602/10 602/11
606/20 611/1
611/2 611/14
611/15 613/7
613/19
**rioters [6]**
571/17 571/18
572/1 582/5
610/18 610/19
**room [4]**
527/24 576/16
592/9 592/10
**rooms [1]**
545/2
**Rotunda [2]**
557/3 583/21
**round [1]**
557/18
**route [1]**
595/17
**Rule [1]**
567/21
**ruling [4]**
552/23 567/21
580/19 612/15
**run [4]** 575/22
576/8 583/4

595/5
**running [6]**
576/4 576/12
582/19 583/7
591/10 610/21
**runs [1]**
582/21
**rush [1]**
597/15
**rushes [1]**
598/4

## S

**same [13]**
552/20 553/23
562/8 566/15
567/21 595/17
595/18 595/18
595/18 600/11
604/20 612/7
613/6
**sat [3]** 539/21
539/22 539/25
**saw [22]**
536/14 537/14
541/7 545/8
551/16 551/17
552/5 552/7
564/1 564/2
571/21 573/24
574/20 576/23
576/24 581/14
581/23 582/3
584/18 595/5
595/6 601/14
**saying [14]**
550/15 550/16
552/5 556/19
557/20 566/20
579/13 596/25
600/2 602/15
603/21 605/19
613/22 614/12
**scaffolding [5]**
571/9 575/15
576/2 582/4
582/9
**scene [7]**
531/11 537/7
538/4 540/25
541/25 552/11
602/17
**school [2]**
565/4 565/8
**scope [1]**
565/11
**screaming [1]**
590/3
**screen [12]**

548/15 553/6
557/24 558/1
559/17 568/21
569/1 571/7
571/16 574/2
590/12 590/14
**scrim [2]**
582/13 582/14
**se [1]** 611/25
**seat [1]**
546/19
**seated [1]**
529/12
**second [12]**
551/6 566/14
569/14 569/16
569/19 572/6
572/18 581/10
581/10 582/11
590/9 595/8
**seconds [15]**
530/13 532/14
533/1 534/17
534/17 535/12
535/20 538/9
551/8 552/24
553/8 553/13
553/21 562/5
601/18
**Secret [3]**
573/16 573/19
574/4
**secured [1]**
574/5
**seeing [1]**
586/19
**seek [2]**
572/14 597/15
**seeking [1]**
588/19
**seem [1]** 551/8
**seemed [1]**
606/15
**seems [1]**
579/6
**sees [3]**
609/14 612/14
613/3
**seizure [1]**
546/24
**Senate [3]**
583/20 596/17
597/8
**Senator [1]**
581/16
**sense [1]**
594/16
**sent [1]**

547/21
**separate [2]**
576/20 578/25
**Service [3]**
573/16 573/19
574/4
**settled [1]**
549/24
**seven [16]**
577/24 578/3
578/5 578/10
578/12 578/17
578/20 578/22
579/3 579/6
579/16 580/6
580/13 580/23
609/24 610/1
**several [5]**
540/8 562/15
584/19 601/18
602/9
**shake [1]**
601/23
**shaking [1]**
605/19
**shape [1]**
579/14
**shared [1]**
573/4
**shook [2]**
605/2 608/2
**shooting [36]**
529/24 530/9
531/8 532/5
535/18 535/21
535/23 535/24
536/8 536/18
536/19 537/3
537/3 537/15
537/19 538/4
539/4 541/22
542/10 549/17
550/25 551/1
551/16 554/2
554/8 554/14
554/17 555/21
556/13 556/14
556/22 557/2
557/6 558/3
562/16 584/16
**short [2]**
548/10 609/21
**shortly [2]**
558/3 586/1
**shot [18]**
536/1 537/11
537/13 550/18
551/8 554/4

**S**

**shot... [12]**
555/13 555/14
557/5 557/8
558/11 558/19
558/21 558/23
562/1 562/5
602/8 602/25
**show [17]**
530/10 531/12
531/13 532/1
533/9 534/14
550/13 554/4
554/5 556/12
557/6 570/1
574/13 593/6
611/17 611/22
613/4
**showed [2]**
535/22 550/10
**showing [4]**
555/7 555/14
560/23 600/1
**shown [6]**
531/15 554/7
554/9 568/21
582/9 590/1
**shows [17]**
530/8 532/4
555/3 555/5
555/5 556/12
556/14 557/17
561/8 564/6
574/2 582/25
583/5 591/1
597/1 597/9
602/18
**side [21]**
535/23 537/11
537/12 539/19
539/20 539/23
539/24 543/25
550/14 550/22
552/9 552/10
560/21 560/22
562/19 564/7
566/15 567/1
582/10 605/5
605/10
**sideways [1]**
583/10
**sign [2]**   545/8
609/15
**significance
[1]**   558/5
**significant [1]**
558/17
**signs [1]**

608/1
**similar [1]**
577/25
**simple [2]**
601/4 602/25
**Simultaneously
[1]**   599/14
**single [2]**
536/16 565/23
**sit [1]**   545/15
**sitting [2]**
540/1 600/24
**situation [1]**
551/3
**six [12]**   573/3
573/12 576/20
577/15 578/8
578/10 578/10
578/12 578/16
580/25 607/21
607/22
**skip [1]**
572/12
**skipping [2]**
573/7 573/9
**slice [1]**
608/21
**smoke [2]**
582/20 609/14
**social [1]**
540/21
**somebody [8]**
579/21 601/2
601/4 602/16
602/18 602/22
602/25 609/10
**someone [4]**
543/3 548/8
562/13 602/8
**Somewhat [1]**
551/4
**son [1]**   594/22
**SONIA [2]**
527/12 529/7
**soon [1]**
536/15
**sorry [5]**
531/23 541/5
555/10 573/8
608/13
**sort [6]**
595/11 600/8
600/9 601/5
606/23 608/21
**sorts [1]**
595/25
**sought [1]**
585/3

**sound [2]**
576/9 576/25
**Southeast [1]**
539/14
**speak [3]**
549/16 563/7
601/24
**Speaker's [20]**
545/8 545/12
545/16 545/20
553/17 555/19
557/4 557/19
558/2 563/6
572/25 586/11
590/15 591/5
591/19 593/15
602/4 602/10
610/17 610/24
**speaking [1]**
606/23
**speaks [1]**
593/13
**speech [2]**
596/13 596/13
**speed [1]**
583/1
**spent [1]**
568/6
**spoke [4]**
562/20 583/23
585/25 600/19
**spoken [1]**
587/10
**staff [1]**
612/8
**stage [1]**
576/3
**stairs [1]**
552/15
**stairwell [2]**
591/11 591/22
**stamp [10]**
555/4 556/12
556/21 557/25
558/24 559/3
559/6 559/10
559/20 560/1
**stamped [5]**
555/18 555/20
555/23 557/15
557/23
**stand [8]**
529/16 529/16
584/9 598/10
599/10 599/25
603/24 614/22
**standard [6]**
580/4 580/12

580/22 587/21
588/4 609/21
**standing [8]**
533/15 537/16
545/20 554/16
563/13 589/20
611/1 611/2
**start [2]**
534/16 572/13
**Starting [1]**
529/3
**state [2]**
529/4 604/12
**stated [1]**
603/5
**statement [10]**
581/15 598/17
599/1 599/18
599/25 600/2
600/3 603/23
607/9 607/14
**statements [2]**
598/17 608/22
**STATES [13]**
527/1 527/3
527/10 528/10
528/12 529/3
529/9 544/11
565/22 568/4
572/20 573/19
610/8
**Statuary [1]**
590/23
**statute [2]**
570/24 573/13
**stay [3]**
538/15 584/5
584/9
**stayed [4]**
533/8 595/18
602/21 603/1
**staying [1]**
601/1
**step [1]**   566/4
**steps [2]**
539/20 592/3
**still [9]**
538/6 543/16
549/7 551/23
561/19 579/21
596/15 597/24
610/10
**stipulation [2]**
569/14 572/7
**stipulations
[3]**   568/10
568/17 568/18
**stood [1]**

537/22
**stop [10]**
540/11 565/24
577/13 584/3
590/7 595/21
596/9 597/16
598/13 598/20
**stopped [4]**
540/6 540/8
540/11 564/5
**stopping [1]**
574/11
**stops [2]**
540/3 583/9
**story [1]**
565/25
**straight [1]**
562/17
**Street [3]**
527/13 527/16
539/13
**strikes [1]**
580/13
**striking [1]**
572/24
**struck [2]**
593/3 610/16
**struggling [6]**
611/3 611/5
611/6 611/7
611/8 611/8
**stuck [1]**
561/21
**stuff [1]**
548/11
**submit [4]**
567/11 567/13
572/2 609/19
**submitted [3]**
572/21 574/14
611/18
**subsumed [1]**
578/18
**succeed [2]**
580/14 580/25
**successful [2]**
579/9 579/12
**sudden [1]**
598/4
**sufficient [2]**
593/17 610/11
**suggest [3]**
558/12 589/1
596/4
**suggested [1]**
596/8
**suggestion [1]**
600/10

## S

**suggestions [1]** 595/1

**suggests [1]** 579/22

**Suite [1]** 527/19

**summations [1]** 566/12

**supply [1]** 613/1

**sure [19]** 532/3 533/5 540/19 540/20 542/20 547/20 554/13 555/20 558/20 562/15 568/6 569/9 604/17 612/10 612/10 612/14 613/3 613/5 613/6

**surely [1]** 605/25

**surely not [1]** 605/25

**surprise [1]** 602/7

**surprises [1]** 569/10

**surveillance [5]** 541/2 541/7 571/22 576/9 583/18

**sustain [1]** 565/12

**system [2]** 566/13 576/9

## T

**table [1]** 529/13

**talk [4]** 538/17 549/3 562/18 564/6

**talked [3]** 542/14 549/5 600/16

**talking [7]** 551/11 551/13 551/14 557/21 599/7 602/14 603/17

**Tamica [1]** 529/7

**team [3]** 592/1 592/2 598/3

**teams [1]**

568/9

**tear [1]** 596/5

**telephone [6]** 542/17 548/9 549/6 587/20 587/21 588/3

**television [1]** 571/24

**telling [13]** 535/23 536/3 536/5 536/5 536/7 541/17 550/24 551/11 551/16 552/6 552/8 566/20 585/4

**tells [1]** 574/16

**temporarily [1]** 573/16

**term [2]** 573/5 595/12

**terms [3]** 580/17 604/16 608/6

**Terrace [2]** 555/9 555/11

**testified [11]** 529/23 532/5 533/21 539/9 541/24 575/6 596/12 598/14 601/12 602/21 603/6

**testifying [1]** 589/18

**testimony [14]** 531/4 534/20 536/10 567/12 567/20 573/17 573/24 595/2 597/3 597/5 600/15 603/14 603/23 603/24

**texts [1]** 586/14

**thereafter [1]** 586/1

**thinking [2]** 566/21 613/13

**third [7]** 568/16 569/13 570/16 570/21 572/6 572/19 592/12

**though [4]** 533/11 535/19 543/24 586/20

**thought [6]** 537/10 539/22 547/10 596/4 598/14 604/8

**threatened [1]** 571/12

**three [24]** 534/1 535/25 537/4 537/16 548/17 553/8 568/16 569/23 571/1 571/11 572/16 573/7 573/9 573/11 579/5 580/25 581/2 581/6 581/6 593/19 603/20 606/4 606/21 611/11

**Three Percenter [1]** 603/20

**threw [3]** 540/12 543/16 593/10

**throughout [2]** 581/25 603/9

**throw [5]** 540/10 581/1 582/9 582/15 582/18

**thumb [3]** 611/16 611/21 612/2

**thwart [2]** 596/10 604/9

**timeline [2]** 596/7 596/20

**times [5]** 541/11 562/12 562/15 565/6 572/25

**timing [1]** 534/7

**Title [3]** 580/6 580/7 580/10

**to a [1]** 562/20

**today [3]** 589/14 597/25 613/12

**told [33]** 529/24 537/6 537/24 538/12 539/13 540/6 542/6 542/12 542/15 542/25 543/8 543/10

545/24 546/25 547/4 547/7 549/9 549/10 549/11 550/3 553/17 562/3 575/11 575/17 577/8 577/9 577/11 584/9 589/12 590/4 592/20 593/9 598/10

**took [13]** 537/15 539/16 540/24 543/14 545/5 546/1 571/8 575/14 593/3 593/14 595/17 598/10 599/16

**total [1]** 566/16

**totality [1]** 608/24

**touched [1]** 607/24

**touches [1]** 606/24

**towards [13]** 534/8 552/14 553/16 553/17 555/13 557/14 559/22 563/6 563/11 563/21 582/19 582/21 596/16

**towers [1]** 541/13

**track [1]** 577/24

**transcript [2]** 527/9 615/5

**trial [18]** 527/9 530/6 541/3 541/7 568/6 568/12 568/24 570/3 571/4 572/13 572/21 573/17 574/13 581/13 600/1 601/12 613/16 613/21

**trials [1]** 613/17

**tried [6]** 558/12 564/11 584/5 584/8 598/1 608/21

**tries [1]**

600/6

**trip [1]** 612/25

**truck [10]** 539/10 539/12 539/13 539/17 540/2 543/12 543/19 543/22 546/12 565/22

**true [2]** 552/25 615/4

**Trump [5]** 595/5 595/6 595/7 595/10 597/23

**Trump's [1]** 596/13

**try [7]** 541/15 593/24 602/22 606/21 612/15 612/17 614/14

**trying [18]** 537/8 537/8 541/11 546/17 551/3 551/23 556/18 571/20 579/8 579/8 583/3 583/5 584/9 598/13 602/17 605/4 605/21 608/16

**Tuesday [4]** 612/16 612/17 613/9 614/1

**turn [1]** 549/14

**turned [6]** 535/8 535/14 553/20 562/17 564/5 595/15

**turns [1]** 583/9

**TV [1]** 586/20

**Twenty [2]** 544/20 610/1

**Twenty-five [1]** 544/20

**Twenty-seven [1]** 610/1

**two [17]** 536/17 537/16 555/6 561/25 569/16 570/8 570/21 581/1 581/1 593/21 599/18 599/23 600/23 600/25 603/16 603/16

**T**

**two... [1]**
611/12

**two-hour [2]**
599/18 599/23

**type [3]**
585/14 609/9
609/18

**typically [1]**
546/11

**U**

**U.S [3]**   527/23
573/18 597/19

**U.S.C [1]**
570/25

**Uh [1]**   566/8

**ulterior [1]**
603/4

**ultimately [8]**
533/18 569/15
571/11 582/25
584/15 588/18
589/10 589/19

**under [6]**
529/17 580/6
580/7 589/13
601/13 609/25

**undeterred [1]**
611/9

**UNITED [13]**
527/1 527/3
527/10 528/10
528/12 529/3
529/8 544/11
565/21 568/4
572/20 573/19
610/8

**unlawful [1]**
593/3

**up [30]**   529/16
529/22 531/10
534/15 542/14
543/9 545/11
548/12 548/14
553/2 553/4
556/9 557/18
559/5 559/15
568/9 583/12
586/13 589/7
589/11 590/10
590/14 590/18
592/2 592/22
594/1 597/4
598/2 601/5
604/19

**upon [4]**
567/20 583/11

606/24 607/25

**USAO [1]**
527/15

**USAO-DC [1]**
527/15

**use [13]**
530/24 532/22
540/12 540/18
547/13 566/18
566/25 567/5
567/6 567/6
593/25 599/24
608/16

**used [5]**   565/4
565/6 576/25
577/21 601/10

**using [6]**
531/21 531/24
531/25 558/25
566/16 608/17

**UTC [5]**   581/21
586/14 586/18
586/21 587/1

**V**

**vantage [3]**
533/10 571/9
575/13

**vehicle [2]**
546/5 546/6

**version [1]**
572/14

**versus [1]**
580/20

**via [1]**   548/9

**vice [7]**
573/20 573/22
573/25 573/25
574/2 578/13
608/4

**video [63]**
530/13 531/9
532/2 532/3
532/7 532/12
532/14 532/17
533/2 533/3
533/3 534/6
534/7 534/18
535/13 535/22
536/12 538/11
541/14 550/12
551/7 551/22
551/25 552/4
552/7 554/10
554/13 554/15
555/3 555/18
555/19 555/23
555/24 558/15
558/24 559/24

560/23 561/10
562/16 562/25
563/9 563/19
563/24 564/4
571/8 571/15
573/2 574/18
575/3 575/12
575/14 575/15
576/6 576/14
577/10 577/23
583/14 584/19
592/21 597/9
597/9 600/12
602/14

**video's [1]**
532/4

**videos [1]**
567/6

**videotapes [1]**
611/15

**view [1]**   564/4

**violation [1]**
572/16

**violence [2]**
571/1 577/17

**visit [1]**
573/20

**visiting [2]**
573/16 573/23

**voice [10]**
590/5 597/15
598/18 599/6
604/3 604/8
607/10 607/12
609/12 610/15

**voted [1]**
595/9

**W**

**walk [2]**   583/5
596/16

**walked [6]**
534/14 539/23
562/17 564/5
597/12 607/25

**walking [4]**
563/14 564/19
565/3 603/10

**walks [1]**
601/21

**want the [1]**
594/5

**wants [2]**
602/16 603/12

**warnings [1]**
575/25

**Washington [12]**
527/5 527/14
527/16 527/25

543/12 543/13
595/13 596/3
609/3 609/3
609/5 612/25

**waste [1]**
600/9

**way [25]**
548/10 553/15
553/18 553/20
553/24 556/15
560/17 567/2
574/7 575/20
575/22 579/14
583/7 583/12
591/10 597/16
598/9 598/18
598/21 600/19
601/21 602/3
604/4 604/25
609/6

**ways [1]**
601/22

**weaponry [2]**
574/24 596/4

**weapons [1]**
596/1

**wearing [1]**
596/5

**Wednesday [3]**
612/18 613/10
614/1

**week [1]**
612/18

**Welcome [2]**
529/10 529/15

**weren't [8]**
534/12 536/4
541/25 542/1
542/12 543/8
579/16 611/24

**west [9]**
539/19 539/24
555/9 555/11
560/22 571/17
571/22 574/23
582/6

**what's [11]**
530/5 531/21
553/10 553/21
556/25 560/1
579/22 579/23
580/13 586/6
588/15

**whenever [1]**
568/3

**whereas [1]**
573/11

**who's [4]**

529/12 542/3
549/21 603/19

**whole [3]**
532/16 594/5
597/16

**whose [2]**
546/5 564/20

**wife [3]**   546/8
613/8 613/24

**wife's [3]**
543/22 543/23
600/11

**willfully [5]**
572/19 578/22
579/22 579/24
580/20

**WILLIAM [2]**
527/18 529/11

**WILLIAMS [1]**
527/12

**willing [4]**
541/25 542/1
550/4 579/17

**willingly [1]**
600/11

**window [13]**
557/7 572/24
593/4 593/15
597/24 601/15
602/6 603/8
603/13 605/24
606/3 608/9
610/16

**wins [1]**   598/3

**within [6]**
543/10 575/4
575/18 578/18
578/23 601/18

**without [4]**
538/5 576/22
604/22 609/15

**witness [6]**
528/2 549/17
589/10 599/10
599/25 602/23

**witnessed [6]**
535/17 537/19
538/6 539/4
541/18 543/4

**witnesses [2]**
566/5 597/6

**wooden [1]**
593/3

**word [2]**
547/13 601/12

**words [6]**
578/11 583/3
590/6 608/17

**W**

**words... [2]**
609/4 609/5
**wore [1]**
595/18
**work [2]**
541/12 603/22
**working [1]**
560/4
**works [1]**
604/5
**worn [6]**
562/23 563/3
563/4 584/22
602/18 602/20
**wrong [3]**
593/9 593/12
600/9
**wrongfulness**
**[1]** 593/13

**Y**

**Y'all [1]**
584/3
**years [4]**
544/18 544/20
613/15 613/16
**yelling [1]**
591/4
**yellow [1]**
562/22
**yesterday [5]**
529/23 533/21
545/7 589/14
612/15
**young [1]**
544/12

**Z**

**zoom [1]**
590/20